**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| **MADSTAD ENGINEERING, INC., a Florida corporation, and MARK STADNYK, an individual,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO.: 8:12-CV-01589-SDM-MAP** <br> <u>Injunctive Relief Sought</u> |
| **U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS, in his official capacity as Director of U.S. PATENT AND TRADEMARK OFFICE, and THE UNITED STATES OF AMERICA,** | |
| **Defendants.** | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT**

## I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 65 and Local Rule 4.06, Plaintiffs Mark Stadnyk ("Stadnyk") and MadStad Engineering, Inc. ("MadStad") respectfully move this Honorable Court for a preliminary injunction against the America Invents Act of 2011, 125 Stat. 284 ("AIA").[1]

Since the days of Thomas Jefferson and Chief Justice John Marshall, our patent system has successfully operated according to the Constitution's premise that only the actual *inventor* of a discovery is entitled to a patent. The AIA changes this time-tested system –

---

[1] For the Court's convenience, the text of the AIA is contained in Exhibit A to the Declaration of Jonathan S. Massey submitted herewith ("Massey Decl.").

which has led the world in science, technology, and industry for more than two centuries – by awarding patents not to the first *inventors* of genuine *discoveries* but rather to the first to submit applications to the U.S. Patent and Trademark Office ("PTO").  The AIA is a radical change that discards the "First-to-Invent" ("FTI") patent system crafted by the framers and substitutes a "First-to-File" ("FTF") system that flies in the face of traditional practice and the Constitution.  FTF violates the Intellectual Property Clause, Article I, Section 8, Clause 8, which provides Congress with the power "[T]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  The constitutional text, purpose, and traditional understanding – as well as the weight of academic scholarship – all point to the same conclusion:  the Intellectual Property Clause bars Congress from vesting patents in anyone but the actual "Inventors" of genuine "Discoveries."

The issues presented in this Motion are purely legal issues (chiefly questions of constitutional law) that are ripe for decision in the context of a preliminary injunction. Assessing the constitutional validity of FTF will not require discovery or factfinding.  The question is a fundamental issue of law under the Intellectual Property Clause and squarely within the rightful province of this Court.

## II.     RELIEF REQUESTED/SPECIFIC CONDUCT TO BE ENJOINED

Pursuant to Local Rules 3.01(a) and 4.05(b)(3)(i), Plaintiffs state that Defendants, their employees, officers, and agents should be enjoined from enforcing the provisions of the America Invents Act, 125 Stat. 284 ("AIA"), against the Plaintiffs.

## III.     STATEMENT OF THE BASIS FOR THE REQUEST

Pursuant to Local Rule 3.01(a), Plaintiffs state that the basis of the request is Article I, Section 8, Clause 8 of the Constitution.

## IV.    ORAL ARGUMENT REQUESTED

Pursuant to Local Rule 3.01(j), Plaintiffs state that oral argument is requested.

## V.    STATUTORY BACKGROUND

Under the AIA, a patent will be awarded to the person who is first to file a patent application, regardless of whether the applicant was the actual first inventor of the technology in question, so long as the first filer has not "derived" its patented invention from another inventor who later filed for a patent.  AIA, Section 3(h), 125 Stat. 288-89.  Thus, although the AIA is nominally labeled as a "First-Inventor-to-File" system (rather than an explicit "First-to-File" scheme), that label is a mere smokescreen.[2]

The AIA creates an FTF system, plain and simple.  As the final Committee Report states, the Act "switches the United States to a first-to-file patent system."  H.R. Rep. No. 112-98, at 62 (2011).  The Report explained that "§102 is amended to make an invention's priority date its effective filing date. This change moves the United States to the first-to-file system."  *Id*. at 73.

The AIA removes from the "conditions of patentability" of Section 102 of the Patent Act (and thereby from the conditions of patent validity) the requirement that the named inventor actually invented the claimed subject matter.  In particular, Section 3(b)(1) of the AIA (125 Stat. 285-87) deletes the requirement in Section 102 of the Patent Act, 35 U.S.C. §

---

[2] *See* Michael A. Glenn and Peter J. Nagle, *Article I And The First Inventor To File: Patent Reform Or Doublespeak?* 50 IDEA 441, 457 (2010) (criticizing the label of "First-Inventor-to-File" as nothing but "doublespeak" and "clever manipulation of words").

102 (which sets forth conditions of patentability), that the patent holder be the actual inventor of the discovery in question.  The AIA eliminates Section 102(f), which formerly provided: "A person shall be entitled to a patent unless … he did not himself invent the subject matter sought to be patented."  Section 102(f) played a key role in the FTI system because it made "the naming of the correct inventor or inventors a condition of patentability; failure to name them renders a patent invalid."  *Pannu v. Iolab Corp*., 155 F.3d 1344, 1351 (Fed.Cir.1998).  Until now, the requirement of Section 102(f) has been rigorously enforced.  *E.g., Checkpoint Systems, Inc. v. All-Tag Sec. S.A.,* 412 F.3d 1331, 1337-38 (Fed. Cir. 2005); *Rosco, Inc. v. Mirror Lite Co*., 304 F.3d 1373, 1376 (Fed. Cir. 2002); *Solomon v. Kimberly-Clark Corp*., 216 F.3d 1372, 1381-82 (Fed. Cir. 2000); *Gambro Lundia AB v. Baxter Healthcare Corp*., 110 F.3d 1573, 1576-77 (Fed. Cir. 1997); *New England Braiding Co., Inc. v. A.W. Chesterton Co*., 970 F.2d 878, 883-84 (Fed. Cir. 1992).

Section 3(b)(1) of the AIA deletes Section 102(f).  The AIA also eliminates an entire subsection in Section 102 of the Patent Act that previously created the substantive and procedural requirements for ensuring that only the first inventor receives a patent (35 U.S.C. §102(g)).

In addition, Section 3 of the AIA deletes or rewrites numerous references to priority of inventorship in the Patent Act and makes the patent process turn on the "effective filing date" of an application (as defined in new Section 100(i)(1), added by Section 3(a) of the AIA, 125 Stat. 285).  For example, the AIA amends existing Section 102(a) of the Patent Act (dealing with novelty and prior art) to provide that prior art will be measured from the filing date of the patent application rather than the date of invention.  AIA Section 3(b)(1), 125

Stat. 286.   The AIA amends Section 103 so that a claimed invention's obviousness is measured against the prior art that existed at the time of the invention's effective-filing date, rather than at the time the inventor made it.   AIA Section 3(c), 125 Stat. 287.

As a result of the change to FTF, the Act eliminates reference to "interferences" in §§ 134, 135, 146, 154 and 305 of Title 35.   AIA Section 3(j), 125 Stat. 290.   Previously, interference proceedings were the means by which competing patent claims were resolved on the basis of each inventor's respective actual date of invention.   Under the AIA, "an interference" is replaced by "a derivation proceeding," in which a board within the PTO will determine whether the inventor named in an earlier-filed application derived the subject matter from the inventor of a later-filed application.   AIA Section 3(i), 125 Stat. 289-90.

All of these changes replace FTI with FTF throughout the patent system.   The AIA does not contain an effective statutory requirement that the applicant be an "inventor" for a patent to be valid.   The AIA awards patents not to the actual inventors of genuine discoveries but rather to the first filers to invoke the administrative process of the PTO.   Although the AIA retains two provisions of the Patent Act relating to inventorship, neither alters the FTF system.[3]   The AIA does not provide any mechanism for the invalidation of a patent on the ground that the applicant is not the genuine inventor of a discovery.

---

[3] First, Section 101 of the Patent Act continues to provide that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, *subject to the conditions and requirements of this title*." 35 U.S.C. § 101 (emphasis added). As the Supreme Court has explained, "Section 101 defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 130 S.Ct. 3218, 3225 (2010). But it does not prescribe the procedures by which patents are granted and in fact provides that patents may be obtained "subject to the conditions and requirements of this title," which under the AIA is an FTF system.

The enactment of FTF was highly contentious, and many Members of Congress disputed its constitutionality. *E.g.*, 157 Cong. Rec. S1096-97 (Mar. 2, 2011) (remarks of Sen. Boxer); *id.* at H4384-85, H4421 (June 22, 2011) (remarks of Rep. Kaptur); *id.* at H4421-22, H4423 (remarks of Rep. Sensenbrenner); *id.* at H4422 (remarks of Rep. Garrett); *id.* at H4428-29 (remarks of Rep. Manzullo); *id.* at H4491 (June 23, 2011) (remarks of Rep. Sensenbrenner); *id.* at E1191 (statement of Rep. West). Indeed, the House took the highly unusual step of designating a period of debate exclusively for consideration of the constitutional questions raised by the AIA. 157 Cong. Rec. H4382 (June 22, 2011) (remarks of Rep. Nugent) ("I'm proud to say this is the first time ever, the first time ever this rule actually specifically designates 20 minutes for debate devoted exclusively to the constitutionality concerning H.R. 1249.").

## VI.    ARGUMENT

---

Next, the AIA amends Section 115 of the Patent Act, requiring an oath by a patent applicant to the effect that the "individual believes himself or herself to be the original inventor or an original joint inventor of a claimed invention." AIA Section 4(a)(1), 125 Stat. 294. But the oath requirement is no substitute for an actual inventorship standard. A person might honestly but mistakenly believe himself or herself to be an inventor and swear a truthful (but incorrect) oath. Section 115 contains no provision invalidating a patent for a false oath, let alone a mistaken one. Even if a false oath might qualify as "inequitable conduct" authorizing the PTO to invalidate a patent, the doctrine of inequitable conduct would require a challenger to prove intent by clear and convincing evidence, *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067 (1989) — a high standard indeed. Moreover, the AIA waters down the oath requirement by allowing the applicant to file a substitute statement in lieu of an inventor's oath if the original inventor cannot be reached after a diligent effort, or refuses to execute the oath but is under an obligation to assign the invention; the AIA permits the required statements — the inventor's authorization and confirmation statements — simply to be added to the inventor's assignment of the invention; and the AIA allows the applicant to replace or correct the oath or substitute statement at any time and provides that "[a] patent shall not be invalid or unenforceable based upon the failure of the applicant to comply" with § 115 if the failure is thereafter remedied. AIA Section 4(a)(1), 125 Stat. 294-95.

## A.     LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc); *see also Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir.2003) (same factors).

## B.     PLAINTIFFS CAN ESTABLISH PROBABLE SUCCESS FOR BOTH COUNTS IN THE COMPLAINT.

### 1.     First-to-File Is Unconstitutional.

Constitutional interpretation begins with text.  "[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." *National Federation of Independent Business v. Sebelius*, 132 S.Ct. 2566, 2586 (2012) (opinion of Roberts, C.J.) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 188 (1824)).

Article I, Section 8, Clause 8 of the Constitution provides Congress with the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." This language "is both a grant of power and a limitation." *Graham v. John Deere Co.*, 383 U.S. 1, 5 (1966).  As Justice Douglas observed, "Congress does not have free rein . . . to decide that patents should be easily or freely given." *Great A. & Pac. Tea Co. v. Supermarket Equip. Co.*, 340 U.S. 147, 154 (1950) (concurring opinion).  "The Intellectual

Property Clause is unique in that it is the only one of the Enumerated Powers where the drafters mandated 'a specific mode of accomplishing the particular authority granted,' *i.e.,* 'by securing exclusive rights for limited times to authors and inventors in their respective writings and discoveries.'" *Figueroa v. U.S.*, 66 Fed.Cl. 139, 149 (Fed.Cl. 2005) (citation omitted). Hence, the specific terms – and the reference to "Inventors" and "Discoveries" – must be taken as significant.

A 1785 dictionary published by Samuel Johnson defined an "inventor" as "one who produces something *new*; a devisor of something *not known* before" and a "discoverer" as "one that finds anything unknown before."[4]  Webster's Dictionary of 1828 (the first American dictionary) defined "inventor" as "[o]ne who finds out something new; one who contrives and produces any thing not before existing,"[5] and "discovery" as "[t]hat which is discovered, found out or revealed; that which is first brought to light, seen or known. The properties of the magnet were an important discovery."[6]  The constitutional text thus plainly refers to actual inventors who make genuine discoveries, not to government-anointed winners of a race to the patent office.

Early Acts of Congress are often considered to be highly probative of constitutional intent, because of the 55 delegates at the Convention, 19 later served as Senators and 13 as

---

[4]  Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) (emphasis added) (attached hereto as Massey Decl., Exhibit B).

[5]  Available at http://1828.mshaffer.com/d/word/inventor.

[6]  Available at http://1828.mshaffer.com/d/word/discovery.

Representatives.[7]  The first patent statutes strongly support FTI.  The Patent Act of 1790,

enacted in the second session of the First Congress, authorized the grant of a patent to one

having "invented or discovered any useful art . . . not before known or used," Patent Act of

1790, § 1, 1 Stat. 109-110, and provided for repeal of a patent "if it shall appear that the

patentee was not the first and true inventor."  *Id.* at § 5, 1 Stat. 111.  During the drafting of

the bill, the House committee decided not to follow the English practice of extending patent

rights to the "first importers" of overseas inventions.  A "first importer" is not equivalent to

an inventor, and Rep. Thomas Fitzsimmons wrote: "The 6th Section, allowing Importers, was

left out, the Constitutional power being Questionable."[8]  Madison also voiced concern that

patents of importation were unconstitutional, and judicial decisions refused to recognize

them.[9]

     The Patent Act of 1793 similarly authorized the issuance of a patent on the basis of a

petition demonstrating not that the applicant was the first filer, but rather that the applicant

had "invented any new and useful art, machine, manufacture or composition . . . not known

or used before the application."  Patent Act of 1793, § 1, 1 Stat. 318-19.  The 1793 Act

permitted a defendant to plead for a declaration of invalidity if "the thing, thus secured by

patent, was not originally discovered by the patentee," *id.* at § 6, 1 Stat. 322, and provided for

---

[7] Rebecca C.E. McFadyen, *The "First-to-File" Patent System: Why Adoption Is Not An Option!* 14 RICH. J.L. & TECH. 3, 44 & n.242 (2007).

[8] Quoted in Karen E. Simon, *The Patent Reform Act's Proposed First-to-File Standard: Needed Reform or Constitutional Blunder?* 6 J. MARSHALL REV. INTELL. PROP. L. 129, 141 & n. 95 (2006-2007).

[9] *Id.*

the repeal of a patent if the "patentee was not the true inventor or discoverer."  *Id.* at § 10, 1 Stat. 322.

The 1793 Act also created the first interference provision, an administrative procedure for resolving competing claims to the same invention.  In one of the best known early cases, involving four claimants to a steamboat patent, the Patent Board *rejected* the proposal that the patent should be awarded to the first person to file an application.[10] Thomas Jefferson served as one of the members of the original Patent Board, and his role in the decision to reject FTF is significant.[11]  The Supreme Court has recognized Jefferson's influence on American patent law.  *Graham*, 383 U.S. at 7.

The courts' early construction of "Inventor" further indicates that the first-to-invent standard was the commonly understood meaning at the time of the Constitution's adoption. For example, Chief Justice John Marshall explained that the law recognized a property right in the inventor "from the moment of invention," which was "only perfected by the patent." *Evans v. Jordan*, 8 Fed. Cas. 872, 873-74 (C.C.D.Va. 1813).  In 1829, the Supreme Court opined that, under the Constitution, "the right is created by the invention, and not by the patent."  *Pennock v. Dialogue*, 27 U.S. 1, 12 (1829).  The Court held that "it clearly appears, that it was the intention of the legislature, by a compliance with the requisites of the law, to vest the exclusive right in the inventor only."  *Shaw v. Cooper*, 32 U.S. 292, 319 (1833).

---

[10] Karen E. Simon, "The Patent Reform Act's Proposed First-to-File Standard: Needed Reform or Constitutional Blunder?" 6 J. MARSHALL REV. INTELL. PROP. L. 129, 134 (2006-2007).

[11] Edwin A. Suominen, "Re-Discovering Article I, Section 8 – The Formula for First-to-Invent," 83 J. PAT. & TRADEMARK OFF. SOC'Y 641, 647, 648 (2001).

Justice Story wrote that "[t]he power in its terms, is confined to authors and inventors; and cannot be extended to the introducers of any new works or inventions."[12]   A New York district judge noted in 1826 that "[i]t is very true that 'the right to a patent belongs to him who is the first inventor, even before the patent is granted.' That is, none but the first inventor can have a patent." *Thompson v. Haight*, 23 Fed. Cas. 1040, 1048 (C.C.S.D.N.Y. 1826).   A federal court in Ohio instructed a jury that the plaintiff in an infringement suit was "protected by the law" against issuance of a rival patent, "unless the defendant's invention entitled him to a patent before the plaintiff applied for his patent." *Allen v. Hunter*, 1 Fed. Cas. 476, 477 (D. Ohio 1855).   "[N]o exclusive right can be granted for anything which the patentee has not invented or discovered." *Id.*   Decades later, Abraham Lincoln declared that the American "patent system . . . *secured to the inventor*, for a limited time, the exclusive use of his invention; and thereby added the fuel of interest to the fire of genius, in *the discovery and production of new and useful things*."[13]

The history is clear: only the first actual inventor of a discovery is entitled to a patent. "Since 1790, the patent law has operated on the premise that rights in an invention belong to the inventor." *Board of Trustees of the Leland Standford Junior University v. Roche Molecular Systems, Inc.,* 131 S.Ct. 2188, 2192 (2011).   "[A]n inventor owns the product of [his or her] original thought." *Id.* at 2195 (quoting *United States v. Dubilier Condenser*

---

[12] Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1153 (1833).

[13] Abraham Lincoln, *Second Lecture on Discoveries and Inventions* (Feb. 11, 1859), *in* 3 THE COLLECTED WORKS OF ABRAHAM LINCOLN 356, 363 (Roy P. Basler ed., 1953) (emphasis added).

*Corp.*, 289 U.S. 178, 188 (1933)). "Although much in intellectual property law has changed in the 220 years since the first Patent Act, the basic idea that inventors have the right to patent their inventions has not." *Id.* at 2194. Although legislative novelty is not itself fatal, sometimes "the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent" for Congress' action. *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 130 S.Ct. 3138, 3159 (2010) (internal quotation marks omitted).

In this case, the absence of precedent for FTF indicates a deeper constitutional defect in the AIA. In Congress' rush to harmonize the U.S. patent system with its European counterparts, the legislature ignored the fundamental purpose of the Intellectual Property Clause: to avoid the abusive system of royally-granted monopolies that had emerged under the English Crown and other European systems. *See Graham v. John Deere Co.*, 383 U.S. at 7. Madison, for example, decried monopolies as "justly classed among the greatest nuisances in Government."[14] Allowing the government to redefine an "inventor" to be the person officially designated as such, on the basis of a procedural filing rather than scientific ingenuity and diligence in moving forward to disclose the invention, flies in the face of the framers' decision to reject the British system of government-bestowed monopolies.[15]

Under the framers' conception, government does not create property rights, but rather safeguards pre-existing rights. It is significant that the Intellectual Property Clause calls for

---

[14] Letter from James Madison to Thomas Jefferson (Oct. 7, 1788) in 11 THE PAPERS OF JAMES MADISON 297, 299-300 (Robert A. Rutland et al. eds., 1977).

[15] *See* Adam Mossoff, *Rethinking the Development of Patents: An Intellectual History, 1550–1800*, 52 HASTINGS L.J. 1255, 1259-76 (2001); Adam Mossoff, *Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context*, 92 Cornell L. Rev. 953, 977 (2007).

"*securing* . . . exclusive Rights" – pre-existing rights – rather than creating new rights in a grant. In his 1792 treatise, Joseph Barnes, one of the early American patent commentators, explained the idea of a patent "securing" a pre-existing right: "[A] system for securing property in the products of genius is a mutual contract between the inventor and the public, in which the inventor agrees, on proviso that the public will *secure* to him *his property* in, and the exclusive use of *his discovery* for a limited time, he will, at the expiration of such time, cede *his right* in the same to the public . . . ."[16] In his influential edition of Blackstone's *Commentaries*, St. George Tucker summarily rejected criticisms of the Constitution that the Copyright and Patent Clause permitted the federal government "to establish trading companies."[17] He concluded that "nothing could be more fallacious" because "such monopolies" were "incompatible" with a constitutional provision that secured only an "exclusive right" for "authors and inventors.[18] In other words, the Constitution authorized Congress only to secure property rights to *first inventors*.

In his equally important American *Commentaries*, Chancellor James Kent classified both copyrights and patents under the heading, "Of original acquisition by intellectual labor."[19] As Daniel Webster declared in the House of Representatives in 1824, "the right of

---

[16] Cited in Edward C. Walterscheid, THE NATURE OF THE INTELLECTUAL PROPERTY CLAUSE: A STUDY IN HISTORICAL PERSPECTIVE 143 (2002).

[17] 1 St. George Tucker, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA 266 (1803) (appendix to vol. 1).

[18] *Id.*

[19] 2 James Kent, COMMENTARIES ON AMERICAN LAW 497 (O.W. Holmes, Jr. ed., 12th ed. 1873) (1826).

the inventor" is "the fruit of his mind—it belongs to him more than any other property—he does not inherit it—he takes it by no man's gift—it peculiarly belongs to him, and he ought to be protected in the enjoyment of it."[20]

The emphasis on the moral claim of the first inventor to the fruits of his labor was a uniquely American justification for patents under the Constitution. Securing patents as fundamental property rights to first inventors was alien to foreign patent systems, which viewed patents as special privileges allocated by the government in pursuit of its regulatory policies.[21] England's FTF system was well known to Americans.[22] In *McKeever v. United States*, 14 Ct. Cl. 396 (1878), the Court of Claims compared the English and American schemes, observing that, even in the late nineteenth century, England adhered to its traditional view of patents as "a grant" issuing solely from "royal favor," and therefore it "shall not exclude a use[] by the Crown." *Id.* at 420. The *McKeever* court pointed out the different legal status of patents in the United States, which secured the "property in the mind-work of the inventor." *Id.* at 417-18.

---

[20] 41 ANNALS OF CONG. 934 (1824).

[21] *See* B. Zorina Khan, THE DEMOCRACTIZATION OF INVENTION: PATENTS AND COPYRIGHTS IN AMERICAN ECONOMIC DEVELOPMENT, 1790-1920, at 182 (2005) ("The tendency to democratization was manifest in unique features of the U.S. patent system, such as . . . the award of property rights only to the first and true inventors.").

[22] In a widely publicized dispute, Charles Goodyear lost his right to patent in England his groundbreaking discovery of vulcanized rubber because he lost the race to file a patent application in the English patent office. Luckily, Goodyear was able to patent his discovery in the United States because he was in fact the first inventor of this monumental discovery. *See* Charles Slack, NOBLE OBSESSION: CHARLES GOODYEAR, THOMAS HANCOCK, AND THE RACE TO UNLOCK THE GREATEST INDUSTRIAL SECRET OF THE NINETEENTH CENTURY 134-38, 156-61 (2002).

FTF would replicate the British scheme of making patent rights dependent on government-granted privileges, rather than on the ingenuity and hard work that the framers believed were the ultimate foundation of patent rights. Allowing the government to redefine an "inventor" to be the person officially designated as such, on the basis of a procedural filing with the PTO, is exactly the kind of system the framers rejected.

The weight of academic scholarship supports Plaintiffs' argument that FTF is unconstitutional:

• Michael A. Glenn and Peter J. Nagle, *Article I And The First Inventor To File: Patent Reform Or Doublespeak*? 50 IDEA 441, 461-62 (2010) ("It is clear that the patent grant was never intended to be a race to the U.S. patent office, a race in which the legions of fleet-footed lawyers in the pay of powerful market forces are sure to win. The Article I grant is an individual right granted to the true and first inventor and the Constitution does not support a tortured interpretation urged by proponents of a first inventor to file system.")

• Timothy R. Holbrook, *The Treaty Power and the Patent Clause: Are There Limits on the United States' Ability to Harmonize?*, 22 CARDOZO ARTS & ENT. L.J. 1, 8 (2004) ("Given that historically the inventor has been viewed as first to create, then such tradition may suggest a constitutionally rooted requirement that would preclude a first to file system . . . .").

• Rebecca C.E. McFadyen, *The "First-To-File" Patent System: Why Adoption Is NOT An Option!*, 14 RICH. J.L. & TECH. 3, 40 (2007) ("[A]n analysis of the framers' intent as well as statutory language of the early patent acts demonstrate that the Constitution authorizes the patent to be awarded only to the 'first and true inventor.' To hold otherwise poses a direct challenge to the Constitution. . . . Constitutional and statutory language makes it clear that the 'first inventor' deserved the patent. The terms 'first and true inventor' and 'original inventor' were codified in the nation's first two patent acts.").

• John J. Okuley, *Resolution of Inventorship Disputes: Avoiding Litigation Through Early Evaluation*, 18 OHIO ST. J. ON DISP. RESOL. 915, 917 n.5 (2003) ("Though many commentators argue that the United States should adopt a first-to-file system, the current interpretation of the United States Constitution and the patent statutes is that patents are to be awarded to the first inventor.").

• Max Stul Oppenheimer, *Harmonization Through Condemnation: Is New London The Key To World Patent Harmony?* 40 VAND. J. TRANSNAT'L L. 445, 488 (2007) ("granting the patent to the first filer deprives the inventor of 'the exclusive right' guaranteed by the Constitution and is therefore unconstitutional").

• Paul M. Schoenhard, *Reconceptualizing Inventive Conception: Strengthening, Not Abandoning the First-To-Invent System*, 17 FED. CIR. B.J. 567, 581 (2008–2009) ("By these terms, it is readily apparent that the IP Clause is not aimed at the securing of rights to 'disclosers' or 'filers,' but to inventors.").

• Adam Sedia, Legislative Update*: Storming The Last Bastion: The Patent Reform Act Of 2007 And Its Assault On The Superior First-To-Invent Rule*, 18 DEPAUL J. ART TECH. & INTELL. PROP. L. 79, 118-19 (2007-2008) ("Based on historical understanding, outlined in Section II above, those who view the first-to-file system as unconstitutional appear to have the better argument. . . . The courts' early construction of 'Inventors' as the first to invent, rather than file, from the earliest cases onward further suggests that the first-to-invent rule was the commonly understood meaning at the time of the Constitution's drafting . . . . The meaning of 'Inventor' as within this continuous interpretation is consistent with originalist, strict constructionist, and textualist views of the Constitution . . . .").

• Dave Simon, "The First-to-File Provisions of the Patent Reform Act of 2005 Violate the Constitution's Intellectual Property Clause" (Nov. 2005) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=841404) ("The Patent Reform Act of 2005 proposes provisions that would change the granting of patents from the so-called first-to-invent system to a first-to-file system. The Intellectual Property Clause limits Congress to granting patents only to 'Inventors.' A system enacted by Congress for granting patents to anyone other than a good faith inventor operates outside of the constraints enumerated in the Clause, and therefore is facially impermissible. The first-to-file provisions of the Act are violative of Article I, Section 8, Clause 8 of the United States Constitution.");

• Karen E. Simon, Comment, *The Patent Reform Act's First-to-File Standard: Needed Reform or Constitutional Blunder?*, 6 J. MARSHALL REV. INTELL. PROP. L. 129, 150 (2006) ("Section 3 of H.R. 2795, which departs from over two hundred years of settled patent law by adopting a first-to-file standard for patent dispute resolution, should not be enacted because it is unconstitutional under Article I, Section 8, Clause 8 and contrary to the fundamental concern of the Framers in strictly limiting monopolies. . . . For over two hundred years, Congress and the courts consistently interpreted the principles required by the Patent Clause.").

• Edwin Suominen, *Re-Discovering Article 1, Section 8 -- The Formula for First-to-Invent*, 83 J. PAT. OFF. SOC'Y 641, 641-43 (2001) ("In 1791, the earliest predecessor to the U.S. Patent Office considered adopting a first-to-file system to settle disputes between interfering patent applicants and chose not to do so. . . . . The U.S. should not, and must not, abandon the uniquely American, and uniquely successful, first-to-invent system of patent protection prescribed by Article I, Section 8 and maintained for over two centuries. . . . The plain language of the terms would thus seem to settle the issue, clearly prohibiting any first-to-file

system as unconstitutionally denying actual inventors the exclusive right to their discoveries.").[23]

The Constitution does not grant Congress the power to authorize the grant of patents to first-filers rather than the inventors of discoveries. The wisdom of a policy is not material to whether it exceeds the limits of an enumerated Article I power. Judicial "deference in matters of policy cannot, however, become abdication in matters of law." *Sebelius*, 132 S.Ct. at 2579.

### 2.    The First-to-File Provision Is Not Severable From The Remainder Of The AIA.

Plaintiffs' second claim in their complaint asks the Court to hold that FTF is not severable from the remainder of the AIA. "The inquiry into whether a statute is severable is essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). If a court holds a statutory provision unconstitutional, it must determine whether the now truncated statute will operate in the manner Congress

---

[23] FTF proponents sometimes claim support from the research of Edward C. Walterscheid, *Priority of Invention: How the United States Came to Have a "First-to-Invent" Patent System*, 23 AIPLA Q.J. 263 (1995). But that article in fact shows:
• As introduced, the Patent Act of 1790 contained language expressly authorizing patents of importation. "During debate on the bill, however, the House removed this language from H.R. 41, apparently out of concern that there indeed was a constitutional impediment to patents of importation," because they would not restrict patents to "the original inventor." *Id.* at 282.
• The first Patent Board, on which Thomas Jefferson sat, rejected a file-inventor-to-file system, and Mr. Walterscheid admits that it is "possible the board may have interpreted 'inventor' to mean the true and first, i.e. original, inventor in a literal sense." *Id.* at 292.
• In cases when competing inventors claimed the same patent under the 1793 Patent Act, priority "seems to have been generally viewed as requiring a determination as to who had invented first." *Id.* at 318.
• "There is little question that to the extent that priority of invention was sought to be determined under the Act of 1793, it was done so on the basis of who was first to invent." "But it simply did not happen very often, and the criteria for deciding who was first to invent were not spelled out." *Id.* at 319.

intended.  If not, the remaining provisions must be invalidated.  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).  This test requires more than asking whether "the balance of the legislation is incapable of functioning independently."  *Id.* at 684.  Even if the remaining provisions will operate in some coherent way, that alone does not save the statute.  The question is whether the provisions will work as Congress intended: the "relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress."  *Id.* at 685.  The Supreme Court has cautioned that severing an invalid statutory provision risks "rewrit[ing] a statute and giv[ing] it an effect altogether different from that sought by the measure viewed as a whole."  *Railroad Retirement Bd. v. Alton R. Co.*, 295 U.S. 330, 362 (1935).  Thus, the Court has frequently found statutes non-severable.  *E.g.*, *Randall v. Sorrell*, 548 U.S. 230, 262 (2006) ("To sever provisions to avoid constitutional objection here would require us to write words into the statute . . . or to leave gaping loopholes . . . or to foresee which of many different possible ways the legislature might respond to the constitutional objections we have found."); *Mille Lacs*, 526 U.S. at 194 ("[E]mbodying as it did one coherent policy, [the entire order] is inseverable").  A plaintiff may seek a judgment of non-severability whether or not he or she is affected by every aspect of the statutory scheme.  *See, e.g.*, *Williams v. Standard Oil Co. of La.*, 278 U.S. 235, 242–44 (1929) (holding non-severable statutory provisions that did not burden the parties).

Under this test, FTF is not severable from the remainder of the AIA.  The AIA does not contain a severability clause.  In fact, Congress considered a severability provision but did not adopt it.  157 Cong. Rec. H4491 (June 23, 2011) (remarks of Rep. Watt).  Although the AIA contains a host of provisions, FTF is central to the Act.  Sen. Kyl described FTF as

"undoubtedly the most important among the bill's changes to current law."  157 Cong. Rec. S5319-20 (Sept. 6, 2011).  The definition of what is patentable is not a peripheral issue; rather, it is fundamental to the operation of the Patent Act.  Moreover, Section 3 of AIA amends many different sections of the Patent Act.  FTF is interwoven throughout the changes made by the AIA.

Senator Leahy, the leading sponsor of the AIA, described FTF as non-severable:

> First-inventor-to-file is a necessary component of this legislation . . . This amendment [to strike first to file] would gut the reforms intended by the bill and be a poison pill to these legislative reform efforts. Supporters of the legislation, ranging from high-tech and life sciences companies, to universities and small businesses, place such a high importance on the transition to first-inventor-to-file system that many of them – including those who reside in most of our states -- will not support a bill without those provisions. A vote in support of this amendment, which would strike first-inventor-to-file provision, is effectively a vote against the heart of the America Invents Act.[24]

Congress would not have adopted the AIA, at least not in anything resembling its present form, absent FTF.  Hence, FTF is non-severable from the remainder of the AIA.

### C.    PLAINTIFFS CAN ESTABLISH IRREPARABLE INJURY.

Pursuant to Local Rule 4.05(b)(2), Plaintiffs state that the AIA is causing, and will continue to cause, irreparable harm to Plaintiffs' businesses, property, and constitutional rights.  Plaintiffs lack any adequate remedy at law for their injury.[25]

---

[24] Massey Decl., Exhibit C.

[25] A plaintiff may support a motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. Local Rule 4.05(b)(2), 4.06(b)(3).  In considering a motion for preliminary injunctive relief, the Court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995).

The Declaration of inventor and Plaintiff Mark Stadnyk ("Stadnyk Decl.") details the numerous kinds of irreparable injury that FTF causes to Plaintiffs:

• FTF causes costs and burdens because of the need to maintain heightened secrecy around potential inventions until a patent application is filed.  Stadnyk Decl. ¶¶ 4-7. The security risks faced by Plaintiffs are corroborated in the Declaration of technology investor Gary Lauder ("Lauder Decl."), Exhibit G.

• FTF causes further costs and burdens because of the need to purchase additional testing equipment.  Stadnyk Decl. ¶¶ 8-9.

• FTF causes additional injury because of the increased time and effort and higher costs relating to patent applications, which FTF forces applicants to file.  Patent applications cost thousands of dollars per invention in attorney's fees and divert many hours of time of the company's key personnel.  *Id.* ¶¶ at 10-15.

• FTF further harms Plaintiffs because small inventors are at a competitive disadvantage in the race to file patent applications with the PTO.  Large firms can shoulder the burdens of additional patent filings, but Plaintiffs cannot.  *Id.*; *see also* Lauder Decl.., Exhibits A-F.[26]

• FTF has further injured Plaintiffs by reducing their access to potential investors and business partners.  Stadnyk Decl. ¶ 16; *see also* Lauder Decl., Exhibits A-F.

---

[26] Being placed at a competitive disadvantage is itself a form of injury.  *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 211 (1995); *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993).

The record before Congress supports Plaintiffs' claim of irreparable injury.[27]

All of these harms constitute irreparable injury.  It is unclear how Plaintiffs could ever receive compensation from the Government for the injuries caused by FTF, given federal sovereign immunity, qualified immunity (*Burge v. Ferguson*, 619 F.Supp.2d 1225,

---

[27] 157 Cong. Rec. S1094 (Mar. 2, 2011) (remarks of Sen. Feinstein) ("I have heard more and more in the past 2 years from small inventors, startup companies, small businesses, venture capitalists, and, yes, even large companies from all around our country, but especially in my State of California, that this proposed transition from our first-to-invent system to a first-to-file system would be severely harmful to innovation, and especially burdensome on small inventors, startups, and small businesses."); *id.* at S1112-13 (remarks of Sen. Reid) (Inventors "tell me that now they will have to try to file many more applications, earlier in the process. They tell me that the balm of 'cheap provisionals' is snake oil, because a provisional still has to meet certain legal standards, meaning that you still have to spend a lot for patent counsel, which is the biggest single expense of filing an application. Because they can't afford to file that many applications, regular or provisional, they will have to give up on some inventions altogether. If that is so, it wouldn't just be bad for them, it would be bad for the creation of innovation in America. They also are concerned that it will be harder to get VC [venture capitalist] funding because they will have filed applications on inventions that weren't quite the right ones. The added risk about whether they can ensure that the provisional application will be adequate to provide protection to this slightly modified but commercially more meaningful invention will be enough to scare off already difficult to obtain venture capital funding."); *id.* at H4385 (June 22, 2011) (remarks of Rep. Rohrabacher) ("The Hoover Institution just did a major study showing that the patent bill demonstrably is a plus for large corporations who have created no jobs and hurts all the little guys and the small guys and the startups who have created all the jobs."); *id.* at H4491 (June 23, 2011) (remarks of Rep. Sensenbrenner) ("The current first-to-invent system has been key in encouraging entrepreneurial innovation and evens the playing field for individual inventors who are not represented by a major industry.  . . . If we change to a first-to-file system, inventors who believe they do not have sufficient resources to win the race to the PTO will not have any motivation at all to continue developing the new invention. This will stifle innovation, and given the current state of our economy, that's the last thing we need."); *id.* at H4493 (remarks of Rep. Sensenbrenner) ("The reason that first-to- invent is important is that it allows an inventor to talk to investors, conduct trial and error innovation and deal with leaks, because commercially important patent rights are determined by ordinary, nonburdensome business activities. Where this hurts the ordinary inventor by going to first-to-file is that he needs to get his venture capital together, and then go ahead and file for a patent. With first-to-file, he has to put all of the money up front to file in order to protect himself; and what that will do is have a chilling effect on the small inventor who needs to get capital in order to perfect a patent and in order to market it."); *id.* at E1190 (statement of Rep. Hirono) (FTF hurts small inventors).

1233-35 (M.D. Fla. 2008)), and other obstacles to suit against the Government.  In addition, the difficulty in measuring Plaintiffs' injuries makes monetary compensation inadequate.  *See Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991) (irreparable injury test met where injury is "difficult, if not impossible, to determine monetarily"); *FSC Franchise Co., LLC v. Express Corporate Apparel, LLC*, No. 8:09–CV–454–T–23TGW, 2009 WL 3334138, *5 (M.D.Fla. Oct. 6, 2009) (granting preliminary injunction in trademark infringement case where the harm from consumer confusion "cannot meaningfully be compensated by an award of damages since the extent of the injury would be difficult, if not impossible, to calculate"); *Suntrust Inv. Services, Inc. v. Springer*, No. 8:08-CV-296-T-23TBM, 2008 WL 410105, *1 (M.D.Fla. Feb. 12, 2008) (granting TRO where plaintiff "will suffer an immeasurable loss of business" absent relief); *Wine Not, Intl. v. 2atec, LLC*, No. 8:06-CV-117-T-23, 2006 WL 1766508, *10 (M.D.Fla. June 26, 2006) (irreparable injury test met where harm to plaintiff "cannot meaningfully be compensated by an award of damages").

Federal law recognizes the irreparable nature of the loss of patent rights and specifically authorizes injunctive relief in patent infringement cases.  35 U.S.C. § 283 (authorizing injunctions "to prevent the violation of any right secured by patent").  The Supreme Court has recognized the availability of preliminary injunctive relief in patent infringement cases, according to principles of equity.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006); *see also C.E. Trading, Inc. v. Famiano*, 2006 WL 571723, *7-8 (M.D.Fla. Mar. 8, 2006) (noting availability of injunctive relief in a patent case but finding plaintiff unlikely to prevail).

### D.   A PRELIMINARY INJUNCTION WOULD CAUSE NO HARDSHIP TO DEFENDANTS

A preliminary injunction in this case would not harm Defendants and in fact would serve the traditional function of maintaining the status quo during the pendency of the litigation.   The longstanding FTI standard is a well settled part of the status quo; it has governed U.S. patent law for over two centuries.   The FTF provisions of the AIA will begin to apply to patent applications filed on March 16, 2013, although the provisions already cause real and tangible injury to Plaintiffs.   This lawsuit has been brought in advance of the effective date of the FTF provision, and the PTO has just begun the process of soliciting comments on its proposed regulations to implement FTF.   *See* Notice of Proposed Rulemaking, 77 Fed. Reg. 43742 (July 26, 2012).   Hence, a preliminary injunction in this case would not harm Defendants and "is necessary to preserve the status quo."   *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc*., 887 F.2d 1535, 1537 (11th Cir.1989); *see also Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir.1983).

### E.   A PRELIMINARY INJUNCTION WOULD BE CONSISTENT WITH THE PUBLIC INTEREST.

By virtue of the Supremacy Clause, the Constitution is the highest law of the land. Accordingly, vindicating constitutional principles is always in the public interest.   Further, FTI has enabled the U.S. patent system to lead the world in science, technology, and industry for more than two hundred years.   It is a tested and familiar standard that is squarely in the public interest.   An injunction would protect patent rights and would thereby "affirmatively serve the public interest."   *FSC Franchise Co., LLC v. Express Corporate Apparel, LLC*, No. 8:09–CV–454–T–23TGW, 2009 WL 3334138, *5 (M.D.Fla. Oct. 6, 2009).

F.     THE COURT SHOULD NOT REQUIRE SIGNIFICANT SECURITY

Pursuant to Local Rule 4.05(b)(3)(ii), Plaintiffs state that no security or alternatively de minimis security should be required for the preliminary injunction sought.  Under Fed. R. Civ. P. 65(c), an applicant for a preliminary injunction must provide security against the potential effects of a wrongly-issued injunction. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 -971 (11th Cir.2005).  However, "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'"  *Id*. at 971 (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth*., 636 F.2d 1084, 1094 (5th Cir. Unit B 1981) (brackets in original)); *see also AFC Enterprises, Inc. v. THG Restaurant Group, LLC,* 416 Fed.Appx. 898 (11th Cir. 2011) (affirming grant of preliminary injunction that did not require any bond or security); *Carillon Importers, Ltd. v. Frank Pesce Intern. Group Ltd*., 112 F.3d 1125, 1127 (11th Cir. 1997) ("The amount of an injunction bond is within the sound discretion of the district court.").

In this case, a bond of zero or a de minimis amount is warranted for several reasons.  First, this case is brought by a local business and its owner, who do not have the resources for a substantial bond.  Imposing such a burden would close the courthouse doors at the outset and prevent Plaintiffs from vindicating their constitutional rights.  *See Simulnet East Associates v. Ramada Hotel Operating Co*., 37 F.3d 573, 575-76 (9th Cir. 1994) ("In requiring a security bond for defendants' costs, care must be taken not to deprive a plaintiff of access to the federal courts. To do so has serious constitutional implications."); *see also Gay v. Chandra*, 682 F.3d 590, 594-95 (7th Cir. 2012) (finding bond to be abuse of discretion);

24

*Campos v. I.N.S.*, 70 F.Supp.2d 1296, 1310 (S.D.Fla. 1998) (dispensing with bond under Rule 65(c) where plaintiffs were indigent and sought only to vindicate federal rights).

Next, the purpose of a bond is to protect the opposing party from the adverse effects of a wrongly issued preliminary injunction. But just as Plaintiffs' irreparable injuries are difficult to measure, so too would be any adverse effects of a wrongfully issued injunction. Further, the probability of a wrongfully issued preliminary injunction in this case is low. The question at bar is a matter of constitutional law. This is not a case where, after the preliminary injunction is issued, facts will emerge at a subsequent trial that would lead the Court to reconsider its ruling.

## VII.   CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted.

Dated: July 31, 2012

Respectfully submitted,

|  |  |
|---|---|
| **TRIAL COUNSEL** | /s/   Jonathan S. Massey_____ |
|  | Jonathan S. Massey, Esq. *(pro hac vice granted)* |
|  | D.C. Bar No.:457593 |
|  | Leonard A. Gail, Esq. *(pro hac vice granted)* |
|  | ARDC No.: 6199745 |
|  | Matthew J. Reedy, Esq. *(pro hac vice granted)* |
|  | ARDC No.: 6306809 |
|  | Attorneys For Plaintiffs |
|  | MadStad Engineering, Inc., and Mark Stadnyk |
|  | **Massey & Gail LLP** |
|  | 1325 G St., NW, Suite 500 |
|  | Washington, DC 20005 |
|  | Telephone: (202) 652-4511 |
|  | Fax: (312) 379-0467 |
|  | Email: Jmassey@masseygail.com |
|  | Email: Lgail@masseygail.com |
|  | Email: mreedy@masseygail.com |

Michele Leo Hintson, Esquire
Florida Bar No. 0604941
Jaime Austrich, Esquire
Florida Bar No. 084565
Attorneys For Plaintiffs
MadStad Engineering, Inc., and Mark Stadnyk
**Shumaker, Loop & Kendrick, LLP**
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
Telephone: (813) 229-7600
Fax: (813) 229-1660
Email: MHintson@slk-law.com
Email: JAustrich@slk-law.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| **MADSTAD ENGINEERING, INC., a Florida corporation, and MARK STADNYK, an individual,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO.: 8:12-CV-01589-SDM-MAP** <br> <u>Injunctive Relief Sought</u> |
| **U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS, in his official capacity as Director of U.S. PATENT AND TRADEMARK OFFICE, and THE UNITED STATES OF AMERICA,** | |
| **Defendants.** | |

## DECLARATION OF MARK STADNYK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1.        I am over 21 years of age and a resident of the State of Florida.  I make this declaration based on personal knowledge and subject to penalties for perjury under the laws of Florida and the United States.

2.        Plaintiff MadStad Engineering, Inc. ("MadStad") is a corporation incorporated in the state of Florida on December 10, 2008.  Its principal place of business is located in Pasco County.

3.        I hold three patents and have numerous inventions at different stages of development.  Some of my inventions are close to patentability but other ideas require additional research, development and testing.

4.       As a result of the enactment of the America Invents Act ("AIA"), MadStad and I face increased costs and burdens from having to operate in a First-to-File environment.   These costs include the burden of maintaining heightened secrecy around potential inventions until a patent application is filed.   Although the First-to-File provisions of the AIA begin to apply to patent applications filed on March 16, 2013, the provisions already cause real and tangible injury to me and to MadStad.

5.       Much of the intellectual property ("IP") owned by MadStad and me is created on or stored on computers, virtually all of which are connected to the internet for reasons of research, communication and collaboration.   Since the AIA no longer concerns itself with who actually invented an invention prior to filing, the new law makes it attractive and profitable for computer hackers to steal IP and file it as their own (or to sell it to the highest bidder).   That means that MadStad and I must invest in greater protection and security for our computers and networks.

6.       Because the new law increases the threat of IP theft, MadStad and I must invest substantially to protect their computers.   This includes hardware firewalls, software firewalls, encryption software, internal storage systems, and the IT expertise to install and manage all of this, which usually means hiring an outside company or professional.   For MadStad and me, these measures have entailed substantial costs.

7.       Since the enactment of the AIA, MadStad and I have been forced to invest approximately $3,500.00 in additional computer security measures.

8.       In addition, the threat of IP theft burdens inventors and entrepreneurs to develop their inventions in private as much as possible, which involves a substantial

investment in equipment, facilities and engineering expertise.  MadStad and I (like most small-entity inventors) do not have the resources or capacity to produce prototypes, manufacture samples, nor the facilities to execute testing and development.  Sending IP out into the public domain or to outside vendors for such services exposes it to theft, and with no safeguards to successfully defend against such theft under the AIA, the only secure option is to develop and test inventions in-house and on private property as much as possible.  This requires the purchase of manufacturing equipment, test equipment, leasing of private property, and either hiring personnel to run it all or substantially investing in the training and expertise necessary to perform all of these tasks.

9.      Since the enactment of the AIA, MadStad and I have been forced to invest approximately $105,000 in additional equipment for product development and testing, as well as $840.00 per month investment in expanded facilities for same.  This is only a partial investment which does not come anywhere near providing MadStad and me with full capabilities to develop and test new IP in-house.

10.     MadStad and I have suffered further injury from the challenged provisions of the AIA because we face burdens in the form of increased time and effort and higher costs relating to patent applications.

11.     Under the prior first-to-invent system, I was able to diligently proceed to reduce my inventions to practice, without having to rush to file a patent application.  I could wait until inventions were fully developed and performed satisfactorily.  Delaying filing until the invention was fully developed allowed me to more fully describe inventions, thereby improving my chances of obtaining a patent.

12.     The First-to-File standard of the AIA eliminates the ability of small-entity inventors like me to delay filing an application until their inventions are more fully developed.  The AIA creates the need to file a provisional patent application (PPA) and full patent application for an invention as soon as possible.

13.     Patent applications are burdensome and expensive costing thousands of dollars per invention in attorneys' fees and many thousands of dollars in time of a company's key personnel.  Each patent application costs approximately $10,000.00 for a minimally complex product.  Small inventors like me are particularly harmed by such burdens.

14.     The availability of a PPA does not eliminate the burden on Plaintiffs.  A PPA gives an inventor 12 months to develop his or her invention without fear of IP theft.  The problem is that many inventions take more than 12 months to develop.  Small-entity inventors like me lack sufficient funds and resources to fully produce their own in-house prototypes or to expeditiously perform their own in-house product testing and engineering.  Small-entity inventors like me must hire outside companies to fulfill these rolls and to do so in the short time frame of 12 months.  Often this means paying hefty expedite fees to have parts or products prototyped quickly.  Even if that occurs, there is no guarantee that a given product can complete testing within the remaining time, and if that is the case then I would be forced to file a full patent application without knowing if the product claims have been fully vetted or verified.

15.     If the 12-month time limit for PPAs expires and I have not completed prototyping or testing sufficiently (and this is very likely for many products), the full patent application must be filed anyway in order to preserve the claim to the original IP.  Should

continued testing reveal new claims that were not part of the first filing, or should I need to change the product slightly in a way that was not documented in the initial filing, I would be forced to make a new filing to secure the rights to the new claims. This places additional financial burdens in the form of multiple patent filings for the same product. For small companies like MadStad and individual inventors like me, this cost of multiple filings is a substantial burden.

16.     MadStad and I have suffered further injury from the challenged provisions of the AIA because we have suffered reduced access to potential investors and business partners due to the new law. Small-entity inventors like me face additional burdens in marketing ideas to potential investors and business partners under the AIA. I am deterred from sharing ideas and inventions with potential investors and business partners because of the risk that another party will "scoop" ideas and inventions through IP theft or other means and be the first to file a patent application with the PTO. Even though I might be the actual inventor, the AIA awards patents not to the actual inventor but to the first party to file. Consequently, any new IP developed by me and by MadStad is less valuable from the perspective of potential investors and business partners who are less certain that my IP can be defended and/or protected should they choose to invest their time, money and resources. Accordingly, we have suffered lost business opportunities as a result of the AIA.

Further Declarant sayeth not.

July 30, 2012

_Mark Stadnyk_ (signature)

Mark Stadnyk

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**MADSTAD ENGINEERING, INC., a
Florida corporation, and MARK
STADNYK, an individual,**

          **Plaintiffs,**

v.

          **CASE NO.: 8:12-CV-01589-SDM-MAP**
          <u>**Injunctive Relief Sought**</u>

**U.S. PATENT AND TRADEMARK
OFFICE, DAVID KAPPOS, in his official
capacity as Director of U.S. PATENT AND
TRADEMARK OFFICE, and THE
UNITED STATES OF AMERICA,**

          **Defendants.**

## <u>DECLARATION OF GARY LAUDER</u>

    1.      I am over 21 years of age and a resident of the State of California.  I make this declaration based on personal knowledge and subject to penalties for perjury under applicable law.

    2.      I am the Managing Partner of Lauder Partners LLC, a Silicon Valley-based venture capital firm investing primarily in information technologies.  I have been a venture capitalist since 1985, investing in over 75 private companies.  I am also Chairman of ActiveVideo Networks, a developer of interactive television technology.  Other directorships include Promptu, MediaFriends and ShotSpotter.

    3.      I hold a BA in International Relations from the University of Pennsylvania; a BS in Economics from the Wharton School; and an MBA from the Stanford

Graduate School of Business. I am the co-creator of the Aspen Institute's Socrates Society and a member of the inaugural class of the Aspen Institute's Henry Crown Fellowship Program. In the 1980s, I worked at the venture firms of Aetna, Jacobs & Ramo Technology Ventures, as well as Wolfensohn Associates.

4.      I am familiar with the issues surrounding the America Invents Act, particularly as the first-to-file provision currently affects small-entity inventors in other countries, and the probable effect here. I am co-inventor of 12 patents and have spoken at over 100 industry forums. I was also an active participant during the congressional consideration of the Act. I participated in several briefings, panels, and discussions of the Act on Capitol Hill with Senators, House Members, staff, and proponents of the Act.

5.      As a result of the first-to-file provisions, venture capitalists like me will be deterred from investing in small-entity inventors for a variety of reasons.

6.      Attached to this declaration are a series of articles, opinion pieces, and other publications written by me detailing the various means by which first-to-file chills investment in small-entity inventors – because small inventors do not have the resources to file multiple patent applications, because first-to-file requires secrecy on the part of small inventors and prevents them from openly communicating with venture capitalists, because of cybersecurity risks, and because of other reasons. I reaffirm my writings as accurate analyses of the impact of first-to-file.

Further Declarant sayeth not.

Dated:  7/28/12

Gary Lauder

2

# EXHIBIT A

REUTERS VENTURE CAPITAL JOURNAL



www.vjcnews.com

GUEST ARTICLE

# PATENTLY ABSURD CHANGES THREATENING PATENT SYSTEM

*The America Invents Act, which is likely to pass soon, would be a travesty for our innovation economy*

Most VCs have strong feelings about the U.S. patent system—mainly frustration—about the three to eight-year waits to obtain patents, frivolous lawsuits, overly broad software patents, wrongful denials, etc.

The industry is mostly unaware that major patent reforms are about to make things go from bad to worse, and largely benefit big companies—the ones with the resources to lobby—to the detriment of smaller entrepreneurial startups and for whom patents were first created.

This topic is under-reported due to its complexity and obscurity, yet it has the potential to knock a few more percentage points off of the average IRRs as Sarbanes-Oxley did.

The America Invents Act passed the Senate in March, and the House version was approved by the House Judiciary Committee in April. As of this writing, it hasn't been scheduled for a vote in the House, but it is likely to pass soon. As is, it would be a travesty for our innovation economy due to three major changes:

1) Grace period eliminations,
2) Change from First-to-Invent (FTI) to First-to-File (FTF), and
3) Post-grant review.

### Grace Period

The current grace period is the one-year period inventors have between public disclosure and filing deadline, enabling the time for fundraising, getting customer feedback and other acts that share information outside the company.

Under the new law, public use or offers for sale become an immediate bar against getting a patent. This law would have precluded the Wright brothers from patenting the airplane due to public use at Kitty Hawk. Similarly, Hewlett and Packard would have been denied a patent due to their offering their first product, an audio oscillator, for sale at a trade show, despite the key innovations being concealed inside the instrument's case.

This requires being careful to not publicly use nor offer products for sale before filing. What's particularly insidious is that, many years from now, defendants' discovery could use these provisions to disallow patents asserted against them if they can obtain evidence of early use or offers.

### First-to-File

For 200+ years, the U.S. has had an FTI patent system that served us well. Everyone else uses FTF, and the results have been bad for entrepreneurship. Canada changed in 1989, and the adverse effects on small companies have been proven.

The main problem with FTF is the new secrecy required prior to filing due to the fact that if someone else learns of the invention, that party can apply for the patent—and prevail—unless the original inventor can prove that it was derived from him or her without the benefit of discovery.

This creates an unparalleled reward system for corporate espionage and hacking. The Chinese Google attack and China's passing the U.S. in patent applications in 2009 should give us pause.

FTF also means that innovators must apply early and often, which will flood the patent office with higher quantities of lower-quality patents, as it did in Canada. This will worsen the delays to issuance. While a selling point of the new bill is that delays will be lessened by ending congress's diversions of money from the PTO, the fact is that only $65 million has been diverted over the past six years, which is insignifi-



**GARY LAUDER**
LAUDER PARTNERS

cant relative to the PTO's 2010 budget of $2.3 billion.

The combination of the grace period restrictions and the change to FTF will require secrecy and close down the open-innovation model we enjoy in America. It will also force companies to file sooner, before fundraising — a Catch-22.

### Review Process

Post-Grant Review would be the ability of a third-party to challenge a patent that just issued and cause it to be unassertable while being adjudicated—potentially for years. (See *PatentAssassins.com*)

Not all sectors benefit from patents, but many crucial ones do (for example, clean-tech and medical). This article could only scratch the surface of this critical issue. Please consider urging your congressman and the **National Venture Capital Association** to oppose these provisions.

*Gary Lauder is Managing Director of Lauder Partners. You can reach him at Gary@LauderPartners.com.*



(#23039) Reprinted with permission from the June 2011 issue of Reuters Venture Capital Journal. Copyright 2011 Thomson Reuters.
To subscribe to Reuters Venture Capital Journal contact Greg Winterton at greg.winterton@thomsonreuters.com.
For more information about reprints from Reuters Venture Capital Journal please contact PARS International Corp. at 212-221-9595 x426

# EXHIBIT B



**Forbes**



## CIO Network
INSIGHTS AND IDEAS FOR TECHNOLOGY LEADERS.

TECH  |  9/20/2011 @ 4:04PM  | 14,974 views

# New Patent Law Means Trouble For Tech Entrepreneurs

[Eric Savitz], Forbes Staff

**Written by Gary Lauder**

Last Friday, President Obama signed into law the Leahy-Smith America Invents Act, which passed the Senate last week by a large bipartisan majority, 89-9. Normally, when both political parties agree on *anything*, it's time to celebrate. I wish that were the case here. To the contrary, this law will undermine one of the things that has made America unique and our economy strong: technology entrepreneurship.



There are two main problems in this new law for statups:

- The change from first-to-invent (FTI) to first-to-file (FTF)
- The introduction of yet another (third) form of post-grant review.

Proponents of this bill argued that all other industrialized countries are on the first-to-file system, so we should be too. If we look at the evidence from other countries, we should be grateful that we dodged the bullet of past attempts to change to FTF since it has not gone well for them by several measures. Canada changed to FTF in 1989, and two studies concluded that it was bad for small companies and individual inventors. A 2010 Canadian study also said "long-term returns in the Canadian venture capital industry are such that capital has fled the market." We invest 10x more venture and angel capital per capita than Europe does. Clearly technology entrepreneurship blossoms here to a much greater extent than every other country other than Israel — and Israeli companies rely on our patent system way more than their own.

There is other evidence from Europe that their patent system is not working for their start-ups. In May, the U.K.'s Small Medium-sized Entity Innovation

Alliance sent a letter to their prime minister complaining that they "know only too well the failure of the patent system and have given up." Two years ago, a European research organization published a study titled "Lost property: The European patent system and why it doesn't work." In February, the EU declared an "innovation emergency" due to how far behind us they are falling in innovation and in R&D investments. This is whom we are "harmonizing" with? Our government has not done its homework.

To understand how FTF would affect entrepreneurs, think about the process that they go through from ideation onwards. After getting an idea and doing some Web research, an entrepreneur vets her idea by talking with others (potential customers, experts, potential co-founders, etc.). If it seems worth pursuing, she will usually look for financing from angel investors or venture capitalists. Successful entrepreneurship is a highly social activity that puts one's ideas out there — and good ideas spread like wildfire. Under the existing system (which will remain in effect until 18 months from signing), if someone applies for a patent and you have evidence that you invented it first, you can institute an interference proceeding. This is a rare event (less than 100/year, and less than 0.05% of patents issued/year), but this system gives proper recourse and therefore discourages theft more than FTF. Under FTF, theft is much easier, rewarding hacking and other bad behavior, and, most important to me: will suppress the openness on which our innovation ecosystem thrives.

Embedded in FTF is an elimination of the "grace period," which is the one-year limit from "enabling disclosure" until one must file a patent. Under the new law, any public use or offer to sell an invention (even if the functioning of it is not disclosed) becomes an immediate bar on patenting. So if an inventor shows her invention working at a trade show, demonstrates it for an angel investor group or offers a single unit for sale, it will not receive a patent even if she applies the next day. How could Congress have allowed that? They were duped. Evidence of this is that both chambers published a colloquy — a staged dialog meant to clarify — that said the bill did the opposite of what the bill actually does. Courts have ruled that when such conflicts exist, the bill prevails. This was only one of the many ways that proponents misled decision-makers on this bill.

Post-grant review is yet another reason why the European system does not work for small companies. It is used by deep-pocketed companies to prevent others' patents from issuing. If the patentee is a small company, it usually can't afford to fight. The nation's top patent judge, Judge Paul Michel, retired early from his lifetime appointment to speak out against this bill. He said of PGR: "I can guarantee you that if I went into private practice, I could hold up any patent for almost a decade in post-grant proceedings. It would never get to trial in the district court."

You must be wondering what motivated the proponents to lobby so long and hard for this change in the law. Different parties perceive varying benefits from the bill. FTF's main benefit is to pharmaceutical companies who can achieve faster "reduction to practice," which is the time between conception and development of inventions claimed in patent applications. Smaller companies take longer, but use resources more efficiently. Under FTI, they get the priority date based on conception; but under FTF, the only thing that matters is when a patent application is filed. To the extent that such companies perceive themselves to be in a race against small companies, they are advantaged. To the extent big companies rely on buying small ones as

part of their outsourced R&D, they won't be. Another motivation is moving slightly closer to a globally uniform patent system. We are still not close enough for these changes to cause a cost reduction, but "harmonization" is another motivation.

We should not confuse real motivations with believing the fabrications. Congress and the Administration have received about 90% misrepresentation, and about 10% truth. This partially explains why a survey of patent professionals reveals that most don't believe the claimed benefits of this bill. The government may be victims of dissembling lobbyists, but the duty of truth-seeking was always theirs, and they failed. They bought the patent "yellowcake" story and went to war on the world's best patent system.

You may wonder how Congress and the Administration could get it so wrong? My answer is: by only listening to the bill's proponents and not seeking out the other side of the story from the many who could not afford to lobby. Open debate between the sides has yet to occur.

One of the main drivers for getting a bill passed was the prospect of reducing the 4-year average waiting time to get a patent, which has been partially due to fee-diversion by Congress. It has had many bad effects, but the House Appropriations Committee stripped that out such that the funding situation is substantially the same as it has been for the past decade. All stakeholders were in agreement that the PTO needed to be better funded, but they had to assert their authority.

Eric Severeid famously said that "most problems begin as solutions." This bill resembles that remark. The problems that got patent reform started have largely been addressed by many court cases. Once the two main patent reform lobbying organizations were formed, they gained a life of their own and had to continue pushing for changes to justify their existence. If one interviews their membership, there is much less enthusiasm for the changes in the bill. The same is true of the universities that are members of the AAU that supported the bill. One congressman told me that the tech transfer office of a university in his district opposed it, but the university president supported it. Guess who won that argument? There was a courageous splinter group of universities that opposed the legislation, but they were not invited to testify at hearings on the bill.

The bill also requires that the Small Business Administration deliver a study to Congress in one year to determine the potential impact of FTF on small companies. One year is six months prior to FTF going into effect. Isn't it odd that the study would be occurring *after* the decision committing us to that path? It's unclear what Congress will do with that information since there is already enough evidence from other countries to determine NOT to implement FTF — although I'm sure that they are still unaware of it since nobody has paid lobbyists to show it to them.

If we are to preserve what's most unique about our economy, my recommendation to Congress and the Obama Administration is to pass a new bill that does 3 things and nothing more: postpones the implementation of both first-to-file and changes in post-grant review until studies of overseas implementations have proven that they will not harm start-ups here, and properly fund the patent office by letting it keep filing fees. Congress should do its best to adhere to the Hippocratic Oath to "first do no harm," and remember the laws of unintended consequences. Otherwise, "Leahy-Smith" will become the new "Sarbanes-Oxley."

*Gary Lauder* is Managing Director of *Lauder Partners*, a Silicon
Valley-based venture capitalist and co-inventor of a dozen patents. More
info on this issue can be found on *his Web site*.

This article is available online at:
http://www.forbes.com/sites/ciocentral/2011/09/20/new-patent-law-means-trouble-for-tech-entrepreneurs/

# EXHIBIT C

# News

Subscribe  Mobile  Google USA TODAY stories, photos and more

Join USA TODAY
Sign in | Become a member

| Home | News | Travel | Money | Sports | Life | Tech | Weather |

News: Communities | Education | Nation | Military | Election 2012 | Religion | Health & Wellness | Washington | World | Opinion

# Column: Unique U.S. patent system in peril

By Gary Lauder

12    Recommend  36                    1

Updated 9/12/2011 9:38 PM

When the Founding Fathers wrote the Constitution more than 200 years ago, they devised a unique way to keep their young nation on the cutting edge of scientific progress. They agreed "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." In other words, people producing new ideas were assured that they would benefit from them, through a patent system that was created soon after.

Since that time, innovation has blossomed here more than anywhere on earth. But that incentive, still unique among nations, might be diluted as early as next week by legislation that has received far too little attention.

The Senate appears poised to pass the dubiously named America Invents Act, which would grant patents not to the first person to invent something, but to the first person to file for a patent. Whoever hired the quickest lawyer would win — namely big companies. The incentive to invest in starting a company to invent things would wither. This is how patent systems work in the rest of the world, where they have less innovation and more imitation.

We are not just *slightly* better; American start-ups receive 10 times more venture capital and angel capital per capita than Europe does, and other regions are even further behind. While the reasons for the differences are multifaceted, one of them is our better patent system. So what makes it better?

Theft of others' ideas is still common, but here the inventor has a fighting chance. Elsewhere, the patent systems are barely used by individuals or small companies since they don't benefit: It's too expensive and unjust. Here, inventor-entrepreneurs can feel safer demonstrating their invention to a room of potential investors, even if they have not filed their patents yet. Overseas, inventors are admonished to file before that, but that takes money they don't yet have.

Worse yet, publicly using one's invention would cause immediate loss of patentability. Thus our open innovation system will likely disappear.

We may not all be inventors, but we are all beneficiaries of innovation. Unless the Senate gets wise to how it has

By Christopher Powers, Bloomberg News

The original patent model for Thomas Edison's light bulb is displayed in the office of David Kappos, director of the U.S. Patent and Trademark Office.

Sponsored Links

**QUAN Stock Winner**
Hot Industry, High-Potential Investment - Buy Shares Now!
www.QuantumInnovators.com

**GTSO Smart Investment**
Rising Demand, Limited Resources - Stock Could Soar, Buy Now!
www.GTSOResources.com

**LifeLock® Official Site**
Don't Be a Victim of Identity Theft. Enroll w/ LifeLock & Get Protected.
LifeLock.com

Buy a link here

## USA TODAY OPINION

**Columns**
In addition to its own editorials, USA TODAY publishes a variety of opinions from outside writers. On political and policy matters, we publish opinions from across the political spectrum.
Roughly half of our columns come from our Board of Contributors, a group whose interests range from education to religion to sports to the economy. Their charge is to chronicle American culture by telling the

**Videos you may be interested in**

  

Creative director
Max Beland

forced to deport
herself, leave pa...

oday's Stock Pick
QUAN
QuantumInnovators

by Taboola
More videos

---

**Most Popular**

**Stories**
620 million without power in India after 3...
Parents can inflict emotional harm, not...
What cities are best for seniors? Try...
1,000 attend vigil for Mass. boy shot by dad
A defining gap: Seniors for Romney,...

**Videos**
Raw Video: Fireworks display lights up London sky
Raw Video: 'Queen' parachutes into Olympic Stadium, fireworks on the Tower Bridge
Raw Video: Funeral for Colorado shooting victim

**Photos**
Baby animals spring up at zoos
Happy birthday, Corvette
Unrest in Syria

---

**Most Popular E-mail Newsletter**

**Sign up to get:**
Top viewed stories, photo galleries and community posts of the day

**Most popular right now:**
620 million without power in India after 3 power grids fail



 Sign up for USA TODAY E-mail newsletters

stories, large and small, that collectively make us what we are.

We also publish weekly columns by Al Neuharth, USA TODAY's founder, and DeWayne Wickham, who writes primarily on matters of race but on other subjects as well. That leaves plenty of room for other views from across the nation by well-known and lesser-known names alike.

Contributors Board
How to submit a column

been misled, we will lose one of the secret ingredients that has made our country great.

*Gary Lauder, managing partner of Lauder Partners, has been a venture capitalist for 26 years.*

*For more information about reprints & permissions, visit our FAQ's. To report corrections and clarifications, contact Standards Editor Brent Jones. For publication consideration in the newspaper, send comments to letters@usatoday.com. Include name, phone number, city and state for verification. To view our corrections, go to corrections.usatoday.com.*

Posted 9/1/2011 9:38 PM | Updated 9/1/2011 9:38 PM

## More from USATODAY

**Biker wanted for 186-mph YouTube ride surrenders** *USATODAY.com in On Deadline*

**2-time Olympic runner killed in Ariz. plane crash** *USATODAY.com in News*

**Obama related to America's first slave** *USATODAY.com in The Oval*

**A defining gap: Seniors for Romney, Millennials for Obama** *USATODAY.com in News*

**Cheney: Obama 'one of our weakest presidents'** *USATODAY.com in The Oval*

## More from the web

**Sources: Chicago Bulls working on deal to acquire Nate Robinson** *ESPN Chicago*

**10 Cheapest Places to Live in America** *Kiplinger*

**Independent agent jobs at risk: MLR needs to exempt health insurance commissions** *MedCity News*

**Shocking: India's Appetite for Young Girls Fuels the AIDS Epidemic (Free Film)** *SnagFilms*

**10 worst states for retirement** *Bankrate.com*

[?]

*Guidelines: You share in the USA TODAY community, so please keep your comments smart and civil. Don't attack other readers personally, and keep your language decent. Use the "Report Abuse" button to make a difference. Read more*



**What Do You Think?**

To leave a comment, you need to sign up.

Sign up                                          Log in

**7 comments**                           Sort: Oldest to Newest

**GaryLauder**
1:25 AM on September 2, 2011                    Score: 7

That's my story and I'm sticking with it...in other words, I wrote that column.
For more information on this subject, I have collected the best info I could      Report Abuse
find on this at: http://www.lauderpartners.com/PatentReform/

Senators have heard very little from constituents, so hearing ANYTHING
could have impact. They will vote on it as early as this Tuesday (9/6/11).
You can find your senator's contact info here: http://www.reformaia.org/call

Share this with your friends. Raise the alarm!

Thanks,

-Gary

1 reply

**cosmicfish**
8:05 PM on September 4, 2011                    Score: 3

As an engineer, I cannot support this bill. While the current patent system
is rife with problems, this bill solves only some of those that concern         Report Abuse
lawyers and (as the author noted) benefit big companies. Compatibility
with international systems is a laudable goal, especially since many of the
most important protection issues are international in nature, but that is not
enough.

One of the hiring managers at my company lamented how new applicants
no longer had patents on their resumes like they used to, and I told him
that I was not surprised. The obstacles to filing patents are ever higher.

and we have systematically made the benefits to the entrepreneur ever lower. As an engineer for a major company, my personal benefit in a patent is negligible except as a resume point - I get more money and prestige within the company working on a failed business proposal than I do patenting something genuinely innovative and important.



**jclpack**
9:35 AM on September 5, 2011                              Score: -1

This advantage for big business is expected from their government, the government is theirs-bought and paid for.                    Report Abuse

What this article fails to note is the patent laws that are already in place give the government the right to deny a patent and confiscate any and all research! The government uses 'national security' as their excuse for this.

This would be fine except, in todays world, national security means the bottom line for big business (money!).

Our government told us to our face that they will not let certain big business's fail...and they won't, there will be no change. They are rich and powerful, and intend to stay that way!

American Inventions have been suppressed by our government, big business's, for decades! Any patent that could alter our routine of bowing down to big business have been denied and confiscated.

Free energy patents, efficient solar generators, efficient alternate fuel sources...all have been 'invented numerous times, patent denied and research confiscated numerous times.

President Barack HUSSEIN Obama called for American ingenuity, and entrepreneurs to help us in these tough economic times, all one needs to do is look at the confiscated and denied patents!



**Dar**
10:17 PM on September 5, 2011                             Score: 0

The patent system is already in peril. It has been abused more and more over the years.                                          Report Abuse



**Rob+Craig**
12:10 AM on September 6, 2011                             Score: 2

@Volante,                                                Report Abuse

I don' t understand your argument, "... getting in line with the rest of the world can only help matters." At what point in our history has that been an advantage? What does any other government "that is in line with the rest of the world" have to offer our system that would improve it? Any concrete example you have would be interesting. Anything at all.

As a recent garage-startup receiving financing from the VC community, I can tell you that without the intellectual properties rights we wouldn't have seen dollar one. Without these protections, what competitive advantages would young businesses seeking financing have? Why in the world would any investor risk their money? Would you?

There is a direct relationship between protection, innovation, and invention. I can't believe there's even a contrary point of view!



**flanglotz**
2:04 AM on September 6, 2011                              Score: 1

As a European with a lot of experience in the "first-to-file" patent system, I've difficulties following the argumentation in the story as well as in some    Report Abuse
of the comments here. How do your concerns relate to a recent analysis of global innovation (http://ipwatchdog.com/2011/07/01/global-innovation-index-2011-switzerland-ranks-first/id=17962/)? This study ranks the US on place 7 - and Switzerland on No. 1 (97% of all Swiss companies have 250 employees or less...)

So giving a patent to the first person to file it is not necessarily more



beneficial to large companies. If the US system is so much in favour of individuals and small companies, why are patent litigation costs in the US so much higher than in the rest of the world?

Last but not least, please explain to me why scheduling the filing of a patent as part of your company's innovation process should be such a big obstacle that only big players will be able to receive protection for their inventions?

Frank

2 replies

**Sponsored Links**

**QUAN Stock Winner**
Hot Industry, High-Potential
Investment - Buy Shares Now!
www.QuantumInnovators.com

**GTSO Smart Investment**
Rising Demand, Limited Resources -
Stock Could Soar,...
www.GTSOResources.com

**LifeLock® Official Site**
Don't Be a Victim of Identity Theft.
Enroll w/ LifeLock & Get...
LifeLock.com

Buy a link here

**USA TODAY Digital Services**

Mobile | E-Newsletters | RSS | Twitter | Podcasts | Widgets | e-Edition | USA TODAY for iPad | Kindle Edition | Subscribe to Home Delivery
Reprints & Permissions | USA TODAY Topics | Reporter Index | Corrections/Clarifications | Contact Us | Archives



Home | News | Travel | Money | Sports | Life | Tech | Weather

Visit our Partners: USA WEEKEND | Sports Weekly | Education | Space.com | Travel Tips

Contact us | Advertise | Pressroom | Jobs | FAQ | Reprints/Permissions | Privacy Notice/Your California Privacy Rights | Ad Choices | Terms of Service | Site Index

© 2012 USA TODAY, a division of Gannett Co. Inc.

# EXHIBIT D



# How the new bid to reform patent law will kill jobs

September 2, 2011: 11:12 AM ET

**The creators of a new measure claim it will spur 200,000 jobs, but the red tape it creates will hinder growth, not boost it.**

*By Gary Lauder, contributor*

FORTUNE -- Few things upset me more than being lied to, so I am quite distressed that the proponents of the America Invents Act are getting away with characterizing this bill as promoting job growth. The Senate is scheduled to vote on the bill when it returns after Labor Day, and if it passes, I believe the new law will have the opposite effect by hindering entrepreneurs whose inventions rely on patents.

If you are like most people, you probably have no idea what I am talking about. The esoteric nature of this bill means it hasn't been reported meaningfully in the mainstream press. This has enabled this legislation to crawl forward under the radar of the affected parties. As beneficiaries of technological innovations, we will all be affected parties. I will explain.

Today's patent law allows entrepreneurs to wait to file patent applications until they know they have inventions that are valuable. The one-year grace period lets inventors discuss their ideas with investors and strategic partners and experiment with different versions of the idea. Even if during that time the idea leaks out, the company can still win a patent as long as it applies within one year of first public disclosure. According to David Boundy, Vice President for Intellectual Property at Cantor Fitzgerald, the America Invents Act would: "require a company to file premature, hasty, and expensive patent applications on every baby-step idea to preserve rights against third parties who are dabbling in the field without intent to develop a commercial product." This red tape would slow innovation and cost America jobs. Why change the current law?

### The Smartest People in Tech 2011

I have been a venture capitalist for 26 years and am intimately familiar with the process through which an inventor or entrepreneur's ideas become funded and commercialized. I also appreciate how much better our entrepreneurial ecosystem seems to work in America than does Europe's or Japan's -- the countries with whom we are supposedly "harmonizing" our laws. We are not just slightly better; American startups receive ten times more venture capital and angel capital per capita than Europe does, and other regions are even further behind. While the reasons for the differences are multi-faceted, one of them is our better patent system.

A patent's primary purpose is to prevent copying. This provides financial incentives for inventors and investors to take the many risks associated with innovating new technologies. The history of innovation is riddled with theft. Some of the most famous inventors in America died penniless due to theft or other unethical legal maneuvers that deprived the inventors of just compensation. Even Ben Franklin cited the problem in 1755 when he said:

"One would not ... of all faculties, or qualities of the mind, wish for a friend, or a child, that he should have that of invention.

For his attempts to benefit mankind in that way, however well imagined, if they do not succeed, expose him, though very unjustly, to general ridicule and contempt; and, if they do succeed, to envy, robbery, and abuse."

Thefts go back even further. Physicist Stephen Hawking is a patron of an organization in the UK representing small businesses (SMEIA) who would like to see their patent system become more like ours. In May he told the group:

"As a cosmologist, you may be interested to know that my illustrious predecessor Galileo Galilei had his design for a compass stolen, by his one time protégé Baldassar Capra. I know that patent theft is one of the big issues that innovative SMEs face today. Galileo described such theft as "worse than murder, the victim feels the loss of fame, honour and merited glory, obtained not by nature, fate or chance ... but from studies, hard work and long vigils."

The UK's situation is similar to the rest of Europe and the rest of the world -- other than the U.S.A. Two years ago, a European research organization published a study named "**Lost property: The European patent system and why it doesn't work.**" This is whom we are "harmonizing" with?

## Executive Dream Team: The startup edition

A study by The Kauffman Foundation found that all new job growth in our country comes from startups, so it's easy to see how the changes would reduce jobs, not grow them. It seems reasonable to expect the proponents of the "patent reforms" in the AIA to bear the burden of proof that these changes might help, but that is not the case. Senator Patrick Leahy, who is sponsoring the bill, has claimed that it will spur 200,000 jobs, but not a shred of evidence exists for that. In Washington if one simply restates the same fiction enough times, it is believed.

Why is this happening? The answer is that five to 10 years ago, patent litigation was growing more rapidly and scared many big firms into creating industry groups to lobby congress to "fix it." IT firms and pharmaceuticals butted heads for years and ultimately they compromised on this bill. It does not benefit either of them very much -- nor anyone else, but their lobbying groups, such as the Coalition for 21st Century Patent Reform want a victory to justify their existence. In fact, during the intervening years, many major court decisions have occurred which have incrementally solved most of the problems that existed when those groups were formed … but they developed a life of their own. Their corporate members have an average company age of about a century and have been net exporters of jobs

So congress is putting the interests of the job exporters ahead of the job creators … all due to the fact that the job creators have had no voice in this process and are still unaware of what's about to happen. Nor do they have the resources to hire lobbyists or make campaign contributions. Not a single inventor nor startup was invited to testify before the Senate on this in the past six years of hearings. This was not an accident.

If the bill is passed, it is unlikely to be undone. Sarbanes-Oxley has proved that point. Despite destroying billions of dollars of value, it's still there nine years after it passed the Senate 99-0-1. As Walter Lippmann once said: "When all think alike, few think very much." Let's hope the Senate will think again … or for the first time.

--Gary Lauder is the Managing Partner of **Lauder Partners LLC**, a Silicon Valley-based venture capital firm investing primarily in information technologies. He has assembled the best information he could find on patent reform and the AIA **here**.

### Recommended for You

Can the U.S. handle a manufacturing comeback?

Europe must act fast to avoid the risk of a bank run

Facebook earnings: Good, but not good enough

How hackers can steal your debit card info

### Around the Web

Economist Warns: Prepare for Global Meltdown in 2013
NewsmaxWorld.com

A clear choice: How can any American not care?
UnionLeader

Why Richard Branson Gave $400,000 to an 18-Year-Old
OPEN Forum

[what's this]

© 2012 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy. Ad choices

# EXHIBIT E

JOIN THE
SLOW-NEWS MOVEMENT.
iPad is a trademark of Apple Inc. registered in the U.S. and other countries. App Store is a service mark of Apple Inc.

SPEND A LITTLE MORE TIME WITH **Huffington.**
Download the new, weekly iPad®
magazine from The Huffington Post.
 App Store

July 31, 2012

### HUFF POST BUSINESS

## The Internet Newspaper: News, Blogs, Video, Community

# Patently Absurd or: How to Go From the World's Best Patent System to Worse-Than-Most in a Single Step

Posted: 03/07/2011 10:03 pm

When I talk with fellow Silicon Valley entrepreneurs, inventors and investors about patent reform, the universal response is "What's that?" They are unaware that the patent landscape -- which has helped make the USA into the most innovative country on the planet -- is about to tilt in favor of the large companies that have representation in Washington. This topic is unknown to most Americans due to its complexity -- and therefore difficulty -- in reporting on it (or even writing a succinct Op-Ed on it).

This week -- perhaps today (Tuesday) -- the Senate will vote on S.23, the America Invents Act. Its main proponent, Senator Patrick Leahy (D-VT), says that we are the last industrialized nation using the antiquated subjective First-to-Invent (FTI) system, instead of the First-to File (FTF) system, which awards the patent to the first one to submit an application, rather than the one who can prove having invented it first. Isn't it odd that ours is old, subjective and different, yet we are the world's leader in innovation?

Canada shifted to FTF in 1989, and a 2009 study found an "adverse effect on domestic-oriented industries and skewed the ownership structure of patented inventions towards large corporations, away from independent inventors and small businesses." The EU, which has had FTF for a while, last month declared an "innovation emergency" due to how far behind us they are falling in innovation and R&D investments. It's not working for them. There is even a movement afoot among small businesses in the UK and Germany to try to change their system to be more like ours!

This attempt to conform to other countries is called "harmonization," which is a melodious word for "succumbing to peer pressure." We tell our children not to do so when we know it's wrong. So should we. In reality, the FTF part of the bill only superficially harmonizes. There remain substantial differences, such that the claimed benefits of cost-reduction would not materialize. This bill "improves" so much on foreign law that it would make getting patents even harder here than overseas. For example, this potential law bars receiving a patent for

inventions that were publicly used or offered for sale prior to filing. This rule, had it been in place then, would have prevented the Wright brothers from receiving their patent on their airplane due to its public use at Kitty Hawk. It is unconscionable that our government would intentionally establish trip-wires to eliminate the patentability of legitimate inventions in this way, and it's bizarre that they would make it more draconian than foreign laws.

Under current law, we have what's called a "grace period." That is the one-year between public use or sale, and the time by which the inventor must file the application. This enables entrepreneurs to present to investors, share plans with potential hires, or exhibit at trade shows during that time without concern that such acts would either preclude a patent or enable someone else to poison the well so that no one can get a patent. Under FTF, if someone else finds out about your invention, and if they apply first, they can win. Overturning that requires proving that they derived their idea from yours. This would be almost impossible to prove since there is inadequate right to discovery. What's most scary to me is that this creates strong financial incentives for usurping patents rights by hacking and industrial espionage, which is increasingly state-sponsored (think China). Through the new mechanisms of this new law, competitors could destroy nascent companies by using their own information against them. The flip side of the problem is that it will put a chill on the normal open discourse that occurs today between innovators, investors and customers.

The FTI regime was established in the constitution: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." (Article I, Section 8, Clause 8). An inventor is defined as the first to CREATE an invention, not the first to FILE the forms. Overcoming a constitutional challenge may require legislators to engage in Orwellian doublespeak to redefine "inventor" or perhaps the concept of time embodied in "first" will be spread out to deem the same month as being "simultaneous." All scholarly publications on this have cast doubt on FTF in the USA without amending the constitution. The uncertainty of a constitutional challenge to this is yet another concern.

One of the great benefits of our FTI system is that inventors can refine and improve their inventions in private prior to filing for it. Under FTF, one should file early and often on each idea, however impractical it later proves to be. That burden falls disproportionately on smaller companies for whom patenting expenses are material. This will increase the workload of the Patent and Trademark Office (PTO), which will exacerbate their delays in processing patents. Those delays are probably the worst problem of the PTO. It now takes about twice as long to get a patent than it did 20 years ago. The main cause has been fee-diversion by congress to cover the national deficit. If ever there was an innovation tax, this is it. Ironically, one of the selling points of this bill to to reduce those delays, when all that is needed is to lay off their revenue. A simple bill to forswear taking the PTO's money would be universally accepted.

It is rare that both parties can agree on anything, so when they do, such moments would normally be worth celebrating. Unfortunately, this one is scary. During the six years that the Senate Judiciary Committee deliberated this and held hearings, they did not call any small company inventor or individual inventor. The one inventor that the House counterpart heard, Dean Kamen, was vehemently against the patent reform that was being proposed. They call them "hearings," but it's clear that few are listening. Senator Feinstein is one of the few who listened, and offered an amendment that would have struck FTF and solved many of the above issues, but it lost on Thursday by 87-13.

A year ago, one of my portfolio company founder/CEOs, Steve Perlman, was invited to present for one hour with a colleague -- Tim, a patent attorney representing a small company that is developing non-invasive glucose monitoring -- to a bunch of house and senate staffers.

Unbeknownst to them, their slides were shared in advance with a representative of Johnson & Johnson who spoke both before them *and* after them and took up much of their time...prior to handing out laminated cards listing how to vote and misrepresenting the positions of Steve and Tim. (It has been captured on video if anyone is interested). The point is that small companies are no match for the maneuvers of large companies who have controlled this process and continue to. It is up to congress to actively seek out other voices to understand the counter-arguments to craft the most balanced path.

In the last decade or so, certain industries have found patents to be more of a liability than an asset. Software and internet companies are particularly vocal in this arena. IBM is now mostly a software company, and Microsoft always was. They have both been very active for years advocating patent reform. There are legitimate concerns that software companies have in this area, but I suspect that they can best be addressed by internal PTO processes to crowd-source for prior art and be vigilant about obviousness. The current approach of making patents harder to get and of lesser value is not a true solution and is a classic case of throwing the baby out with the bathwater.

The Obama administration espoused some wonderful ethical principles on the day it took office. In particular, it committed that all employees entering government agree to the "Revolving Door Ban" which stipulates:

"I will not for a period of 2 years from the date of my appointment participate in any particular matter involving specific parties that is directly and substantially related to my former employer or former clients, including regulations and contracts."

That does not seem to have stopped a key advocate of patent reform from IBM, David Kappos, from being appointed to head the PTO or from continuing to lobby on behalf of patent reform. A Politico article touched on this fact and on Microsoft's former lobbyist, Marc Berejka, being appointed to senior role in the Department of Commerce, which controls the PTO, which could theoretically enable the company to pursue its agenda from within the administration. That article does not discuss Commerce Secretary Gary Locke's extensive ties to Microsoft. Senator Leahy's state's largest employer is IBM, but that is not as dispositive of ethical breach as the Commerce/PTO connections are. These people are probably not evil, but their view of what's best for America has been distorted by having seen it from one perspective for so long.

The rhetoric is that patent reform is about jobs, but the reality is that there is no legitimate reason given for why it would accomplish that. In fact, the evidence points to the opposite. The Kauffman Foundation's studies found that small companies are the primary driver of new job growth in our economy, yet this bill harms small companies and claims that it will help the economy. It is opposed by the National Small Business Association, the National Venture Capital Association, and many other organizations, but that does not seem to matter enough to the powers that be. One reason is that they are not hearing from constituents (hint hint).

It is extremely hard to succeed as an inventor and entrepreneur, but America has created the most fertile ground in the world for doing so. Maintaining that fertility enables Schumpeter's "creative destruction" to reshape our world for the better. Patents confer power to the otherwise powerless. Customers prefer established companies they know, not upstarts. The same is true for hiring, renting property and most other transactions that start-ups have to compete for. We should do all we can to increase the chances of their success. All of the companies that are advocating for patent reform were once start-ups.

In a decade or two when the post-mortem is written, it will be hard to disaggregate the relative contributions to our decline from patent law changes from our declining public education and the rest of the world's rising education quality, Sarbanes-Oxley, options expensing, immigration policy, the forced separation of research analysts from investment banking, decimalization of stock trading, and the myriad other forces that tilt the ecosystem against technology entrepreneurship. Since it's multifactorial, it's important to fight all steps in the wrong direction whenever and wherever they arise.

The above problems are complex -- as are most aspects of intellectual property law -- but they are solvable. If we do not appreciate the recipe for how we became preeminent in innovation, then we will lose the important ingredients. Private funding of innovation is one. Venture capital raised by funds has already shrunk by 70% since 2007, and are likely to shrink further if this bill becomes law. The innovation economy is a delicate ecosystem that should be operated on with a scalpel, not a machete. The law of unintended consequences has not been repealed.

This raises the natural question: why is Congress doing this? The answer is that Congress is responding to the ones who can afford to lobby and not bothering to seek the opinions of entrepreneurial inventors -- for whom the patent system was created over 200 years ago by a single sentence in the Constitution. Patents in England back then were used primarily for maintaining monopolies and status quo among the elite, so the founders of our country intentionally designed it to do the opposite: encourage innovation by the common man. This design has done well for America up until now. Whether that will continue going forward is in Congress's hands.

*Gary Lauder has been a venture capitalist with Lauder Partners for 25 years. He is an inventor on 12 patents.*

# EXHIBIT F



# Venture Capital – The Buck Stops Where?

By Gary Lauder
Managing Partner,
Lauder Partners, LLC

*By extending the duration and grounds for patent re-examination, weakening the grace period and the overall patent system, the 2010 Patent Reform Act threatens venture capital investment in American innovation.*

14   Medical Innovations & Business

Copyright © 2010 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

## VENTURE CAPITAL INVESTMENT AND PATENT PROTECTION: VITAL TO INNOVATION

All technology companies are working toward the same goal—to translate brilliant ideas into commercially viable products. Ideas on a blackboard are useless; ideas only mean something when an investor and an entrepreneur join together to take the risk to turn ideas into product. For products that require high fixed-cost startup investments, that blackboard-to-commercialization translation only happens when some barrier to entry against competitors exists, so that profits can last long enough to recover the up-front investments. Our founding fathers recognized this and put it in our constitution: Article I, Section 8 reads "Congress shall have power . . . to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Thus, the patent system.

In 2008, venture capital-backed companies employed more than 12 million people and generated nearly $3 trillion in revenue.[1] Respectively, these figures accounted for 11% of private sector employment and represented the equivalent of 21% of U.S. GDP during that same year. Venture-backed companies outperformed the overall economy in terms of creating jobs and increasing revenue, and the venture capital industry continues to grow entire new industries nearly from scratch. The VC community is the primary source of funding for emerging life sciences, technology, and alternative energy companies. In 2007 alone, VCs committed $25.9 billion toward innovative companies in these areas. If one adds in the companies that were *formed* with venture capital investment and have since graduated to the public capital markets, about a quarter of all economic activity in the United States exists because entrepreneurs and new companies were able to show investors that they were a better bet than established "blue chip" companies.

Because small companies do not have "legislative affairs" staffs, the vast majority are completely unaware of the existence of Patent Reform—let alone its provisions. They lack the financial wherewithal to lobby their views on Capitol Hill. The members of Congress and staffers who would enact this legislation have barely sought the perspectives of inventors, entrepreneurs or venture capitalists in the past few years, so it is not surprising that the current "compromise" bills are compromises among big companies that fail to reflect effects on small ones. Their interests—and therefore mine—are about to be buried. Tomorrow's companies—the companies that don't exist yet, who would depend on the patent system to come into existence—by definition have no

representation or lobbying voice at all. That fact was my strongest motivation to take on this issue.

## HOW PATENTS FUEL AMERICAN INNOVATION

Patents are not about technology. Patents are about investment, and getting innovative products off the drawing boards and into consumers' hands. Initial ideas are usually cheap. But turning an idea into a product— proof-of-concept testing, identifying the best chemical compound out of a large genus, engineering, debugging, prototype-to-product engineering, ruggedizing and reliability engineering, testing for "safe and effective," building a production facility, building a distribution and sales channel, marketing to develop demand—those steps are *expensive*.

VCs are investors, not gamblers. VCs only invest in companies that can make convincing showings that they have a good likelihood of being profitable, and maintaining that profitability for years. When a new company sets out in a risky new technological direction and the company will require substantial investment to develop its raw ideas into a profitable business and profitability is years in the future, VCs need assurance that the risks carry a reward, that the R&D funding that they provide will generate a return once the company and new product succeed. Nobody wants to invest in "the next big thing" if someone else will run off with the profits!

In most high-dollar venture investments, patents are essential to the company's and VC's ability to ensure that success will not be taken away by competitors who free ride on the original company's R&D. The vibrant VC and startup environment in the United States will continue to exist only if companies that present great technological risk can show a lower competitive risk. Patents provide a little cocoon of protection *against competitors*. That tips the investment decision-maker's scale just a little from "Let's do this the safe way" to "Let's do it the new but potentially-higher-payoff way." That's how patents turn ideas into useful products, and create value for entrepreneurs, investors, and for society.

## SPECIFIC CONCERNS WITH S.515 AND H.R.1260

Two patent reform bills are currently pending, S.515 in the Senate and H.R.1260 in the House of Representatives. Any patent reform must account for the needs of the small, emerging growth companies that are key components of U.S. economic growth and innovation. While these two bills reflect well-intentioned efforts of the staffers that negotiated them

---

1. National Venture Capital Association Report, "Venture Impact: The Economic Importance of Venture Capital-Backed Companies to the U.S. Economy", p 2, (2009).

Copyright © 2010 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.



*Patent Reform must not impose inefficient paperwork demands on a small company's scarce capital or on the time of key people for either acquisition or defense of patents.*

with the help of representatives of large companies, both are all but certain to have devastating effects on small companies and venture capital investment.

The challenge for Congress is to ensure that policy decisions reflect and account for different industry business models and the business realities of small companies. For example, life sciences companies need to protect the fruits of their research, testing and regulatory approval investments, because many life sciences products can be reverse engineered from the extensive disclosures required for regulatory approval. Policy decisions must maintain small companies' ability to assemble ideas, capital, and productive capacity inter-firm on the same footing as large companies that build their teams intra-firm. Patent Reform must not impose inefficient paperwork demands on a small company's scarce capital or on the time of key people for either acquisition or defense of patents.

### Weakening the Filing Grace Period

Unique among world patent systems, the U.S. patent system *reserves* an inventor's "place in line" largely based on facts that arise in the ordinary course of business. Remarkably, the centerpiece of the Patent Reform Act turns that principle on its head: under Patent Reform, ordinary business activities create risks that *destroy* patent rights. Patent Reform proposes to replace our system based on ordinary course of business with a system based on forced patent paperwork and the pointless patent filings that will drain nearly $1 billion per year from small companies. The incremental patent applications of the proposed "forced-to-file" system will create *no value whatsoever* for business.

"Prior art" constitutes all information that has been made available to the public before certain deadlines measured relative to an application's filing date and the date when an inventor conceived the invention. If an invention has been described in prior art, the Patent Office may not issue a patent.

Currently, U.S. inventors enjoy a very strong one-year grace period: any printed publication, offer for sale, or public use of the invention less than one year before the patent application doesn't count as prior art, so long as the patent applicant can prove a date

of invention from his own files that predates the disclosure by the third party.

Under current law, important new ideas have months or even years to gestate, to be fleshed-out, refined and tested before the patent-or-no-patent decision point. During this time, many inventions prove unworthy and the inventor never wastes the time or money on filing an application. This saves many thousands of dollars during the part of a company's lifetime when those thousands of dollars can mean life or death.

The Patent Reform Act would dramatically weaken this grace period: to overcome disclosures by third parties within the year before filing, the inventor will have to show that the third party's disclosure was derived from the inventor. However, the law gives the inventor no subpoena power to get information from the alleged deriver to make this showing. Even if that information were available, showings of "derivation" are among the most difficult and expensive showings in the patent law, so companies will go to great lengths to avoid the risk of having to show derivation. The unpredictability and expense of Patent Reform's weakened grace period means that no company will be able to rely on it, so every inventor will have to act as if there is no grace period at all.

"Forced-to-file" will have severe consequences on our nation's startups, new businesses and universities. Preparing a written description adequate to meet the requirements of the new Patent Reform grace period will cost thousands of dollars per invention for attorney fees, and many thousands of dollars in time of the company's key personnel, for 50,000 to 100,000 inventions per year. This diversion of capital and of time of key personnel, from running the business to gratuitous legal costs with only speculative business benefit, is not a recipe for a healthy startup ecosystem. Because filing on every new idea will be cost-prohibitive, companies will have to choose which inventions to patent and which to sacrifice. They will have roughly a year's less information than under current law to make those decisions. Earlier decisions will be less accurate decisions, so patent protection will be lost for valuable inventions, and costly applications will be filed for inventions that turn out to be useless. This change will almost certainly lead to

Copyright © 2010 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

more filings of lesser quality and exacerbate the Patent Office's backlog.

Pendency (the time it takes to receive a patent) has doubled over the last 20 years, while product lifecycles have shortened. "Forced to file" will worsen one of the biggest problems in the patent system. This is not just speculation. When Canada changed to a system very similar to the bill's proposed first-inventor-to-file system in 1989, total patent applications increased by nearly 50% between 1988 and 1990.

The proponents of the change, all either currently at the nation's largest companies, or recently moved to government after a career in large companies, make a number of arguments to show that "forced-to-file" is good for small companies. With all respect for their integrity and experience within the large company environment, their arguments make clear they have no understanding of the differences between how large companies and small companies use the patent system, nor the business reality of a startup's daily struggle to stretch its initial financing to make milestones for the next investment round. In large companies, an inventor can assemble capital, R&D, manufacturing and marketing within the company, without an external disclosure that triggers patent deadlines. In contrast, small companies have to talk to outsiders: investors, potential employees and other outside experts to solve specific business problems. Current law accommodates this; Patent Reform does not.

"Forced-to-file" is an innocuous small change for large companies, but it's a gag order for small companies, making it much harder to assemble the resources the company needs. Large companies have confidentiality agreements with their employees—or at least the power to fire employees that improperly disclose. Large companies therefore face little risk of having to show derivation for unintended disclosures. In contrast, venture capitalists and other potential partners that a small company needs uniformly do not sign confidentiality agreements for initial pitch meetings. Under current law, a "handshake" understanding of confidentiality is sufficient to preserve rights, but under Patent Reform, without the audit trail of a written agreement to show derivation, these "first date" conversations become existential risks to a small company.

Because large companies use international patent systems, "forced-to-file" in the U.S. is an innocuous change; for small companies that want to establish solid businesses in the U.S. before seeking world markets, it's a huge drain of capital and expertise. Big companies generally have in-house patent attorneys embedded with the R&D team so that patent applications can be ready to go on a business schedule; for small companies, outside patent attorneys and their well-known delays will become gating roadblocks that choke many business activities and decisions. Proponents suggest that small companies can overcome the disadvantages of "forced-to-file" by publishing their best ideas on the internet as they are conceived - but don't identify instances in which their own companies have published patent-quality disclosures of their own most advanced technology plans that would give competitors a year's notice of their own business plans.

If that were not enough, the weakened grace period dramatically increases the potential profitability of corporate espionage. Given the recent revelations of China's hacking role, and given China's dramatically rising rate of U.S. patent filings, even the largest corporations should be scared of this provision becoming law.

## Post-Grant Opposition

The goal of post-grant opposition—invalidating flawed patents—is a noble one. Since 1980, a person who believes a patent should not have issued has had a right to request that the Patent Office "reexamine" the patent and revoke any patent that was improperly granted. In 2002, the right of a third party to request reexamination was expanded, so that the attacker could participate in the process, rather than leaving the Patent Office and patent owner to resolve the issues themselves. S.515 and H.R.1260 propose to expand the rights of third parties to oppose a patent, the March 4, 2010 Senate Managers' Amendment proposes to expand opposers' rights by a little and H.R.1260 proposes to expand them a lot. Many VCs and small companies have expressed concerns about the indefinite uncertainty and substantial costs that an overly-expansive post-grant opposition process would create for small company patent holders and their investors. The Patent Office claims that it takes 28 months for a case to go through the re-exam process, but an outside study found a more typical average is 36 to 52 months unless there is an appeal, in which case it can take five to eight years.

Any expansion of post-grant opposition is detrimental to all venture-backed companies, because those who oppose a patent have opportunities over the entire life of the patent to bring opposition. A cottage industry has grown up around accused infringers who use reexamination simply to drag out infringement litigation and delay any liability for damages, or to weaken the patentee company so that any competitive threat from a technological insurgent is neutralized. This is sometimes called "patent assassination." The delay and uncertainty clouding a patent's validity is detrimental to small companies that need patent certainty to obtain funding. Creating lower-cost and higher-risk avenues to question the validity of patents adds another investment risk to the overall equation that venture capitalists use to make investment decisions. If the process becomes too uncertain, VCs will stop investing.

Any expanded post-grant opposition procedure should allow only a single window with a short,

Copyright © 2010 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.



The current damages system, in which the full impact of a patented feature on a product is considered, is an appropriate one.

predictable duration of no more than nine months. Rounds of venture funding are typically designed to carry a company to meaningful milestones every 18 to 36 months. As a company reaches each milestone, its prospects should become clearer, permitting it to seek a new round of funding from new investors who are less risk tolerant, but who can invest at larger amounts. The mere existence of a challenge to the validity of a key patent—whether eventually successful or not—can create enough appearance of risk to discourage the new round of investors. Meanwhile, existing investors may not have the resources to advance a company to the next stage of development. Continued access to venture funding requires that a company have quiet title to its assets, including its patents, and expanded post-grant opposition will inevitably cloud that title and impair access to capital.

Opposers should be required to identify themselves and all issues regarding patentability and all material information that supports any argument of patent invalidity. If a party elects to oppose a patent, the party should not be permitted to raise a second opposition or court challenge on these or other issues that could have been raised. The proponents of post-grant review argue that they seek "certainty." The VC community agrees and wonders why both the Senate and House bills leave venture-backed companies exposed to additional cost, time, distraction and uncertainty even after the patentee's defense of the patent has been successful.

Finally, the process has to conclude expeditiously because the company's ability to raise capital is crippled until the review proceeding concludes. The Office's record under existing law is not encouraging. Even though Congress ordered the Patent Office to conduct existing reexaminations "with special dispatch," the Patent Office took *seven years* to complete its *first* fully contested *inter partes* reexamination under the 2002 law. The Office has given conclusory statements that it can handle a new post-grant opposition system without similar delays, but has not identified process changes and personnel reallocations that will permit it to complete oppositions in a time frame commensurate with business and investment decisions, let alone how those reallocations will avoid impacting operations throughout the rest of the Office.

### Apportionment of Damages

The VC community supports a compromise on the calculation of damages that was reached by the Senate Judiciary Committee in April 2009. This compromise requires a trial court judge to serve as a "gatekeeper" to keep speculative theories and calculations of damages out of court, in order to pull in outlier runaway jury cases. The current damages system, in which the full impact of a patented feature on a product is considered, is an appropriate one. For decades, courts have refined damages calculations to properly reflect the value of patented components. The system works and only needs judicial oversight to make sure it works more reliably. However, H.R. 1260 has a proposal for "apportionment of damages" which limits damages to only the patented feature. This proposal does not recognize that in a competitive environment, the sale and value of a whole product is often dependent upon the presence of a patented improvement. The apportionment concept would ask a trial court to subtract the value of the prior art and attempt to value the improvement in isolation—a logical impossibility where the improvement is a slightly different shape for a component, or a reordering of steps in a process or similar improvement that has no meaning or value outside its context. For example, how much of the iPhone's value should be ascribed to the touch-sensitive glass after the rest of the phone is removed?

Estimating value in the context of the entire device is difficult but tractable; the question in isolation is meaningless. The damage apportionment concept is particularly troubling, for example, to medical device companies whose discrete improvements to a product may shift the sale of the entire system to the inventor of that improvement. This shift occurred in the case of the addition of "motion tolerance" to pulse oximeter systems and, to some extent, when "rapid exchange" capability was added to angioplasty balloons.

Arbitrarily denying courts the ability to base computations on the entire market reality, for example, where an improvement drives market demand for an entire

Copyright © 2010 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

product, will lead to equally arbitrary results as judges grope for the hypothetical price of a feature that is only sold as a component of a larger assembly or are otherwise barred from considering the totality of a market. Consideration of a non-exclusive license to make the determination is just as unacceptable because it effectively uses a standard of compulsory licensing as a measure for damages when a company may need to maintain exclusive control for strategic reasons. This is an area of "reform" that is best left alone.

We must also be careful not to enact reforms that would allow large companies to infringe small company's patents for a small cost. Penalties for infringement must be substantial enough to serve as a deterrent to large entities.

## STRENGTHEN PATENT EXAMINATION EFFICIENCY AND QUALITY

Patent value is not measurable only by lawsuits and settlements. Along with encouraging investment in product R&D, patents improve our economy by discouraging copying and thereby preventing over-investment in undifferentiated competitors. During the internet bubble this occurred in many sectors, most memorably the optical switch market. The crash of 2000-2001 was a result of over-investment in many "me-too" technology companies. This misallocation of resources could have been prevented by limiting market entry. Patents—when examined and issued promptly—do that in an efficient and neutral way, but long pendency robs the markets of most of the patent systems' value to prevent these capital misallocations.

Improving patent quality means approving more good patents and denying more of the bad ones. It also means good patents must issue in a reasonable time, not the four, seven and ten years that we often see today. The shortest path to these twin goals is to give the Patent Office resources it needs to hire and retain more qualified examiners and to give them the time they need to make correct decisions on each patent application. The Patent Office must be allowed to keep its patent filing fees. It is commonly agreed that the Patent Office is the weak link in the U.S. patent system and that the main impetus for Patent Reform would dissolve if the Patent Office did its job well; yet the bill treats the symptoms and does nothing to treat the illness of fee diversion from patent applicant fees to the U.S. Treasury. Until this fundamental problem is fixed, most other changes are likely to make things worse instead of better.

Eric Severeid, the great CBS journalist of the mid 20th Century, noted that "Most problems begin as solutions." Patent Reform—depending on the provisions enacted—may rank up there with Sarbanes-Oxley, deregulation of Savings & Loans (the S&L crisis cost taxpayers $200B in the 1990's) and a host of other notorious wounds self-inflicted when well-intentioned legislators act without considering enough facts, or the

economic incentives their proposals create. The law of unintended consequences has not been repealed.

## THE BIGGER PICTURE

The innovation economy ecosystem is very delicate and is currently limping due to many self-inflicted wounds and the general economic malaise. It is not just small companies that are suffering. Many venture funds have been unable to raise new funds and are winding down. Others are investing overseas in search of better return. It is often the case that societies do not realize what their source of strength is until they lose it, and we are already on the road to doing so. The venture market has always ebbed and flowed, but there have been a number of changes in the past decade that may lead to a long-term structural decline. Patent Reform threatens to be yet another accelerator of that decline.

The main provisions of Patent Reform are uniformly adverse to small companies, and consequently to venture capital. The U.S. has the most innovative economy in the world, yet this bill threatens to materially harm it to solve "problems" that are not really problems. As I noted in the opening paragraphs of this article, the economics of new company formation and investment are orders of magnitude larger than the patent litigation concerns driving Patent Reform, and probably more sensitive, in that small changes in legal input may lead to large changes in behavior and economic output. Why has the effect on those economic segments not been fully considered and weighed?

If a company were to lobby for a change in laws that benefited that company at the expense of its larger community—for example if it wanted to pollute more—we would consider it unethical. Yet that is precisely what Patent Reform's advocates seek.

Today, the main proponents of Patent Reform are large companies: the large IT companies in the Coalition for Patent Fairness and the large pharma and large manufacturing companies in the 21st Century Coalition. From the perspective of the large IT segment in particular, the whole patent system could go away with no harm to them. Patents are certainly important to other large companies, but they would survive with a weakened patent system, on the strength of their market power, assembled resources and the like. But small company innovation and investment lives and dies by a strong patent system. Small companies are generating the overwhelming majority of new high-paying American jobs, and many large companies rely on buying small companies or licensing innovations from them to stay competitive. The major provisions of Patent Reform directly impair the innovation ecosystem and I urge Congress not to adopt the weak "forced-to-file" grace period, a post-grant review that raises existential uncertainty for small companies, or a damages provision that ensures small companies a fair return for their risky investments. ∎

Copyright © 2010 Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

# EXHIBIT G

# Cybersecurity Implications of The America Invents Act (HR 1249)

By Gary Lauder, Managing Director, Lauder Partners

July 8, 2012

Summary:

This bill, which was signed into law on September 16, 2011, will create a new reward system for those who steal others' intellectual property by enabling such stolen IP to either: 1) be patented by the thief, or 2) prevent the actual inventor from receiving a patent.  Historically the economic value of hacking has been quite limited, but this change threatens to create new incentives for this illegal activity — at a time when we should be trying inhibit hacking rather than rewarding it.

The Leahy-Smith America Invents Act, formerly known as the "Patent Reform Act of 2011," makes many changes to US patent law, but the one most relevant to cybersecurity is the change from First-to-Invent (FTI) to First-to-File (FTF) for applications filed on or after March 16, 2013 (18 months post-enactment).  America is the last remaining country with a FTI system and also enjoys the most vibrant innovation ecosystem.  Under FTI, if two people both file for the same invention at the Patent and Trademark Office (PTO), the party who can prove an earlier invention date is entitled to receive the patent.  That process is called an "interference proceeding" and is rare (<100/year, <0.01% of patents filed) and expensive.  Under FTF, invention date does not matter and the main thing that matters is the date of application filing.  Under FTF, if an inventor alleges that someone else filed based on misappropriated IP, that party can initiate a "derivation proceeding," in which once must prove that the information was derived from the inventor.  Since the inventor does not have the right to discovery, and, more importantly, since someone who knowingly applies for a patent based on stolen ideas knows they must cover their tracks, it is not likely that evidence can be found to prove derivation.  Derivation proceedings are expected to be at least as expensive as interference proceedings, but much less likely to succeed.

Our FTI system discourages theft much more than FTF.  As a result, in countries where FTF prevails, the standing advice that entrepreneurs receive is to apply for patents PRIOR to talking to investors (whose money would be needed to apply) and PRIOR to talking with customers (whose input might refine the invention or cause one to re-evaluate the wisdom of pursuing a patent).

If a competitor or customer wishes to prevent the original inventor from receiving a patent, but doesn't have the chutzpah to apply for the patent, it can be prevented by publicly writing about it in a way that the inventor can't prove derivation.  Such publications prior to filing are deemed prior art and would preclude getting a patent.  Again, there is no right of discovery to prove derivation.

The economic value of patents have recently reached new heights with the Nortel patent portfolio of 6,000 patents being sold for $4.5B or $750K/patent.  Also

reaching a crescendo is hacking. There is another new development in the hacking world, which may make this a perfect storm: the emergence of markets for stolen information.[1] Previously, most hackers hacked for mischief or actionable financial information (e.g. credit card and bank numbers), and mostly for their own account. Since non-financial information is much more prevalent on hackable computers and is less well-protected, the opportunity to cash in on this via anonymous markets represents a dangerous new development. With stolen IP suddenly being worth much more due to the FTF, hacking could dramatically increase even further. It is worth noting that state-sponsored hacking is occurring via China, and that foreign patent applications to the USPTO now exceeds domestic.

The Obama Administration issued a favorable Statement of Administration Position despite not having even been aware of the cybersecurity implications. Nor has congress seriously considered this issue despite one public attempt to raise awareness about it.[2]

The national security implications of making this change to our patent laws should have been properly evaluated prior to passing or signing this legislation. The potential harm to start-ups and other small and early-stage companies was also not taken into account. As with any governmental mistake, it can be undone — but it will require leadership...and a sense of urgency to fix it prior to March of 2013.

*Gary Lauder is a venture capitalist based in Silicon Valley and has been a venture capitalist since 1985. His advocacy on this issue is based on not wanting to see more self-inflicted wounds, such as Sarbanes-Oxley, hindering the innovation ecosystem that has already shrunk dramatically in the past decade. For more on this subject, see http://www.lauderpartners.com/PatentReform/ He can be reached at: (650) 323-5700 or via Gary@LauderPartners.com.*

---

[1] "Cybercriminals target corporate data," 3/28/11, http://www.tgdaily.com/security-features/55037-cybercriminals-target-corporate-data
[2] Letter from the Inventors Network of the Capital Area to Speaker Boehner, http://www.dcinventors.org/wp-content/uploads/2011/07/incaletteronHR1249.pdf
http://www.dcinventors.org/wp-content/uploads/2011/07/UPDATEtotheApril2011INCALetter.pdf

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| **MADSTAD ENGINEERING, INC., a Florida corporation, and MARK STADNYK, an individual,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO.: 8:12-CV-01589-SDM-MAP** |
| | <u>**Injunctive Relief Sought**</u> |
| **U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS, in his official capacity as Director of U.S. PATENT AND TRADEMARK OFFICE, and THE UNITED STATES OF AMERICA,** | |
| **Defendants.** | |

<u>**DECLARATION OF JONATHAN S. MASSEY**</u>

      1.      I am counsel of record to Plaintiffs in this action.  I make this declaration based on personal knowledge and subject to penalties for perjury under applicable law.

      2.      Attached hereto as Exhibit A is a true and correct copy of the America Invents Act of 2011, 125 Stat. 284.

      3.      Attached hereto as Exhibit B is a true and correct copy of relevant portions of Samuel Johnson's 1785 Dictionary of the English Language.

      4.      Attached hereto as Exhibit C is a true and correct copy of the Statement of Senator Patrick Leahy dated March 3, 2011.

      Further Declarant sayeth not.

Dated: July 31, 2012                    _____

                                        Jonathan S. Massey

# EXHIBIT A

PUBLIC LAW 112–29—SEPT. 16, 2011

LEAHY–SMITH AMERICA INVENTS ACT

125 STAT. 284    PUBLIC LAW 112–29—SEPT. 16, 2011

## Public Law 112–29
## 112th Congress

### An Act

Sept. 16, 2011
[H.R. 1249]

To amend title 35, United States Code, to provide for patent reform.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Leahy-Smith
America Invents
Act.

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

35 USC 1 note.

(a) SHORT TITLE.—This Act may be cited as the "Leahy-Smith America Invents Act".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.
Sec. 3. First inventor to file.
Sec. 4. Inventor's oath or declaration.
Sec. 5. Defense to infringement based on prior commercial use.
Sec. 6. Post-grant review proceedings.
Sec. 7. Patent Trial and Appeal Board.
Sec. 8. Preissuance submissions by third parties.
Sec. 9. Venue.
Sec. 10. Fee setting authority.
Sec. 11. Fees for patent services.
Sec. 12. Supplemental examination.
Sec. 13. Funding agreements.
Sec. 14. Tax strategies deemed within the prior art.
Sec. 15. Best mode requirement.
Sec. 16. Marking.
Sec. 17. Advice of counsel.
Sec. 18. Transitional program for covered business method patents.
Sec. 19. Jurisdiction and procedural matters.
Sec. 20. Technical amendments.
Sec. 21. Travel expenses and payment of administrative judges.
Sec. 22. Patent and Trademark Office funding.
Sec. 23. Satellite offices.
Sec. 24. Designation of Detroit satellite office.
Sec. 25. Priority examination for important technologies.
Sec. 26. Study on implementation.
Sec. 27. Study on genetic testing.
Sec. 28. Patent Ombudsman Program for small business concerns.
Sec. 29. Establishment of methods for studying the diversity of applicants.
Sec. 30. Sense of Congress.
Sec. 31. USPTO study on international patent protections for small businesses.
Sec. 32. Pro bono program.
Sec. 33. Limitation on issuance of patents.
Sec. 34. Study of patent litigation.
Sec. 35. Effective date.
Sec. 36. Budgetary effects.
Sec. 37. Calculation of 60-day period for application of patent term extension.

35 USC 1 note.

**SEC. 2. DEFINITIONS.**

In this Act:

(1) DIRECTOR.—The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 285

(2) OFFICE.—The term "Office" means the United States Patent and Trademark Office.

(3) PATENT PUBLIC ADVISORY COMMITTEE.—The term "Patent Public Advisory Committee" means the Patent Public Advisory Committee established under section 5(a) of title 35, United States Code.

(4) TRADEMARK ACT OF 1946.—The term "Trademark Act of 1946" means the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes", approved July 5, 1946 (15 U.S.C. 1051 et seq.) (commonly referred to as the "Trademark Act of 1946" or the "Lanham Act").

(5) TRADEMARK PUBLIC ADVISORY COMMITTEE.—The term "Trademark Public Advisory Committee" means the Trademark Public Advisory Committee established under section 5(a) of title 35, United States Code.

**SEC. 3. FIRST INVENTOR TO FILE.**

(a) DEFINITIONS.—Section 100 of title 35, United States Code, is amended—

(1) in subsection (e), by striking "or inter partes reexamination under section 311"; and

(2) by adding at the end the following:

"(f) The term 'inventor' means the individual or, if a joint invention, the individuals collectively who invented or discovered the subject matter of the invention.

"(g) The terms 'joint inventor' and 'coinventor' mean any 1 of the individuals who invented or discovered the subject matter of a joint invention.

"(h) The term 'joint research agreement' means a written contract, grant, or cooperative agreement entered into by 2 or more persons or entities for the performance of experimental, developmental, or research work in the field of the claimed invention.

"(i)(1) The term 'effective filing date' for a claimed invention in a patent or application for patent means—

"(A) if subparagraph (B) does not apply, the actual filing date of the patent or the application for the patent containing a claim to the invention; or

"(B) the filing date of the earliest application for which the patent or application is entitled, as to such invention, to a right of priority under section 119, 365(a), or 365(b) or to the benefit of an earlier filing date under section 120, 121, or 365(c).

"(2) The effective filing date for a claimed invention in an application for reissue or reissued patent shall be determined by deeming the claim to the invention to have been contained in the patent for which reissue was sought.

"(j) The term 'claimed invention' means the subject matter defined by a claim in a patent or an application for a patent.".

(b) CONDITIONS FOR PATENTABILITY.—

(1) IN GENERAL.—Section 102 of title 35, United States Code, is amended to read as follows:

**"§ 102. Conditions for patentability; novelty**

"(a) NOVELTY; PRIOR ART.—A person shall be entitled to a patent unless—

"(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or

"(2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

"(b) EXCEPTIONS.—

"(1) DISCLOSURES MADE 1 YEAR OR LESS BEFORE THE EFFECTIVE FILING DATE OF THE CLAIMED INVENTION.—A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if—

"(A) the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

"(B) the subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

"(2) DISCLOSURES APPEARING IN APPLICATIONS AND PATENTS.—A disclosure shall not be prior art to a claimed invention under subsection (a)(2) if—

"(A) the subject matter disclosed was obtained directly or indirectly from the inventor or a joint inventor;

"(B) the subject matter disclosed had, before such subject matter was effectively filed under subsection (a)(2), been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

"(C) the subject matter disclosed and the claimed invention, not later than the effective filing date of the claimed invention, were owned by the same person or subject to an obligation of assignment to the same person.

"(c) COMMON OWNERSHIP UNDER JOINT RESEARCH AGREEMENTS.—Subject matter disclosed and a claimed invention shall be deemed to have been owned by the same person or subject to an obligation of assignment to the same person in applying the provisions of subsection (b)(2)(C) if—

"(1) the subject matter disclosed was developed and the claimed invention was made by, or on behalf of, 1 or more parties to a joint research agreement that was in effect on or before the effective filing date of the claimed invention;

"(2) the claimed invention was made as a result of activities undertaken within the scope of the joint research agreement; and

"(3) the application for patent for the claimed invention discloses or is amended to disclose the names of the parties to the joint research agreement.

"(d) PATENTS AND PUBLISHED APPLICATIONS EFFECTIVE AS PRIOR ART.—For purposes of determining whether a patent or

application for patent is prior art to a claimed invention under subsection (a)(2), such patent or application shall be considered to have been effectively filed, with respect to any subject matter described in the patent or application—

"(1) if paragraph (2) does not apply, as of the actual filing date of the patent or the application for patent; or

"(2) if the patent or application for patent is entitled to claim a right of priority under section 119, 365(a), or 365(b), or to claim the benefit of an earlier filing date under section 120, 121, or 365(c), based upon 1 or more prior filed applications for patent, as of the filing date of the earliest such application that describes the subject matter.".

(2) CONTINUITY OF INTENT UNDER THE CREATE ACT.—The enactment of section 102(c) of title 35, United States Code, under paragraph (1) of this subsection is done with the same intent to promote joint research activities that was expressed, including in the legislative history, through the enactment of the Cooperative Research and Technology Enhancement Act of 2004 (Public Law 108–453; the "CREATE Act"), the amendments of which are stricken by subsection (c) of this section. The United States Patent and Trademark Office shall administer section 102(c) of title 35, United States Code, in a manner consistent with the legislative history of the CREATE Act that was relevant to its administration by the United States Patent and Trademark Office.    35 USC 102 note.

(3) CONFORMING AMENDMENT.—The item relating to section 102 in the table of sections for chapter 10 of title 35, United States Code, is amended to read as follows:

"102. Conditions for patentability; novelty.".

(c) CONDITIONS FOR PATENTABILITY; NONOBVIOUS SUBJECT MATTER.—Section 103 of title 35, United States Code, is amended to read as follows:

## "§ 103. Conditions for patentability; non-obvious subject matter

"A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.".

(d) REPEAL OF REQUIREMENTS FOR INVENTIONS MADE ABROAD.—Section 104 of title 35, United States Code, and the item relating to that section in the table of sections for chapter 10 of title 35, United States Code, are repealed.

(e) REPEAL OF STATUTORY INVENTION REGISTRATION.—

(1) IN GENERAL.—Section 157 of title 35, United States Code, and the item relating to that section in the table of sections for chapter 14 of title 35, United States Code, are repealed.

(2) REMOVAL OF CROSS REFERENCES.—Section 111(b)(8) of title 35, United States Code, is amended by striking "sections 115, 131, 135, and 157" and inserting "sections 131 and 135".

Applicability.
35 USC 111 note.

(3) EFFECTIVE DATE.—The amendments made by this sub-section shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this Act, and shall apply to any request for a statutory invention registration filed on or after that effective date.

(f) EARLIER FILING DATE FOR INVENTOR AND JOINT INVENTOR.—Section 120 of title 35, United States Code, is amended by striking "which is filed by an inventor or inventors named" and inserting "which names an inventor or joint inventor".

(g) CONFORMING AMENDMENTS.—

(1) RIGHT OF PRIORITY.—Section 172 of title 35, United States Code, is amended by striking "and the time specified in section 102(d)".

(2) LIMITATION ON REMEDIES.—Section 287(c)(4) of title 35, United States Code, is amended by striking "the earliest effective filing date of which is prior to" and inserting "which has an effective filing date before".

(3) INTERNATIONAL APPLICATION DESIGNATING THE UNITED STATES: EFFECT.—Section 363 of title 35, United States Code, is amended by striking "except as otherwise provided in section 102(e) of this title".

(4) PUBLICATION OF INTERNATIONAL APPLICATION: EFFECT.—Section 374 of title 35, United States Code, is amended by striking "sections 102(e) and 154(d)" and inserting "section 154(d)".

(5) PATENT ISSUED ON INTERNATIONAL APPLICATION: EFFECT.—The second sentence of section 375(a) of title 35, United States Code, is amended by striking "Subject to section 102(e) of this title, such" and inserting "Such".

(6) LIMIT ON RIGHT OF PRIORITY.—Section 119(a) of title 35, United States Code, is amended by striking "; but no patent shall be granted" and all that follows through "one year prior to such filing".

(7) INVENTIONS MADE WITH FEDERAL ASSISTANCE.—Section 202(c) of title 35, United States Code, is amended—

(A) in paragraph (2)—

(i) by striking "publication, on sale, or public use," and all that follows through "obtained in the United States" and inserting "the 1-year period referred to in section 102(b) would end before the end of that 2-year period"; and

(ii) by striking "prior to the end of the statutory" and inserting "before the end of that 1-year"; and

(B) in paragraph (3), by striking "any statutory bar date that may occur under this title due to publication, on sale, or public use" and inserting "the expiration of the 1-year period referred to in section 102(b)".

(h) DERIVED PATENTS.—

(1) IN GENERAL.—Section 291 of title 35, United States Code, is amended to read as follows:

## "§ 291. Derived Patents

"(a) IN GENERAL.—The owner of a patent may have relief by civil action against the owner of another patent that claims the same invention and has an earlier effective filing date, if the invention claimed in such other patent was derived from the inventor

of the invention claimed in the patent owned by the person seeking relief under this section.

"(b) FILING LIMITATION.—An action under this section may be filed only before the end of the 1-year period beginning on the date of the issuance of the first patent containing a claim to the allegedly derived invention and naming an individual alleged to have derived such invention as the inventor or joint inventor.". *Time period.*

"(2) CONFORMING AMENDMENT.—The item relating to section 291 in the table of sections for chapter 29 of title 35, United States Code, is amended to read as follows:

"291. Derived patents.".

(i) DERIVATION PROCEEDINGS.—Section 135 of title 35, United States Code, is amended to read as follows:

## "§ 135. Derivation proceedings

"(a) INSTITUTION OF PROCEEDING.—An applicant for patent may file a petition to institute a derivation proceeding in the Office. The petition shall set forth with particularity the basis for finding that an inventor named in an earlier application derived the claimed invention from an inventor named in the petitioner's application and, without authorization, the earlier application claiming such invention was filed. Any such petition may be filed only within the 1-year period beginning on the date of the first publication of a claim to an invention that is the same or substantially the same as the earlier application's claim to the invention, shall be made under oath, and shall be supported by substantial evidence. Whenever the Director determines that a petition filed under this subsection demonstrates that the standards for instituting a derivation proceeding are met, the Director may institute a derivation proceeding. The determination by the Director whether to institute a derivation proceeding shall be final and nonappealable. *Time period.*

"(b) DETERMINATION BY PATENT TRIAL AND APPEAL BOARD.— In a derivation proceeding instituted under subsection (a), the Patent Trial and Appeal Board shall determine whether an inventor named in the earlier application derived the claimed invention from an inventor named in the petitioner's application and, without authorization, the earlier application claiming such invention was filed. In appropriate circumstances, the Patent Trial and Appeal Board may correct the naming of the inventor in any application or patent at issue. The Director shall prescribe regulations setting forth standards for the conduct of derivation proceedings, including requiring parties to provide sufficient evidence to prove and rebut a claim of derivation. *Regulations.*

"(c) DEFERRAL OF DECISION.—The Patent Trial and Appeal Board may defer action on a petition for a derivation proceeding until the expiration of the 3-month period beginning on the date on which the Director issues a patent that includes the claimed invention that is the subject of the petition. The Patent Trial and Appeal Board also may defer action on a petition for a derivation proceeding, or stay the proceeding after it has been instituted, until the termination of a proceeding under chapter 30, 31, or 32 involving the patent of the earlier applicant. *Time period.*

"(d) EFFECT OF FINAL DECISION.—The final decision of the Patent Trial and Appeal Board, if adverse to claims in an application for patent, shall constitute the final refusal by the Office on those claims. The final decision of the Patent Trial and Appeal

Board, if adverse to claims in a patent, shall, if no appeal or other review of the decision has been or can be taken or had, constitute cancellation of those claims, and notice of such cancellation shall be endorsed on copies of the patent distributed after such cancellation.

"(e) SETTLEMENT.—Parties to a proceeding instituted under subsection (a) may terminate the proceeding by filing a written statement reflecting the agreement of the parties as to the correct inventors of the claimed invention in dispute. Unless the Patent Trial and Appeal Board finds the agreement to be inconsistent with the evidence of record, if any, it shall take action consistent with the agreement. Any written settlement or understanding of the parties shall be filed with the Director. At the request of a party to the proceeding, the agreement or understanding shall be treated as business confidential information, shall be kept separate from the file of the involved patents or applications, and shall be made available only to Government agencies on written request, or to any person on a showing of good cause.

"(f) ARBITRATION.—Parties to a proceeding instituted under subsection (a) may, within such time as may be specified by the Director by regulation, determine such contest or any aspect thereof by arbitration. Such arbitration shall be governed by the provisions of title 9, to the extent such title is not inconsistent with this section. The parties shall give notice of any arbitration award to the Director, and such award shall, as between the parties to the arbitration, be dispositive of the issues to which it relates. The arbitration award shall be unenforceable until such notice is given. Nothing in this subsection shall preclude the Director from determining the patentability of the claimed inventions involved in the proceeding.".

(j) ELIMINATION OF REFERENCES TO INTERFERENCES.—(1) Sections 134, 145, 146, 154, and 305 of title 35, United States Code, are each amended by striking "Board of Patent Appeals and Interferences" each place it appears and inserting "Patent Trial and Appeal Board".

(2)(A) Section 146 of title 35, United States Code, is amended—

(i) by striking "an interference" and inserting "a derivation proceeding"; and

(ii) by striking "the interference" and inserting "the derivation proceeding".

(B) The subparagraph heading for section 154(b)(1)(C) of title 35, United States Code, is amended to read as follows:

"(C) GUARANTEE OF ADJUSTMENTS FOR DELAYS DUE TO DERIVATION PROCEEDINGS, SECRECY ORDERS, AND APPEALS.—".

(3) The section heading for section 134 of title 35, United States Code, is amended to read as follows:

## "§ 134. Appeal to the Patent Trial and Appeal Board".

(4) The section heading for section 146 of title 35, United States Code, is amended to read as follows:

*Confidentiality.*

*Regulations.*

*Notice.*

**"§ 146. Civil action in case of derivation proceeding".**

(5) The items relating to sections 134 and 135 in the table of sections for chapter 12 of title 35, United States Code, are amended to read as follows:

"134. Appeal to the Patent Trial and Appeal Board.
"135. Derivation proceedings.".

(6) The item relating to section 146 in the table of sections for chapter 13 of title 35, United States Code, is amended to read as follows:

"146. Civil action in case of derivation proceeding.".

(k) STATUTE OF LIMITATIONS.—

(1) IN GENERAL.—Section 32 of title 35, United States Code, is amended by inserting between the third and fourth sentences the following: "A proceeding under this section shall be commenced not later than the earlier of either the date that is 10 years after the date on which the misconduct forming the basis for the proceeding occurred, or 1 year after the date on which the misconduct forming the basis for the proceeding is made known to an officer or employee of the Office as prescribed in the regulations established under section 2(b)(2)(D).".

(2) REPORT TO CONGRESS.—The Director shall provide on a biennial basis to the Judiciary Committees of the Senate and House of Representatives a report providing a short description of incidents made known to an officer or employee of the Office as prescribed in the regulations established under section 2(b)(2)(D) of title 35, United States Code, that reflect substantial evidence of misconduct before the Office but for which the Office was barred from commencing a proceeding under section 32 of title 35, United States Code, by the time limitation established by the fourth sentence of that section. 35 USC 32 note.

(3) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply in any case in which the time period for instituting a proceeding under section 32 of title 35, United States Code, had not lapsed before the date of the enactment of this Act. 35 USC 32 note.

(l) SMALL BUSINESS STUDY.—

(1) DEFINITIONS.—In this subsection—

(A) the term "Chief Counsel" means the Chief Counsel for Advocacy of the Small Business Administration;

(B) the term "General Counsel" means the General Counsel of the United States Patent and Trademark Office; and

(C) the term "small business concern" has the meaning given that term under section 3 of the Small Business Act (15 U.S.C. 632).

(2) STUDY.—

(A) IN GENERAL.—The Chief Counsel, in consultation with the General Counsel, shall conduct a study of the effects of eliminating the use of dates of invention in determining whether an applicant is entitled to a patent under title 35, United States Code.

(B) AREAS OF STUDY.—The study conducted under subparagraph (A) shall include examination of the effects

of eliminating the use of invention dates, including examining—

(i) how the change would affect the ability of small business concerns to obtain patents and their costs of obtaining patents;

(ii) whether the change would create, mitigate, or exacerbate any disadvantages for applicants for patents that are small business concerns relative to applicants for patents that are not small business concerns, and whether the change would create any advantages for applicants for patents that are small business concerns relative to applicants for patents that are not small business concerns;

(iii) the cost savings and other potential benefits to small business concerns of the change; and

(iv) the feasibility and costs and benefits to small business concerns of alternative means of determining whether an applicant is entitled to a patent under title 35, United States Code.

(3) REPORT.—Not later than the date that is 1 year after the date of the enactment of this Act, the Chief Counsel shall submit to the Committee on Small Business and Entrepreneurship and the Committee on the Judiciary of the Senate and the Committee on Small Business and the Committee on the Judiciary of the House of Representatives a report on the results of the study under paragraph (2).

(m) REPORT ON PRIOR USER RIGHTS.—

(1) IN GENERAL.—Not later than the end of the 4-month period beginning on the date of the enactment of this Act, the Director shall report, to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives, the findings and recommendations of the Director on the operation of prior user rights in selected countries in the industrialized world. The report shall include the following:

(A) A comparison between patent laws of the United States and the laws of other industrialized countries, including members of the European Union and Japan, Canada, and Australia.

(B) An analysis of the effect of prior user rights on innovation rates in the selected countries.

(C) An analysis of the correlation, if any, between prior user rights and start-up enterprises and the ability to attract venture capital to start new companies.

(D) An analysis of the effect of prior user rights, if any, on small businesses, universities, and individual inventors.

(E) An analysis of legal and constitutional issues, if any, that arise from placing trade secret law in patent law.

(F) An analysis of whether the change to a first-to-file patent system creates a particular need for prior user rights.

(2) CONSULTATION WITH OTHER AGENCIES.—In preparing the report required under paragraph (1), the Director shall consult with the United States Trade Representative, the Secretary of State, and the Attorney General.

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 293

(n) EFFECTIVE DATE.—

    (1) IN GENERAL.—Except as otherwise provided in this section, the amendments made by this section shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this Act, and shall apply to any application for patent, and to any patent issuing thereon, that contains or contained at any time—

        (A) a claim to a claimed invention that has an effective filing date as defined in section 100(i) of title 35, United States Code, that is on or after the effective date described in this paragraph; or

        (B) a specific reference under section 120, 121, or 365(c) of title 35, United States Code, to any patent or application that contains or contained at any time such a claim.

    (2) INTERFERING PATENTS.—The provisions of sections 102(g), 135, and 291 of title 35, United States Code, as in effect on the day before the effective date set forth in paragraph (1) of this subsection, shall apply to each claim of an application for patent, and any patent issued thereon, for which the amendments made by this section also apply, if such application or patent contains or contained at any time—

        (A) a claim to an invention having an effective filing date as defined in section 100(i) of title 35, United States Code, that occurs before the effective date set forth in paragraph (1) of this subsection; or

        (B) a specific reference under section 120, 121, or 365(c) of title 35, United States Code, to any patent or application that contains or contained at any time such a claim.

(o) SENSE OF CONGRESS.—It is the sense of the Congress that converting the United States patent system from "first to invent" to a system of "first inventor to file" will promote the progress of science and the useful arts by securing for limited times to inventors the exclusive rights to their discoveries and provide inventors with greater certainty regarding the scope of protection provided by the grant of exclusive rights to their discoveries.

(p) SENSE OF CONGRESS.—It is the sense of the Congress that converting the United States patent system from "first to invent" to a system of "first inventor to file" will improve the United States patent system and promote harmonization of the United States patent system with the patent systems commonly used in nearly all other countries throughout the world with whom the United States conducts trade and thereby promote greater international uniformity and certainty in the procedures used for securing the exclusive rights of inventors to their discoveries.

**SEC. 4. INVENTOR'S OATH OR DECLARATION.**

(a) INVENTOR'S OATH OR DECLARATION.—

    (1) IN GENERAL.—Section 115 of title 35, United States Code, is amended to read as follows:

## "§ 115. Inventor's oath or declaration

    "(a) NAMING THE INVENTOR; INVENTOR'S OATH OR DECLARATION.—An application for patent that is filed under section 111(a) or commences the national stage under section 371 shall include, or be amended to include, the name of the inventor for any invention claimed in the application. Except as otherwise provided in this section, each individual who is the inventor or a joint inventor

Applicability.
35 USC 100 note.

125 STAT. 294        PUBLIC LAW 112–29—SEPT. 16, 2011

of a claimed invention in an application for patent shall execute an oath or declaration in connection with the application.

"(b) REQUIRED STATEMENTS.—An oath or declaration under subsection (a) shall contain statements that—

"(1) the application was made or was authorized to be made by the affiant or declarant; and

"(2) such individual believes himself or herself to be the original inventor or an original joint inventor of a claimed invention in the application.

"(c) ADDITIONAL REQUIREMENTS.—The Director may specify additional information relating to the inventor and the invention that is required to be included in an oath or declaration under subsection (a).

"(d) SUBSTITUTE STATEMENT.—

Regulations.

"(1) IN GENERAL.—In lieu of executing an oath or declaration under subsection (a), the applicant for patent may provide a substitute statement under the circumstances described in paragraph (2) and such additional circumstances that the Director may specify by regulation.

"(2) PERMITTED CIRCUMSTANCES.—A substitute statement under paragraph (1) is permitted with respect to any individual who—

"(A) is unable to file the oath or declaration under subsection (a) because the individual—

"(i) is deceased;

"(ii) is under legal incapacity; or

"(iii) cannot be found or reached after diligent effort; or

"(B) is under an obligation to assign the invention but has refused to make the oath or declaration required under subsection (a).

"(3) CONTENTS.—A substitute statement under this subsection shall—

"(A) identify the individual with respect to whom the statement applies;

"(B) set forth the circumstances representing the permitted basis for the filing of the substitute statement in lieu of the oath or declaration under subsection (a); and

"(C) contain any additional information, including any showing, required by the Director.

"(e) MAKING REQUIRED STATEMENTS IN ASSIGNMENT OF RECORD.—An individual who is under an obligation of assignment of an application for patent may include the required statements under subsections (b) and (c) in the assignment executed by the individual, in lieu of filing such statements separately.

"(f) TIME FOR FILING.—A notice of allowance under section 151 may be provided to an applicant for patent only if the applicant for patent has filed each required oath or declaration under subsection (a) or has filed a substitute statement under subsection (d) or recorded an assignment meeting the requirements of subsection (e).

"(g) EARLIER-FILED APPLICATION CONTAINING REQUIRED STATEMENTS OR SUBSTITUTE STATEMENT.—

"(1) EXCEPTION.—The requirements under this section shall not apply to an individual with respect to an application for patent in which the individual is named as the inventor or

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 295

a joint inventor and who claims the benefit under section 120, 121, or 365(c) of the filing of an earlier-filed application, if—

"(A) an oath or declaration meeting the requirements of subsection (a) was executed by the individual and was filed in connection with the earlier-filed application;

"(B) a substitute statement meeting the requirements of subsection (d) was filed in connection with the earlier filed application with respect to the individual; or

"(C) an assignment meeting the requirements of subsection (e) was executed with respect to the earlier-filed application by the individual and was recorded in connection with the earlier-filed application.

"(2) COPIES OF OATHS, DECLARATIONS, STATEMENTS, OR ASSIGNMENTS.—Notwithstanding paragraph (1), the Director may require that a copy of the executed oath or declaration, the substitute statement, or the assignment filed in connection with the earlier-filed application be included in the later-filed application.

"(h) SUPPLEMENTAL AND CORRECTED STATEMENTS; FILING ADDITIONAL STATEMENTS.—

"(1) IN GENERAL.—Any person making a statement required under this section may withdraw, replace, or otherwise correct the statement at any time. If a change is made in the naming of the inventor requiring the filing of 1 or more additional statements under this section, the Director shall establish regulations under which such additional statements may be filed.

"(2) SUPPLEMENTAL STATEMENTS NOT REQUIRED.—If an individual has executed an oath or declaration meeting the requirements of subsection (a) or an assignment meeting the requirements of subsection (e) with respect to an application for patent, the Director may not thereafter require that individual to make any additional oath, declaration, or other statement equivalent to those required by this section in connection with the application for patent or any patent issuing thereon.

"(3) SAVINGS CLAUSE.—A patent shall not be invalid or unenforceable based upon the failure to comply with a requirement under this section if the failure is remedied as provided under paragraph (1).

"(i) ACKNOWLEDGMENT OF PENALTIES.—Any declaration or statement filed pursuant to this section shall contain an acknowledgment that any willful false statement made in such declaration or statement is punishable under section 1001 of title 18 by fine or imprisonment of not more than 5 years, or both.".

(2) RELATIONSHIP TO DIVISIONAL APPLICATIONS.—Section 121 of title 35, United States Code, is amended by striking "If a divisional application" and all that follows through "inventor.".

(3) REQUIREMENTS FOR NONPROVISIONAL APPLICATIONS.— Section 111(a) of title 35, United States Code, is amended—

(A) in paragraph (2)(C), by striking "by the applicant" and inserting "or declaration";

(B) in the heading for paragraph (3), by inserting "OR DECLARATION" after "AND OATH"; and

(C) by inserting "or declaration" after "and oath" each place it appears.

Regulations.

(4) CONFORMING AMENDMENT.—The item relating to section 115 in the table of sections for chapter 11 of title 35, United States Code, is amended to read as follows:

"115. Inventor's oath or declaration.".

(b) FILING BY OTHER THAN INVENTOR.—

(1) IN GENERAL.—Section 118 of title 35, United States Code, is amended to read as follows:

## "§ 118. Filing by other than inventor

"A person to whom the inventor has assigned or is under an obligation to assign the invention may make an application for patent. A person who otherwise shows sufficient proprietary interest in the matter may make an application for patent on behalf of and as agent for the inventor on proof of the pertinent facts and a showing that such action is appropriate to preserve the rights of the parties. If the Director grants a patent on an application filed under this section by a person other than the inventor, the patent shall be granted to the real party in interest and upon such notice to the inventor as the Director considers to be sufficient.".

(2) CONFORMING AMENDMENT.—Section 251 of title 35, United States Code, is amended in the third undesignated paragraph by inserting "or the application for the original patent was filed by the assignee of the entire interest" after "claims of the original patent".

(c) SPECIFICATION.—Section 112 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "The specification" and inserting "(a) IN GENERAL.—The specification"; and

(B) by striking "of carrying out his invention" and inserting "or joint inventor of carrying out the invention";

(2) in the second undesignated paragraph—

(A) by striking "The specification" and inserting "(b) CONCLUSION.—The specification"; and

(B) by striking "applicant regards as his invention" and inserting "inventor or a joint inventor regards as the invention";

(3) in the third undesignated paragraph, by striking "A claim" and inserting "(c) FORM.—A claim";

(4) in the fourth undesignated paragraph, by striking "Subject to the following paragraph," and inserting "(d) REFERENCE IN DEPENDENT FORMS.—Subject to subsection (e),";

(5) in the fifth undesignated paragraph, by striking "A claim" and inserting "(e) REFERENCE IN MULTIPLE DEPENDENT FORM.—A claim"; and

(6) in the last undesignated paragraph, by striking "An element" and inserting "(f) ELEMENT IN CLAIM FOR A COMBINATION.—An element".

(d) CONFORMING AMENDMENTS.—

(1) Sections 111(b)(1)(A) of title 35, United States Code, is amended by striking "the first paragraph of section 112 of this title" and inserting "section 112(a)".

(2) Section 111(b)(2) of title 35, United States Code, is amended by striking "the second through fifth paragraphs of

section 112," and inserting "subsections (b) through (e) of section 112,".

(e) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent application that is filed on or after that effective date.

Applicability.
35 USC 111 note.

## SEC. 5. DEFENSE TO INFRINGEMENT BASED ON PRIOR COMMERCIAL USE.

(a) IN GENERAL.—Section 273 of title 35, United States Code, is amended to read as follows:

## "§ 273. Defense to infringement based on prior commercial use

"(a) IN GENERAL.—A person shall be entitled to a defense under section 282(b) with respect to subject matter consisting of a process, or consisting of a machine, manufacture, or composition of matter used in a manufacturing or other commercial process, that would otherwise infringe a claimed invention being asserted against the person if—

"(1) such person, acting in good faith, commercially used the subject matter in the United States, either in connection with an internal commercial use or an actual arm's length sale or other arm's length commercial transfer of a useful end result of such commercial use; and

"(2) such commercial use occurred at least 1 year before the earlier of either—

"(A) the effective filing date of the claimed invention; or

"(B) the date on which the claimed invention was disclosed to the public in a manner that qualified for the exception from prior art under section 102(b).

"(b) BURDEN OF PROOF.—A person asserting a defense under this section shall have the burden of establishing the defense by clear and convincing evidence.

"(c) ADDITIONAL COMMERCIAL USES.—

"(1) PREMARKETING REGULATORY REVIEW.—Subject matter for which commercial marketing or use is subject to a premarketing regulatory review period during which the safety or efficacy of the subject matter is established, including any period specified in section 156(g), shall be deemed to be commercially used for purposes of subsection (a)(1) during such regulatory review period.

"(2) NONPROFIT LABORATORY USE.—A use of subject matter by a nonprofit research laboratory or other nonprofit entity, such as a university or hospital, for which the public is the intended beneficiary, shall be deemed to be a commercial use for purposes of subsection (a)(1), except that a defense under this section may be asserted pursuant to this paragraph only for continued and noncommercial use by and in the laboratory or other nonprofit entity.

"(d) EXHAUSTION OF RIGHTS.—Notwithstanding subsection (e)(1), the sale or other disposition of a useful end result by a person entitled to assert a defense under this section in connection with a patent with respect to that useful end result shall exhaust the patent owner's rights under the patent to the extent that

such rights would have been exhausted had such sale or other disposition been made by the patent owner.

"(e) LIMITATIONS AND EXCEPTIONS.—

"(1) PERSONAL DEFENSE.—

"(A) IN GENERAL.—A defense under this section may be asserted only by the person who performed or directed the performance of the commercial use described in subsection (a), or by an entity that controls, is controlled by, or is under common control with such person.

"(B) TRANSFER OF RIGHT.—Except for any transfer to the patent owner, the right to assert a defense under this section shall not be licensed or assigned or transferred to another person except as an ancillary and subordinate part of a good-faith assignment or transfer for other reasons of the entire enterprise or line of business to which the defense relates.

"(C) RESTRICTION ON SITES.—A defense under this section, when acquired by a person as part of an assignment or transfer described in subparagraph (B), may only be asserted for uses at sites where the subject matter that would otherwise infringe a claimed invention is in use before the later of the effective filing date of the claimed invention or the date of the assignment or transfer of such enterprise or line of business.

"(2) DERIVATION.—A person may not assert a defense under this section if the subject matter on which the defense is based was derived from the patentee or persons in privity with the patentee.

"(3) NOT A GENERAL LICENSE.—The defense asserted by a person under this section is not a general license under all claims of the patent at issue, but extends only to the specific subject matter for which it has been established that a commercial use that qualifies under this section occurred, except that the defense shall also extend to variations in the quantity or volume of use of the claimed subject matter, and to improvements in the claimed subject matter that do not infringe additional specifically claimed subject matter of the patent.

"(4) ABANDONMENT OF USE.—A person who has abandoned commercial use (that qualifies under this section) of subject matter may not rely on activities performed before the date of such abandonment in establishing a defense under this section with respect to actions taken on or after the date of such abandonment.

"(5) UNIVERSITY EXCEPTION.—

"(A) IN GENERAL.—A person commercially using subject matter to which subsection (a) applies may not assert a defense under this section if the claimed invention with respect to which the defense is asserted was, at the time the invention was made, owned or subject to an obligation of assignment to either an institution of higher education (as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)), or a technology transfer organization whose primary purpose is to facilitate the commercialization of technologies developed by one or more such institutions of higher education.

"(B) EXCEPTION.—Subparagraph (A) shall not apply if any of the activities required to reduce to practice the subject matter of the claimed invention could not have been undertaken using funds provided by the Federal Government.

"(f) UNREASONABLE ASSERTION OF DEFENSE.—If the defense under this section is pleaded by a person who is found to infringe the patent and who subsequently fails to demonstrate a reasonable basis for asserting the defense, the court shall find the case exceptional for the purpose of awarding attorney fees under section 285.

"(g) INVALIDITY.—A patent shall not be deemed to be invalid under section 102 or 103 solely because a defense is raised or established under this section.".

(b) CONFORMING AMENDMENT.—The item relating to section 273 in the table of sections for chapter 28 of title 35, United States Code, is amended to read as follows:

"273. Defense to infringement based on prior commercial use.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to any patent issued on or after the date of the enactment of this Act.

Applicability.
35 USC 273 note.

**SEC. 6. POST-GRANT REVIEW PROCEEDINGS.**

(a) INTER PARTES REVIEW.—Chapter 31 of title 35, United States Code, is amended to read as follows:

## "CHAPTER 31—INTER PARTES REVIEW

"Sec.
"311. Inter partes review.
"312. Petitions.
"313. Preliminary response to petition.
"314. Institution of inter partes review.
"315. Relation to other proceedings or actions.
"316. Conduct of inter partes review.
"317. Settlement.
"318. Decision of the Board.
"319. Appeal.

### "§ 311. Inter partes review

"(a) IN GENERAL.—Subject to the provisions of this chapter, a person who is not the owner of a patent may file with the Office a petition to institute an inter partes review of the patent. The Director shall establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the review.

Regulations.

"(b) SCOPE.—A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.

"(c) FILING DEADLINE.—A petition for inter partes review shall be filed after the later of either—

"(1) the date that is 9 months after the grant of a patent or issuance of a reissue of a patent; or

"(2) if a post-grant review is instituted under chapter 32, the date of the termination of such post-grant review.

### "§ 312. Petitions

"(a) REQUIREMENTS OF PETITION.—A petition filed under section 311 may be considered only if—

"(1) the petition is accompanied by payment of the fee established by the Director under section 311;

"(2) the petition identifies all real parties in interest;

"(3) the petition identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim, including—

"(A) copies of patents and printed publications that the petitioner relies upon in support of the petition; and

"(B) affidavits or declarations of supporting evidence and opinions, if the petitioner relies on expert opinions;

"(4) the petition provides such other information as the Director may require by regulation; and

"(5) the petitioner provides copies of any of the documents required under paragraphs (2), (3), and (4) to the patent owner or, if applicable, the designated representative of the patent owner.

"(b) PUBLIC AVAILABILITY.—As soon as practicable after the receipt of a petition under section 311, the Director shall make the petition available to the public.

### "§ 313. Preliminary response to petition

"If an inter partes review petition is filed under section 311, the patent owner shall have the right to file a preliminary response to the petition, within a time period set by the Director, that sets forth reasons why no inter partes review should be instituted based upon the failure of the petition to meet any requirement of this chapter.

### "§ 314. Institution of inter partes review

"(a) THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

"(b) TIMING.—The Director shall determine whether to institute an inter partes review under this chapter pursuant to a petition filed under section 311 within 3 months after—

"(1) receiving a preliminary response to the petition under section 313; or

"(2) if no such preliminary response is filed, the last date on which such response may be filed.

"(c) NOTICE.—The Director shall notify the petitioner and patent owner, in writing, of the Director's determination under subsection (a), and shall make such notice available to the public as soon as is practicable. Such notice shall include the date on which the review shall commence.

"(d) NO APPEAL.—The determination by the Director whether to institute an inter partes review under this section shall be final and nonappealable.

### "§ 315. Relation to other proceedings or actions

"(a) INFRINGER'S CIVIL ACTION.—

"(1) INTER PARTES REVIEW BARRED BY CIVIL ACTION.—An inter partes review may not be instituted if, before the date on which the petition for such a review is filed, the petitioner or real party in interest filed a civil action challenging the validity of a claim of the patent.

"(2) STAY OF CIVIL ACTION.—If the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for inter partes review of the patent, that civil action shall be automatically stayed until either—

"(A) the patent owner moves the court to lift the stay;

"(B) the patent owner files a civil action or counterclaim alleging that the petitioner or real party in interest has infringed the patent; or

"(C) the petitioner or real party in interest moves the court to dismiss the civil action.

"(3) TREATMENT OF COUNTERCLAIM.—A counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent for purposes of this subsection.

"(b) PATENT OWNER'S ACTION.—An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. The time limitation set forth in the preceding sentence shall not apply to a request for joinder under subsection (c).

*Deadline.*

"(c) JOINDER.—If the Director institutes an inter partes review, the Director, in his or her discretion, may join as a party to that inter partes review any person who properly files a petition under section 311 that the Director, after receiving a preliminary response under section 313 or the expiration of the time for filing such a response, determines warrants the institution of an inter partes review under section 314.

"(d) MULTIPLE PROCEEDINGS.—Notwithstanding sections 135(a), 251, and 252, and chapter 30, during the pendency of an inter partes review, if another proceeding or matter involving the patent is before the Office, the Director may determine the manner in which the inter partes review or other proceeding or matter may proceed, including providing for stay, transfer, consolidation, or termination of any such matter or proceeding.

"(e) ESTOPPEL.—

"(1) PROCEEDINGS BEFORE THE OFFICE.—The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not request or maintain a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

"(2) CIVIL ACTIONS AND OTHER PROCEEDINGS.—The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any

ground that the petitioner raised or reasonably could have raised during that inter partes review.

## "§ 316. Conduct of inter partes review

"(a) REGULATIONS.—The Director shall prescribe regulations—

"(1) providing that the file of any proceeding under this chapter shall be made available to the public, except that any petition or document filed with the intent that it be sealed shall, if accompanied by a motion to seal, be treated as sealed pending the outcome of the ruling on the motion;

"(2) setting forth the standards for the showing of sufficient grounds to institute a review under section 314(a);

"(3) establishing procedures for the submission of supplemental information after the petition is filed;

"(4) establishing and governing inter partes review under this chapter and the relationship of such review to other proceedings under this title;

"(5) setting forth standards and procedures for discovery of relevant evidence, including that such discovery shall be limited to—

"(A) the deposition of witnesses submitting affidavits or declarations; and

"(B) what is otherwise necessary in the interest of justice;

"(6) prescribing sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding, such as to harass or to cause unnecessary delay or an unnecessary increase in the cost of the proceeding;

"(7) providing for protective orders governing the exchange and submission of confidential information;

"(8) providing for the filing by the patent owner of a response to the petition under section 313 after an inter partes review has been instituted, and requiring that the patent owner file with such response, through affidavits or declarations, any additional factual evidence and expert opinions on which the patent owner relies in support of the response;

"(9) setting forth standards and procedures for allowing the patent owner to move to amend the patent under subsection (d) to cancel a challenged claim or propose a reasonable number of substitute claims, and ensuring that any information submitted by the patent owner in support of any amendment entered under subsection (d) is made available to the public as part of the prosecution history of the patent;

"(10) providing either party with the right to an oral hearing as part of the proceeding;

"(11) requiring that the final determination in an inter partes review be issued not later than 1 year after the date on which the Director notices the institution of a review under this chapter, except that the Director may, for good cause shown, extend the 1-year period by not more than 6 months, and may adjust the time periods in this paragraph in the case of joinder under section 315(c);

"(12) setting a time period for requesting joinder under section 315(c); and

"(13) providing the petitioner with at least 1 opportunity to file written comments within a time period established by the Director.

"(b) CONSIDERATIONS.—In prescribing regulations under this section, the Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter.

"(c) PATENT TRIAL AND APPEAL BOARD.—The Patent Trial and Appeal Board shall, in accordance with section 6, conduct each inter partes review instituted under this chapter.

"(d) AMENDMENT OF THE PATENT.—

"(1) IN GENERAL.—During an inter partes review instituted under this chapter, the patent owner may file 1 motion to amend the patent in 1 or more of the following ways:

"(A) Cancel any challenged patent claim.

"(B) For each challenged claim, propose a reasonable number of substitute claims.

"(2) ADDITIONAL MOTIONS.—Additional motions to amend may be permitted upon the joint request of the petitioner and the patent owner to materially advance the settlement of a proceeding under section 317, or as permitted by regulations prescribed by the Director.

"(3) SCOPE OF CLAIMS.—An amendment under this subsection may not enlarge the scope of the claims of the patent or introduce new matter.

"(e) EVIDENTIARY STANDARDS.—In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.

## "§ 317. Settlement

"(a) IN GENERAL.—An inter partes review instituted under this chapter shall be terminated with respect to any petitioner upon the joint request of the petitioner and the patent owner, unless the Office has decided the merits of the proceeding before the request for termination is filed. If the inter partes review is terminated with respect to a petitioner under this section, no estoppel under section 315(e) shall attach to the petitioner, or to the real party in interest or privy of the petitioner, on the basis of that petitioner's institution of that inter partes review. If no petitioner remains in the inter partes review, the Office may terminate the review or proceed to a final written decision under section 318(a).

"(b) AGREEMENTS IN WRITING.—Any agreement or understanding between the patent owner and a petitioner, including any collateral agreements referred to in such agreement or understanding, made in connection with, or in contemplation of, the termination of an inter partes review under this section shall be in writing and a true copy of such agreement or understanding shall be filed in the Office before the termination of the inter partes review as between the parties. At the request of a party to the proceeding, the agreement or understanding shall be treated as business confidential information, shall be kept separate from the file of the involved patents, and shall be made available only to Federal Government agencies on written request, or to any person on a showing of good cause.

Confidentiality.

## "§ 318. Decision of the Board

"(a) FINAL WRITTEN DECISION.—If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial

and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d).

"(b) CERTIFICATE.—If the Patent Trial and Appeal Board issues a final written decision under subsection (a) and the time for appeal has expired or any appeal has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable.

"(c) INTERVENING RIGHTS.—Any proposed amended or new claim determined to be patentable and incorporated into a patent following an inter partes review under this chapter shall have the same effect as that specified in section 252 for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation therefor, before the issuance of a certificate under subsection (b).

Public information.

"(d) DATA ON LENGTH OF REVIEW.—The Office shall make available to the public data describing the length of time between the institution of, and the issuance of a final written decision under subsection (a) for, each inter partes review.

## "§ 319. Appeal

"A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision pursuant to sections 141 through 144. Any party to the inter partes review shall have the right to be a party to the appeal.".

(b) CONFORMING AMENDMENT.—The table of chapters for part III of title 35, United States Code, is amended by striking the item relating to chapter 31 and inserting the following:

"31. Inter Partes Review ........................................................................................ 311".

(c) REGULATIONS AND EFFECTIVE DATE.—

35 USC 311 note.

(1) REGULATIONS.—The Director shall, not later than the date that is 1 year after the date of the enactment of this Act, issue regulations to carry out chapter 31 of title 35, United States Code, as amended by subsection (a) of this section.

35 USC 311 note.

(2) APPLICABILITY.—

(A) IN GENERAL.—The amendments made by subsection (a) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after effective date.

(B) GRADUATED IMPLEMENTATION.—The Director may impose a limit on the number of inter partes reviews that may be instituted under chapter 31 of title 35, United States Code, during each of the first 4 1-year periods in which the amendments made by subsection (a) are in effect, if such number in each year equals or exceeds the number of inter partes reexaminations that are ordered under chapter 31 of title 35, United States Code, in the last fiscal year ending before the effective date of the amendments made by subsection (a).

(3) TRANSITION.—

(A) IN GENERAL.—Chapter 31 of title 35, United States Code, is amended—

 (i) in section 312—

  (I) in subsection (a)—

   (aa) in the first sentence, by striking "a substantial new question of patentability affecting any claim of the patent concerned is raised by the request," and inserting "the information presented in the request shows that there is a reasonable likelihood that the requester would prevail with respect to at least 1 of the claims challenged in the request,"; and

   (bb) in the second sentence, by striking "The existence of a substantial new question of patentability" and inserting "A showing that there is a reasonable likelihood that the requester would prevail with respect to at least 1 of the claims challenged in the request"; and

  (II) in subsection (c), in the second sentence, by striking "no substantial new question of patentability has been raised," and inserting "the showing required by subsection (a) has not been made,"; and

 (ii) in section 313, by striking "a substantial new question of patentability affecting a claim of the patent is raised" and inserting "it has been shown that there is a reasonable likelihood that the requester would prevail with respect to at least 1 of the claims challenged in the request".

(B) APPLICATION.—The amendments made by this paragraph—

 35 USC 312 note.

 (i) shall take effect on the date of the enactment of this Act; and

 (ii) shall apply to requests for inter partes reexamination that are filed on or after such date of enactment, but before the effective date set forth in paragraph (2)(A) of this subsection.

(C) CONTINUED APPLICABILITY OF PRIOR PROVISIONS.—The provisions of chapter 31 of title 35, United States Code, as amended by this paragraph, shall continue to apply to requests for inter partes reexamination that are filed before the effective date set forth in paragraph (2)(A) as if subsection (a) had not been enacted.

 35 USC 312 note.

(d) POST-GRANT REVIEW.—Part III of title 35, United States Code, is amended by adding at the end the following:

## "CHAPTER 32—POST-GRANT REVIEW

"Sec.
"321. Post-grant review.
"322. Petitions.
"323. Preliminary response to petition.
"324. Institution of post-grant review.
"325. Relation to other proceedings or actions.
"326. Conduct of post-grant review.
"327. Settlement.
"328. Decision of the Board.
"329. Appeal.

### "§ 321. Post-grant review

"(a) IN GENERAL.—Subject to the provisions of this chapter, a person who is not the owner of a patent may file with the Office a petition to institute a post-grant review of the patent. The Director shall establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the post-grant review.

"(b) SCOPE.—A petitioner in a post-grant review may request to cancel as unpatentable 1 or more claims of a patent on any ground that could be raised under paragraph (2) or (3) of section 282(b) (relating to invalidity of the patent or any claim).

"(c) FILING DEADLINE.—A petition for a post-grant review may only be filed not later than the date that is 9 months after the date of the grant of the patent or of the issuance of a reissue patent (as the case may be).

### "§ 322. Petitions

"(a) REQUIREMENTS OF PETITION.—A petition filed under section 321 may be considered only if—

"(1) the petition is accompanied by payment of the fee established by the Director under section 321;

"(2) the petition identifies all real parties in interest;

"(3) the petition identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim, including—

"(A) copies of patents and printed publications that the petitioner relies upon in support of the petition; and

"(B) affidavits or declarations of supporting evidence and opinions, if the petitioner relies on other factual evidence or on expert opinions;

"(4) the petition provides such other information as the Director may require by regulation; and

"(5) the petitioner provides copies of any of the documents required under paragraphs (2), (3), and (4) to the patent owner or, if applicable, the designated representative of the patent owner.

"(b) PUBLIC AVAILABILITY.—As soon as practicable after the receipt of a petition under section 321, the Director shall make the petition available to the public.

### "§ 323. Preliminary response to petition

"If a post-grant review petition is filed under section 321, the patent owner shall have the right to file a preliminary response to the petition, within a time period set by the Director, that sets forth reasons why no post-grant review should be instituted based upon the failure of the petition to meet any requirement of this chapter.

### "§ 324. Institution of post-grant review

"(a) THRESHOLD.—The Director may not authorize a post-grant review to be instituted unless the Director determines that the information presented in the petition filed under section 321, if such information is not rebutted, would demonstrate that it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable.

Regulations.

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 307

"(b) ADDITIONAL GROUNDS.—The determination required under subsection (a) may also be satisfied by a showing that the petition raises a novel or unsettled legal question that is important to other patents or patent applications.

"(c) TIMING.—The Director shall determine whether to institute a post-grant review under this chapter pursuant to a petition filed under section 321 within 3 months after—

"(1) receiving a preliminary response to the petition under section 323; or

"(2) if no such preliminary response is filed, the last date on which such response may be filed.

"(d) NOTICE.—The Director shall notify the petitioner and patent owner, in writing, of the Director's determination under subsection (a) or (b), and shall make such notice available to the public as soon as is practicable. Such notice shall include the date on which the review shall commence.

"(e) NO APPEAL.—The determination by the Director whether to institute a post-grant review under this section shall be final and nonappealable.

## "§ 325. Relation to other proceedings or actions

"(a) INFRINGER'S CIVIL ACTION.—

"(1) POST-GRANT REVIEW BARRED BY CIVIL ACTION.—A post-grant review may not be instituted under this chapter if, before the date on which the petition for such a review is filed, the petitioner or real party in interest filed a civil action challenging the validity of a claim of the patent.

"(2) STAY OF CIVIL ACTION.—If the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for post-grant review of the patent, that civil action shall be automatically stayed until either—

"(A) the patent owner moves the court to lift the stay;

"(B) the patent owner files a civil action or counterclaim alleging that the petitioner or real party in interest has infringed the patent; or

"(C) the petitioner or real party in interest moves the court to dismiss the civil action.

"(3) TREATMENT OF COUNTERCLAIM.—A counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent for purposes of this subsection.

"(b) PRELIMINARY INJUNCTIONS.—If a civil action alleging infringement of a patent is filed within 3 months after the date on which the patent is granted, the court may not stay its consideration of the patent owner's motion for a preliminary injunction against infringement of the patent on the basis that a petition for post-grant review has been filed under this chapter or that such a post-grant review has been instituted under this chapter.

"(c) JOINDER.—If more than 1 petition for a post-grant review under this chapter is properly filed against the same patent and the Director determines that more than 1 of these petitions warrants the institution of a post-grant review under section 324, the Director may consolidate such reviews into a single post-grant review.

"(d) MULTIPLE PROCEEDINGS.—Notwithstanding sections 135(a), 251, and 252, and chapter 30, during the pendency of any post-

grant review under this chapter, if another proceeding or matter involving the patent is before the Office, the Director may determine the manner in which the post-grant review or other proceeding or matter may proceed, including providing for the stay, transfer, consolidation, or termination of any such matter or proceeding. In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

"(e) ESTOPPEL.—

"(1) PROCEEDINGS BEFORE THE OFFICE.—The petitioner in a post-grant review of a claim in a patent under this chapter that results in a final written decision under section 328(a), or the real party in interest or privy of the petitioner, may not request or maintain a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that post-grant review.

"(2) CIVIL ACTIONS AND OTHER PROCEEDINGS.—The petitioner in a post-grant review of a claim in a patent under this chapter that results in a final written decision under section 328(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that post-grant review.

"(f) REISSUE PATENTS.—A post-grant review may not be instituted under this chapter if the petition requests cancellation of a claim in a reissue patent that is identical to or narrower than a claim in the original patent from which the reissue patent was issued, and the time limitations in section 321(c) would bar filing a petition for a post-grant review for such original patent.

## "§ 326. Conduct of post-grant review

"(a) REGULATIONS.—The Director shall prescribe regulations—

"(1) providing that the file of any proceeding under this chapter shall be made available to the public, except that any petition or document filed with the intent that it be sealed shall, if accompanied by a motion to seal, be treated as sealed pending the outcome of the ruling on the motion;

"(2) setting forth the standards for the showing of sufficient grounds to institute a review under subsections (a) and (b) of section 324;

"(3) establishing procedures for the submission of supplemental information after the petition is filed;

"(4) establishing and governing a post-grant review under this chapter and the relationship of such review to other proceedings under this title;

"(5) setting forth standards and procedures for discovery of relevant evidence, including that such discovery shall be limited to evidence directly related to factual assertions advanced by either party in the proceeding;

"(6) prescribing sanctions for abuse of discovery, abuse of process, or any other improper use of the proceeding, such

as to harass or to cause unnecessary delay or an unnecessary increase in the cost of the proceeding;

"(7) providing for protective orders governing the exchange and submission of confidential information;

"(8) providing for the filing by the patent owner of a response to the petition under section 323 after a post-grant review has been instituted, and requiring that the patent owner file with such response, through affidavits or declarations, any additional factual evidence and expert opinions on which the patent owner relies in support of the response;

"(9) setting forth standards and procedures for allowing the patent owner to move to amend the patent under subsection (d) to cancel a challenged claim or propose a reasonable number of substitute claims, and ensuring that any information submitted by the patent owner in support of any amendment entered under subsection (d) is made available to the public as part of the prosecution history of the patent;

"(10) providing either party with the right to an oral hearing as part of the proceeding;

"(11) requiring that the final determination in any post-grant review be issued not later than 1 year after the date on which the Director notices the institution of a proceeding under this chapter, except that the Director may, for good cause shown, extend the 1-year period by not more than 6 months, and may adjust the time periods in this paragraph in the case of joinder under section 325(c); and

"(12) providing the petitioner with at least 1 opportunity to file written comments within a time period established by the Director.

"(b) CONSIDERATIONS.—In prescribing regulations under this section, the Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter.

"(c) PATENT TRIAL AND APPEAL BOARD.—The Patent Trial and Appeal Board shall, in accordance with section 6, conduct each post-grant review instituted under this chapter.

"(d) AMENDMENT OF THE PATENT.—

"(1) IN GENERAL.—During a post-grant review instituted under this chapter, the patent owner may file 1 motion to amend the patent in 1 or more of the following ways:

"(A) Cancel any challenged patent claim.

"(B) For each challenged claim, propose a reasonable number of substitute claims.

"(2) ADDITIONAL MOTIONS.—Additional motions to amend may be permitted upon the joint request of the petitioner and the patent owner to materially advance the settlement of a proceeding under section 327, or upon the request of the patent owner for good cause shown.

"(3) SCOPE OF CLAIMS.—An amendment under this subsection may not enlarge the scope of the claims of the patent or introduce new matter.

"(e) EVIDENTIARY STANDARDS.—In a post-grant review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.

## "§ 327. Settlement

"(a) IN GENERAL.—A post-grant review instituted under this chapter shall be terminated with respect to any petitioner upon the joint request of the petitioner and the patent owner, unless the Office has decided the merits of the proceeding before the request for termination is filed. If the post-grant review is terminated with respect to a petitioner under this section, no estoppel under section 325(e) shall attach to the petitioner, or to the real party in interest or privy of the petitioner, on the basis of that petitioner's institution of that post-grant review. If no petitioner remains in the post-grant review, the Office may terminate the post-grant review or proceed to a final written decision under section 328(a).

"(b) AGREEMENTS IN WRITING.—Any agreement or understanding between the patent owner and a petitioner, including any collateral agreements referred to in such agreement or understanding, made in connection with, or in contemplation of, the termination of a post-grant review under this section shall be in writing, and a true copy of such agreement or understanding shall be filed in the Office before the termination of the post-grant review as between the parties. At the request of a party to the proceeding, the agreement or understanding shall be treated as business confidential information, shall be kept separate from the file of the involved patents, and shall be made available only to Federal Government agencies on written request, or to any person on a showing of good cause.

Confidentiality.

## "§ 328. Decision of the Board

"(a) FINAL WRITTEN DECISION.—If a post-grant review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 326(d).

"(b) CERTIFICATE.—If the Patent Trial and Appeal Board issues a final written decision under subsection (a) and the time for appeal has expired or any appeal has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable.

"(c) INTERVENING RIGHTS.—Any proposed amended or new claim determined to be patentable and incorporated into a patent following a post-grant review under this chapter shall have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation therefor, before the issuance of a certificate under subsection (b).

"(d) DATA ON LENGTH OF REVIEW.—The Office shall make available to the public data describing the length of time between the institution of, and the issuance of a final written decision under subsection (a) for, each post-grant review.

Public information.

**"§ 329. Appeal**

"A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 328(a) may appeal the decision pursuant to sections 141 through 144. Any party to the post-grant review shall have the right to be a party to the appeal.".

(e) CONFORMING AMENDMENT.—The table of chapters for part III of title 35, United States Code, is amended by adding at the end the following:

"32. Post-Grant Review ............................................................................................ 321".

(f) REGULATIONS AND EFFECTIVE DATE.—

(1) REGULATIONS.—The Director shall, not later than the date that is 1 year after the date of the enactment of this Act, issue regulations to carry out chapter 32 of title 35, United States Code, as added by subsection (d) of this section. | 35 USC 321 note.

(2) APPLICABILITY.— | 35 USC 321 note.

(A) IN GENERAL.—The amendments made by subsection (d) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and, except as provided in section 18 and in paragraph (3), shall apply only to patents described in section 3(n)(1).

(B) LIMITATION.—The Director may impose a limit on the number of post-grant reviews that may be instituted under chapter 32 of title 35, United States Code, during each of the first 4 1-year periods in which the amendments made by subsection (d) are in effect.

(3) PENDING INTERFERENCES.— | 35 USC 321 note.

(A) PROCEDURES IN GENERAL.—The Director shall determine, and include in the regulations issued under paragraph (1), the procedures under which an interference commenced before the effective date set forth in paragraph (2)(A) is to proceed, including whether such interference—

(i) is to be dismissed without prejudice to the filing of a petition for a post-grant review under chapter 32 of title 35, United States Code; or

(ii) is to proceed as if this Act had not been enacted.

(B) PROCEEDINGS BY PATENT TRIAL AND APPEAL BOARD.—For purposes of an interference that is commenced before the effective date set forth in paragraph (2)(A), the Director may deem the Patent Trial and Appeal Board to be the Board of Patent Appeals and Interferences, and may allow the Patent Trial and Appeal Board to conduct any further proceedings in that interference.

(C) APPEALS.—The authorization to appeal or have remedy from derivation proceedings in sections 141(d) and 146 of title 35, United States Code, as amended by this Act, and the jurisdiction to entertain appeals from deriva-tion proceedings in section 1295(a)(4)(A) of title 28, United States Code, as amended by this Act, shall be deemed to extend to any final decision in an interference that is commenced before the effective date set forth in para-graph (2)(A) of this subsection and that is not dismissed pursuant to this paragraph.

(g) CITATION OF PRIOR ART AND WRITTEN STATEMENTS.—

(1) IN GENERAL.—Section 301 of title 35, United States Code, is amended to read as follows:

**"§ 301. Citation of prior art and written statements**

"(a) IN GENERAL.—Any person at any time may cite to the Office in writing—

"(1) prior art consisting of patents or printed publications which that person believes to have a bearing on the patentability of any claim of a particular patent; or

"(2) statements of the patent owner filed in a proceeding before a Federal court or the Office in which the patent owner took a position on the scope of any claim of a particular patent.

"(b) OFFICIAL FILE.—If the person citing prior art or written statements pursuant to subsection (a) explains in writing the pertinence and manner of applying the prior art or written statements to at least 1 claim of the patent, the citation of the prior art or written statements and the explanation thereof shall become a part of the official file of the patent.

"(c) ADDITIONAL INFORMATION.—A party that submits a written statement pursuant to subsection (a)(2) shall include any other documents, pleadings, or evidence from the proceeding in which the statement was filed that addresses the written statement.

"(d) LIMITATIONS.—A written statement submitted pursuant to subsection (a)(2), and additional information submitted pursuant to subsection (c), shall not be considered by the Office for any purpose other than to determine the proper meaning of a patent claim in a proceeding that is ordered or instituted pursuant to section 304, 314, or 324. If any such written statement or additional information is subject to an applicable protective order, such statement or information shall be redacted to exclude information that is subject to that order.

"(e) CONFIDENTIALITY.—Upon the written request of the person citing prior art or written statements pursuant to subsection (a), that person's identity shall be excluded from the patent file and kept confidential.".

(2) CONFORMING AMENDMENT.—The item relating to section 301 in the table of sections for chapter 30 of title 35, United States Code, is amended to read as follows:

"301. Citation of prior art and written statements.".

35 USC 301 note.

(3) EFFECTIVE DATE.—The amendments made by this subsection shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that effective date.

(h) REEXAMINATION.—

(1) DETERMINATION BY DIRECTOR.—

(A) IN GENERAL.—Section 303(a) of title 35, United States Code, is amended by striking "section 301 of this title" and inserting "section 301 or 302".

Applicability.
35 USC 303 note.

(B) EFFECTIVE DATE.—The amendment made by this paragraph shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that effective date.

(2) APPEAL.—

(A) IN GENERAL.—Section 306 of title 35, United States Code, is amended by striking "145" and inserting "144".

Applicability.
35 USC 306 note.

(B) EFFECTIVE DATE.—The amendment made by this paragraph shall take effect on the date of the enactment

of this Act and shall apply to any appeal of a reexamination before the Board of Patent Appeals and Interferences or the Patent Trial and Appeal Board that is pending on, or brought on or after, the date of the enactment of this Act.

**SEC. 7. PATENT TRIAL AND APPEAL BOARD.**

(a) COMPOSITION AND DUTIES.—

(1) IN GENERAL.—Section 6 of title 35, United States Code, is amended to read as follows:

## "§ 6. Patent Trial and Appeal Board

"(a) IN GENERAL.—There shall be in the Office a Patent Trial and Appeal Board. The Director, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and the administrative patent judges shall constitute the Patent Trial and Appeal Board. The administrative patent judges shall be persons of competent legal knowledge and scientific ability who are appointed by the Secretary, in consultation with the Director. Any reference in any Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or pertaining to the Board of Patent Appeals and Interferences is deemed to refer to the Patent Trial and Appeal Board.

*Establishment.*

"(b) DUTIES.—The Patent Trial and Appeal Board shall—

"(1) on written appeal of an applicant, review adverse decisions of examiners upon applications for patents pursuant to section 134(a);

"(2) review appeals of reexaminations pursuant to section 134(b);

"(3) conduct derivation proceedings pursuant to section 135; and

"(4) conduct inter partes reviews and post-grant reviews pursuant to chapters 31 and 32.

"(c) 3-MEMBER PANELS.—Each appeal, derivation proceeding, post-grant review, and inter partes review shall be heard by at least 3 members of the Patent Trial and Appeal Board, who shall be designated by the Director. Only the Patent Trial and Appeal Board may grant rehearings.

"(d) TREATMENT OF PRIOR APPOINTMENTS.—The Secretary of Commerce may, in the Secretary's discretion, deem the appointment of an administrative patent judge who, before the date of the enactment of this subsection, held office pursuant to an appointment by the Director to take effect on the date on which the Director initially appointed the administrative patent judge. It shall be a defense to a challenge to the appointment of an administrative patent judge on the basis of the judge's having been originally appointed by the Director that the administrative patent judge so appointed was acting as a de facto officer.".

(2) CONFORMING AMENDMENT.—The item relating to section 6 in the table of sections for chapter 1 of title 35, United States Code, is amended to read as follows:

"6. Patent Trial and Appeal Board.".

(b) ADMINISTRATIVE APPEALS.—Section 134 of title 35, United States Code, is amended—

(1) in subsection (b), by striking "any reexamination proceeding" and inserting "a reexamination"; and

(2) by striking subsection (c).

(c) CIRCUIT APPEALS.—

(1) IN GENERAL.—Section 141 of title 35, United States Code, is amended to read as follows:

## "§ 141. Appeal to Court of Appeals for the Federal Circuit

"(a) EXAMINATIONS.—An applicant who is dissatisfied with the final decision in an appeal to the Patent Trial and Appeal Board under section 134(a) may appeal the Board's decision to the United States Court of Appeals for the Federal Circuit. By filing such an appeal, the applicant waives his or her right to proceed under section 145.

"(b) REEXAMINATIONS.—A patent owner who is dissatisfied with the final decision in an appeal of a reexamination to the Patent Trial and Appeal Board under section 134(b) may appeal the Board's decision only to the United States Court of Appeals for the Federal Circuit.

"(c) POST-GRANT AND INTER PARTES REVIEWS.—A party to an inter partes review or a post-grant review who is dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) or 328(a) (as the case may be) may appeal the Board's decision only to the United States Court of Appeals for the Federal Circuit.

Deadlines.
Notices.

"(d) DERIVATION PROCEEDINGS.—A party to a derivation proceeding who is dissatisfied with the final decision of the Patent Trial and Appeal Board in the proceeding may appeal the decision to the United States Court of Appeals for the Federal Circuit, but such appeal shall be dismissed if any adverse party to such derivation proceeding, within 20 days after the appellant has filed notice of appeal in accordance with section 142, files notice with the Director that the party elects to have all further proceedings conducted as provided in section 146. If the appellant does not, within 30 days after the filing of such notice by the adverse party, file a civil action under section 146, the Board's decision shall govern the further proceedings in the case.".

(2) JURISDICTION.—Section 1295(a)(4)(A) of title 28, United States Code, is amended to read as follows:

"(A) the Patent Trial and Appeal Board of the United States Patent and Trademark Office with respect to a patent application, derivation proceeding, reexamination, post-grant review, or inter partes review under title 35, at the instance of a party who exercised that party's right to participate in the applicable proceeding before or appeal to the Board, except that an applicant or a party to a derivation proceeding may also have remedy by civil action pursuant to section 145 or 146 of title 35; an appeal under this subparagraph of a decision of the Board with respect to an application or derivation proceeding shall waive the right of such applicant or party to proceed under section 145 or 146 of title 35;".

(3) PROCEEDINGS ON APPEAL.—Section 143 of title 35, United States Code, is amended—

(A) by striking the third sentence and inserting the following: "In an ex parte case, the Director shall submit to the court in writing the grounds for the decision of the Patent and Trademark Office, addressing all of the issues raised in the appeal. The Director shall have the

right to intervene in an appeal from a decision entered by the Patent Trial and Appeal Board in a derivation proceeding under section 135 or in an inter partes or post-grant review under chapter 31 or 32."; and

(B) by striking the last sentence.

(d) CONFORMING AMENDMENTS.—

(1) ATOMIC ENERGY ACT OF 1954.—Section 152 of the Atomic Energy Act of 1954 (42 U.S.C. 2182) is amended in the third undesignated paragraph—

(A) by striking "Board of Patent Appeals and Interferences" each place it appears and inserting "Patent Trial and Appeal Board"; and

(B) by inserting "and derivation" after "established for interference".

(2) TITLE 51.—Section 20135 of title 51, United States Code, is amended—

(A) in subsections (e) and (f), by striking "Board of Patent Appeals and Interferences" each place it appears and inserting "Patent Trial and Appeal Board"; and

(B) in subsection (e), by inserting "and derivation" after "established for interference".

(e) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to proceedings commenced on or after that effective date, except that—

35 USC 6 note.

(1) the extension of jurisdiction to the United States Court of Appeals for the Federal Circuit to entertain appeals of decisions of the Patent Trial and Appeal Board in reexaminations under the amendment made by subsection (c)(2) shall be deemed to take effect on the date of the enactment of this Act and shall extend to any decision of the Board of Patent Appeals and Interferences with respect to a reexamination that is entered before, on, or after the date of the enactment of this Act;

(2) the provisions of sections 6, 134, and 141 of title 35, United States Code, as in effect on the day before the effective date of the amendments made by this section shall continue to apply to inter partes reexaminations that are requested under section 311 of such title before such effective date;

(3) the Patent Trial and Appeal Board may be deemed to be the Board of Patent Appeals and Interferences for purposes of appeals of inter partes reexaminations that are requested under section 311 of title 35, United States Code, before the effective date of the amendments made by this section; and

(4) the Director's right under the fourth sentence of section 143 of title 35, United States Code, as amended by subsection (c)(3) of this section, to intervene in an appeal from a decision entered by the Patent Trial and Appeal Board shall be deemed to extend to inter partes reexaminations that are requested under section 311 of such title before the effective date of the amendments made by this section.

## SEC. 8. PREISSUANCE SUBMISSIONS BY THIRD PARTIES.

(a) IN GENERAL.—Section 122 of title 35, United States Code, is amended by adding at the end the following:

"(e) PREISSUANCE SUBMISSIONS BY THIRD PARTIES.—

"(1) IN GENERAL.—Any third party may submit for consideration and inclusion in the record of a patent application, any patent, published patent application, or other printed publication of potential relevance to the examination of the application, if such submission is made in writing before the earlier of—

"(A) the date a notice of allowance under section 151 is given or mailed in the application for patent; or

"(B) the later of—

"(i) 6 months after the date on which the application for patent is first published under section 122 by the Office, or

"(ii) the date of the first rejection under section 132 of any claim by the examiner during the examination of the application for patent.

"(2) OTHER REQUIREMENTS.—Any submission under paragraph (1) shall—

"(A) set forth a concise description of the asserted relevance of each submitted document;

"(B) be accompanied by such fee as the Director may prescribe; and

"(C) include a statement by the person making such submission affirming that the submission was made in compliance with this section.".

Applicability.
35 USC 122 note.

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent application filed before, on, or after that effective date.

**SEC. 9. VENUE.**

(a) TECHNICAL AMENDMENTS RELATING TO VENUE.—Sections 32, 145, 146, 154(b)(4)(A), and 293 of title 35, United States Code, and section 21(b)(4) of the Trademark Act of 1946 (15 U.S.C. 1071(b)(4)), are each amended by striking "United States District Court for the District of Columbia" each place that term appears and inserting "United States District Court for the Eastern District of Virginia".

Applicability.
35 USC 1071 note.

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to any civil action commenced on or after that date.

35 USC 41 note.

**SEC. 10. FEE SETTING AUTHORITY.**

(a) FEE SETTING.—

(1) IN GENERAL.—The Director may set or adjust by rule any fee established, authorized, or charged under title 35, United States Code, or the Trademark Act of 1946 (15 U.S.C. 1051 et seq.), for any services performed by or materials furnished by, the Office, subject to paragraph (2).

(2) FEES TO RECOVER COSTS.—Fees may be set or adjusted under paragraph (1) only to recover the aggregate estimated costs to the Office for processing, activities, services, and materials relating to patents (in the case of patent fees) and trademarks (in the case of trademark fees), including administrative costs of the Office with respect to such patent or trademark fees (as the case may be).

(b) SMALL AND MICRO ENTITIES.—The fees set or adjusted under subsection (a) for filing, searching, examining, issuing, appealing, and maintaining patent applications and patents shall be reduced by 50 percent with respect to the application of such fees to any

small entity that qualifies for reduced fees under section 41(h)(1) of title 35, United States Code, and shall be reduced by 75 percent with respect to the application of such fees to any micro entity as defined in section 123 of that title (as added by subsection (g) of this section).

(c) REDUCTION OF FEES IN CERTAIN FISCAL YEARS.—In each fiscal year, the Director—

(1) shall consult with the Patent Public Advisory Committee and the Trademark Public Advisory Committee on the advisability of reducing any fees described in subsection (a); and

*Consultation.*

(2) after the consultation required under paragraph (1), may reduce such fees.

(d) ROLE OF THE PUBLIC ADVISORY COMMITTEE.—The Director shall—

(1) not less than 45 days before publishing any proposed fee under subsection (a) in the Federal Register, submit the proposed fee to the Patent Public Advisory Committee or the Trademark Public Advisory Committee, or both, as appropriate;

*Deadline.*

(2)(A) provide the relevant advisory committee described in paragraph (1) a 30-day period following the submission of any proposed fee, in which to deliberate, consider, and comment on such proposal;

*Time period.*

(B) require that, during that 30-day period, the relevant advisory committee hold a public hearing relating to such proposal; and

*Time period.*

(C) assist the relevant advisory committee in carrying out that public hearing, including by offering the use of the resources of the Office to notify and promote the hearing to the public and interested stakeholders;

(3) require the relevant advisory committee to make available to the public a written report setting forth in detail the comments, advice, and recommendations of the committee regarding the proposed fee; and

(4) consider and analyze any comments, advice, or recommendations received from the relevant advisory committee before setting or adjusting (as the case may be) the fee.

(e) PUBLICATION IN THE FEDERAL REGISTER.—

(1) PUBLICATION AND RATIONALE.—The Director shall—

(A) publish any proposed fee change under this section in the Federal Register;

(B) include, in such publication, the specific rationale and purpose for the proposal, including the possible expectations or benefits resulting from the proposed change; and

(C) notify, through the Chair and Ranking Member of the Committees on the Judiciary of the Senate and the House of Representatives, the Congress of the proposed change not later than the date on which the proposed change is published under subparagraph (A).

*Notification.*
*Deadline.*

(2) PUBLIC COMMENT PERIOD.—The Director shall, in the publication under paragraph (1), provide the public a period of not less than 45 days in which to submit comments on the proposed change in fees.

(3) PUBLICATION OF FINAL RULE.—The final rule setting or adjusting a fee under this section shall be published in

the Federal Register and in the Official Gazette of the Patent and Trademark Office.

(4) CONGRESSIONAL COMMENT PERIOD.—A fee set or adjusted under subsection (a) may not become effective—

(A) before the end of the 45-day period beginning on the day after the date on which the Director publishes the final rule adjusting or setting the fee under paragraph (3); or

(B) if a law is enacted disapproving such fee.

(5) RULE OF CONSTRUCTION.—Rules prescribed under this section shall not diminish—

(A) the rights of an applicant for a patent under title 35, United States Code, or for a mark under the Trademark Act of 1946; or

(B) any rights under a ratified treaty.

(f) RETENTION OF AUTHORITY.—The Director retains the authority under subsection (a) to set or adjust fees only during such period as the Patent and Trademark Office remains an agency within the Department of Commerce.

(g) MICRO ENTITY DEFINED.—

(1) IN GENERAL.—Chapter 11 of title 35, United States Code, is amended by adding at the end the following new section:

## "§ 123. Micro entity defined

"(a) IN GENERAL.—For purposes of this title, the term 'micro entity' means an applicant who makes a certification that the applicant—

"(1) qualifies as a small entity, as defined in regulations issued by the Director;

"(2) has not been named as an inventor on more than 4 previously filed patent applications, other than applications filed in another country, provisional applications under section 111(b), or international applications filed under the treaty defined in section 351(a) for which the basic national fee under section 41(a) was not paid;

"(3) did not, in the calendar year preceding the calendar year in which the applicable fee is being paid, have a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census; and

"(4) has not assigned, granted, or conveyed, and is not under an obligation by contract or law to assign, grant, or convey, a license or other ownership interest in the application concerned to an entity that, in the calendar year preceding the calendar year in which the applicable fee is being paid, had a gross income, as defined in section 61(a) of the Internal Revenue Code of 1986, exceeding 3 times the median household income for that preceding calendar year, as most recently reported by the Bureau of the Census.

"(b) APPLICATIONS RESULTING FROM PRIOR EMPLOYMENT.—An applicant is not considered to be named on a previously filed application for purposes of subsection (a)(2) if the applicant has assigned, or is under an obligation by contract or law to assign, all ownership rights in the application as the result of the applicant's previous employment.

PUBLIC LAW 112–29—SEPT. 16, 2011        125 STAT. 319

"(c) FOREIGN CURRENCY EXCHANGE RATE.—If an applicant's or entity's gross income in the preceding calendar year is not in United States dollars, the average currency exchange rate, as reported by the Internal Revenue Service, during that calendar year shall be used to determine whether the applicant's or entity's gross income exceeds the threshold specified in paragraphs (3) or (4) of subsection (a).

"(d) INSTITUTIONS OF HIGHER EDUCATION.—For purposes of this section, a micro entity shall include an applicant who certifies that—

    "(1) the applicant's employer, from which the applicant obtains the majority of the applicant's income, is an institution of higher education as defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)); or

    "(2) the applicant has assigned, granted, conveyed, or is under an obligation by contract or law, to assign, grant, or convey, a license or other ownership interest in the particular applications to such an institution of higher education.

"(e) DIRECTOR'S AUTHORITY.—In addition to the limits imposed by this section, the Director may, in the Director's discretion, impose income limits, annual filing limits, or other limits on who may qualify as a micro entity pursuant to this section if the Director determines that such additional limits are reasonably necessary to avoid an undue impact on other patent applicants or owners or are otherwise reasonably necessary and appropriate. At least 3 months before any limits proposed to be imposed pursuant to this subsection take effect, the Director shall inform the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate of any such proposed limits.".

Deadline.
Notification.

    (2) CONFORMING AMENDMENT.—Chapter 11 of title 35, United States Code, is amended by adding at the end the following new item:

"123. Micro entity defined.".

    (h) ELECTRONIC FILING INCENTIVE.—

    (1) IN GENERAL.—Notwithstanding any other provision of this section, an additional fee of $400 shall be established for each application for an original patent, except for a design, plant, or provisional application, that is not filed by electronic means as prescribed by the Director. The fee established by this subsection shall be reduced by 50 percent for small entities that qualify for reduced fees under section 41(h)(1) of title 35, United States Code. All fees paid under this subsection shall be deposited in the Treasury as an offsetting receipt that shall not be available for obligation or expenditure.

    (2) EFFECTIVE DATE.—This subsection shall take effect upon the expiration of the 60-day period beginning on the date of the enactment of this Act.

    (i) EFFECTIVE DATE; SUNSET.—

    (1) EFFECTIVE DATE.—Except as provided in subsection (h), this section and the amendments made by this section shall take effect on the date of the enactment of this Act.

    (2) SUNSET.—The authority of the Director to set or adjust any fee under subsection (a) shall terminate upon the expiration of the 7-year period beginning on the date of the enactment of this Act.

(3) PRIOR REGULATIONS NOT AFFECTED.—The termination of authority under this subsection shall not affect any regulations issued under this section before the effective date of such termination or any rulemaking proceeding for the issuance of regulations under this section that is pending on such date.

**SEC. 11. FEES FOR PATENT SERVICES.**

(a) GENERAL PATENT SERVICES.—Subsections (a) and (b) of section 41 of title 35, United States Code, are amended to read as follows:

"(a) GENERAL FEES.—The Director shall charge the following fees:

"(1) FILING AND BASIC NATIONAL FEES.—

"(A) On filing each application for an original patent, except for design, plant, or provisional applications, $330.

"(B) On filing each application for an original design patent, $220.

"(C) On filing each application for an original plant patent, $220.

"(D) On filing each provisional application for an original patent, $220.

"(E) On filing each application for the reissue of a patent, $330.

"(F) The basic national fee for each international application filed under the treaty defined in section 351(a) entering the national stage under section 371, $330.

"(G) In addition, excluding any sequence listing or computer program listing filed in an electronic medium as prescribed by the Director, for any application the specification and drawings of which exceed 100 sheets of paper (or equivalent as prescribed by the Director if filed in an electronic medium), $270 for each additional 50 sheets of paper (or equivalent as prescribed by the Director if filed in an electronic medium) or fraction thereof.

"(2) EXCESS CLAIMS FEES.—

"(A) IN GENERAL.—In addition to the fee specified in paragraph (1)—

"(i) on filing or on presentation at any other time, $220 for each claim in independent form in excess of 3;

"(ii) on filing or on presentation at any other time, $52 for each claim (whether dependent or independent) in excess of 20; and

"(iii) for each application containing a multiple dependent claim, $390.

"(B) MULTIPLE DEPENDENT CLAIMS.—For the purpose of computing fees under subparagraph (A), a multiple dependent claim referred to in section 112 or any claim depending therefrom shall be considered as separate dependent claims in accordance with the number of claims to which reference is made.

"(C) REFUNDS; ERRORS IN PAYMENT.—The Director may by regulation provide for a refund of any part of the fee specified in subparagraph (A) for any claim that is canceled before an examination on the merits, as prescribed by the Director, has been made of the application under section 131. Errors in payment of the additional fees under

this paragraph may be rectified in accordance with regulations prescribed by the Director.

"(3) EXAMINATION FEES.—

"(A) IN GENERAL.—

"(i) For examination of each application for an original patent, except for design, plant, provisional, or international applications, $220.

"(ii) For examination of each application for an original design patent, $140.

"(iii) For examination of each application for an original plant patent, $170.

"(iv) For examination of the national stage of each international application, $220.

"(v) For examination of each application for the reissue of a patent, $650.

"(B) APPLICABILITY OF OTHER FEE PROVISIONS.—The provisions of paragraphs (3) and (4) of section 111(a) relating to the payment of the fee for filing the application shall apply to the payment of the fee specified in subparagraph (A) with respect to an application filed under section 111(a). The provisions of section 371(d) relating to the payment of the national fee shall apply to the payment of the fee specified in subparagraph (A) with respect to an international application.

"(4) ISSUE FEES.—

"(A) For issuing each original patent, except for design or plant patents, $1,510.

"(B) For issuing each original design patent, $860.

"(C) For issuing each original plant patent, $1,190.

"(D) For issuing each reissue patent, $1,510.

"(5) DISCLAIMER FEE.—On filing each disclaimer, $140.

"(6) APPEAL FEES.—

"(A) On filing an appeal from the examiner to the Patent Trial and Appeal Board, $540.

"(B) In addition, on filing a brief in support of the appeal, $540, and on requesting an oral hearing in the appeal before the Patent Trial and Appeal Board, $1,080.

"(7) REVIVAL FEES.—On filing each petition for the revival of an unintentionally abandoned application for a patent, for the unintentionally delayed payment of the fee for issuing each patent, or for an unintentionally delayed response by the patent owner in any reexamination proceeding, $1,620, unless the petition is filed under section 133 or 151, in which case the fee shall be $540.

"(8) EXTENSION FEES.—For petitions for 1-month extensions of time to take actions required by the Director in an application—

"(A) on filing a first petition, $130;

"(B) on filing a second petition, $360; and

"(C) on filing a third or subsequent petition, $620.

"(b) MAINTENANCE FEES.—

"(1) IN GENERAL.—The Director shall charge the following fees for maintaining in force all patents based on applications filed on or after December 12, 1980:

"(A) Three years and 6 months after grant, $980.

"(B) Seven years and 6 months after grant, $2,480.

"(C) Eleven years and 6 months after grant, $4,110.

125 STAT. 322          PUBLIC LAW 112–29—SEPT. 16, 2011

Expiration date.

"(2) GRACE PERIOD; SURCHARGE.—Unless payment of the applicable maintenance fee under paragraph (1) is received in the Office on or before the date the fee is due or within a grace period of 6 months thereafter, the patent shall expire as of the end of such grace period. The Director may require the payment of a surcharge as a condition of accepting within such 6-month grace period the payment of an applicable maintenance fee.

"(3) NO MAINTENANCE FEE FOR DESIGN OR PLANT PATENT.— No fee may be established for maintaining a design or plant patent in force.".

(b) DELAYS IN PAYMENT.—Subsection (c) of section 41 of title 35, United States Code, is amended—

(1) by striking "(c)(1) The Director" and inserting:

"(c) DELAYS IN PAYMENT OF MAINTENANCE FEES.—

"(1) ACCEPTANCE.—The Director"; and

(2) by striking "(2) A patent" and inserting:

"(2) EFFECT ON RIGHTS OF OTHERS.—A patent".

(c) PATENT SEARCH FEES.—Subsection (d) of section 41 of title 35, United States Code, is amended to read as follows:

"(d) PATENT SEARCH AND OTHER FEES.—

"(1) PATENT SEARCH FEES.—

"(A) IN GENERAL.—The Director shall charge the fees specified under subparagraph (B) for the search of each application for a patent, except for provisional applications. The Director shall adjust the fees charged under this paragraph to ensure that the fees recover an amount not to exceed the estimated average cost to the Office of searching applications for patent by Office personnel.

"(B) SPECIFIC FEES.—The fees referred to in subparagraph (A) are—

"(i) $540 for each application for an original patent, except for design, plant, provisional, or international applications;

"(ii) $100 for each application for an original design patent;

"(iii) $330 for each application for an original plant patent;

"(iv) $540 for the national stage of each international application; and

"(v) $540 for each application for the reissue of a patent.

"(C) APPLICABILITY OF OTHER PROVISIONS.—The provisions of paragraphs (3) and (4) of section 111(a) relating to the payment of the fee for filing the application shall apply to the payment of the fee specified in this paragraph with respect to an application filed under section 111(a). The provisions of section 371(d) relating to the payment of the national fee shall apply to the payment of the fee specified in this paragraph with respect to an international application.

Regulations.

"(D) REFUNDS.—The Director may by regulation provide for a refund of any part of the fee specified in this paragraph for any applicant who files a written declaration of express abandonment as prescribed by the Director before an examination has been made of the application under section 131.

"(2) OTHER FEES.—

"(A) IN GENERAL.—The Director shall establish fees for all other processing, services, or materials relating to patents not specified in this section to recover the estimated average cost to the Office of such processing, services, or materials, except that the Director shall charge the following fees for the following services:

"(i) For recording a document affecting title, $40 per property.

"(ii) For each photocopy, $.25 per page.

"(iii) For each black and white copy of a patent, $3.

"(B) COPIES FOR LIBRARIES.—The yearly fee for providing a library specified in section 12 with uncertified printed copies of the specifications and drawings for all patents in that year shall be $50.".

(d) FEES FOR SMALL ENTITIES.—Subsection (h) of section 41 of title 35, United States Code, is amended to read as follows:

"(h) FEES FOR SMALL ENTITIES.—

"(1) REDUCTIONS IN FEES.—Subject to paragraph (3), fees charged under subsections (a), (b), and (d)(1) shall be reduced by 50 percent with respect to their application to any small business concern as defined under section 3 of the Small Business Act, and to any independent inventor or nonprofit organization as defined in regulations issued by the Director.

"(2) SURCHARGES AND OTHER FEES.—With respect to its application to any entity described in paragraph (1), any surcharge or fee charged under subsection (c) or (d) shall not be higher than the surcharge or fee required of any other entity under the same or substantially similar circumstances.

"(3) REDUCTION FOR ELECTRONIC FILING.—The fee charged under subsection (a)(1)(A) shall be reduced by 75 percent with respect to its application to any entity to which paragraph (1) applies, if the application is filed by electronic means as prescribed by the Director.".

(e) TECHNICAL AMENDMENTS.—Section 41 of title 35, United States Code, is amended—

(1) in subsection (e), in the first sentence, by striking "The Director" and inserting "WAIVER OF FEES; COPIES REGARDING NOTICE.—The Director";

(2) in subsection (f), by striking "The fees" and inserting "ADJUSTMENT OF FEES.—The fees";

(3) by repealing subsection (g); and

(4) in subsection (i)—

(A) by striking "(i)(1) The Director" and inserting the following:

"(i) ELECTRONIC PATENT AND TRADEMARK DATA.—

"(1) MAINTENANCE OF COLLECTIONS.—The Director";

(B) by striking "(2) The Director" and inserting the following:

"(2) AVAILABILITY OF AUTOMATED SEARCH SYSTEMS.—The Director";

(C) by striking "(3) The Director" and inserting the following:

"(3) ACCESS FEES.—The Director"; and

(D) by striking "(4) The Director" and inserting the following:

"(4) ANNUAL REPORT TO CONGRESS.—The Director".

(f) ADJUSTMENT OF TRADEMARK FEES.—Section 802(a) of division B of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended—

35 USC 41 note.

(1) in the first sentence, by striking "During fiscal years 2005, 2006, and 2007,", and inserting "Until such time as the Director sets or adjusts the fees otherwise,"; and

(2) in the second sentence, by striking "During fiscal years 2005, 2006, and 2007, the" and inserting "The".

(g) EFFECTIVE DATE, APPLICABILITY, AND TRANSITION PROVISIONS.—Section 803(a) of division B of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by striking "and shall apply only with respect to the remaining portion of fiscal year 2005 and fiscal year 2006".

35 USC 41 note.

(h) PRIORITIZED EXAMINATION FEE.—

35 USC 41 note.

(1) IN GENERAL.—

(A) FEE.—

(i) PRIORITIZED EXAMINATION FEE.—A fee of $4,800 shall be established for filing a request, pursuant to section 2(b)(2)(G) of title 35, United States Code, for prioritized examination of a nonprovisional application for an original utility or plant patent.

(ii) ADDITIONAL FEES.—In addition to the prioritized examination fee under clause (i), the fees due on an application for which prioritized examination is being sought are the filing, search, and examination fees (including any applicable excess claims and application size fees), processing fee, and publication fee for that application.

(B) REGULATIONS; LIMITATIONS.—

(i) REGULATIONS.—The Director may by regulation prescribe conditions for acceptance of a request under subparagraph (A) and a limit on the number of filings for prioritized examination that may be accepted.

(ii) LIMITATION ON CLAIMS.— Until regulations are prescribed under clause (i), no application for which prioritized examination is requested may contain or be amended to contain more than 4 independent claims or more than 30 total claims.

(iii) LIMITATION ON TOTAL NUMBER OF REQUESTS.—The Director may not accept in any fiscal year more than 10,000 requests for prioritization until regulations are prescribed under this subparagraph setting another limit.

(2) REDUCTION IN FEES FOR SMALL ENTITIES.—The Director shall reduce fees for providing prioritized examination of non-provisional applications for original utility and plant patents by 50 percent for small entities that qualify for reduced fees under section 41(h)(1) of title 35, United States Code.

(3) DEPOSIT OF FEES.—All fees paid under this subsection shall be credited to the United States Patent and Trademark Office Appropriation Account, shall remain available until expended, and may be used only for the purposes specified in section 42(c)(3)(A) of title 35, United States Code.

(4) EFFECTIVE DATE AND TERMINATION.—

(A) EFFECTIVE DATE.—This subsection shall take effect on the date that is 10 days after the date of the enactment of this Act.

(B) TERMINATION.—The fee imposed under paragraph (1)(A)(i), and the reduced fee under paragraph (2), shall terminate on the effective date of the setting or adjustment of the fee under paragraph (1)(A)(i) pursuant to the exercise of the authority under section 10 for the first time with respect to that fee.

(i) APPROPRIATION ACCOUNT TRANSITION FEES.—

(1) SURCHARGE.—

(A) IN GENERAL.—There shall be a surcharge of 15 percent, rounded by standard arithmetic rules, on all fees charged or authorized by subsections (a), (b), and (d)(1) of section 41, and section 132(b), of title 35, United States Code. Any surcharge imposed under this subsection is, and shall be construed to be, separate from and in addition to any other surcharge imposed under this Act or any other provision of law.

(B) DEPOSIT OF AMOUNTS.—Amounts collected pursuant to the surcharge imposed under subparagraph (A) shall be credited to the United States Patent and Trademark Appropriation Account, shall remain available until expended, and may be used only for the purposes specified in section 42(c)(3)(A) of title 35, United States Code.

(2) EFFECTIVE DATE AND TERMINATION OF SURCHARGE.— The surcharge provided for in paragraph (1)—

(A) shall take effect on the date that is 10 days after the date of the enactment of this Act; and

(B) shall terminate, with respect to a fee to which paragraph (1)(A) applies, on the effective date of the setting or adjustment of that fee pursuant to the exercise of the authority under section 10 for the first time with respect to that fee.

(j) EFFECTIVE DATE.—Except as otherwise provided in this section, this section and the amendments made by this section shall take effect on the date of the enactment of this Act.

**SEC. 12. SUPPLEMENTAL EXAMINATION.**

(a) IN GENERAL.—Chapter 25 of title 35, United States Code, is amended by adding at the end the following:

### "§ 257. Supplemental examinations to consider, reconsider, or correct information

"(a) REQUEST FOR SUPPLEMENTAL EXAMINATION.—A patent owner may request supplemental examination of a patent in the Office to consider, reconsider, or correct information believed to be relevant to the patent, in accordance with such requirements as the Director may establish. Within 3 months after the date a request for supplemental examination meeting the requirements of this section is received, the Director shall conduct the supplemental examination and shall conclude such examination by issuing a certificate indicating whether the information presented in the request raises a substantial new question of patentability.

"(b) REEXAMINATION ORDERED.—If the certificate issued under subsection (a) indicates that a substantial new question of patentability is raised by 1 or more items of information in the request,

35 USC 41 note.

Applicability.

35 USC 41 note.

Deadline.
Certificate.

the Director shall order reexamination of the patent. The reexamination shall be conducted according to procedures established by chapter 30, except that the patent owner shall not have the right to file a statement pursuant to section 304. During the reexamination, the Director shall address each substantial new question of patentability identified during the supplemental examination, notwithstanding the limitations in chapter 30 relating to patents and printed publication or any other provision of such chapter.

"(c) EFFECT.—

"(1) IN GENERAL.—A patent shall not be held unenforceable on the basis of conduct relating to information that had not been considered, was inadequately considered, or was incorrect in a prior examination of the patent if the information was considered, reconsidered, or corrected during a supplemental examination of the patent. The making of a request under subsection (a), or the absence thereof, shall not be relevant to enforceability of the patent under section 282.

"(2) EXCEPTIONS.—

"(A) PRIOR ALLEGATIONS.—Paragraph (1) shall not apply to an allegation pled with particularity in a civil action, or set forth with particularity in a notice received by the patent owner under section 505(j)(2)(B)(iv)(II) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(2)(B)(iv)(II)), before the date of a supplemental examination request under subsection (a) to consider, reconsider, or correct information forming the basis for the allegation.

"(B) PATENT ENFORCEMENT ACTIONS.—In an action brought under section 337(a) of the Tariff Act of 1930 (19 U.S.C. 1337(a)), or section 281 of this title, paragraph (1) shall not apply to any defense raised in the action that is based upon information that was considered, reconsidered, or corrected pursuant to a supplemental examination request under subsection (a), unless the supplemental examination, and any reexamination ordered pursuant to the request, are concluded before the date on which the action is brought.

"(d) FEES AND REGULATIONS.—

"(1) FEES.—The Director shall, by regulation, establish fees for the submission of a request for supplemental examination of a patent, and to consider each item of information submitted in the request. If reexamination is ordered under subsection (b), fees established and applicable to ex parte reexamination proceedings under chapter 30 shall be paid, in addition to fees applicable to supplemental examination.

"(2) REGULATIONS.—The Director shall issue regulations governing the form, content, and other requirements of requests for supplemental examination, and establishing procedures for reviewing information submitted in such requests.

"(e) FRAUD.—If the Director becomes aware, during the course of a supplemental examination or reexamination proceeding ordered under this section, that a material fraud on the Office may have been committed in connection with the patent that is the subject of the supplemental examination, then in addition to any other actions the Director is authorized to take, including the cancellation of any claims found to be invalid under section 307 as a result of a reexamination ordered under this section, the Director shall

also refer the matter to the Attorney General for such further action as the Attorney General may deem appropriate. Any such referral shall be treated as confidential, shall not be included in the file of the patent, and shall not be disclosed to the public unless the United States charges a person with a criminal offense in connection with such referral.

"(f) RULE OF CONSTRUCTION.—Nothing in this section shall be construed—

"(1) to preclude the imposition of sanctions based upon criminal or antitrust laws (including section 1001(a) of title 18, the first section of the Clayton Act, and section 5 of the Federal Trade Commission Act to the extent that section relates to unfair methods of competition);

"(2) to limit the authority of the Director to investigate issues of possible misconduct and impose sanctions for misconduct in connection with matters or proceedings before the Office; or

"(3) to limit the authority of the Director to issue regulations under chapter 3 relating to sanctions for misconduct by representatives practicing before the Office.".

(b) CONFORMING AMENDMENT.—The table of sections for chapter 25 of title 35, United States Code, is amended by adding at the end the following new item:

"257. Supplemental examinations to consider, reconsider, or correct information.".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that effective date.

*Applicability.*
*35 USC 257 note.*

## SEC. 13. FUNDING AGREEMENTS.

(a) IN GENERAL.—Section 202(c)(7)(E)(i) of title 35, United States Code, is amended—

(1) by striking "75 percent" and inserting "15 percent";

(2) by striking "25 percent" and inserting "85 percent"; and

(3) by striking "as described above in this clause (D);" and inserting "described above in this clause;".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to any patent issued before, on, or after that date.

*Applicability.*
*35 USC 202 note.*

## SEC. 14. TAX STRATEGIES DEEMED WITHIN THE PRIOR ART.

*35 USC 102 note.*

(a) IN GENERAL.—For purposes of evaluating an invention under section 102 or 103 of title 35, United States Code, any strategy for reducing, avoiding, or deferring tax liability, whether known or unknown at the time of the invention or application for patent, shall be deemed insufficient to differentiate a claimed invention from the prior art.

(b) DEFINITION.—For purposes of this section, the term "tax liability" refers to any liability for a tax under any Federal, State, or local law, or the law of any foreign jurisdiction, including any statute, rule, regulation, or ordinance that levies, imposes, or assesses such tax liability.

(c) EXCLUSIONS.—This section does not apply to that part of an invention that—

(1) is a method, apparatus, technology, computer program product, or system, that is used solely for preparing a tax

or information return or other tax filing, including one that records, transmits, transfers, or organizes data related to such filing; or

(2) is a method, apparatus, technology, computer program product, or system used solely for financial management, to the extent that it is severable from any tax strategy or does not limit the use of any tax strategy by any taxpayer or tax advisor.

(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to imply that other business methods are patentable or that other business method patents are valid.

(e) EFFECTIVE DATE; APPLICABILITY.—This section shall take effect on the date of the enactment of this Act and shall apply to any patent application that is pending on, or filed on or after, that date, and to any patent that is issued on or after that date.

## SEC. 15. BEST MODE REQUIREMENT.

(a) IN GENERAL.—Section 282 of title 35, United States Code, is amended in the second undesignated paragraph by striking paragraph (3) and inserting the following:

"(3) Invalidity of the patent or any claim in suit for failure to comply with—

"(A) any requirement of section 112, except that the failure to disclose the best mode shall not be a basis on which any claim of a patent may be canceled or held invalid or otherwise unenforceable; or

"(B) any requirement of section 251.".

(b) CONFORMING AMENDMENT.—Sections 119(e)(1) and 120 of title 35, United States Code, are each amended by striking "the first paragraph of section 112 of this title" and inserting "section 112(a) (other than the requirement to disclose the best mode)".

Applicability.
35 USC 119 note.

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the date of the enactment of this Act and shall apply to proceedings commenced on or after that date.

## SEC. 16. MARKING.

(a) VIRTUAL MARKING.—

(1) IN GENERAL.—Section 287(a) of title 35, United States Code, is amended by striking "or when," and inserting "or by fixing thereon the word 'patent' or the abbreviation 'pat.' together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when,".

Applicability.
35 USC 287 note.

(2) EFFECTIVE DATE.—The amendment made by this subsection shall apply to any case that is pending on, or commenced on or after, the date of the enactment of this Act.

(3) REPORT.—Not later than the date that is 3 years after the date of the enactment of this Act, the Director shall submit a report to Congress that provides—

(A) an analysis of the effectiveness of "virtual marking", as provided in the amendment made by paragraph (1) of this subsection, as an alternative to the physical marking of articles;

(B) an analysis of whether such virtual marking has limited or improved the ability of the general public to access information about patents;

(C) an analysis of the legal issues, if any, that arise from such virtual marking; and

(D) an analysis of the deficiencies, if any, of such virtual marking.

(b) FALSE MARKING.—

(1) CIVIL PENALTY.—Section 292(a) of title 35, United States, Code, is amended by adding at the end the following: "Only the United States may sue for the penalty authorized by this subsection.".

(2) CIVIL ACTION FOR DAMAGES.—Subsection (b) of section 292 of title 35, United States Code, is amended to read as follows:

"(b) A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury.".

(3) EXPIRED PATENTS.—Section 292 of title 35, United States Code, is amended by adding at the end the following:

"(c) The marking of a product, in a manner described in subsection (a), with matter relating to a patent that covered that product but has expired is not a violation of this section.".

(4) EFFECTIVE DATE.—The amendments made by this subsection shall apply to all cases, without exception, that are pending on, or commenced on or after, the date of the enactment of this Act.

*Applicability.*
*35 USC 292 note.*

### SEC. 17. ADVICE OF COUNSEL.

(a) IN GENERAL.—Chapter 29 of title 35, United States Code, is amended by adding at the end the following:

### "§ 298. Advice of counsel

"The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent.".

(b) CONFORMING AMENDMENT.—The table of sections for chapter 29 of title 35, United States Code, is amended by adding at the end the following:

"298. Advice of counsel.".

### SEC. 18. TRANSITIONAL PROGRAM FOR COVERED BUSINESS METHOD PATENTS.

*35 USC 321 note.*

(a) TRANSITIONAL PROGRAM.—

(1) ESTABLISHMENT.—Not later than the date that is 1 year after the date of the enactment of this Act, the Director shall issue regulations establishing and implementing a transitional post-grant review proceeding for review of the validity of covered business method patents. The transitional proceeding implemented pursuant to this subsection shall be regarded as, and shall employ the standards and procedures of, a post-grant review under chapter 32 of title 35, United States Code, subject to the following:

*Deadline.*
*Regulations.*

(A) Section 321(c) of title 35, United States Code, and subsections (b), (e)(2), and (f) of section 325 of such title shall not apply to a transitional proceeding.

(B) A person may not file a petition for a transitional proceeding with respect to a covered business method patent unless the person or the person's real party in interest or privy has been sued for infringement of the patent or has been charged with infringement under that patent.

(C) A petitioner in a transitional proceeding who challenges the validity of 1 or more claims in a covered business method patent on a ground raised under section 102 or 103 of title 35, United States Code, as in effect on the day before the effective date set forth in section 3(n)(1), may support such ground only on the basis of—

(i) prior art that is described by section 102(a) of such title of such title (as in effect on the day before such effective date); or

(ii) prior art that—

(I) discloses the invention more than 1 year before the date of the application for patent in the United States; and

(II) would be described by section 102(a) of such title (as in effect on the day before the effective date set forth in section 3(n)(1)) if the disclosure had been made by another before the invention thereof by the applicant for patent.

(D) The petitioner in a transitional proceeding that results in a final written decision under section 328(a) of title 35, United States Code, with respect to a claim in a covered business method patent, or the petitioner's real party in interest, may not assert, either in a civil action arising in whole or in part under section 1338 of title 28, United States Code, or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337), that the claim is invalid on any ground that the petitioner raised during that transitional proceeding.

(E) The Director may institute a transitional proceeding only for a patent that is a covered business method patent.

(2) EFFECTIVE DATE.—The regulations issued under paragraph (1) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any covered business method patent issued before, on, or after that effective date, except that the regulations shall not apply to a patent described in section 6(f)(2)(A) of this Act during the period in which a petition for postgrant review of that patent would satisfy the requirements of section 321(c) of title 35, United States Code.

(3) SUNSET.—

(A) IN GENERAL.—This subsection, and the regulations issued under this subsection, are repealed effective upon the expiration of the 8-year period beginning on the date that the regulations issued under to paragraph (1) take effect.

(B) APPLICABILITY.—Notwithstanding subparagraph (A), this subsection and the regulations issued under this subsection shall continue to apply, after the date of the

repeal under subparagraph (A), to any petition for a transitional proceeding that is filed before the date of such repeal.

(b) REQUEST FOR STAY.—

(1) IN GENERAL.—If a party seeks a stay of a civil action alleging infringement of a patent under section 281 of title 35, United States Code, relating to a transitional proceeding for that patent, the court shall decide whether to enter a stay based on—

(A) whether a stay, or the denial thereof, will simplify the issues in question and streamline the trial;

(B) whether discovery is complete and whether a trial date has been set;

(C) whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and

(D) whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court.

(2) REVIEW.—A party may take an immediate interlocutory appeal from a district court's decision under paragraph (1). The United States Court of Appeals for the Federal Circuit shall review the district court's decision to ensure consistent application of established precedent, and such review may be de novo.

(c) ATM EXEMPTION FOR VENUE PURPOSES.—In an action for infringement under section 281 of title 35, United States Code, of a covered business method patent, an automated teller machine shall not be deemed to be a regular and established place of business for purposes of section 1400(b) of title 28, United States Code.

(d) DEFINITION.—

(1) IN GENERAL.—For purposes of this section, the term "covered business method patent" means a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions.

(2) REGULATIONS.—To assist in implementing the transitional proceeding authorized by this subsection, the Director shall issue regulations for determining whether a patent is for a technological invention.

(e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed as amending or interpreting categories of patent-eligible subject matter set forth under section 101 of title 35, United States Code.

### SEC. 19. JURISDICTION AND PROCEDURAL MATTERS.

(a) STATE COURT JURISDICTION.—Section 1338(a) of title 28, United States Code, is amended by striking the second sentence and inserting the following: "No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights. For purposes of this subsection, the term 'State' includes any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.".

(b) COURT OF APPEALS FOR THE FEDERAL CIRCUIT.—Section 1295(a)(1) of title 28, United States Code, is amended to read as follows:

"(1) of an appeal from a final decision of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court of the Northern Mariana Islands, in any civil action arising under, or in any civil action in which a party has asserted a compulsory counterclaim arising under, any Act of Congress relating to patents or plant variety protection;".

(c) REMOVAL.—

(1) IN GENERAL.—Chapter 89 of title 28, United States Code, is amended by adding at the end the following new section:

## "§ 1454. Patent, plant variety protection, and copyright cases

"(a) IN GENERAL.—A civil action in which any party asserts a claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights may be removed to the district court of the United States for the district and division embracing the place where the action is pending.

"(b) SPECIAL RULES.—The removal of an action under this section shall be made in accordance with section 1446, except that if the removal is based solely on this section—

"(1) the action may be removed by any party; and

"(2) the time limitations contained in section 1446(b) may be extended at any time for cause shown.

"(c) CLARIFICATION OF JURISDICTION IN CERTAIN CASES.—The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in the civil action because the State court from which the civil action is removed did not have jurisdiction over that claim.

"(d) REMAND.—If a civil action is removed solely under this section, the district court—

"(1) shall remand all claims that are neither a basis for removal under subsection (a) nor within the original or supplemental jurisdiction of the district court under any Act of Congress; and

"(2) may, under the circumstances specified in section 1367(c), remand any claims within the supplemental jurisdiction of the district court under section 1367.".

(2) CONFORMING AMENDMENT.—The table of sections for chapter 89 of title 28, United States Code, is amended by adding at the end the following new item:

"1454. Patent, plant variety protection, and copyright cases.".

(d) PROCEDURAL MATTERS IN PATENT CASES.—

(1) JOINDER OF PARTIES AND STAY OF ACTIONS.—Chapter 29 of title 35, United States Code, as amended by this Act, is further amended by adding at the end the following new section:

## "§ 299. Joinder of parties

"(a) JOINDER OF ACCUSED INFRINGERS.—With respect to any civil action arising under any Act of Congress relating to patents, other than an action or trial in which an act of infringement under section 271(e)(2) has been pled, parties that are accused infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, or counterclaim defendants only if—

"(1) any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process; and

"(2) questions of fact common to all defendants or counterclaim defendants will arise in the action.

"(b) ALLEGATIONS INSUFFICIENT FOR JOINDER.—For purposes of this subsection, accused infringers may not be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, based solely on allegations that they each have infringed the patent or patents in suit.

"(c) WAIVER.—A party that is an accused infringer may waive the limitations set forth in this section with respect to that party.".

(2) CONFORMING AMENDMENT.—The table of sections for chapter 29 of title 35, United States Code, as amended by this Act, is further amended by adding at the end the following new item:

"299. Joinder of parties.".

(e) EFFECTIVE DATE.—The amendments made by this section shall apply to any civil action commenced on or after the date of the enactment of this Act.

Applicability.
28 USC 1295 note.

### SEC. 20. TECHNICAL AMENDMENTS.

(a) JOINT INVENTIONS.—Section 116 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph, by striking "When" and inserting "(a) JOINT INVENTIONS.—When";

(2) in the second undesignated paragraph, by striking "If a joint inventor" and inserting "(b) OMITTED INVENTOR.—If a joint inventor"; and

(3) in the third undesignated paragraph—

(A) by striking "Whenever" and inserting "(c) CORRECTION OF ERRORS IN APPLICATION.—Whenever"; and

(B) by striking "and such error arose without any deceptive intention on his part,".

(b) FILING OF APPLICATION IN FOREIGN COUNTRY.—Section 184 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "Except when" and inserting "(a) FILING IN FOREIGN COUNTRY.—Except when"; and

(B) by striking "and without deceptive intent";

(2) in the second undesignated paragraph, by striking "The term" and inserting "(b) APPLICATION.—The term"; and

(3) in the third undesignated paragraph, by striking "The scope" and inserting "(c) SUBSEQUENT MODIFICATIONS, AMENDMENTS, AND SUPPLEMENTS.—The scope".

(c) FILING WITHOUT A LICENSE.—Section 185 of title 35, United States Code, is amended by striking "and without deceptive intent".

(d) REISSUE OF DEFECTIVE PATENTS.—Section 251 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "Whenever" and inserting "(a) IN GENERAL.—Whenever"; and

125 STAT. 334        PUBLIC LAW 112–29—SEPT. 16, 2011

(B) by striking "without any deceptive intention";

(2) in the second undesignated paragraph, by striking "The Director" and inserting "(b) MULTIPLE REISSUED PATENTS.— The Director";

(3) in the third undesignated paragraph, by striking "The provisions" and inserting "(c) APPLICABILITY OF THIS TITLE.— The provisions"; and

(4) in the last undesignated paragraph, by striking "No reissued patent" and inserting "(d) REISSUE PATENT ENLARGING SCOPE OF CLAIMS.—No reissued patent".

(e) EFFECT OF REISSUE.—Section 253 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph, by striking "Whenever, without any deceptive intention," and inserting "(a) IN GENERAL.—Whenever"; and

(2) in the second undesignated paragraph, by striking "In like manner" and inserting "(b) ADDITIONAL DISCLAIMER OR DEDICATION.—In the manner set forth in subsection (a),".

(f) CORRECTION OF NAMED INVENTOR.—Section 256 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "Whenever" and inserting "(a) CORRECTION.—Whenever"; and

(B) by striking "and such error arose without any deceptive intention on his part"; and

(2) in the second undesignated paragraph, by striking "The error" and inserting "(b) PATENT VALID IF ERROR CORRECTED.— The error".

(g) PRESUMPTION OF VALIDITY.—Section 282 of title 35, United States Code, is amended—

(1) in the first undesignated paragraph—

(A) by striking "A patent" and inserting "(a) IN GENERAL.—A patent"; and

(B) by striking the third sentence;

(2) in the second undesignated paragraph—

(A) by striking "The following" and inserting "(b) DEFENSES.—The following";

(B) in paragraph (1), by striking "uneforceability," and inserting "unenforceability."; and

(C) in paragraph (2), by striking "patentability," and inserting "patentability." ; and

(3) in the third undesignated paragraph—

(A) by striking "In actions involving the validity or infringement of a patent" and inserting "(c) NOTICE OF ACTIONS; ACTIONS DURING EXTENSION OF PATENT TERM.— In an action involving the validity or infringement of a patent"; and

(B) by striking "Claims Court" and inserting "Court of Federal Claims".

(h) ACTION FOR INFRINGEMENT.—Section 288 of title 35, United States Code, is amended by striking ", without deceptive intention,".

(i) REVISER'S NOTES.—

(1) Section 3(e)(2) of title 35, United States Code, is amended by striking "this Act," and inserting "that Act,".

(2) Section 202 of title 35, United States Code, is amended—

(A) in subsection (b)(3), by striking "the section 203(b)" and inserting "section 203(b)"; and

(B) in subsection (c)(7)(D), by striking "except where it proves" and all that follows through "small business firms; and" and inserting: "except where it is determined to be infeasible following a reasonable inquiry, a preference in the licensing of subject inventions shall be given to small business firms; and".

(3) Section 209(d)(1) of title 35, United States Code, is amended by striking "nontransferrable" and inserting "non-transferable".

(4) Section 287(c)(2)(G) of title 35, United States Code, is amended by striking "any state" and inserting "any State".

(5) Section 371(b) of title 35, United States Code, is amended by striking "of the treaty" and inserting "of the treaty.".

(j) UNNECESSARY REFERENCES.—

(1) IN GENERAL.—Title 35, United States Code, is amended by striking "of this title" each place that term appears.

(2) EXCEPTION.—The amendment made by paragraph (1) shall not apply to the use of such term in the following sections of title 35, United States Code:

(A) Section 1(c).

(B) Section 101.

(C) Subsections (a) and (b) of section 105.

(D) The first instance of the use of such term in section 111(b)(8).

(E) Section 161.

(F) Section 164.

(G) Section 171.

(H) Section 251(c), as so designated by this section.

(I) Section 261.

(J) Subsections (g) and (h) of section 271.

(K) Section 287(b)(1).

(L) Section 289.

(M) The first instance of the use of such term in section 375(a).

(k) ADDITIONAL TECHNICAL AMENDMENTS.—Sections 155 and 155A of title 35, United States Code, and the items relating to those sections in the table of sections for chapter 14 of such title, are repealed.

(l) EFFECTIVE DATE.—The amendments made by this section shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to proceedings commenced on or after that effective date.

35 USC 2, 12, 32, 41, 103, 104, 111, 119–123, 132, 135, 143, 145, 146, 154, 157, 162, 172, 182–186, 207, 210, 257, 267.

Applicability. 35 USC 2 note.

## SEC. 21. TRAVEL EXPENSES AND PAYMENT OF ADMINISTRATIVE JUDGES.

(a) AUTHORITY TO COVER CERTAIN TRAVEL RELATED EXPENSES.—Section 2(b)(11) of title 35, United States Code, is amended by inserting ", and the Office is authorized to expend funds to cover the subsistence expenses and travel-related expenses, including per diem, lodging costs, and transportation costs, of persons attending such programs who are not Federal employees" after "world".

125 STAT. 336          PUBLIC LAW 112–29—SEPT. 16, 2011

(b) PAYMENT OF ADMINISTRATIVE JUDGES.—Section 3(b) of title 35, United States Code, is amended by adding at the end the following:

"(6) ADMINISTRATIVE PATENT JUDGES AND ADMINISTRATIVE TRADEMARK JUDGES.—The Director may fix the rate of basic pay for the administrative patent judges appointed pursuant to section 6 and the administrative trademark judges appointed pursuant to section 17 of the Trademark Act of 1946 (15 U.S.C. 1067) at not greater than the rate of basic pay payable for level III of the Executive Schedule under section 5314 of title 5. The payment of a rate of basic pay under this paragraph shall not be subject to the pay limitation under section 5306(e) or 5373 of title 5.".

## SEC. 22. PATENT AND TRADEMARK OFFICE FUNDING.

(a) IN GENERAL.—Section 42(c) of title 35, United States Code, is amended—

(1) by striking "(c)" and inserting "(c)(1)";

(2) in the first sentence, by striking "shall be available" and inserting "shall, subject to paragraph (3), be available";

(3) by striking the second sentence; and

(4) by adding at the end the following:

"(2) There is established in the Treasury a Patent and Trademark Fee Reserve Fund. If fee collections by the Patent and Trademark Office for a fiscal year exceed the amount appropriated to the Office for that fiscal year, fees collected in excess of the appropriated amount shall be deposited in the Patent and Trademark Fee Reserve Fund. To the extent and in the amounts provided in appropriations Acts, amounts in the Fund shall be made available until expended only for obligation and expenditure by the Office in accordance with paragraph (3).

"(3)(A) Any fees that are collected under sections 41, 42, and 376, and any surcharges on such fees, may only be used for expenses of the Office relating to the processing of patent applications and for other activities, services, and materials relating to patents and to cover a share of the administrative costs of the Office relating to patents.

"(B) Any fees that are collected under section 31 of the Trademark Act of 1946, and any surcharges on such fees, may only be used for expenses of the Office relating to the processing of trademark registrations and for other activities, services, and materials relating to trademarks and to cover a share of the administrative costs of the Office relating to trademarks.".

35 USC 142 note.

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on October 1, 2011.

35 USC 1 note.

## SEC. 23. SATELLITE OFFICES.

Deadline.

(a) ESTABLISHMENT.—Subject to available resources, the Director shall, by not later than the date that is 3 years after the date of the enactment of this Act, establish 3 or more satellite offices in the United States to carry out the responsibilities of the Office.

(b) PURPOSES.—The purposes of the satellite offices established under subsection (a) are to—

(1) increase outreach activities to better connect patent filers and innovators with the Office;

(2) enhance patent examiner retention;

(3) improve recruitment of patent examiners;

(4) decrease the number of patent applications waiting for examination; and

(5) improve the quality of patent examination.

(c) REQUIRED CONSIDERATIONS.—

(1) IN GENERAL.—In selecting the location of each satellite office to be established under subsection (a), the Director—

(A) shall ensure geographic diversity among the offices, including by ensuring that such offices are established in different States and regions throughout the Nation;

(B) may rely upon any previous evaluations by the Office of potential locales for satellite offices, including any evaluations prepared as part of the Office's Nationwide Workforce Program that resulted in the 2010 selection of Detroit, Michigan, as the first satellite office of the Office;

(C) shall evaluate and consider the extent to which the purposes of satellite offices listed under subsection (b) will be achieved;

(D) shall consider the availability of scientific and technically knowledgeable personnel in the region from which to draw new patent examiners at minimal recruitment cost; and

(E) shall consider the economic impact to the region.

(2) OPEN SELECTION PROCESS.—Nothing in paragraph (1) shall constrain the Office to only consider its evaluations in selecting the Detroit, Michigan, satellite office.

(d) REPORT TO CONGRESS.—Not later than the end of the third fiscal year that begins after the date of the enactment of this Act, the Director shall submit a report to Congress on—

(1) the rationale of the Director in selecting the location of any satellite office required under subsection (a), including an explanation of how the selected location will achieve the purposes of satellite offices listed under subsection (b) and how the required considerations listed under subsection (c) were met;

(2) the progress of the Director in establishing all such satellite offices; and

(3) whether the operation of existing satellite offices is achieving the purposes under subsection (b).

**SEC. 24. DESIGNATION OF DETROIT SATELLITE OFFICE.**                     35 USC 1 note.

(a) DESIGNATION.—The satellite office of the United States Patent and Trademark Office to be located in Detroit, Michigan, shall be known and designated as the "Elijah J. McCoy United States Patent and Trademark Office".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the satellite office of the United States Patent and Trademark Office to be located in Detroit, Michigan, referred to in subsection (a) shall be deemed to be a reference to the "Elijah J. McCoy United States Patent and Trademark Office".

**SEC. 25. PRIORITY EXAMINATION FOR IMPORTANT TECHNOLOGIES.**

Section 2(b)(2) of title 35, United States Code, is amended—

(1) in subparagraph (E), by striking "and" after the semicolon;

(2) in subparagraph (F), by inserting "and" after the semicolon; and

(3) by adding at the end the following:

"(G) may, subject to any conditions prescribed by the Director and at the request of the patent applicant, provide for prioritization of examination of applications for products, processes, or technologies that are important to the national economy or national competitiveness without recovering the aggregate extra cost of providing such prioritization, notwithstanding section 41 or any other provision of law;".

**SEC. 26. STUDY ON IMPLEMENTATION.**

(a) PTO STUDY.—The Director shall conduct a study on the manner in which this Act and the amendments made by this Act are being implemented by the Office, and on such other aspects of the patent policies and practices of the Federal Government with respect to patent rights, innovation in the United States, competitiveness of United States markets, access by small businesses to capital for investment, and such other issues, as the Director considers appropriate.

(b) REPORT TO CONGRESS.—The Director shall, not later than the date that is 4 years after the date of the enactment of this Act, submit to the Committees on the Judiciary of the House of Representatives and the Senate a report on the results of the study conducted under subsection (a), including recommendations for any changes to laws and regulations that the Director considers appropriate.

**SEC. 27. STUDY ON GENETIC TESTING.**

(a) IN GENERAL.—The Director shall conduct a study on effective ways to provide independent, confirming genetic diagnostic test activity where gene patents and exclusive licensing for primary genetic diagnostic tests exist.

(b) ITEMS INCLUDED IN STUDY.—The study shall include an examination of at least the following:

(1) The impact that the current lack of independent second opinion testing has had on the ability to provide the highest level of medical care to patients and recipients of genetic diagnostic testing, and on inhibiting innovation to existing testing and diagnoses.

(2) The effect that providing independent second opinion genetic diagnostic testing would have on the existing patent and license holders of an exclusive genetic test.

(3) The impact that current exclusive licensing and patents on genetic testing activity has on the practice of medicine, including but not limited to: the interpretation of testing results and performance of testing procedures.

(4) The role that cost and insurance coverage have on access to and provision of genetic diagnostic tests.

(c) CONFIRMING GENETIC DIAGNOSTIC TEST ACTIVITY DEFINED.—For purposes of this section, the term "confirming genetic diagnostic test activity" means the performance of a genetic diagnostic test, by a genetic diagnostic test provider, on an individual solely for the purpose of providing the individual with an independent confirmation of results obtained from another test provider's prior performance of the test on the individual.

(d) REPORT.—Not later than 9 months after the date of enactment of this Act, the Director shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary

of the House of Representatives on the findings of the study and provide recommendations for establishing the availability of such independent confirming genetic diagnostic test activity.

## SEC. 28. PATENT OMBUDSMAN PROGRAM FOR SMALL BUSINESS CONCERNS.

35 USC 2 note.

Using available resources, the Director shall establish and maintain in the Office a Patent Ombudsman Program. The duties of the Program's staff shall include providing support and services relating to patent filings to small business concerns and independent inventors.

## SEC. 29. ESTABLISHMENT OF METHODS FOR STUDYING THE DIVERSITY OF APPLICANTS.

Deadline.

The Director shall, not later than the end of the 6-month period beginning on the date of the enactment of this Act, establish methods for studying the diversity of patent applicants, including those applicants who are minorities, women, or veterans. The Director shall not use the results of such study to provide any preferential treatment to patent applicants.

## SEC. 30. SENSE OF CONGRESS.

It is the sense of Congress that the patent system should promote industries to continue to develop new technologies that spur growth and create jobs across the country which includes protecting the rights of small businesses and inventors from predatory behavior that could result in the cutting off of innovation.

## SEC. 31. USPTO STUDY ON INTERNATIONAL PATENT PROTECTIONS FOR SMALL BUSINESSES.

(a) STUDY REQUIRED.—The Director, in consultation with the Secretary of Commerce and the Administrator of the Small Business Administration, shall, using the existing resources of the Office, carry out a study—

(1) to determine how the Office, in coordination with other Federal departments and agencies, can best help small businesses with international patent protection; and

(2) whether, in order to help small businesses pay for the costs of filing, maintaining, and enforcing international patent applications, there should be established either—

(A) a revolving fund loan program to make loans to small businesses to defray the costs of such applications, maintenance, and enforcement and related technical assistance; or

(B) a grant program to defray the costs of such applications, maintenance, and enforcement and related technical assistance.

(b) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Director shall issue a report to the Congress containing—

(1) all findings and determinations made in carrying out the study required under subsection (a);

(2) a statement of whether the determination was made that—

(A) a revolving fund loan program described under subsection (a)(2)(A) should be established;

(B) a grant program described under subsection (a)(2)(B) should be established; or

125 STAT. 340          PUBLIC LAW 112–29—SEPT. 16, 2011

(C) neither such program should be established; and
(3) any legislative recommendations the Director may have developed in carrying out such study.

35 USC 2 note.

**SEC. 32. PRO BONO PROGRAM.**

(a) IN GENERAL.—The Director shall work with and support intellectual property law associations across the country in the establishment of pro bono programs designed to assist financially under-resourced independent inventors and small businesses.

(b) EFFECTIVE DATE.—This section shall take effect on the date of the enactment of this Act.

35 USC 101 note.

**SEC. 33. LIMITATION ON ISSUANCE OF PATENTS.**

(a) LIMITATION.—Notwithstanding any other provision of law, no patent may issue on a claim directed to or encompassing a human organism.

(b) EFFECTIVE DATE.—

Applicability.

(1) IN GENERAL.—Subsection (a) shall apply to any application for patent that is pending on, or filed on or after, the date of the enactment of this Act.

(2) PRIOR APPLICATIONS.—Subsection (a) shall not affect the validity of any patent issued on an application to which paragraph (1) does not apply.

**SEC. 34. STUDY OF PATENT LITIGATION.**

(a) GAO STUDY.—The Comptroller General of the United States shall conduct a study of the consequences of litigation by non-practicing entities, or by patent assertion entities, related to patent claims made under title 35, United States Code, and regulations authorized by that title.

(b) CONTENTS OF STUDY.—The study conducted under this section shall include the following:

(1) The annual volume of litigation described in subsection (a) over the 20-year period ending on the date of the enactment of this Act.

(2) The volume of cases comprising such litigation that are found to be without merit after judicial review.

(3) The impacts of such litigation on the time required to resolve patent claims.

(4) The estimated costs, including the estimated cost of defense, associated with such litigation for patent holders, patent licensors, patent licensees, and inventors, and for users of alternate or competing innovations.

(5) The economic impact of such litigation on the economy of the United States, including the impact on inventors, job creation, employers, employees, and consumers.

(6) The benefit to commerce, if any, supplied by non-practicing entities or patent assertion entities that prosecute such litigation.

(c) REPORT TO CONGRESS.—The Comptroller General shall, not later than the date that is 1 year after the date of the enactment of this Act, submit to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate a report on the results of the study required under this section, including recommendations for any changes to laws and regulations that will minimize any negative impact of patent litigation that was the subject of such study.

PUBLIC LAW 112–29—SEPT. 16, 2011          125 STAT. 341

**SEC. 35. EFFECTIVE DATE.**

Except as otherwise provided in this Act, the provisions of this Act shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any patent issued on or after that effective date.

*Applicability.*
*35 USC 1 note.*

**SEC. 36. BUDGETARY EFFECTS.**

The budgetary effects of this Act, for the purpose of complying with the Statutory Pay-As-You-Go Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, submitted for printing in the Congressional Record by the Chairman of the House Budget Committee, provided that such statement has been submitted prior to the vote on passage.

**SEC. 37. CALCULATION OF 60-DAY PERIOD FOR APPLICATION OF PATENT TERM EXTENSION.**

(a) IN GENERAL.—Section 156(d)(1) of title 35, United States Code, is amended by adding at the end the following flush sentence: "For purposes of determining the date on which a product receives permission under the second sentence of this paragraph, if such permission is transmitted after 4:30 P.M., Eastern Time, on a business day, or is transmitted on a day that is not a business day, the product shall be deemed to receive such permission on the next business day. For purposes of the preceding sentence, the term 'business day' means any Monday, Tuesday, Wednesday, Thursday, or Friday, excluding any legal holiday under section 6103 of title 5.".

(b) APPLICABILITY.—The amendment made by subsection (a) shall apply to any application for extension of a patent term under section 156 of title 35, United States Code, that is pending on, that is filed after, or as to which a decision regarding the application is subject to judicial review on, the date of the enactment of this Act.

*35 USC 156 note.*

Approved September 16, 2011.

---

LEGISLATIVE HISTORY—H.R. 1249:
HOUSE REPORTS: No. 112–98, Pt. 1 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 157 (2011):
    June 22, 23, considered and passed House.
    Sept. 7, 8, considered and passed Senate.
DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2011):
    Sept. 16, Presidential remarks.

○

# EXHIBIT B

Case 8:12-cv-01589-SDM-MAP  Document 11-6  Filed 07/31/12  Page 62 of 69 PageID 188

# DICTIONARY

OF THE

# ENGLISH LANGUAGE:

IN WHICH

## THE WORDS ARE DEDUCED FROM THEIR ORIGINALS,

AND ILLUSTRATED IN THEIR DIFFERENT SIGNIFICATIONS BY EXAMPLES FROM THE BEST WRITERS.

TO WHICH ARE PREFIXED,

# A HISTORY OF THE LANGUAGE,

AND

# AN ENGLISH GRAMMAR.

## BY SAMUEL JOHNSON, LL.D.

IN TWO VOLUMES.——VOL. I.

THE SIXTH EDITION.

Cum tabulis animum censoris sumet honesti :
Audebit quæcunque parùm splendoris habebunt,
Et fine pondere erunt, et honore indigna ferentur,
Verba movere loco; quamvis invita recedant,
Et versentur adhuc intra penetralia Vestæ :
Obscurata diu populo bonus eruet, atque
Proferet in lucem speciosa vocabula rerum,
Quæ priscis memorata Catonibus atque Cethegis
Nunc situs informis premit et deserta vetustas.        HOR.

LONDON:

Printed for J. F. and C. RIVINGTON, L. DAVIS, T. PAYNE and SON, T. LONGMAN, B. LAW, J. DODSLEY, C. DILLY,
W. LOWNDES, G. G. J. and J. ROBINSON, T. CADELL, JO. JOHNSON, J. ROBSON, W. RICHARDSON, J. NICHOLS,
R. BALDWIN, W. GOLDSMITH, J. MURRAY, W. STUART, P. ELMSLY, W. FOX, S. HAYES, D. OGILVIE,
W. BENT, T. and J. EGERTON, J. PHILLIPS, and M. NEWBERY.

M.DCC.LXXXV. (1785)

DIS

*Discord*, that only this dispute shall bring,
Who best shall love the deuke and serve the king.
　　　　　　　　　　　　　　　*Dryden.*

All nature is but art unknown to thee;
All chance, direction which thou canst not see;
All *discord*, harmony not understood;
All partial evil, universal good.　　*Pope.*

3. [In music.] Sounds not of themselves pleasing, but necessary to be mixed with others.

It is found alone that doth immediately and incorporeally affect most; this is most manifest in music, and concords and *discords* in music: for all sounds, whether they be sharp or flat, if they be sweet, have a roundness and equality; and if they be harsh, are unequal: for a *discord* itself is but a harshness of divers sounds meeting. *Bacon.*

It is the lark that sings so out of tune,
Straining harsh *discords* and unpleasing sharps.
　　　　　　　　　　　　　　　*Shakespeare.*

How doth music amaze us, when of *discords* she maketh the sweetest harmony! *Peacham.*

**To DISCORD.** *v. n.* [*discordo*, Latin.] To disagree; not to suit with.

Sounds do disturb and alter the one the other; sometimes the one drowning the other, and making it not heard; sometimes the one jarring and *discording* with the other, and making a confusion. 　　　　　　　　　　　　　　　*Bacon.*

**DISCORDANCE.** ) *n. s.* [from *discord*.]
**DISCORDANCY.** ) Disagreement; opposition; inconsistency.

**DISCORDANT.** *adj.* [*discordans*, Latin.]
1. Inconsistent; at variance with itself.

Myrrha was joy'd the welcome news to hear,
But, clogg'd with guilt, the joy was unsincere;
So various, fo *discordant* is the mind,
That in our will a different will we find. *Dryden.*

2. Opposite; contrarious.

The *discordant* attraction of some wandering comets would certainly disorder the revolutions of the planets, if they approach'd too near them. 　　　　　　　　　　　　　　　*Cheyne.*

3. Incongruous; not conformable.

Hither conscience is to be referred; if by a comparison of things done with the rule there be a consonancy, then follows the sentence of approbation; if *discordant* from it, the sentence of condemnation. *Hale's Origin of Mankind.*

**DISCORDANTLY.** *adv.* [from *discordant*.]
1. Inconsistently; in disagreement with itself.
2. In disagreement with another.

Two strings of a musical instrument being struck together, making two noises that arrive at the ear at the same time as to sense, yield a sound differing from either of them, and as it were compounded of both; insomuch, that if they be *discordantly* tuned, though each of them struck apart would yield a pleasing sound, yet being struck together they make a harsh and troublesome noise. *Boyle on Colours.*

3. Peevishly; in a contradictious manner.

**To DISCOVER.** *v. a.* [*découvrir*, French; *dis* and *cover*.]
1. To shew; to disclose; to bring to light; to make visible.
2. To expose to view.

The cover of the coach was made with such joints, that as they might, to avoid the weather, pull it up close, so they might put each end down, and remain as *disvovered* and open-sighted as on horseback. *Sidney.*
　To draw aside the curtains, and *discover*
The several caskets to this noble prince. *Shakesp.*
　He *discovereth* deep things out of darkness, and bringeth out to light the shadow of death. *Job, xii. 22.*

3. To shew; not to shelter; to expose.
And now will I *discover* her lewdness. *Hosea.*
Law can *discover* sin, but not remove. *Milton.*

4. To make known; not to disguise; to reveal.

We will pass over unto those men, and we will *discover* ourselves unto them. *Isa. xiv. 8.*
　Eve, who unseen
Yet all had heard, with audible lament
*Discover'd* from the place of her retire. *Milton.*

5. To ken; to espy.

When we had *discovered* Cyprus, we left it on the left hand. *Acts.*

6. To find out; to obtain information.

He shall never, by any alteration in me, *discover* my knowledge of his mistake. *Pope's Letters.*

7. To detect; to find though concealed.
Up he starts,
*Discover'd* and surpris'd. *Milton.*

Man with strength and free will arm'd
Complete, to have *discover'd* and repuls'd
Whatever wiles of foe or seeming friend. *Milton.*

8. To find things or places not known before.

Some to *discover* islands far away. *Shakesp.*
Another part in squadrons bend their march
On bold adventure, to *discover* wide
That dismal world. *Milton.*
　So of things. The Germans *discovered* printing and gunpowder.

9. To exhibit to view.

Some high climbing hill,
Which to his eye *discovers* unaware
The goodly prospect of some foreign land,
First seen, or some renown'd metropolis
With glist'ring spires and battlements adorn'd. *Milton.*

Not light, but rather darkness visible,
Serv'd only to *discover* fights of woe. *Milton.*

**DISCOVERABLE.** *adj.* [from *discover*.]
1. That which may be found out.

That mineral matter, which is so intermixed with the common and terrestrial matter, as not to be *discoverable* by human industry; or, if *discoverable*, diffused and scattered amongst the crasser matter, can never be separated. *Woodward's Natural History.*
　Revelation may affect two things to be joined, whose connection or agreement is not *discoverable* by reason. *Watts.*

2. Apparent; exposed to view.

They were deceived by Satan, and that not in an invisible situation, but in an open and *discoverable* apparition, that is, in the form of a serpent. *Brown's Vulgar Errours.*

It is concluded by astronomers, that the atmosphere of the moon hath no clouds nor rains, but a perpetual and uniform serenity; because nothing *discoverable* in the lunar surface is ever covered and absconded by the interposition of any clouds or mists. *Bentley.*

**DISCOVERER.** *n. s.* [from *discover*.]
1. One that finds any thing not known before; a finder out.

If more be found out, they will not recompense the *discoverer's* pains, but will be fitter to be cast out. *Holder.*
　Places receive appellations, according to the language of the *discoverer*, from observations made upon the people. *Browne.*
　The Cape of Good Hope was doubled in those early times; and the Portuguese were not the first *discoverers* of that navigation. *Arbuthnot on Coins.*
　An old maiden gentlewoman is the greatest *discoverer* of judgments; she can tell you what fin it was that set such a man's house on fire. *Addison's Spectator.*

2. A scout; one who is put to descry the posture or number of an enemy; speculator.

Here stand, my lords, and send *discoverers* forth,
To know the numbers of our enemies. *Shakesp.*

**DISCOVERY.** *n. s.* [from *discover*.]
1. The act of finding any thing hidden.

Of all who since have us'd the open sea,
Then the bold English none more fame have won,
Beyond the year, and out of heaven's highway,
They make *discoveries* where they see no sun. *Dryden.*

2. The act of revealing or disclosing any secret.

What, must I hold a candle to my shame?
They in themselves, good sooth, are too, too light,
Why 'tis an office of *discovery*, love,
And I should be obscur'd. *Shak. Merch. of Venice.*
　Things that appeared amiable by the light of this world, appear of a different odious hue in the clear *discoveries* of the next. *South.*

It would be necessary to say something of the state to which the war hath reduced us; such a *discovery* ought to be made as late as possible.
　　　　　　　　　　　　　　　*Swift.*

**To DISCOUNSEL.** *v. a.* [*dis* and *counsel*.] To dissuade; to give contrary advice. Obsolete.

But him that palmer from that vanity
With temperate advice *discounselled*. *Spenser.*

**DISCOUNT.** *n. s.* [*dis* and *count*.] The sum refunded in a bargain.

His whole intention was, to buy a certain quantity of copper money from Wood, at a large *discount*, and sell them as well as he could. *Swift.*

**To DISCOUNT.** *v. a.* [from the noun.] To count back; to pay back again.

My father's, mother's, brother's death I pardon:
My prayers and penance shall *discount* for these,
And beg of heav'n to charge the bill on me. *Dryden.*

The farmers, spitefully combin'd,
Force him to take his tithes in kind;
And Parvisol *discounts* arrears
By bills for taxes and repairs. *Swift.*

**To DISCOUNTENANCE.** *v. a.* [*dis* and *countenance*.]
1. To discourage by cold treatment.

Unwilling they were to *discountenance* any man who was willing to serve them. *Clarendon.*
　The truly upright judge will always countenance rig't, and *discountenance* wrong. *Atterbury.*

2. To abash; to put to shame.

Wisdom, in *discourse* with her,
Loses *discountenanc'd*, and like folly shews. *Milton.*
　He came, and with him Eve, more loth, tho' first
To offend; *discountenanc'd* both and discompos'd. *Milton.*

How would one look from his majestic brow,
Seated as on the top of virtue's hill,
*Discount'nance* her despis'd! *Milton.*

**DISCOUNTENANCE.** *n. s.* [*dis* and *countenance*.] Cold treatment; unfavourable aspect; unfriendly regard.

He thought a little *discountenance* upon those persons would suppress that spirit. *Clarendon.*
　All accidental misfortunes, how inevitable soever, were still attended with very apparent *discountenance*. *Clarendon.*
　In expectation of the hour of judgment, he patiently bears all the difficulties of duty, and the *discountenance* he meets with from a wicked and prophane world. *Rogers.*

**DISCOUNTENANCER.** *n. s.* [from *discountenance*.] One that discourages by cold treatment; one that depresses by unfriendly regard.

Rumours of scandal and murmurs against the king, and his government, taxed him for a great tacer of his people, and *discountenancer* of his nobility. *Bacon.*

**To DISCOURAGE.** *v. a.* [*décourager*, Fr. *dis* and *courage*.]
1. To depress; to deprive of confidence; to deject; to dastardize.

I might neither encourage the rebels insolence, nor *discourage* the protestants loyalty and patience.
　　　　　　　　　　　　　　　*King Charles.*

The

INV                    INV                    INV

But I urge,
Admitting motion in the heav'ns, to shew
Invalid, that which thee to doubt it mov'd.
                                        Milton.

To INVA'LIDATE. v. a. [from invalid.]
To weaken; to deprive of force or effi-
cacy.

To invalidate such a consequence, some things
might be speciously enough alledged.    Boyle.

Tell a man, passionately in love, that he is
jilted, bring a score of witnesses of the falsehood
of his mistress, and it is ten to one but three kind
words of her's, shall invalidate all their testimonies.
                                        Locke.

INVALI'DE. n. s. [French.] One disabled
by sickness or hurts.

What beggar in the invalides,
With lameness broke, with blindness smitten,
With'd ever decently to die?            Prior.

INVALI'DITY. n. s. [in and validity; inva-
lidité, Fr.]

1. Weakness; want of cogeney.

2. Want of bodily strength. This is no
English meaning.

He ordered, that none who could work should be
idle; and that none who could not work, by age,
sickness, or invalidity, should want.    Temple.

INVA'LUABLE. adj. [in and valuable.] Pre-
cious above estimation; inestimable.

The faith produced by terrour would not be so
free an act as it ought, to which are annexed all
the glorious and invaluable privileges of believing.
                                        Atterbury.

INVA'RIABLE. adj. [in and varius, Lat.
invariable, F.] Unchangeable; constant.

Being not able to design times by days, months,
or years, they thought best to determine these
alterations by some known and invariable signs, and
such they conceive the rising and setting of the
fixed stars.                            Brown.

The rule of good and evil would not appear uniform
and invariable, but different, according to men's
different complexions and inclinations.  Atterbury.

INVA'RIABLENESS. n. s. [from invariable.]
Immutability; constancy.

INVA'RIABLY. adv. [from invariable.] Un-
changeably; constantly.

He, who steers his course invariably by this rule,
takes the surest way to make all men praise him.
                                        Atterbury.

INVA'SION. n. s. [invasion, French; invasio,
Latin.]

1. Hostile entrance upon the rights or pos-
sessions of another; hostile encroachment.
We made an invasion upon the Cherethites.
                                        1 Sam. xxx.

Reason finds a secret grief and remorse from every
invasion that sin makes upon innocence, and that
must render the first entrance and admission of sin
uneasy.                                 South.

The nations of th' Ausonian shore
Shall hear the dreadful rumour from afar,
Of arm'd invasion, and embrace the war.
                                        Dryden's Æn.

William the Conqueror invaded England about
the year 1060, which means this; that taking the
duration from our Saviour's time 'till now, for one
entire length of time, it shews at what distance this
invasion was from the two extremes.     Locke.

2. Attack of a disease.

What demonstrates the plague to be endemial to
Egypt, is its invasion and going off at certain seasons.
                                        Arbuthnot.

INVA'SIVE. adj. [from invade.] Entering
hostilely upon other men's possessions;
not defensive.

I must come closer to my purpose, and not make
more invasive wars abroad, when, like Hannibal, I
am called back to the defence of my country.
                                        Dryden.

Let other monarchs, with invasive bands,
Lessen their people, and extend their lands;

By gasping nations hated and obey'd,
Lords of the deserts that their swords had made.
                                        Arbuthnot.

INVE'CTIVE. n. s. [invective; French; in-
vectiva, low Latin.]

1. A censure in speech or writing; a re-
proachful accusation.

Plain men desiring to serve God as they ought,
but being not so skilful as to unwind themselves,
where the snares of glosing speech do lie to entangle
them, are in mind not a little troubled, when they
hear so bitter invectives against that which this
church hath taught them to reverence as holy, to
approve as lawful, and to observe as behoveful for the
exercise of Christian duty.              Hooker.

If we take satyr, in the general signification of the
word, for an invective, 'tis almost as old as verse.
                                        Dryd. Juv.

2. It is used with against.

So desp'rate thieves, all hopeless of their lives,
Breathe out invectives 'gainst the officers.
                                        Shakesp. Henry VI.

Casting off respect, he fell into bitter invectives
against the French king.     Bacon's Henry VII.

3. Less properly with at.

Whilst we condemn others, we may indeed be in
the wrong; and then all the invectives we make at
their supposed errours fall back with a rebounded
force upon our own real ones.            Decay of Piety.

INVE'CTIVE. adj. [from the noun.] Sa-
tirical; abusive.

Let him rail on; let his invective muse
Have four-and-twenty letters to abuse.   Dryden.

INVE'CTIVELY. adv. Satirically; abusively.

Thus moft invectively he pierceth through
The body of the country, city, court;
Yea, and of this our life; swearing that we
Are mere usurpers, tyrants.             Shakespeare.

To INVE'IGH. v. a. [inveho, Latin.] To
utter censure or reproach: with against.

I cannot blame him for inveighing so sharply
against the vices of the clergy in his age.   Dryden.

He inveighs severely against the folly of parties,
in retaining scoundrels to retail their lyes. Arbuthnot.

INVE'IGHER. n. s. [from inveigh.] Vehe-
ment railer.

One of these inveighers against mercury, in seven
weeks, could not cure one small herpes in the face.
                                        Wiseman.

To INVE'IGLE. v. a. [invogliare, Ital.
Minshew; aveugler, or enaveugler, Fr.
Skinner and Junius.] To persuade to
something bad or hurtful; to wheedle;
to allure; to seduce.

Most false Duessa, royal richly dight,
That easy was to inveigle weaker sight,
Was, by her wicked arts and wily skill,
Too false and strong for earthly skill or might.
                                        Fairy Queen.

Achilles hath inveigled his fool from him.
                                        Shakespeare.

Yet have they many baits and guileful spells,
To inveigle and invite th' unwary sense
Of them that pass unweeting by the way.   Milton.

T' inveigle and draw in the rabble.      Hudibras.

Those drops of prettiness, scatteringly sprinkled
amongst the creatures, were designed to exalt our
conceptions, not inveigle or detain our passions.
                                        Boyle.

I leave the use of garlick to such as are inveigled
into the gout by the use of too much drinking.
                                        Temple.

The inveigling a woman, before she is come to
years of discretion, should be as criminal as the se-
ducing of her before she is ten years old. Spectator.

INVE'IGLER. n. s. [from inveigle.] Seducer;
deceiver; allurer to ill.

Being presented to the Emperor for his admirable
beauty, the prince clapt him up as his inveigler.
                                        Sandys.

To INVE'NT. v. a. [inventer, Fr. invenio,
Latin.]

1. To discover; to find out; to excogitate;
to produce something not made before.

The substance of the service of God, so far forth
as it hath in it any thing more than the law of reason
doth teach, may not be invented of men, but must
be received from God himself.            Hooker.

By their count, which lovers books invent,
The sphere of Cupid forty years contains.   Spenser.

Matter of mirth enough, though there were none
She could devise, and thousand ways invent
To feed her foolish humour and vain jolliment.
                                        Fairy Queen.

Woe to them that invent to themselves instruments
of musick.                              Amos.

We may invent
With what more forcible we may offend
Our enemies.                            Milton.

In the motion of the bones in their articulations,
a twofold liquor is prepared for the inunction of their
heads; both which make up the most apt mixture,
for this use, that can be invented or thought upon.
                                        Ray.

Ye skilful masters of Machaon's race,
Who Nature's mazy intricacies trace,
By manag'd fire and late invented eyes. Blackmore.

But when long time the wretches thoughts refin'd,
When want had set an edge upon their mind,
Then various cares their working thoughts em-
ploy'd,
And that which each invented, all enjoy'd.  Creech.

The ship, by help of a screw, invented by
Archimedes, was launched into the water.
                                        Arbuthnot.

2. To forge; to contrive falsely; to fabri-
cate.

I never did such things as those men have ma-
liciously invented against me.            Susan. xliii.

Here is a strange figure invented, against the
plain sense of the words.                Stillingfleet.

3. To feign; to make by the imagination.

I would invent as bitter searching terms,
With full as many signs of deadly hate,
As lean-fac'd envy in her loathsome cave.  Shak.

Hercules's meeting with Pleasure and Virtue was
invented by Prodicus, who lived before Socrates, and
in the first dawnings of philosophy.      Addison.

4. To light on; to meet with.    Not used.

Far off he wonders what them makes so glad:
Or Bacchus' merry fruit they did invent,
Or Cybel's frantick rites have made them mad.
                                        Spenser.

INVE'NTOR. n. s. [from inventeur, French.]

1. One who produces something new; a
deviser of something not known before.

As a translator, he was just; as an inventor, he
was rich.                               Garth.

2. A forger.

INVE'NTION. n. s. [invention, French; in-
ventio, Latin.]

1. Excogitation; the act or power of pro-
ducing something new.

O for a muse of fire, that would ascend
The brightest heaven of invention!       Shakesp.

By improving what was easily found,
Invention labours less, but judgment more.
                                        Roscommon.

Invention is a kind of muse; which, being pos-
sessed of the other advantages common to her sisters,
and being warmed by the fire of Apollo, is raised
higher than the rest.                   Dryden.

Mine is th' invention of the charming lyre:
Sweet notes and heav'nly numbers I inspire.
                                        Dryden.

The chief excellence of Virgil is judgment, of
Homer is invention.                     Pope.

2. Discovery.

Nature hath provided several glandules to separate
spittle from the blood, and no less than four pair
of channels to convey it into the mouth, which are
of a late invention, and called ductus salivales.
                                        Ray on the Creation.

3. Forgery; fiction.

We hear our bloody cousins, not confessing
Their cruel parricide, filling their hearers
With strange invention.          Shakesp. Macbeth.

2                                       1E

# EXHIBIT C

# Leahy: First-Inventor-To-File Transition Support In Every Corner Of Patent Community

(Source: http://leahy.senate.gov/press/press_releases/release/?id=74E2E0A6-C9EF-4804-995D-0109D3C205DE)

March 3, 2011

**Statement Of Senator Patrick Leahy (D-Vt.),**

**Chairman, Senate Judiciary Committee,**

**The America Invents Act**

**March 3, 2011**

The America Invents Act will promote innovation, which in turn creates new businesses and as a result, new jobs.  This is bipartisan legislation that will allow inventors to secure their patents more quickly, and have better success commercializing them.  The pending amendment would eliminate a major piece of this effort – the transition to a first-inventor-to-file patent system.

First-inventor-to-file is a necessary component of this legislation and enjoys support from every corner of the patent community. The Administration, the Secretary of Commerce, and the head of the Patent and Trademark Office oppose this amendment.  A vast array of individual, independent and small inventors, small businesses, and labor oppose this amendment.  The four senior Republicans on the Judiciary Committee who have worked on this bill, Senators Grassley, Hatch, Kyl and Sessions oppose this amendment.

This amendment would gut the reforms intended by the bill and be a poison pill to these legislative reform efforts.  Supporters of the legislation, ranging from high-tech and life sciences companies, to universities and small businesses, place such a high importance on the transition to first-inventor-to-file system that many of them – including those who reside in most of our states -- will not support a bill without those provisions.  A vote in support of this amendment, which would strike first-inventor-to-file provision, is effectively a vote against the heart of the America Invents Act.

A transition to first-inventor-to-file has been a part of this bill since its introduction four Congresses ago.  Yet until very recently, first-inventor-to-file was never the subject of even a single amendment in Judiciary Committee.  This legislation is the product of eight Senate hearings and three markups spanning weeks of consideration and many amendments.  Never was first-inventor-to-file a contentious issue. Some well-financed, special interests that do not

support the American Invests Act have decided to try to kill the bill by a last minute campaign to strike these vital provisions.  I urge Senators who support the goals of the America Invents Act to vote against this amendment to strike first-inventor-to-file.

The United States is the only industrialized country still using a first-to-invent system.  There is a reason for that.  A first-inventor-to-file system, where the priority of a right to a patent is based on the earlier filed application, adds simplicity and objectivity into a very complex system.  By contrast, our current, outdated method for determining the priority right to a patent is extraordinarily complex, subjective, time-intensive, and expensive.  The old system almost always favors the larger corporation and the deep pockets over the small, independent inventor.

This past weekend, *The Washington Post* editorial board endorsed the transition, calling the first-inventor-to-file standard a "bright line," and stating that it would bring "certainty to the process."  The editorial also right recognizes the "protections for academics who share their ideas with outside colleagues or preview them in public seminars" that are included in the bill.

The transition to a first-inventor-to-file system will benefit small inventors, and inventors of all sizes, by creating certainty.  Once a patent is granted, an inventor can rely on its filing date on the face of the patent.  This certainty is necessary to raise capital, grow businesses, and create jobs.

The reduction in costs to patent applications that comes with a transition to this system should also help the small, independent inventor.  In the outdated, current system, when more than one application claiming the same invention is filed, the priority of a right to a patent is decided through an "interference" proceeding to determine which applicant can be declared to have invented the claimed invention first.  This process is lengthy, complex, and can cost hundreds of thousands of dollars.  Small inventors rarely, if ever, win interference proceedings.  In a first-inventor-to-file system, however, the filing date of the application is objective and easy to determine, resulting in a streamlined and less costly process.

The bill protects against the concerns of many small inventors and universities by including a one-year grace period to ensure that inventor's own publication or disclosure cannot be used against him as prior art, but will act as prior art against another patent application.  This encourages early disclosure of new inventions, regardless of whether the inventor ends up trying to patent the invention.

The transition to first-inventor-to-file is also needed to help American companies and innovators compete globally.  As business and competition increasingly operate on a worldwide scale, inventors must file patent applications in both the United States and other countries for protection of their inventions.  Since America's current, outdated system differs from the first-inventor-to-file system used in other patent-issuing jurisdictions, it causes confusion and inefficiencies for American companies and innovators.  Harmonization will benefit American inventors.

Commerce Secretary Gary Locke highlighted the importance of the first-inventor-to-file provisions to the bill in his column in *The Hill* yesterday.  He noted that it "would be good for U.S. businesses, providing a more transparent and cost-effective process that puts them on a level playing field with their competitors around the world."  Secretary Locke went on to confront the erroneous notion that the current, outdated system is better for small, independent inventors and he did it head on by explaining his "strong opinion that the opposite is true." The first-inventor-to-file system is better for the small and independent inventor.

As the Secretary noted:
"The cost of proving that one was first to invent is prohibitive and requires detailed and complex documentation of the invention process. In cases where there's a dispute about who the actual inventor is, it typically costs at least $400,000 in legal fees, and even more if the case is appealed.  By comparison, establishing a filing date through a provisional application and establishing priority of invention costs just $110."

He explained how the 125,000 provisional applications currently filed each year prove that early filing dates protect the rights of small inventors. And he reiterated that during the past seven years under the current, outdated, cumbersome and expensive system, of almost 3,000,000 applications filed, only one patent was granted to an individual inventor who was the second to file.

Our reform legislation enjoys broad support.  I have already mentioned some of those supporters, but let me highlight a few more:

Just yesterday, the National Association of Manufacturers urged every Senator to oppose the effort to strike the first-to-file transition, writing,  "The NAM supports transitioning the United States from a 'first-to-invent' system to a 'first-to-file' system to eliminate unnecessary cost and complexity in the U.S. patent system."

The Small Business & Entrepreneurship Council has expressed its strong support for the first-inventor-to-file system, writing that "small firms will in no way be disadvantaged, while opportunities in the international markets will expand."

The Intellectual Property Owners Association calls the first-inventor-to file system "central to modernization and simplification of patent law" and "very widely supported by U.S. companies."

Independent inventor Louis Foreman has said the first-inventor-to-file transition will help "independent inventors across the country by strengthening the current system for entrepreneurs and small businesses."

Six university, medical college, and higher education associations have urged the transition to first-to-file, saying that it will "add greater clarity to the US system."

And, in urging the transition to the first-to-file system, the Association for Competitive Technology, which represents small and mid-size IT firms, has said the current outdated system "negatively impacts entrepreneurs" and puts American inventors "at a disadvantage with competitors abroad who can implement first inventor to file standards."   That is why it is so important to move to a first-inventor-to-file system.

I ask that copies of *The Washington Post*'s editorial, "Patenting Innovation," be included in the Record at the conclusion of my remarks.  I also ask that letters from the National Association of Manufacturers, higher education associations, and the Small Business & Entrepreneurship Council be placed in the Record.

If we are to maintain our position at the forefront of the world's economy, if we are to continue to lead the globe in innovation and production, if we are to win the future through American ingenuity and innovation, then we must have a patent system that is streamlined and efficient. The America Invents Act, and a transition to a first-inventor-to-file system in particular, are crucial to fulfilling this promise.

I urge all Senators on both sides of the aisle to oppose the Feinstein amendment, and support the important provision on first-inventor-to-file that is at the heart of the America Invents Act.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MADSTAD ENGINEERING, INC., a Florida corporation, and MARK STADNYK, an individual, <br><br><br> Plaintiffs, <br><br> v. <br><br> U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS, in his official capacity as Director of U.S. PATENT AND TRADEMARK OFFICE, and THE UNITED STATES OF AMERICA, <br><br> Defendants. | CASE NO.: 8:12-CV-01589-SDM-MAP <br> <u>Injunctive Relief Sought</u> |

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This matter having come before the Court upon Plaintiffs' Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65, the Court, having considered Plaintiffs' Motion, the supporting declarations and exhibits thereto, the Response(s) of Defendants and any supporting declarations and exhibits thereto, Plaintiffs' Reply, if any, and the other papers and pleadings on file in this case, finds as follows:

Plaintiffs have shown probable success on their claim that Section 3 of the America Invents Act, 125 Stat. 284 ("AIA"), violates Article I, Section 8, Clause 8 of the Constitution.

Plaintiffs have shown probable success on their claim that Section 3 of the AIA is non-severable from the remainder of the AIA.

Plaintiffs have shown irreparable injury in terms of irreparable harm to their businesses, property, and constitutional rights and have further shown that Plaintiffs lack any adequate remedy at law for their injury.

Plaintiffs have shown that a preliminary injunction would cause no hardship to Defendants and would be in the public interest.

Pursuant to Rule 65(c), no bond or other security is appropriate.

THEREFORE, the Court hereby GRANTS Plaintiffs' Motion and ORDERS as follows:

Defendants, their employees, officers, and agents are hereby ENJOINED from enforcing the provisions of the America Invents Act, 125 Stat. 284 ("AIA").


ENTERED THIS _____ DAY OF _____ 2012.


_____
The Honorable Steven D. Merryday
United States District Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| **MADSTAD ENGINEERING, INC., a Florida corporation, and MARK STADNYK, an individual,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO.: 8:12-CV-1589-T-23 MAP** |
| **U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS, in his official capacity as Director of U.S. PATENT AND TRADEMARK OFFICE, and THE UNITED STATES OF AMERICA,** | |
| **Defendants.** | |

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on July 31, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: Robert E. O'Neill, United States Attorney for the Middle District of Florida, U.S. Attorney's Office, Attn: Civil Process Clerk, 400 North Tampa St., Suite 3200, Tampa, FL  33602; United States of America, Attorney General of the United States, U.S. Department of Justice, c/o Assistant Attorney General for Administration, Justice Management Division,  950 Pennsylvania Avenue NW, Washington, DC 20530-0001; and

Office of the General Counsel, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450.

/s/ Michele Leo Hintson_____
Michele Leo Hintson, Esquire
Florida Bar No. 0604941
Jaime Austrich, Esquire
Florida Bar No. 084565
Attorneys For Plaintiffs,
MadStad Engineering, Inc., and Mark Stadnyk
**Shumaker, Loop & Kendrick, LLP**
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
Telephone: (813) 229-7600
Fax: (813) 229-1660
Email: MHintson@slk-law.com
Email: JAustrich@slk-law.com

**TRIAL COUNSEL**

/s/ Jonathan S. Massey_____
Jonathan S. Massey, Esq.*
D.C. Bar No.:457593
Leonard A. Gail, Esq.*
ARDC No.: 6199745
Matthew J. Reedy, Esq.
ARDC No.: 6306809
Attorneys For Plaintiffs,
MadStad Engineering, Inc., and Mark Stadnyk
**Massey & Gail LLP**
1325 G St., NW, Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
Fax: (312) 379-0467
Email: Jmassey@masseygail.com
Email: Lgail@masseygail.com
Email: Mreedy@masseygail.com