IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MADSTAD ENGINEERING, INC.,
a Florida corporation, and
MARK STADNYK, an individual,

Plaintiffs,

v.

U.S. PATENT AND TRADEMARK
OFFICE, DAVID KAPPOS, in his official
capacity as Director of U.S. PATENT AND
TRADEMARK OFFICE, and the UNITED
STATES OF AMERICA

Defendants.

No. 8:12-cv-01589-SDM-MAP

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**[*]

---

[*] On August 24, 2012, Defendants filed an unopposed motion for an enlargement of the Local Rules' page limit for briefs. The Court has not yet ruled on that motion. Because this brief is due today, Defendants have proceeded as if the enlargement had been granted. If the Court subsequently denies the motion for an enlargement of the page limit, Defendants respectfully request an opportunity to file a substitute brief consistent with the Court's order.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iii

FACTUAL AND LEGAL BACKGROUND ........................................................ 3

   A.   Legislative Background of the AIA ...................................................... 3

   B.   The AIA's First-Inventor-to-File Provisions........................................ 4

      1.   Explicit Inventor Requirement ................................................... 4

      2.   Priority of Invention:  Derivation Proceedings Replace Interferences ................... 5

   C.   Current Implementation of the AIA Through Rulemaking........................................ 6

PROCEDURAL HISTORY.................................................................................. 7

ARGUMENT ....................................................................................................... 8

   I.   PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEY WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION. ......................................... 8

      A.   The First-Inventor-to-File Provisions Are Not Causing Irreparable Harm Because Those Provisions Are Not Currently in Effect. ...................................................... 9

      B.   Plaintiffs Have Failed to Show that the AIA Is Currently Placing Their Patent Rights at Risk...................................................... 11

      C.   Plaintiffs' Speculation Regarding Possible Theft and Lost Business Opportunities Does Not Qualify as Irreparable Harm............................................... 14

   II.   PLAINTIFFS HAVE FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD THAT THE FIRST-INVENTOR-TO-FILE PROVISIONS OF THE AIA ARE UNCONSTITUTIONAL. ...................................................... 19

      A.   The Text and Purpose of the Patent Clause Permit Congress to Award Patents to Second Inventors. .............................................. 21

      B.   Courts Have Long Recognized that a Second Inventor May Be Awarded a Patent Under Certain Circumstances. .............................................. 24

      C.   The Current (Pre-AIA) Patent System Permits a Second Inventor to Obtain a Patent Under Certain Circumstances. .............................................. 27

D. Plaintiffs' Selective Historical Narrative Does Not Show that Congress May Grant Patents Only to First Inventors. .................................................................. 30

III. THE BALANCE OF THE EQUITIES, AND THE PUBLIC INTEREST, FAVOR UPHOLDING THE AIA. ........................................................................................ 33

IV. THE AIA IS SEVERABLE, BUT THE COURT NEED NOT REACH THIS ISSUE. ............................................................................................................... 34

CONCLUSION ...................................................................................................... 35

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1, cl. 8.......................................................................... 7, 19, 22

## CASES

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995)........................................................................... 18

*Alabama v. U.S. Army Corps of Engineers*,
    424 F.3d 1117 (11th Cir. 2005) ...................................................... 10, 17

*Alexander Milburn Co. v. Davis-Bournonville Co.*,
    270 U.S. 390 (1926)........................................................................... 22

*Apotex USA, Inc. v. Merck & Co., Inc.*,
    254 F.3d 1031 (Fed. Cir. 2001) ........................................................ 28

*Bedford v. Hunt*,
    3 F. Cas. 37 (C.C.D. Mass. 1817) .................................................... 27

*Bilski v. Kappos*,
    130 S. Ct. 3218 (2010)....................................................................... 30

*Bloedorn v. Grube*,
    631 F.3d 1218 (11th Cir. 2011) .......................................................... 8

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989)................................................................. 19, 23, 24

*Boulton v. Bull*,
    (1795) 126 Eng. Rep. 651 (K.B.).................................................. 30, 31

*Brunswick Corp. v. United States*,
    34 Fed. Cl. 532 (Fed. Cl. 1995) ....................................................... 27

*Bullock Printing Press Co. v. Jones*,
    4 F. Cas. 659 (C.C.S.D.N.Y. 1878) ................................................. 26

*Burger King Corp. v. Agad*,
    911 F. Supp. 1499 (S.D. Fla. 1995) ................................................. 18

*Church v. City of Huntsville*,
   30 F.3d 1332 (11th Cir. 1994) ........................................................................ 13

*Cooper v. Goldfarb*,
   154 F.3d 1321 (Fed. Cir. 1998) ................................................................... 6, 13

*Del Monte Fresh Produce Co. v. Dole Food Co.*,
   148 F. Supp. 2d 1326 (S.D. Fla. 2001) .......................................................... 16

*Edgeberry v. Stephens*,
   (1691) 91 Eng. Rep. 387 (K.B.) ..................................................................... 31

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003) ................................................................. 19, 20, 31, 32

*Evans v. Eaton*,
   16 U.S. (3 Wheat.) 454 (1818) ....................................................................... 27

*Figueroa v. United States*,
   466 F.3d 1023 (Fed. Cir. 2006) ...................................................................... 20

*Flex-Rest, LLC v. Steelcase, Inc.*,
   455 F.3d 1351 (Fed. Cir. 2006) ...................................................................... 28

*Garcia-Mir v. Meese*,
   781 F.2d 1450 (11th Cir. 1986) ..................................................................... 33

*Gayler v. Wilder*,
   51 U.S. (10 How.) 477 (1850) ........................................................... 22, 24, 25

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ................................................................................... passim

*Grant v. Raymond*,
   31 U.S. (6 Pet.) 218 (1832) ............................................................................ 23

*Int'l Inst. for Learning, Inc. v. J. Ross Pub., Inc.*,
   No. 07-80574-CIV, 2007 WL 4707057 (S.D. Fla. Aug. 28, 2007) ................... 17

*Kendall v. Winsor*,
   62 U.S. (21 How.) 322 (1858) ......................................................... 22, 23, 25, 26

*Kimberly-Clark Corp. v. Johnson & Johnson*,
   745 F.2d 1437 (Fed Cir. 1984) ......................................................................... 5

*Lewis v. Marling,*
   (1829) 109 Eng. Rep. 359 (K.B.) ................................................................. 31

*Los Angeles v. Lyons,*
   461 U.S. 95 (1983) .................................................................................... 14

*Loughlin v. Ling,*
   684 F.3d 1289 (Fed. Cir. 2012) ................................................................ 10

*Mason v. Hepburn,*
   13 App. D.C. 86 (D.C. Cir. 1898) ............................................................. 26

*Mayo Collab. Servs. v. Prometheus Labs., Inc.,*
   132 S. Ct. 1289 (2012) ............................................................................... 4

*McClurg v. Kingsland,*
   42 U.S. (1 How.) 202 (1843) ............................................................... 19, 21

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
   896 F.2d 1283 (11th Cir. 1990) .................................................................. 8

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,*
   508 U.S. 656 (1993) .................................................................................. 18

*OddzOn Prods., Inc. v. Just Toys, Inc.,*
   122 F.3d 1396 (Fed. Cir. 1997) .................................................................. 5

*Pennock v. Dialogue,*
   27 U.S. (2 Pet.) 1 (1829) .................................................................... 23, 27

*Pine v. Bd. of Cnty. Comm'rs,*
   No. 6:06-cv-1551, 2006 WL 3091528 (M.D. Fla. Oct. 30, 2006) ................. 10

*Schiavo ex rel. Schindler v. Schiavo,*
   403 F.3d 1223 (11th Cir. 2005) .................................................................. 9

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000) (en banc) ......................................... passim

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984) .................................................................................. 23

*Time Warner Entm't Co. L.P. v. FCC,*
   810 F. Supp. 1302 (D.D.C. 1992) .............................................................. 10

*United States v. Stevens,* 130 S. Ct. 1577 (2010) ............................................ 7

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) ..................................................... 28

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985)..................................................................... 33

*Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*,
    143 U.S. 275 (1892)................................................................ 25, 28

*Woodcock v. Parker*,
    30 F. Cas. 491 (C.C.D. Mass. 1813) ............................................ 27

*Young v. Dworkin*,
    489 F.2d 1277 (C.C.P.A. 1974) ................................................... 26

## <u>STATUTES AND REGULATIONS</u>

35 U.S.C. § 101........................................................................... 2, 4, 20

35 U.S.C. § 102................................................................................... 5

35 U.S.C. § 102(b) ................................................................. 15, 16, 29

35 U.S.C. § 102(f) ............................................................................... 4

35 U.S.C. § 102(g) ......................................................................... 5, 28

35 U.S.C. § 111(b)(5),
    *as amended by* AIA, sec. 3(e)(2), 125 Stat. at 287 ...................... 13

35 U.S.C. § 135................................................................... passim

35 U.S.C. § 146......................................................................... 3, 5, 20

35 U.S.C. § 291......................................................................... 3, 5, 20

Patent Act of 1790,
    1 Stat. 109 ................................................................................ 31

Patent Act of 1836,
    5 Stat. 117 ................................................................................ 29

## LEGISLATIVE MATERIALS

H.R. Rep. No. 112-98, pt. 1 (2011)................................................................................ passim

## SECONDARY SOURCES

Edward C. Walterscheid, *Priority of Invention:  How the United States Came to Have a 'First-to-Invent' Patent System*,
23 AIPLA Q.J. 263 (1995)............................................................................................ 30, 32

Joe Matal, *A Guide To The Legislative History of the America Invents Act* (pts. 1 & 2),
21 Fed. Cir. B.J. 435, 539 (2012) ...................................................................................... 4

Joseph Story, 3 *Commentaries on the Constitution of the United States*............................... 32

Letter from Thomas Jefferson to Isaac McPherson (Aug. 13, 1813),
*reprinted in* 13 *The Writings of Thomas Jefferson* 326 (Albert Ellery Bergh ed. 1907).... 23

Press Release, The White House, President Obama Signs America Invents Act, Overhauling the Patent System to Stimulate Economic Growth, and Announces New Steps to Help Entrepreneurs Create Jobs (Sept. 16, 2011),
http://www.whitehouse.gov/the-press-office/2011/09/16/president-obama-signs-america-invents-act-overhauling-patent-system-stim ......................................................................... 1

Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785)............................... 22

The Federalist No. 43 (J. Madison),
at 288 (Jacob Ernest Cooke ed., 1961) .............................................................................. 23

USPTO, *Manual of Patent Examining Procedure*............................................................ 14, 15

USPTO, *Process Production Report:  Final Report, FY2011*,
http://www.uspto.gov/ip/boards/bpai/stats/process/fy2011_sep_b.pdf
(last visited Aug. 30, 2012).................................................................................................. 16

USPTO, *U.S. Patent Statistics Chart:  Calendar Years 1963-2011*,
http://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.htm
(last visited Aug. 30, 2012).................................................................................................. 16

## **INTRODUCTION**

The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), represents the most significant reform of the Patent Act since 1952.[1]  Among many other important changes, the AIA adopts a "first-inventor-to-file" system to establish an inventor's priority date, which determines who, as between two competing inventors, receives the patent.  Under the current "first-to-invent" system, an inventor's priority date is determined by the date the claimed subject matter was first invented, so the first inventor is generally entitled to the patent.  Under the AIA, an inventor's priority date will be determined by the date the first patent application is filed, so the inventor who files first is generally entitled to the patent.

Plaintiffs claim that the first-inventor-to-file provisions of the AIA violate the Constitution's Patent Clause and necessitate a preliminary injunction.  But because Plaintiffs have not demonstrated any of the factors required for preliminary injunctive relief, their motion must be denied.

First, Plaintiffs are not suffering irreparable harm because the first-inventor-to-file provisions do not take effect until March 16, 2013, and they do not apply to patent claims filed earlier.  *See* AIA, sec. 3(n), 125 Stat. at 293.  Moreover, Plaintiffs have failed to show that the AIA is currently placing their patent rights at risk, and their other asserted harms are wholly speculative.

---

[1] *See* Press Release, The White House, President Obama Signs America Invents Act, Overhauling the Patent System to Stimulate Economic Growth, and Announces New Steps to Help Entrepreneurs Create Jobs (Sept. 16, 2011), http://www.whitehouse.gov/the-press-office/2011/09/16/president-obama-signs-america-invents-act-overhauling-patent-system-stim.

Second, the AIA's first-inventor-to-file provisions are clearly constitutional, so Plaintiffs cannot show a substantial likelihood of success on the merits.  Plaintiffs' claim that the AIA will unconstitutionally award patents to the winners of a race to the patent office rather than to the inventors of genuine discoveries is without basis:  the AIA explicitly requires that an individual be an "inventor" of a "discovery" in order to obtain a patent.  *See* 35 U.S.C. § 101.  And Plaintiffs' central assumption, that only the first individual to conceive of the invention may constitutionally obtain the patent, is unsupported by the text of the Patent Clause, Supreme Court precedent, and the purpose, history, and current operation of our patent system.

Third, the balancing of the equities and the public interest tip decidedly in favor of upholding the AIA.  Congress concluded that the AIA was the most effective way to encourage innovation, protect patent holders, and promote U.S. economic growth by reducing costs and harmonizing the U.S. patent system with those throughout the industrialized world.  Contrary to Plaintiffs' contention, a preliminary injunction would harm the United States by thwarting the will of Congress and by disrupting the rulemaking process essential to timely implementation of the AIA.  And for their part, Plaintiffs have completely failed to show that the AIA's first-inventor-to-file provisions, not yet in effect, are causing them actual and imminent injury.[2]

---

[2] Plaintiffs have requested oral argument pursuant to Local Rule 3.01(j).  Defendants believe this motion can be decided on the filings, but do not object to oral argument if it would assist the Court.

## FACTUAL AND LEGAL BACKGROUND

**A.      Legislative Background of the AIA**

Congress moved to a first-inventor-to-file system for several reasons.  First, filing

dates are an objective and easy way to establish an inventor's priority date, which becomes

important in addressing competing patent claims and infringement actions.  H.R. Rep. No.

112-98, pt. 1, at 40 (2011).  The date of invention, by contrast, is uncertain and requires proof

by corroborating evidence.  *Id.*

Second, in the event of a dispute, a determination as to who was first to invent is

inherently expensive, may require extensive discovery, and takes years to complete.  Such

disputes must be resolved in interference proceedings before the Board of Patent Appeals and

Interferences, or by suit in district court.  *Id.* at 40-41; *see* 35 U.S.C. §§ 135, 146, 291.  The

very risk of such contests compounds the cost to inventors by forcing them to maintain

extensive records to prove that they invented first.  H.R. Rep. No. 112-98, at 40-41.  A first-

inventor-to-file system is likely to reduce such costs, as priority will be based on a definitive

filing date that can be easily identified.

Finally, the first-inventor-to-file system will set American inventors on equal footing

with foreign inventors, as the first-to-file system predominates throughout the industrialized

world.  *Id.* at 40.  Because inventors and companies routinely file for patent protection here

and overseas, they must comply with two different filing systems, and make decisions in

view of the requirements of each of them.  *Id.* at 41-42.  Those applicants who are forced to

comply with different filing systems may be at a strategic disadvantage as compared to those

who file only in countries outside the United States that use similar first-to-file systems.  *Id.*[3]

## B.     The AIA's First-Inventor-to-File Provisions

### 1.  Explicit Inventor Requirement

The AIA awards patents only to "inventors."  It makes no change to current section 101 of title 35, U.S. Code, which provides that "[w]hoever *invents* or *discovers* any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101 (emphasis added).[4]  While the AIA amends section 102(b) to make an invention's priority date its effective filing date, and thereby moves the United States to the first-inventor-to-file system, first filers may only receive patents if they are in fact inventors pursuant to section 101.  Further, the AIA retains the concept of "prior art" and continues to define it in a manner that reinforces the requirement

---

[3] For a guide to the legislative history of the AIA, see generally Joe Matal, *A Guide To The Legislative History of the America Invents Act* (pts. 1 & 2), 21 Fed. Cir. B.J. 435, 539 (2012).

[4] The AIA's deletion of the redundant requirement in 35 U.S.C. § 102(f) is irrelevant.  The AIA still retains an explicit requirement that an individual must be an "inventor" of a "discovery" in order to obtain a patent.  Matal, *supra* note 3, at 452 ("[E]ven commentary on the 1952 Patent Act noted, with respect to § 102(f), that '[t]his paragraph is perhaps unnecessary since under § 101 it is "Whoever invents . . ." who may obtain a patent and later sections provide that the inventor must apply for the patent and execute an oath of inventorship.'" (citations omitted)).  Thus, Plaintiffs are incorrect in asserting that the AIA removes from the "conditions of patentability" the requirement that the named inventor actually invented the claimed subject matter.  Section 101's requirement that an individual must be an actual inventor is an enforceable condition of patentability.  *See Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1305 (2012) (holding patent claims "invalid" for violating section 101).

that patents may be granted only to inventors.[5]  If "the claimed invention was patented,

described in a printed publication, or in public use, on sale, or otherwise available to the

public before the effective filing date," the applicant cannot obtain a patent.  AIA, sec. 3,

§ 102(a)(1), 125 Stat. at 285-86.  The only exceptions are one-year grace periods for

inventors who have already disclosed their inventions and inventors whose inventions have

been publicly disclosed by derivers.  *Id.* § 102(b)(1), 125 Stat. at 286.

### 2.  Priority of Invention:  Derivation Proceedings Replace Interferences

When two independent inventors both claim the right to a patent involving the same

subject matter, the patent system must have a way to determine who is entitled to priority

(i.e., who receives the patent).  Under the first-to-invent system, these competing patent

claims are resolved through interference lawsuits or proceedings before the Board of Patent

Appeals and Interferences.  *See* 35 U.S.C. §§ 135, 146, 291.  To determine who first invented

the subject matter, and is therefore entitled to the patent, the Board or district court considers

"not only the respective dates of conception and reduction to practice of the invention, but

also the reasonable diligence of one who was first to conceive and last to reduce to practice,

from a time prior to conception by the other."  35 U.S.C. § 102(g).  The "first party to reduce

an invention to practice" receives the patent, "unless the other party can show that it was the

---

[5] "Prior art" is technology that is no longer patentable because it is "already available to the public" because, for instance, it has been "described in the world's accessible literature, including patents, or has been publicly known or in . . . public use or sale 'in this country.'" *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402-03 (Fed. Cir. 1997) (quoting *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed Cir. 1984) (citing 35 U.S.C. § 102)).  If "the difference between the subject matter sought to be patented and the prior art, meaning what was known before . . . is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented."  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 15 (1966).

first to conceive of the invention and that it exercised reasonable diligence in later reducing

that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998)

(citation omitted).

Under the AIA, competing patent claims will be resolved by considering which patent

application has the earlier priority date, or through "derivation proceedings," also before the

Board (renamed the "Patent Trial and Appeal Board," AIA, sec. 7, 125 Stat. at 313) or a

district court. *See* AIA, secs. 3(h)–(i), §§ 135, 291, 125 Stat. at 288-90.  Derivation

proceedings are designed to determine whether one applicant or patentee derived—i.e.,

stole—the claimed invention from a true inventor and then applied for a patent, without the

inventor's authorization, before the inventor.  Congress included derivation proceedings "to

ensure that the first person to file the application is actually a true inventor. . . . [A] person

will not be able to obtain a patent for the invention that he did not actually invent."  H.R.

Rep. No. 112-98, at 42.

## C.      Current Implementation of the AIA Through Rulemaking

The United States Patent and Trademark Office ("USPTO") is in the process of

issuing regulations to implement the AIA.  The USPTO has already published several final

rules in the *Federal Register* to implement provisions of the AIA that (unlike the first-

inventor-to-file provisions) go into effect on September 16, 2012.[6]  The USPTO has also

---

[6] *See, e.g.*, 77 Fed. Reg. 42,150 (July 17, 2012) (preissuance submissions by third parties,
AIA, sec. 8); 77 Fed. Reg. 48,612 (Aug. 14, 2012) (general administrative trial final rules,
AIA, secs. 3, 6, 18); 77 Fed. Reg. 48,680 (Aug. 14, 2012) (inter partes, post grant, and
covered business method review final rules, AIA, secs. 6, 18); 77 Fed. Reg. 48,734 (Aug. 14,
2012) (covered business method and technological invention definitions final rules, AIA, sec.
18); 77 Fed. Reg. 48,756 (Aug. 14, 2012) (trial practice guide, AIA, secs. 3, 6, 18); 77 Fed.

published notices of proposed rulemaking to implement other provisions of the AIA, including the statute's first-inventor-to file provisions.  These rules will take effect on March 16, 2013.[7]  On August 16, 2012, the USPTO published a notice of roundtable, to take place on September 6, 2012, on the first-inventor-to-file provisions.[8]

## PROCEDURAL HISTORY

On July 18, 2012, Plaintiffs filed their Complaint, alleging that the AIA's first-inventor-to-file provisions are unconstitutional under the Patent Clause, Article I, Section 8, Clause 8 of the United States Constitution.  Also, in challenging the constitutionality of the AIA's first-inventor-to-file provisions, Plaintiffs allege that those provisions are not severable from the remainder of the Act.  On July 31, 2012, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin Defendants from enforcing the AIA against them.[9]

---

Reg. 48,776 (Aug. 14, 2012) (inventor's oath or declaration, AIA, sec. 4); 77 Fed. Reg. 48,828 (Aug. 14, 2012) (supplemental examination, AIA, sec. 12).

[7] *See*, *e.g.*, 77 Fed. Reg. 7028 (Feb. 10, 2012) (proposed rules for derivation proceedings, AIA, sec. 3); 77 Fed. Reg. 43,742 (July 26, 2012) (first-inventor-to-file proposed rules, AIA, sec. 3).

[8] *See* 77 Fed. Reg. 49,427 (Aug. 16, 2012).

[9] Plaintiffs do not claim that the AIA has been applied to them in an unconstitutional manner or that it will be applied to them in an unconstitutional manner due to some unique circumstances.  Rather, Plaintiffs allege broadly that the statute's first-inventor-to-file provisions are inconsistent with the Patent Clause.  *See* Compl. ¶¶ 3-5, 17-27.  To prevail on this facial challenge, Plaintiffs must show that "no set of circumstances" exists under which the first-inventor-to-file provisions would be valid, or that the provisions lack any "plainly legitimate sweep."  *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (citations omitted).

# ARGUMENT

Plaintiffs seek the "extraordinary and drastic" remedy of a preliminary injunction, which this Court cannot grant unless Plaintiffs, as movants, clearly establish "the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citation and internal quotation omitted).  Plaintiffs must show that (1) they have "a substantial likelihood of success on the merits"; (2) they will suffer "irreparable injury . . . unless the injunction issues; (3) th[is] threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id.*; *see also Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (same).  Because "preliminary injunctions of legislative enactments . . . interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits," they "must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Plaintiffs have not carried their burden to clearly show that any of the four factors—let alone all of them—favor issuing a preliminary injunction.  Their motion must therefore be denied.

## I.      PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEY WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION.

The failure to establish irreparable injury is, standing alone, grounds for denying a preliminary injunction. *City of Jacksonville*, 896 F.2d at 1285.  Irreparable harm is "the *sine qua non* of injunctive relief." *Id.* (citation omitted); *see also Siegel*, 234 F.3d at 1176

("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").  To establish irreparable injury, Plaintiffs must show that the threat of injury to them is actual and imminent, not remote or speculative.[10]  *Id.*  Plaintiffs have made no such showing.[11]

### A.   The First-Inventor-to-File Provisions Are Not Causing Irreparable Harm Because Those Provisions Are Not Currently in Effect.

Plaintiffs have failed to demonstrate that the first-inventor-to-file provisions of the AIA are causing them actual and imminent harm.  The purpose of a preliminary injunction is "to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits."  *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005).  Accordingly, "the harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the

---

[10] Plaintiffs claim that their harm is "irreparable" because, among other things, it may be difficult to recover monetary damages from the government. Pls.' Br. 21-22.  The Court need not reach that issue here, as the Eleventh Circuit has clearly articulated that a finding of irreparability is contingent on a finding of an actual and imminent injury. *See, e.g.*, *Siegel*, 234 F.3d at 1176 ("As we have emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" (citation omitted)).  Plaintiffs have not demonstrated in the first instance any actual or imminent harm, so it is immaterial whether such harm would qualify as irreparable due to the alleged difficulty in recovering monetary damages.

[11] Plaintiffs' argument that "Federal law recognizes the irreparable nature of the loss of patent rights and specifically authorizes injunctive relief in patent infringement cases," Pls.' Br. 22, along with the cases they cite in support, is irrelevant.  The ultimate question before the Court is not whether an injunction is valid relief in the case of patent infringement, but whether specific statutory changes to the patent law via the AIA are constitutional.  As such, whether injunctive relief is viable in any particular patent infringement dispute has no bearing on whether a preliminary injunction is proper here—which it is not.

preliminary injunction and trial on the merits." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1133-34 (11th Cir. 2005).  As Plaintiffs themselves recognize, the first-inventor-to-file provisions do not become effective until March 16, 2013.  Pls.' Br. 23; AIA, sec. 3(n), 125 Stat. at 293.  Plaintiffs accordingly are not suffering from any actual and imminent harm, because the first-inventor-to-file provisions at issue do not and will not apply for almost six more months.[12]  Issuance of a preliminary injunction in these circumstances is therefore unnecessary to maintain the status quo or alleviate any imminent harm.  *See Pine v. Bd. of Cnty. Comm'rs*, No. 6:06-cv-1551, 2006 WL 3091528, at *3 n.4 (M.D. Fla. Oct. 30, 2006) ("[T]he ripeness injury conflates with the preliminary injunction injury, for if the plaintiffs' challenge is premature, *a fortiori* there is no irreparable injury.") (quoting *Time Warner Entm't Co. L.P. v. FCC*, 810 F. Supp. 1302, 1304 (D.D.C. 1992)).  From Plaintiffs' perspective, the status quo will continue regardless; a preliminary injunction would change nothing.

Plaintiffs are presumably seeking a preliminary injunction in part because they want a decision on the merits before the statute becomes effective.  But it is entirely possible that the Court can resolve this entire lawsuit before March 16, 2013 without enjoining the statute in the meantime with the "extraordinary and drastic remedy" of a preliminary injunction. *Siegel*, 234 F.3d at 1176.  Plaintiffs may also be seeking a preliminary injunction at this time in order to delay the additional security measures they allege are necessary in anticipation of

---

[12] Indeed, since the AIA's passage, courts have recognized that the provisions that are scheduled to go into effect at a later date have no application to current, pending patent litigation for the obvious reason that they have yet to be implemented.  *See, e.g.*, *Loughlin v. Ling*, 684 F.3d 1289, 1291 n.* (Fed. Cir. 2012) ("That newly enacted law [the AIA] does not apply to this case.").

the new first-inventor-to-file regime.  *See* Pls.' Br. 20.  But as explained more fully below,

those measures and their associated costs do not establish actual and imminent harm.  Rather,

they appear to be predicated on a misunderstanding of the changes enacted by the AIA.  But

even assuming otherwise—and Defendants do not—as long as Plaintiffs believe those costs

are necessary under the new first-inventor-to-file regime, a preliminary injunction would

likely provide little comfort, as Plaintiffs still bear the risk that they could ultimately lose the

case, which would dissolve any preliminary injunction anyway.  Thus, the issuance of a

preliminary injunction at this time will not serve to prevent any actual and imminent harm

that Plaintiffs claim to be suffering.

**B.**    **Plaintiffs Have Failed to Show that the AIA Is Currently Placing Their Patent Rights at Risk.**

Although Plaintiffs list several categories of harm that they allege they will suffer as a

result of the first-inventor-to-file provisions, the loss of the right to secure a patent is

surprisingly not among them.  *See* Pls.' Br. 20.  Yet the potential harm underlying Plaintiffs'

motion is that "[u]nder the AIA, a patent will be awarded to the person who is first to file a

patent application, regardless of whether the applicant was the actual first inventor of the

technology in question."  *Id.* at 3.  The explicit harms they list, including additional security

costs and competitive disadvantages, are largely derivative of this regime change.  *Id.*; *see*

Declaration of Mr. Mark Stadnyk ("Stadnyk Decl.") ¶ 16 ("Even though I might be the actual

inventor, the AIA awards patents not to the actual inventor but to the first party to file.

Consequently, any new IP developed by me and by MadStad is less valuable from the

perspective of potential investors and business partners.").  Thus, Plaintiffs' alleged harms

turn largely on whether they will in fact lose a specific patent right to which they would

otherwise be entitled under the first-to-invent system.  This proposition is entirely speculative.

Plaintiffs' evidence does not establish that they are at risk of losing their right to a patent under the AIA.  In his declaration, Mr. Stadnyk states that he holds three patents and is working on other inventions at "different stages of development."  Stadnyk Decl. ¶ 3.  But Mr. Stadnyk further admits that "[s]ome of my inventions are close to patentability but other ideas require additional research, development and testing."  *Id.*  Mr. Stadnyk is presumably suggesting that, at their current stage of development, these inventions have not met the necessary preconditions for obtaining a patent, even under the current patent regime.  It is thus an open question whether these works in progress will ever become "patentable."

And even if one or more of Plaintiffs' inventions becomes patentable, to establish the harm they assert, Plaintiffs would have to establish, at a minimum, that all of the following *will* occur: (1) Plaintiffs' invention becomes "patentable" (2) only after the first-inventor-to-file provisions take effect in mid-March, 2013; (3) Plaintiffs decide to seek a patent on that invention; (4) another party independently invents the same invention (5) *after* Plaintiffs have invented it; and (6) the other party files for a patent (7) *before* Plaintiffs do so, thereby securing the patent and foreclosing Plaintiffs' application.  Such contingent, remote, and speculative events do not constitute irreparable harm.  *See Siegel*, 234 F.3d at 1176-77.

In fact, the first-inventor-to-file provisions may actually *benefit* Plaintiffs.  For example, if Plaintiffs file their patent applications first, they will be granted the patent even if another inventor was arguably first-in-time in creating the invention.  Likewise, Plaintiffs or other similarly situated inventors can secure a filing date via a provisional patent application, thereby significantly reducing their potential litigation costs if another party would otherwise

have challenged their priority under the first-to-invent regime.[13]  *See* 35 U.S.C. § 111(b)(5),

*as amended by* AIA, sec. 3(e)(2), 125 Stat. at 287.  In these scenarios, the first-inventor-to-

file provisions are beneficial, not detrimental, to inventors such as Plaintiffs.  The point is

that there is yet another layer of contingencies piled on Plaintiffs' strained speculation.

Plaintiffs, perhaps aware of the contingent nature of a patent rights claim, do not even

allege that that AIA will jeopardize their right to a particular patent.  *See* Pls.' Br. 19-22.  But

if Plaintiffs cannot establish with certainty that the AIA will cause them to lose a specific

patent right, then *a fortiori* they cannot show that harms contingent upon the loss of a

specific patent right, such as increased IT security costs and competitive disadvantages, are

actual and imminent.  *See, e.g.*, *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir.

1994) ("[A] party has standing to seek injunctive relief only if the party alleges, and

ultimately proves, a real and immediate—as opposed to a merely conjectural or

---

[13] Despite Plaintiffs' criticisms to the contrary, the provisional patent application ("PPA") may prove to be advantageous to Plaintiffs.  Because the PPA allows the inventor to reserve the priority date for a year, the inventor has time to reduce the invention to practice, secure financing, perfect the invention, and complete a formal patent application.  Moreover, the PPA is relatively simple to prepare and file, which could be particularly advantageous to small inventors.  *See* 35 U.S.C. § 111(b)(5), *as amended by* AIA, sec. 3(e)(2), 125 Stat. at 287 (requiring only a section 112(a) specification and section 113 drawing; not requiring claims, as required under section 112(b)–(e)).  And, if challenged, the PPA could help lower the costs of any potential litigation over the priority date, which would be established simply by reviewing the PPA's filing date and ensuring it adequately discloses that the inventor possessed the later-claimed invention.  35 U.S.C. § 100(i) (defining "effective filing date"), *as amended by* AIA, sec. 3, 125 Stat. at 287; 35 U.S.C. § 119(e) (right of priority regarding provisional applications), *as amended by* AIA, sec. 15, 125 Stat. at 328.  By contrast, priority disputes under the current first-to-invent regime can be lengthy and expensive.  *See, e.g.*, *Goldfarb*, 154 F.3d at 1326 (noting interference proceeding lasted twelve years); H.R. Rep. No. 112-98, at 41 (citing Robert W. Pritchard, *The Future is Now—The Case for Patent Harmonization*, 20 N.C. J. Int'l & Com. Reg. 291, 313 (1995)).  But if the first inventor timely files a PPA, it will likely help to resolve the priority inquiry in his favor.

hypothetical—threat of *future* injury." (emphasis in original) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  For these reasons alone, Plaintiffs cannot establish irreparable harm.  Accordingly, their motion should be denied.

> **C.    Plaintiffs' Speculation Regarding Possible Theft and Lost Business Opportunities Does Not Qualify as Irreparable Harm.**

Unable to assert that their patent rights are in jeopardy, Plaintiffs instead argue that the new AIA provisions disadvantage them in other ways.  First, Plaintiffs allege that they must take costly prophylactic steps now to guard against future theft, which they imply will be endemic under the new first-inventor-to-file provisions.  *See* Pls.' Br. 20.  Specifically, Mr. Stadnyk alleges that "[s]ince the AIA no longer concerns itself with who actually invented an invention prior to filing, the new law makes it attractive and profitable" for theft. Stadnyk Decl. ¶ 5; *see also id.* ¶ 8 (alleging that there are "no safeguards to successfully defend against such theft under the AIA").  Mr. Stadnyk does not actually state how the AIA encourages theft, nor does he point to any examples of attempted theft of Plaintiffs' inventions, or others', due to enactment of the AIA.  *See id.*  He simply hypothesizes that the AIA incentivizes theft in a manner the current patent regime does not.  But a careful review of both patent regimes shows that they provide nearly identical protections that allow only true inventors to secure the patent to their inventions in the event of theft.

Under the current patent law, a true inventor can use an interference proceeding to challenge an earlier patent application that the inventor believes was derived from the theft of his invention.  *See* 35 U.S.C. § 135; 37 C.F.R. § 41.208(a)(4); USPTO, *Manual of Patent Examining Procedure* § 2137 ("*MPEP*") ("Although derivation and priority of invention both focus on inventorship, derivation addresses originality (i.e., who invented the subject

matter).").  If the true inventor can establish that the prior application was based on theft, he can still secure the patent for himself.  *See MPEP* § 2137.  While the AIA eliminates interference proceedings, it replaces them with derivation proceedings, thereby continuing to provide an avenue for a true inventor to secure a patent in the event of theft by an applicant who "derived" the patent from the true inventor.[14]  *See* 35 U.S.C. § 135, *as amended by* AIA, sec. 3, § 135, 125 Stat. at 289.

If a thief disseminates the invention to the public via sale or public disclosure, both the current regime and the first-inventor-to-file regime provide avenues for the true inventor to secure the patent, even though such dissemination would otherwise constitute "prior art." *See supra* note 5.  The current law provides for a one-year grace period during which the true inventor can still secure his patent.  35 U.S.C. § 102(b).  Thus, in operation, if an invention is stolen and publicly disclosed, the true inventor can still secure the patent provided that he files his application within a year of the disclosure.  *Id.*  Under the AIA, although an invention would constitute prior art at the moment it is publicly disclosed, the new law provides an important exception:  "[a] disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention . . . if . . . the disclosure was made by . . . *another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor*."  *Id.* (emphasis added).  So as the new section

---

[14] Although the AIA does not define the term "derive" and has left it to the USPTO to set the standards for derivation proceedings, the statue nevertheless provides that derivation proceedings are to settle whether "an inventor named in the earlier application derived the claimed invention from an inventor named in the petitioner's application and, without authorization, the earlier application claiming such invention was filed."  35 U.S.C. § 135, *as amended by* AIA, sec. 3, § 135, 125 Stat. at 289.

102(b) provides, if the invention is obtained from the true inventor, including via theft, the true inventor can still secure his patent, provided that he seeks to do so within one year of the disclosure.  *Id.*  Therefore, under both the first-inventor-to file system and the first-to-invent system, a true inventor has the same ability to secure the rights to his patent if a thief discloses the invention in a manner that constitutes prior art, provided that the true inventor seeks the patent within one year of the disclosure.

The Court should bear in mind that the scenario in which two or more applicants are claiming the same invention, or alleging an invention was stolen, is exceedingly rare.[15] Nevertheless, both the current regime and the new AIA provisions provide robust, and substantially similar, avenues for true inventors to claim the rights to their patent in cases of theft.  And, due in part to the prematurity of Plaintiffs' motion, they cite to no evidence establishing that theft of inventions is on the rise since the passage of the AIA.  Of course, Plaintiffs may decide that it is in their best interests to spend additional money on IT security and other measures to develop their inventions more quickly, but their claim that the new AIA provisions inherently lead to theft is baseless.  Instead, these costs are voluntary, based on Plaintiffs' own fearful presumptions, and contingent on events that have yet to occur. They clearly do not constitute imminent or actual harm.  *See Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001) ("[I]njunctions will not be

---

[15] In 2011, there were 535,188 total patent applications, USPTO, *U.S. Patent Statistics Chart:  Calendar Years 1963-2011*, http://www.uspto.gov/web/offices/ac/ido/oeip/taf/ us_stat.htm (last visited Aug. 30, 2012), but only 64 declared interferences, USPTO, *Process Production Report:  Final Report, FY2011*, http://www.uspto.gov/ip/boards/bpai/stats/ process/fy2011_sep_b.pdf (last visited Aug. 30, 2012).  In other words, inventors contested priority of inventorship for at most only 0.012% of all submitted patent applications.

used merely to allay the fears and apprehensions or to soothe the anxieties of the parties.").

Second, Plaintiffs speculate that the AIA will hurt their overall business, because investors and business partners allegedly will conclude that it is now riskier to invest in "[s]mall-entity inventors like [Plaintiffs]."  Stadnyk Decl. ¶ 16; *see also* Pls.' Br. 20.  As an initial matter, Plaintiffs' evidence is entirely unhelpful in ascertaining whether any business opportunities have already been lost, or whether they just assume it will occur at some undefined moment in the future, because the evidence cited by Plaintiffs could be interpreted either way.  *See, e.g.*, Stadnyk Decl. ¶ 16 ("[A]ny new IP developed by me and by MadStad is less valuable from the perspective of potential investors and business partners who are less certain that my IP can be defended and/or protected. . . . Accordingly, we have suffered lost business opportunities as a result of the AIA.").  In either case, Plaintiffs have failed to establish irreparable harm.

To the extent that Plaintiffs are implying that they have already lost specific, identifiable business opportunities, that harm has already occurred, so it is not a proper basis for injunctive relief.  *See U.S. Army Corps of Engineers*, 424 F.3d at 1134 ("Where the harm to the movant's interests has already occurred, that harm is neither imminent nor irreparable at law and is not the appropriate subject matter for injunctive relief.").  To the extent that Plaintiffs are alleging that they may lose future business opportunities, such a loss is clearly speculative.  *See Int'l Inst. for Learning, Inc. v. J. Ross Pub., Inc.*, No. 07-80574-CIV, 2007 WL 4707057, at *2 (S.D. Fla. Aug. 28, 2007) (rejecting plaintiff's preliminary injunction motion in a business dispute and concluding that its claims of injury, including the "specter of competing [publishing right] claims," "a 'cloud' over Plaintiff's reputation," and

"conclusory assertions . . . of other financial injuries (i.e., increased development costs, loss of revenue, loss of potential revenue)" were "speculative"); *see also, e.g., Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1506 (S.D. Fla. 1995) ("[E]conomic loss alone does not normally rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction."). Here, Plaintiffs have provided absolutely no details that would allow the Court to determine whether their alleged loss is actual or imminent. They have failed to provide any description of the lost business opportunities, the specific reasons why those opportunities were supposedly lost, and the economic impact of such lost opportunities.[16] Plaintiffs simply have not provided any details that would allow the Court to determine whether their alleged lost opportunities constitute actual or imminent harm.[17]

---

[16] Given that their alleged harm is purely speculative, Plaintiffs cannot establish irreparable harm by claiming the AIA places them at a "competitive disadvantage." Pls.' Br. 20, n.26. Moreover, their citations to *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) and *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993), are inapposite. The cited portions of both cases address whether the plaintiffs had standing to challenge on equal protection grounds laws giving preferential treatment or financial incentives to socially and economically disadvantaged businesses. *See Pena*, 515 U.S. at 211; *Jacksonville*, 508 U.S. at 666. Plaintiffs are not challenging the AIA on such grounds.

[17] Plaintiffs attach the Declaration of Gary Lauder ("Lauder Decl."), a venture capitalist who has extensively criticized the AIA in the numerous publications he attached to his declaration. Dkt. 11-2. But nowhere in Lauder's declaration or publications does he discuss investing in Plaintiffs' business or any specified harm that Plaintiffs will incur due to the AIA. Instead, Mr. Lauder opines that, due to the enactment of the AIA, "venture capitalists like [him] will be deterred from investing in small-entity inventors." Lauder Decl. ¶ 5. Mr. Lauder does not, however, cite to any empirical data that shows small businesses have lost venture capitalist investments due to passage of the AIA. And even if he did, it is clear that his reasoning for such lost investment—i.e. "small inventors do not have the resources to file multiple patent applications," "first-to-file requires secrecy on the part of small inventors and prevents them from openly communicating with venture capitalists," and "cybersecurity risks, and . . . other reasons"—are speculative and do not constitute an actual and imminent harm that justifies preliminary injunctive relief. *See id.* ¶ 6.

Therefore, their allegations of business loss, like those of increased theft, fall far short of establishing any irreparable harm necessary for injunctive relief.  And their failure to establish irreparable harm is, standing alone, grounds for denying their preliminary injunction.  *Siegel*, 234 F.3d at 1176.

## II.   PLAINTIFFS HAVE FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD THAT THE FIRST-INVENTOR-TO-FILE PROVISIONS OF THE AIA ARE UNCONSTITUTIONAL.

The federal patent power stems from Article I, Section 8, Clause 8 of the United States Constitution.  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 5-6 (1966).  The Patent Clause provides, in pertinent part, that

> Congress shall have the power . . . [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

U.S. Const. art. I, § 8, cl. 8.[18]  "Within the limits of the constitutional grant, the Congress may . . . implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim."  *Graham*, 383 U.S. at 6.  This power extends to "set[ting] out conditions and tests for patentability."  *Id.* (citing *McClurg v. Kingsland*, 42 U.S. (1 How.) 202, 206 (1843)) ("[T]he powers of Congress to legislate upon the subject of patents is plenary by the terms of the Constitution, and . . . there are no restraints on its exercise . . . .").  Further, when deciding whether legislation is permissible under the Patent Clause, courts grant substantial deference to Congress's policy

---

[18] Article I, Section 8, Clause 8 contains both a copyright and a patent component.  *See Eldred v. Ashcroft*, 537 U.S. 186, 192 (2003).   Following the Court's usage in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, we refer to the patent component as the "Patent Clause."  *See* 489 U.S. 141, 146, 150-51 (1989).

determinations.  *Figueroa v. United States*, 466 F.3d 1023, 1031-32 (Fed. Cir. 2006) (citing *Graham*, 383 U.S. at 6).  Accordingly, judicial review of legislation enacted pursuant to the Patent Clause is limited to determining whether Congress's actions were a "rational exercise of legislative authority."  *See Eldred v. Ashcroft*, 537 U.S. 186, 204-05 (2003); *id.* at 218 ("The Copyright [and Patent] Clause . . . empowers Congress to *define* the scope of the substantive right.") (emphasis in original).

Plaintiffs contend that the first-inventor-to-file system of the AIA violates the Patent Clause because it will award patents to the "government-anointed winners of a race to the patent office" rather than "actual inventors who made genuine discoveries."  Pls.' Br. 8.  This contention is without basis.  The AIA explicitly requires that an individual be an "inventor" of a "discovery" in order to obtain a patent.  35 U.S.C. § 101; *see supra* Section B.1.  In fact, section 101's restriction of patents to inventors is retained verbatim, untouched, by the AIA. In addition, the AIA provides for derivation proceedings, and a derivation cause of action, to ensure that the first person to file the patent application is actually a true inventor, and to prevent an individual from obtaining a patent for something he did not invent himself.  *See* AIA, sec. 3, §§ 135, 146, 291, 125 Stat. at 288-90.  The Patent Trial and Appeal Board has the authority to "correct the naming of the inventor" if it finds that "an inventor named in the earlier application derived the claimed invention" from a true inventor.  *Id.* § 135(b), 125 Stat. at 289.

Plaintiffs dismiss these key provisions, in a footnote, as nothing more than a "smokescreen."  Pls.' Br. 3, 5 n.3.  In their view, the only person who can constitutionally qualify as an "Inventor" is the first person who conceives of the invention, even if that

inventor never discloses the invention and another person then independently conceives of and develops the invention. *See* Pls.' Br. 11 ("[O]nly the first actual inventor of a discovery is entitled to a patent."). But nowhere does the Constitution constrain Congress to granting patents only to first inventors. Plaintiffs' constitutional interpretation is not supported by the text of the Patent Clause, the purpose of the patent system, or the history or current operation of the patent system. Plaintiffs therefore have not shown a substantial likelihood that the first-inventor-to-file provisions of the AIA are unconstitutional.

### A. The Text and Purpose of the Patent Clause Permit Congress to Award Patents to Second Inventors.

Plaintiffs contend that the AIA's awarding of patents to the first inventor to file a patent application rather than to the first individual to invent conflicts with the reference to "Inventors" of "Discoveries" in the Patent Clause. But they completely ignore the fact that the Constitution does not require Congress to grant patents to "first Inventors," but rather only to "Inventors." Nor does the Patent Clause specify any mechanism for determining priority between competing inventors who independently invent something using their own hard work and ingenuity. Instead, as the Supreme Court has long recognized, Congress has the authority to "set out conditions and tests for patentability," *Graham*, 383 U.S. at 6 (citing *McClurg*, 42 U.S. (1 How.) at 206)). Congress has exercised that power in establishing the condition that the effective filing date shall determine priority of invention when two inventors claim the same discovery.

Plaintiffs' citations to Samuel Johnson's dictionary do not show that Congress is limited to granting patents only to the first inventor. Dr. Johnson defined a "Discovery" as "[t]he act of finding any thing hidden." *See* Samuel Johnson, *A Dictionary of the English*

*Language* (6th ed. 1785) (attached as Pls.' Ex. B).  An "Inventor" was "[o]ne who produces

something new; a deviser of something not known before."  *Id.*  Plaintiffs argue that, because

only the first inventor can discover something "new" or "not known," there is no such thing

as a second inventor.  In their words, a second inventor "merely rediscovers that which was

already discovered by the first inventor."  Compl. ¶ 20.  Yet nothing in Johnson's definitions

suggests that only the first person to conceive of an idea can be an inventor.  Two people can

independently "find[] any thing hidden" or "produce[] something new" or "not known"

before."  Furthermore, Plaintiffs' cramped reading of the words "new" and "not known" is

inconsistent with the purpose of the patent laws and has long been rejected by Congress and

the federal courts.  As the Supreme Court explained more than 150 years ago, "[K]nowledge

and use . . . mean[] knowledge and use existing in a manner accessible to the public," as

opposed to "new" or "not known" to some other prior inventor who has not yet disclosed.

*Gayler v. Wilder*, 51 U.S. (10 How.) 477, 497-98 (1850); *see also Kendall v. Winsor*, 62 U.S.

(21 How.) 322, 328 (1858) (emphasizing "the relation borne to the public by inventors");

*Alexander Milburn Co. v. Davis-Bournonville Co.*, 270 U.S. 390, 400 (1926) ("In view of the

gain to the public that the patent laws mean to secure . . . it would have been no bar to

Whitford's patent if Clifford had written out his prior description and kept it in his portfolio

uncommunicated to anyone.").

     The importance of public disclosure of an invention inheres in the Patent Clause

itself, which empowers Congress "to promote the Progress of Science and useful Arts."  U.S.

Const. art. I, § 8, cl. 8; *see Graham*, 383 U.S. at 6 ("Innovation, advancement, and things

which add to the sum of useful knowledge are inherent requisites in a patent system which by

constitutional command must 'promote the Progress of . . . useful Arts.'").  As the Supreme

Court has repeatedly explained, "reward to the owner [is] a secondary consideration," *Sony*

*Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) (citation omitted),

because "the ultimate goal of the patent system is to bring new designs and technologies *into*

*the public domain through disclosure*."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489

U.S. 141, 151 (1989) (emphasis added).  The patent system thus stipulates "the reward" of a

patent in exchange "for the advantages derived by the public" in the form of new knowledge.

*Grant v. Raymond*, 31 U.S. (6 Pet.) 218, 241-42 (1832) (Marshall, C.J.) .[19]

But the public benefits only when the inventor discloses:  "If an inventor should be

permitted to hold back from the knowledge of the public the secrets of his invention; . . . it

would materially retard the progress of science and the useful arts; and give a premium to

those who should be least prompt to communicate their discoveries."  *Pennock v. Dialogue*,

27 U.S. (2 Pet.) 1, 19 (1829) (Story, J.).  Such a withholding inventor "comes not within the

policy or objects of the Constitution or acts of Congress."  *Kendall*, 62 U.S. (21 How.) at

322, 328.  The importance of public disclosure to our patent system also explains why

"Congress may not create patent monopolies of unlimited duration, nor may it 'authorize the

issuance of patents whose effects are to remove existent knowledge from the public domain,

---

[19] The Framers, too, recognized this necessary *quid pro quo*.  James Madison noted that "[t]he public good fully coincides" with inventors' claims to patents.  The Federalist No. 43, at 288 (Jacob Ernest Cooke ed., 1961) (attached as Exhibit A).  And Thomas Jefferson "consider[ed] the [inventor's] exclusive right to invention as given not of natural right, but for the benefit of society," which could extend this right "as an encouragement to men to pursue ideas which may produce utility" for that society.  Letter from Thomas Jefferson to Isaac McPherson (Aug. 13, 1813), *reprinted in* 13 The Writings of Thomas Jefferson 326, 334-35 (Albert Ellery Bergh ed. 1907) (attached as Exhibit B).

or to restrict free access to materials already available.'" *Bonito Boats*, 489 U.S. at 146 (quoting *Graham*, 383 U.S. at 6).

In order to achieve public disclosure of new ideas, "the federal patent system . . . embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years." *Bonito Boats*, 489 U.S. at 151-52. Considering that public disclosure has foundational importance to our patent system and is grounded in the text of the Patent Clause, Plaintiffs' argument that Congress may only constitutionally grant a patent to the first inventor, who may delay in disclosing his invention to the public, falls flat. In the AIA, Congress decided that, when two individuals independently invent the same thing, the rule of priority should favor the inventor who discloses first by filing a patent application. That priority determination is fully authorized by the Patent Clause.

### B.   Courts Have Long Recognized that a Second Inventor May Be Awarded a Patent Under Certain Circumstances.

Plaintiffs are also incorrect that "courts' early construction of 'Inventor' further indicates that the first-to-invent standard was the commonly understood meaning at the time of the Constitution's adoption." Pls.' Br. 10. To the contrary, the Supreme Court, and other courts, have long concluded that a person who is second to invent still qualifies as an inventor and may, under certain circumstances, be entitled to the patent.

In 1850, the Supreme Court embraced a broad definition of inventor and upheld a second inventor's patent under the 1836 Patent Act. *See Gayler*, 51 U.S. (10 How.) at 496-97. In *Gayler*, the accused infringer challenged the validity of Fitzgerald's asserted patent on the grounds that another inventor, Conner, had made and used the patented fire-proof safe

before Fitzgerald filed his patent application. *Id*. at 495. Conner's safe, kept in his foundry and known only to his employees, eventually passed into the hands of unknown individuals. *Id*. Although Fitzgerald was "not strictly speaking the first and original inventor," his patent nonetheless was valid, since "he discovered it by the efforts of his own genius, and believed himself to be the original inventor." *Id.* at 496-97. The Court explained that for prior use or knowledge to invalidate a patent, it must be "accessible to the public"; otherwise it is "as if the improvement had never been discovered." *Id*. at 497. Since Conner had never made his prior invention a matter of public knowledge, his status as first inventor did not deprive Fitzgerald of his status as an inventor. *See id.*[20]

The Supreme Court has subsequently reaffirmed these principles. *See Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*, 143 U.S. 275, 292 (1892) (holding that even if others invented the claimed barbed wire first, "it was Glidden, beyond juestion [sic], who first published this device, put it upon record, made use of it for a practical purpose, and gave it to the public, by which it was eagerly seized upon . . . . Under these circumstances we think the doubts we entertain concerning the actual inventor of this device should be resolved in [his] favor."); *Kendall*, 62 U.S. (21 How.) at 328 ("[T]he inventor who designedly . . .

---

[20] The *Gayler* Court confirmed the distinction between whether an individual is an inventor—a term with constitutional significance—and whether an inventor is entitled to priority— a statutory question. An inventor, the Court explained, is one who "brings [knowledge]" within the reach of the public, "and places it in their possession. And as he does this by the effort of his own genius" then "the law regards him as the first and original inventor, and protects his patent, although the improvement had in fact been invented before, and used by others." 51 U.S. (10 How.) at 497. On the other hand, the issue of priority, the Court indicated, was separate and distinct: had Conner still been alive, and had he sought "to bring [the safe] into public use," then Fitzgerald "would not upon such grounds be entitled to a patent." *Id.* at 498. But whether Fitzgerald was an inventor, and who would receive a patent in a priority dispute, were two separate issues.

withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress."). Lower courts followed in recognizing the rights of second inventors. *See, e.g.*, *Bullock Printing Press Co. v. Jones*, 4 F. Cas. 659, 659-60 (C.C.S.D.N.Y. 1878) ("Bullock [the patentee], although not literally the first, is in law the first inventor of this improvement, and the knowledge and use of it by [prior foreign inventors] Hoe and Tucker, as stated, do not invalidate [Bullock's] patent.").

The suppression doctrine, which traces its roots back to 1898 and beyond, also recognizes the patent rights of second inventors. In *Mason v. Hepburn*, the Court of Appeals for the District of Columbia held that the second of two inventors "must be held to be the first inventor in the sense of the law regulating the grant of patents" where the first inventor concealed his invention from the public. 13 App. D.C. 86, 94 (D.C. Cir. 1898). There, "[i]t [was] unquestioned that [the second inventor's] invention was an independent act; that he had no knowledge whatever of the work done" by the first inventor, "and that when he applied for and received his patent, he in good faith believed himself to be the original and only inventor." *Id.* at 91-92. Reasoning that the patent laws exist for the "paramount interest of the public," the court held that "a subsequent inventor of a new and useful manufacture or improvement who has diligently pursued his labors . . . [must] be regarded as the real inventor and as such entitled to his" patent, where the prior inventor "has deliberately concealed the knowledge of his invention from the public." *Id.* at 96 (citing *Kendall*, 62 U.S. (21 How.) at 327-28). The suppression doctrine flourished. It was eventually codified in the 1952 Patent Act. *See Young v. Dworkin*, 489 F.2d 1277, 1282-83, 1285 (C.C.P.A. 1974) (Rich, J., concurring) ("[F]or at least a century [the patent system] has been a qualified first-

to-invent system.  The de facto first inventor has not necessarily been adjudged to be the de jure first inventor.").

Thus, there is no merit to Plaintiffs' contention that early judicial decisions show that "inventor" meant "first inventor" at the time the Patent Clause was adopted.[21]

## C.   The Current (Pre-AIA) Patent System Permits a Second Inventor to Obtain a Patent Under Certain Circumstances.

Building on over a hundred years of judicial precedent, the current (pre-AIA) patent system permits a second inventor to obtain a patent under "certain circumstances." *Brunswick Corp. v. United States*, 34 Fed. Cl. 532, 583 (Fed. Cl. 1995).  Multiple provisions of the 1952 Patent Act allow the grant of patents not to the first inventor, but rather to a chronologically second inventor.  Accordingly, if Plaintiffs' interpretation of the Patent Clause is correct—that "inventor" constitutionally means "first inventor"—then the current

---

[21] Concededly, all the judicial decisions just discussed, as well as those cited by Plaintiffs in their Brief, do not address the constitutional meaning of "Inventor," but instead address whether a particular inventor was entitled to a patent under the relevant statute.  And Plaintiffs are correct that, *as a statutory matter*, the first inventor was entitled to the patent over a subsequent inventor in several early cases.  *See Evans v. Eaton*, 16 U.S. (3 Wheat.) 454, 513-14 (1818) (Story, J.) (explaining that, under section 6 of the 1793 Patent Act, the patentee must be "first inventor or discoverer"); *Pennock*, 27 U.S. (2 Pet.) at 23 (Story, J.) ("The sixth section [of the 1793 Patent Act] . . . gives the right to the *first* and true inventor and to him only . . . .").  But that does not mean the Patent Clause *constitutionally* prohibits Congress from granting patents to second inventors.  Indeed, Justice Story, who wrote many early patent law opinions, recognized that two people can both qualify as "inventors," even if only one is entitled to the patent as a matter of statutory priority.  *See, e.g.*, *Bedford v. Hunt*, 3 F. Cas. 37, 37-38 (C.C.D. Mass. 1817) ("The *first inventor*, who has put the invention in practice, and he only, is entitled to a patent.  Every *subsequent* patentee, *although an original inventor*, may be defeated of his patent right upon proof of such prior invention being put into use.  The law in such case cannot give the whole patent right to *each inventor*, even if each be equally entitled to the merit of being an original and independent inventor; and it therefore adopts the maxim, '*qui prior est in tempore, potior est in jure*.'") (emphasis added); *Woodcock v. Parker*, 30 F. Cas. 491, 492 (C.C.D. Mass. 1813).

patent system, and more than a century and a half of judicial precedent, are likewise unconstitutional.

First, Congress specifically authorized the grant of patents to second inventors in section 102(g)(1) of title 35, U.S. Code.  Section 102(g) provides that "[a] person shall be entitled to a patent unless . . . another inventor" can establish "that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed."  35 U.S.C. § 102(g)(1).[22]  Accordingly, "once the first party to invent has established priority of invention, the second party to conceive and reduce the invention to practice has the burden of proving that the first party suppressed or concealed the invention."  *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1037 (Fed. Cir. 2001); *see Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1358 (Fed. Cir. 2006).  If the second inventor can meet that burden, it can obtain the patent.  *See, e.g., W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983).  Plaintiffs' interpretation of the Patent Clause—that Congress may constitutionally grant a patent only to the first inventor— cannot be squared with the suppression and concealment conditions in section 102(g).

Second, for an earlier inventor to prevail in a priority contest, the inventor must prove (1) earlier conception of the invention (which requires corroborating evidence, *see, e.g., Beat 'Em All Barbed-Wire Co.*, 143 U.S. at 284-85); (2) an actual or constructive reduction to practice; and (3) diligence.  35 U.S.C. § 102(g)(2) ("In determining priority of invention

---

[22] The use of the words "another inventor" and "other inventor" in section 102(g) clearly shows that Congress, consistent with historical practice and the text of the Patent Clause, has recognized that there can be more than one inventor.  In addition, the structure of section 102(g) clearly shows that the requirement of being an inventor is separate and distinct from the issue of which inventor is entitled to priority.

under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."). Under section 102(g), a second inventor to conceive of an invention can obtain patent rights if the first inventor fails to act diligently to reduce the invention to practice. Plaintiffs' constitutional interpretation is in tension with the conditions of priority in section 102(g).

Finally, Congress has long permitted second inventors to obtain patents when the first invention occurred outside the United States. Currently, section 102(b) allows second inventors to obtain patents on inventions "in public use" in foreign countries, so long as the invention has not been "patented or described in a printed publication." This provision, with roots back to at least 1836, is hardly a new rule. *Compare* 35 U.S.C. § 102(b) *with* Patent Act of 1836, ch. 357, § 15, 5 Stat. 117, 123 ("[A patent] shall not be held to be void on account of the invention or discovery . . . having been before known or used in any foreign country . . . .").

In sum, Plaintiffs' interpretation of the Patent Clause would call into question the constitutionality of multiple statutory provisions of the current patent system. And, because the current patent system builds on hundreds of years of judicial precedent, Plaintiffs' interpretation would require revisiting a substantial number of those decisions. The proper view of the Patent Clause is that Congress may constitutionally grant patents to "inventors" and impose "conditions and tests," *Graham*, 383 U.S. at 6 (citation omitted), to determine who, among competing inventors, is entitled to a patent as a matter of priority. In the AIA, Congress required that an inventor who independently conceives of and develops an idea

must be the first to file the patent application to receive priority over another inventor.  That legislative judgment is fully authorized by the Patent Clause.

> **D.    Plaintiffs' Selective Historical Narrative Does Not Show that Congress May Grant Patents Only to First Inventors.**

According to Plaintiffs, the history of our patent system is "clear" and shows that the Framers intended "Inventor" to mean solely "first Inventor."  Pls.' Br. 11.  But the historical record is far from clear.  In fact, it is threadbare:  no delegate to the Constitutional Convention left any record as to what he intended "Inventors" and "Discoveries" to mean.[23] Although Plaintiffs attempt to stitch together selective citations, their narrative is incomplete. Several key sources cast doubt on the notion that the Framers intended "Inventor" to mean "first Inventor."

First, because the Framers were undoubtedly aware of English patent practice, a proper historical account of our patent system must assess English patent practice at the time of the Framing.[24]  As early as 1766, in *Dollond's Case*, English courts began to recognize that those who created a device, though second in time, were still inventors who were sometimes entitled to patents.  *See Boulton v. Bull*, (1795) 126 Eng. Rep. 651, 655 (K.B.) (discussing *Dollond's Case*) (attached as Exhibit C).  "The objection to Dollond's patent

---

[23] *See* Edward C. Walterscheid, *Priority of Invention:  How the United States Came to Have a 'First-to-Invent' Patent System*, 23 AIPLA Q.J. 263, 280-81 (1995) ("Although Madison was most likely the author of the actual language of the intellectual property clause, neither he nor any other delegate to the Convention provided any interpretation of its language.").

[24] *See Bilski v. Kappos*, 130 S. Ct. 3218, 3239 (2010) (Stevens, J., concurring in the judgment) ("The Constitution's Patent Clause was written against the backdrop of English patent practices, and early American patent law was largely based on and incorporated features of the English patent system." (citation and quotations omitted)).

was, that he was not the inventor of the new method of making object-glasses, but that Dr. Hall had made the same discovery before him.  But it was holden, that as Dr. Hall had confined it to his closet, and the public were not acquainted with it, Dollond was to be considered as the inventor" and was thus entitled to the patent.  *Id.* (Buller, J.).  Later English cases continued to make this distinction clear.[25]

Second, contrary to Plaintiffs' suggestion, the very first patent acts do not clearly show that the Framers intended "Inventor" to mean "first Inventor."  While Plaintiffs are correct to point out that the Patent Acts of 1790 and 1793 are valuable sources of the Framers' intent, *see Eldred v. Ashcroft*, 537 U.S. 186, 228 (2003) (Stevens, J., dissenting), those Acts cannot and do not suggest that only first inventors were "Inventors" under the Patent Clause.  The 1790 Act's requirement that the patentee be "the first and true inventor," ch. 7, § 5, 1 Stat. 109, 111, merely established a rule of priority.  And numerous cases decided under the 1793 Act, for instance, recognize the analytical distinction between status as an inventor and priority status as a first inventor.  *See supra* note 4.  Further, the Framers distinguished noninventor status when they rejected patents of importation[26] as

---

[25] *See, e.g.*, *Lewis v. Marling*, (1829) 109 Eng. Rep. 359, 361 (K.B.) ("[I]f the model brought from America had been seen by the plaintiff, he could not afterwards have claimed to be the inventor.  But if I discover a certain thing for myself, it is no objection to my claim to a patent that another also has made the discovery, provided I first introduced it into public use.") (attached as Exhibit D).

[26] Patents of importation allowed noninventors to obtain patents for inventions "new in England, . . . though the thing was practised beyond sea before; . . . for the Act is intended to encourage new devices useful to the kingdom . . . ."  *See Edgeberry v. Stephens*, (1691) 91 Eng. Rep. 387, 387 (K.B.) (attached as Exhibit F).

unconstitutional.[27]  Patents of importation are constitutionally questionable, not because they occur second, but because an importer does not independently create the new device through his or her own ingenuity and hard work.  *See, e.g.*, Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1153 ("The power, in its terms, is confined to authors and inventors; and cannot be extended to the *introducers* of any new works or inventions." (emphasis added)) (attached as Exhibit E).  Though the Framers must have been familiar with the notion of a second inventor through the English practice, they singled out only "Importers" as not fitting that definition.

Thus, the historical record does not clearly support Plaintiffs' contention that "Inventor" in the Patent Clause means "first Inventor."[28]  What our patent history does support, rather, is Congress's constitutional authority to impose conditions and tests for patentability, such as the AIA's condition that the effective filing date shall determine priority of invention when two inventors claim the same discovery.

---

[27] *See Eldred*, 537 U.S. at 229 (Stevens, J., dissenting) (quoting Letter from Rep. Thomas Fitzsimmons to Tench Coxe (Mar. 5, 1790)).

[28] Plaintiffs' citation to the actions of the first Patent Board, of which Thomas Jefferson was a member, is likewise incomplete and misleading.  While the Board, in a case involving four claimants to a steamboat patent, rejected the proposal that patents should be awarded to the first person to file the application, Pls.' Br. 10, there is no clear record as to why it did so. Walterscheid, *supra*, at 291-92.  Most importantly, the historical record does not show that the Patent Board's rejection was based on constitutional concerns.  In fact, multiple reasons for the rejection are plausible, such as the difficulty of determining a definitive filing date and the fairness of granting the particular patent at issue.  *Id.*  Thus, the Patent Board's rejection of first-to-file in the steamboat case is not evidence that a first-to-file system is constitutionally suspect.

### III.   THE BALANCE OF THE EQUITIES, AND THE PUBLIC INTEREST, FAVOR UPHOLDING THE AIA.

The balance of the equities, and the public interest, favor upholding the AIA.  When the government is a party, the balance of the equities and the public interest are but variations of the same factor.  *Garcia-Mir v. Meese*, 781 F.2d 1450, 1455 (11th Cir. 1986).  Defendants, and the public, have a strong interest in having the AIA upheld.  Congress considered diverse perspectives before concluding that the AIA was the best way to protect patent holders and the U.S. economy by harmonizing our patent system "with the best parts of other major patent systems throughout the industrialized world."  *See* H.R. Rep. No. 112-98, at 39-40 (2011).  The AIA is thus "designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs."  *Id.*; *see id.* at 40-43.  Enjoining the statute would significantly harm the government and the public interest by preventing implementation of a requirement Congress believed essential.  *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319, 323, 326 (1985) (holding that a preliminary injunction enjoining enforcement of federal statute constitutes harm because it "frustrates the will of Congress," which should not be dismissed "cavalierly," but given "great weight").  Moreover, contrary to Plaintiffs' suggestion, a preliminary injunction will harm the USPTO by disrupting and creating confusion in the rulemaking process that is essential to timely implementation of the AIA.[29]

---

[29] The AIA requires the Director to prescribe numerous regulations necessary to administer the patent system.  For the authority to proscribe regulations, see, for example, AIA, sec. 3, §§ 135(b), (f), 125 Stat. at 289-90 (derivation and arbitration); *id*. sec. 4, §§ 115(d)(1), (h)(1), 125 Stat. at 294-95 (oath requirement); *id.* sec. 6, §§ 311–12, 316, 319(c), 125 Stat. at 299-300, 302, 304 (inter partes review and appeals); *id.* §§ 321(a), (f), 322(a)(4), 326(a), 125 Stat. at 306, 308, 311 (post-grant review and appeals); *id.* sec. 10, § 123(a)(1), 125 Stat. at 318

The entire patent system could be held up due to the speculative concerns of one inventor: if final rules are not published in the *Federal Register* by February 16, 2013, they cannot take effect on the first-inventor-to-file provisions' effective date of March 16, 2013.  *See* AIA, sec. 3(n)(1), 125 Stat. at 293; *see also* nn.6-8 and accompanying text (rulemakings in progress).

Plaintiffs, on the other hand, have completely failed to show that the AIA's first-inventor-to-file-provisions, not yet in effect, are causing them actual and imminent injury. They do not allege (and could not meet their burden of showing) that the AIA will cause them to lose a particular patent, and their voluntary actions in anticipation of the AIA do not constitute irreparable harm.  Considering Defendants' substantial interest in improving and implementing our patent system and Plaintiffs' tenuous showing of harm, the balance of the equities and the public interest tip decidedly in favor of Defendants.

## IV.    THE AIA IS SEVERABLE, BUT THE COURT NEED NOT REACH THIS ISSUE.

Because Plaintiffs have failed to show that the AIA is currently causing them irreparable harm and that there is a substantial likelihood that the AIA is unconstitutional, the Court need not address whether the first-inventor-to-file provisions are severable from the remainder of the AIA.  While Defendants believe that the AIA contains numerous provisions that are severable from the first-inventor-to-file provisions,[30] the severability issue is

---

(definition of "micro entity"); *id.* sec. 11, §§ 41(a)(2)(C), 41(d)(1)(C), 41(h)(1), 125 Stat. at 320, 322-23 (fee refund and reduction), etc.

[30]  For example, the AIA contains numerous sections that could operate independently from the first-inventor-to-file provisions.  *E.g.*, AIA, secs. 9 (venue), 10 (fee setting authority), 11

complex and requires analyzing the interplay of multiple provisions.  This analysis cannot be conducted in response to a small section in Plaintiffs' preliminary injunction brief.  In the event the Court were to find that Plaintiffs are somehow suffering irreparable harm as a result of a statute that is substantially likely to be unconstitutional, Defendants respectfully request more briefing on the severability issue.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOHN R. GRIFFITHS
Assistant Branch Director
United States Department of Justice
Civil Division, Federal Programs Branch

/s/ Scott D. Levin
SCOTT D. LEVIN
/s/ Matthew A. Josephson
MATTHEW A. JOSEPHSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

Dated:  August 30, 2012          *Counsel for Defendants*[†]

---

(statutory fees), 12 (supplemental examination), 13 (funding agreements), 14 (tax strategies), 125 Stat. at 316-28.

[†] Counsel for the United States gratefully acknowledge the contributions of law student intern Parker Rider-Longmaid (University of Pennsylvania Law School, Class of 2013) in preparing this brief.

Exhibit A

The Federalist No. 43
(James Madison)

# *THE*
# Federalist

*Edited, with Introduction and Notes, by*

## JACOB E. COOKE



## Wesleyan University Press

HeinOnline -- 1 The Federalist (Jacob Ernest Cooke, ed.) v 1961

WESLEYAN UNIVERSITY PRESS
Published by University Press of New England,
Hanover, NH 03755

Copyright © 1961 by Wesleyan University
All rights reserved

Printed in the United States of America   5   4

The eagle device on the title page is taken from the first spec-
imen book issued by an American type founder—that of
Binny and Ronaldson, Philadelphia, 1809—and is repro-
duced courtesy of the Columbiad Club of Connecticut.

LIBRARY OF CONGRESS CATALOGING IN PUBLICATION DATA
Main entry under title:
The Federalist.
   Reprint. Originally published: Middletown, Conn.:
Wesleyan University Press, 1961.
   Includes index.
   1. United States—Constitutional law.   I. Cooke,
Jacob Ernest, 1924–
KF4515.F4   1982      342.73′024   82-2815
ISBN 0-8195-3016-6 KF4515.F4      1982       342.73′024      82-2815
ISBN 0-8195-6077-4 (pbk.)       347.30224     AACR2

HeinOnline -- 1 The Federalist (Jacob Ernest Cooke, ed.) vi 1961

# The Federalist No. 43
# [42]

### JAMES MADISON

January 23, 1788

*To the People of the State of New York.*

THE *fourth* class comprises the following miscellaneous powers.

1. A power "to promote the progress of science and useful arts, by securing for a limited time, to authors and inventors, the exclusive right, to their respective writings and discoveries."

The utility of this power will scarcely be questioned. The copy right of authors has been solemnly adjudged in Great Britain to be a right at common law. The right to useful inventions, seems with equal reason to belong to the inventors. The public good fully coincides in both cases, with the claims of individuals. The States cannot separately make effectual provision for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress.

2. "To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may by cession of particular States and the acceptance of Congress, become the seat of the Government of the United States; and to exercise like authority over all places purchased by the consent of the Legislature of the States, in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings."

The indispensible necessity of compleat authority at the seat of Government carries its own evidence with it. It is a power exercised by every Legislature of the Union, I might say

---

From *The Independent Journal,* January 23, 1788. This essay appeared on January 25 in both *The New-York Packet* and *The Daily Advertiser.* It was numbered 43 in the McLean edition and 42 in the newspapers.

of the world, by virtue of its general supremacy. Without it, not only the public authority might be insulted and its proceedings be interrupted, with impunity; but a dependence of the members of the general Government, on the State comprehending the seat of the Government for protection in the exercise of their duty, might bring on the national councils an imputation of awe or influence, equally dishonorable to the Government, and dissatisfactory to the other members of the confederacy. This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the Government, would be both too great a public pledge to be left in the hands of a single State; and would create so many obstacles to a removal of the Government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights, and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the Government which is to exercise authority over them; as a municipal Legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the Legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession, will be derived from the whole people of the State, in their adoption of the Constitution, every imaginable objection seems to be obviated.

The necessity of a like authority over forts, magazines &c. established by the general Government is not less evident. The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may

depend, to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned, in every such establishment.

3. "To declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture, except during the life of the person attainted."

As treason may be committed against the United States, the authority of the United States ought to be enabled to punish it. But as new-fangled and artificial treasons, have been the great engines, by which violent factions, the natural offspring of free Governments, have usually wrecked their alternate malignity on each other, the Convention have with great judgment opposed a barrier to this peculiar danger, by inserting a constitutional definition of the crime, fixing the proof necessary for conviction of it, and restraining the Congress, even in punishing it, from extending the consequences of guilt beyond the person of its author.

4. "To admit new States into the Union; but no new State, shall be formed or erected within the jurisdiction of any other State; nor any State be formed by the junction of two or more States, or parts of States, without the consent of the Legislatures of the States concerned, as well as of the Congress."

In the articles of confederation no provision is found on this important subject. Canada was to be admitted of right on her joining in the measures of the United States; and the other *colonies,* by which were evidently meant, the other British colonies, at the discretion of nine States. The eventual establishment of *new States,* seems to have been overlooked by the compilers of that instrument. We have seen the inconvenience of this omission, and the assumption of power into which Congress have been led by it. With great propriety therefore has the new system supplied the defect. The general precaution that no new States shall be formed without the concurrence of the

federal authority and that of the States concerned, is consonant to the principles which ought to govern such transactions. The particular precaution against the erection of new States, by the partition of a State without its consent, quiets the jealousy of the larger States; as that of the smaller is quieted by a like precaution against a junction of States without their consent.

5. "To dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, with a proviso that nothing in the Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State." 2

This is a power of very great importance, and required by considerations similar to those which shew the propriety of the former. The proviso annexed is proper in itself, and was probably rendered absolutely necessary, by jealousies and questions concerning the Western territory, sufficiently known to the public.

6. "To guarantee to every state in the Union a Republican form of Government; to protect each of them against invasion; and on application of the Legislature; or of the Executive (when the Legislature cannot be convened) against domestic violence."

In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchical innovations. The more intimate the nature of such a Union may be, the greater interest have the members in the political institutions of each other; and the greater right to insist that the forms of government under which the compact was entered into, should be *substantially* maintained. But a right implies a remedy; and where else could the remedy be deposited, than where it is deposited by the Constitution? Governments of dissimilar principles and forms have been found less adapted to a federal

coalition of any sort, than those of a kindred nature. "As the
3   confederate republic of Germany," says Montesquieu, "consists
of free cities and petty states subject to different Princes, ex-
perience shews us that it is more imperfect than that of Hol-
land and Switzerland." "Greece was undone" he adds, "as soon
as the King of Macedon obtained a seat among the Amphyc-
tions." In the latter case, no doubt, the disproportionate force,
as well as the monarchical form of the new confederate, had its
share of influence on the events. It may possibly be asked
what need there could be of such a precaution, and whether it
may not become a pretext for alterations in the state gov-
ernments, without the concurrence of the states themselves.
These questions admit of ready answers. If the interposition of
the general government should not be needed, the provision for
such an event will be a harmless superfluity only in the Consti-
tution. But who can say what experiments may be produced
by the caprice of particular states, by the ambition of enter-
prizing leaders, or by the intrigues and influence of foreign
powers? To the second question it may be answered, that if the
general government should interpose by virtue of this constitu-
tional authority, it will be of course bound to pursue the au-
thority. But the authority extends no farther than to a guaranty
of a republican form of government, which supposes a pre-
existing government of the form which is to be guaranteed. As
long therefore as the existing republican forms are continued
by the States, they are guaranteed by the Federal Constitution.
Whenever the states may chuse to substitute other republican
forms, they have a right to do so, and to claim the federal guar-
anty for the latter. The only restriction imposed on them is,
that they shall not exchange republican for anti-republican
Constitutions; a restriction which it is presumed will hardly be
considered as a grievance.

    A protection against invasion is due from every society
to the parts composing it. The latitude of the expression here

[MADISON]        The Federalist No. 43        293

used, seems to secure each state not only against foreign hos-
tility, but against ambitious or vindictive enterprizes of its
more powerful neighbours. The history both of antient and
modern confederacies, proves that the weaker members of
the Union ought not to be insensible to the policy of this
article.

Protection against domestic violence is added with equal
propriety. It has been remarked* that even among the Swiss
Cantons, which properly speaking are not under one govern-
ment, provision is made for this object; and the history of that
league informs us, that mutual aid is frequently claimed and
afforded; and as well by the most democratic, as the other
Cantons. A recent and well known event among ourselves, has
warned us to be prepared for emergencies of a like nature.†

At first view it might seem not to square with the repub-
lican theory, to suppose either that a majority have not the
right, or that a minority will have the force to subvert a
government; and consequently that the fœderal interposition
can never be required but when it would be improper. But theo-
retic reasoning in this, as in most other cases, must be qualified
by the lessons of practice. Why may not illicit combinations for
purposes of violence be formed as well by a majority of a State,
especially a small State, as by a majority of a county or a district
of the same State; and if the authority of the State ought in
the latter case to protect the local magistracy, ought not the
fœderal authority in the former to support the State authority?
Besides, there are certain parts of the State Constitutions which
are so interwoven with the Fœderal Constitution, that a violent
blow cannot be given to the one without communicating the
wound to the other. Insurrections in a State will rarely induce a
fœderal interposition, unless the number concerned in them,
bear some proportion to the friends of government. It will be

---

* See Essay 19. (Editor)

† The reference is to Shays' Rebellion. (Editor)

much better that the violence in such cases should be repressed by the Superintending power, than that the majority should be left to maintain their cause by a bloody and obstinate contest. The existence of a right to interpose will generally prevent the necessity of exerting it.

Is it true that force and right are necessarily on the same side in republican governments? May not the minor party possess such a superiority of pecuniary resources, of military talents and experience, or of secret succours from foreign powers, as will render it superior also in an appeal to the sword? May not a more compact and advantageous position turn the scale on the same side against a superior number so situated as to be less capable of a prompt and collected exertion of its strength? Nothing can be more chimerical than to imagine that in a trial of actual force, victory may be calculated by the rules which prevail in a census of the inhabitants, or which determine the event of an election! May it not happen in fine that the minority of CITIZENS may become a majority of PERSONS, by the accession of alien residents, of a casual concourse of adventurers, or of those whom the Constitution of the State has not admitted to the rights of suffrage? I take no notice of an unhappy species of population abounding in some of the States, who during the calm of regular government are sunk below the level of men; but who in the tempestuous scenes of civil violence may emerge into the human character, and give a superiority of strength to any party with which they may associate themselves.

In cases where it may be doubtful on which side justice lies, what better umpires could be desired by two violent factions, flying to arms and tearing a State to pieces, than the representatives of confederate States not heated by the local flame? To the impartiality of Judges they would unite the affection of friends. Happy would it be if such a remedy for its infirmities, could be enjoyed by all free governments; if a proj-

ect equally effectual could be established for the universal peace of mankind.

Should it be asked what is to be the redress for an insurrection pervading all the States, and comprizing a superiority of the entire force, though not a constitutional right; the answer must be, that such a case, as it would be without the compass of human remedies, so it is fortunately not within the compass of human probability; and that it is a sufficient recommendation of the Fœderal Constitution, that it diminishes the risk of a calamity, for which no possible constitution can provide a cure.

Among the advantages of a confederate republic enumerated by Montesquieu, an important one is, "that should a popular insurrection happen in one of the States, the others are able to quell it. Should abuses creep into one part, they are reformed by those that remain sound."

7. "To consider all debts contracted and engagements entered into, before the adoption of this Constitution, as being no less valid against the United States under this Constitution, than under the Confederation."

This can only be considered as a declaratory proposition; and may have been inserted, among other reasons, for the satisfaction of the foreign creditors of the United States, who cannot be strangers to the pretended doctrine that a change in the political form of civil society, has the magical effect of dissolving its moral obligations.

Among the lesser criticisms which have been exercised on the Constitution, it has been remarked that the validity of engagements ought to have been asserted in favour of the United States, as well as against them; and in the spirit which usually characterizes little critics, the omission has been transformed and magnified into a plot against the national rights. The authors of this discovery may be told, what few others need be in-

formed of, that as engagements are in their nature reciprocal, an assertion of their validity on one side necessarily involves a validity on the other side; and that as the article is merely declaratory, the establishment of the principle in one case is sufficient for every case. They may be further told that every Constitution must limit its precautions to dangers that are not altogether imaginary; and that no real danger can exist that the government would DARE, with or even without this Constitutional declaration before it, to remit the debts justly due to the public, on the pretext here condemned.

8. "To provide for amendments to be ratified by three-fourths of the States, under two exceptions only."

That useful alterations will be suggested by experience, could not but be foreseen. It was requisite therefore that a mode for introducing them should be provided. The mode preferred by the Convention seems to be stamped with every mark of propriety. It guards equally against that extreme facility which would render the Constitution too mutable; and that extreme difficulty which might perpetuate its discovered faults. It moreover equally enables the general and the state governments to originate the amendment of errors as they may be pointed out by the experience on one side or on the other. The exception in favour of the equality of suffrage in the Senate was probably meant as a palladium to the residuary sovereignty of the States, implied and secured by that principle of representation in one branch of the Legislature; and was probably insisted on by the States particularly attached to that equality. The other exception must have been admitted on the same considerations which produced the privilege defended by it.

9. "The ratification of the conventions of nine States shall be sufficient for the establishment of this Constitution between the States ratifying the same."

This article speaks for itself. The express authority of the people alone could give due validity to the Constitution. To

have required the unanimous ratification of the thirteen States, would have subjected the essential interests of the whole to the caprice or corruption of a single member. It would have marked a want of foresight in the Convention, which our own experience would have rendered inexcusable.

Two questions of a very delicate nature present themselves on this occasion. 1. On what principle the confederation, which stands in the solemn form of a compact among the States, can be superceded without the unanimous consent of the parties to it? 2. What relation is to subsist between the nine or more States ratifying the Constitution, and the remaining few who do not become parties to it.

The first question is answered at once by recurring to the absolute necessity of the case; to the great principle of self-preservation; to the transcendent law of nature and of nature's God, which declares that the safety and happiness of society are the objects at which all political institutions aim, and to which all such institutions must be sacrificed. PERHAPS also an answer may be found without searching beyond the principles of the compact itself. It has been heretofore noted among the defects of the Confederation, that in many of the States, it had received no higher sanction than a mere legislative ratification.* The principle of reciprocality seems to require, that its obligation on the other States should be reduced to the same standard. A compact between independent sovereigns, founded on ordinary acts of legislative authority, can pretend to no higher validity than a league or treaty between the parties. It is an established doctrine on the subject of treaties, that all the articles are mutually conditions of each other; that a breach of any one article is a breach of the whole treaty; and that a breach committed by either of the parties absolves the others; and authorises them, if they please, to pronounce the treaty violated and void.    6

---

* See Essay 22. (Editor)

Should it unhappily be necessary to appeal to these delicate truths for a justification for dispensing with the consent of particular States to a dissolution of the federal pact, will not the complaining parties find it a difficult task to answer the MULTIPLIED and IMPORTANT infractions with which they may be confronted? The time has been when it was incumbent on us all to veil the ideas which this paragraph exhibits. The scene is now changed, and with it, the part which the same motives dictate.

The second question is not less delicate; and the flattering prospect of its being merely hypothetical, forbids an over-curious discussion of it. It is one of those cases which must be left to provide for itself. In general it may be observed, that although no political relation can subsist between the assenting and dissenting States, yet the moral relations will remain uncancelled. The claims of justice, both on one side and on the other, will be in force, and must be fulfilled; the rights of humanity must in all cases be duly and mutually respected; whilst considerations of a common interest, and above all the remembrance of the endearing scenes which are past, and the anticipation of a speedy triumph over the obstacles to re-union, will, it is hoped, not urge in vain MODERATION on one side, and PRUDENCE on the other.

PUBLIUS.

**Exhibit B**

**Letter From Thomas Jefferson to Isaac McPherson (August 13, 1813)**

# THE WRITINGS OF
# THOMAS JEFFERSON

## Definitive Edition

### CONTAINING HIS

**AUTOBIOGRAPHY, NOTES ON VIRGINIA, PARLIA-
MENTARY MANUAL, OFFICIAL PAPERS,
MESSAGES AND ADDRESSES, AND OTHER
WRITINGS, OFFICIAL AND PRIVATE,
NOW COLLECTED AND**

*PUBLISHED IN THEIR ENTIRETY FOR THE FIRST TIME*

### INCLUDING

**ALL OF THE ORIGINAL MANUSCRIPTS, DEPOSITED IN THE DEPARTMENT
OF STATE AND PUBLISHED IN 1853 BY ORDER OF THE
JOINT COMMITTEE OF CONGRESS**

### WITH NUMEROUS ILLUSTRATIONS

### AND

*A COMPREHENSIVE ANALYTICAL INDEX*

ALBERT ELLERY BERGH
**EDITOR**

## VOL. XIII.

**ISSUED UNDER THE AUSPICES OF**
THE THOMAS JEFFERSON MEMORIAL ASSOCIATION
**OF THE UNITED STATES**
**WASHINGTON, D. C.**
**1907**

Digitized by Google

TO ISAAC MCPHERSON.

MONTICELLO, August 13, 1813.

SIR,—Your letter of August 3d asking information
on the subject of Mr. Oliver Evans' exclusive right to
the use of what he calls his Elevators, Conveyers, and
Hopper-boys, has been duly received.   My wish to
see new inventions encouraged, and old ones brought
again into useful notice, has made me regret the cir-
cumstances which have followed the expiration of
his first patent.   I did not expect the retrospection
which has been given to the reviving law.   For
although the second proviso seemed not so clear
as it ought to have been, yet it appeared susceptible
of a just construction; and the retrospective one
being contrary to natural right, it was understood
to be a rule of law that where the words of a statute
admit of two constructions, the one just and the
other unjust, the former is to be given them.   The
first proviso takes care of those who had lawfully
used Evans' improvements under the first patent;
the second was meant for those who had lawfully
erected and used them after that patent expired,
declaring they "should not be liable to damages
therefor."   These words may indeed be restrained
to uses already past, but as there is parity of reason
for those to come, there should be parity of law.
Every man should be protected in his lawful acts, and
be certain that no *ex post facto* law shall punish or
endamage him for them.   But he is endamaged, if
forbidden to use a machine lawfully erected, at con-

Digitized by Google

## Correspondence          327

siderable expense, unless he will pay a new and un-
expected price for it.   The proviso says that he who
erected and used lawfully should not be liable to pay
damages.   But if the proviso had been omitted,
would not the law, construed by natural equity, have
said the same thing?  In truth both provisos are use-
less.   And shall useless provisos, inserted *pro majori
cautela* only, authorize inferences against justice?
The sentiment that *ex post facto* laws are against
natural right, is so strong in the United States, that
few, if any, of the State constitutions have failed to
proscribe them.   The federal constitution indeed
interdicts them in criminal cases only; but they are
equally unjust in civil as in criminal cases, and the
omission of a caution which would have been right,
does not justify the doing what is wrong.   Nor ought
it to be presumed that the legislature meant to use
a phrase in an unjustifiable sense, if by rules of con-
struction it can be ever strained to what is just.
The law books abound with similar instances of the
care the judges take of the public integrity.   Laws,
moreover, abridging the natural right of the citizen,
should be restrained by rigorous constructions within
their narrowest limits.

Your letter, however, points to a much broader
question, whether what have received from Mr.
Evans the new and proper name of Elevators, are
of his invention.   Because, if they are not, his patent
gives him no right to obstruct others in the use of
what they possessed before.   I assume it is a Lemma,

Digitized by Google

that it is the invention of the machine itself, which
is to give a patent right, and not the application of
it to any particular purpose, of which it is susceptible.
If one person invents a knife convenient for pointing
our pens, another cannot have a patent right for the
same knife to point our pencils.   A compass was
invented for navigating the sea; another could not
have a patent right for using it to survey land.   A
machine for threshing *wheat* has been invented in
Scotland; a second person cannot get a patent right
for the same machine to thresh *oats*, a third *rye*, a
fourth *peas*, a fifth *clover*, etc.   A string of buckets
is invented and used for raising water, ore, etc.; can
a second have a patent right to the same machine for
raising wheat, a third oats, a fourth rye, a fifth peas,
etc.?   The question then whether such a string of
buckets was invented first by Oliver Evans, is a mere
question of fact in mathematical history.   Now,
turning to such books only as I happen to possess, **I**
find abundant proof that this simple machinery has
been in use from time immemorial.   Doctor Shaw,
who visited Egypt and the Barbary coast in the
years 1727-8-9, in the margin of his map of Egypt,
gives us the figure of what he calls a Persian wheel,
which is a string of round cups or buckets hanging
on a pulley, over which they revolved, bringing up
water from a well and delivering it into a trough
above.   He found this used at Cairo, in a well 264
feet deep, which the inhabitants believe to have been
the work of the patriarch Joseph.   Shaw's travels,

Digitized by Google

341, Oxford edition of 1738 in folio, and the Universal History, I. 416, speaking of the manner of watering the higher lands in Egypt, says, "formerly they made use of Archimedes' screw, thence named the Egyptian pump, but they now generally use wheels (wallowers) which carry a rope or chain of earthen pots holding about seven or eight quarts apiece, and draw the water from the canals. There are besides a vast number of wells in Egypt, from which the water is drawn in the same manner to water the gardens and fruit trees; so that it is no exaggeration to say, that there are in Egypt above 200,000 oxen daily employed in this labor." Shaw's name of Persian wheel has been since given more particularly to a wheel with buckets, either fixed or suspended on pins, at its periphery. Mortimer's husbandry, I. 18, Duhamel III. II., Ferguson's Mechanic's plate, XIII; but his figure, and the verbal description of the Universal History, prove that the string of buckets is meant under that name. His figure differs from Evans' construction in the circumstances of the buckets being round, and strung through their bottom on a chain. But it is the principle, to wit, a string of buckets, which constitutes the invention, not the form of the buckets, round, square, or hexagon; nor the manner of attaching them, nor the material of the connecting band, whether chain, rope, or leather. Vitruvius, L. x. c. 9, describes this machinery as a windlass, on which is a chain descending to the water, with vessels of

Digitized by Google

copper attached to it; the windlass being turned, the chain moving on it will raise the vessel, which in passing over the windlass will empty the water they have brought up into a reservoir. And Perrault, in his edition of Vitruvius, Paris, 1684, folio plates 61, 62, gives us three forms of these water elevators, in one of which the buckets are square, as Mr. Evans' are. Bossuet, Histoire des Mathematiques, i. 86, says, "the drum wheel, the wheel with buckets and the *Chapelets*, are hydraulic machines which come to us from the ancients. But we are ignorant of the time when they began to be put into use." The *Chapelets* are the revolving bands of the buckets which Shaw calls the Persian wheel, the moderns a chain-pump, and Mr. Evans elevators. The next of my books in which I find these elevators is Wolf's Cours de Mathematiques, i. 370, and plate 1, Paris, 1747, 8vo; here are two forms. In one of them the buckets are square, attached to two chains, passing over a cylinder or wallower at top, and under another at bottom, by which they are made to revolve. It is a nearly exact representation of Evans' Elevators. But a more exact one is to be seen in Desagulier's Experimental Philosophy, ii. plate 34; in the Encyclopedie de Diderot et D'Alembert, 8vo edition of Lausanne, first volume of plates in the four subscribed Hydraulique. Norie, is one where round eastern pots are tied by their collars between two endless ropes suspended on a revolving lantern or wallower. This is said to have been used for

Digitized by Google

## Correspondence

raising ore out of a mine.    In a book which I do not possess, L'Architecture Hidraulique de Belidor, the second volume of which is said [De la Lande's continuation of Montuclas' Histoire de Mathematiques, iii. 711] to contain a detail of all the pumps, ancient and modern, hydraulic machines, fountains, wells, etc., I have no doubt this Persian wheel, chain pump, chapelets, elevators, by whichever name you choose to call it, will be found in various forms.    The last book I have to quote for it is Prony's Architecture Hydraulique i., Avertissement vii., and § 648, 649, 650.    In the latter of which passages he observes that the first idea which occurs for raising water is to lift it in a bucket by hand.    When the water lies too deep to be reached by hand, the bucket is suspended by a chain and let down over a pulley or windlass.    If it be desired to raise a continued stream of water, the simplest means which offers itself to the mind is to attach to an endless chain or cord a number of pots or buckets, so disposed that, the chain being suspended on a lanthorn or wallower above, and plunged in water below, the buckets may descend and ascend alternately, filling themselves at bottom and emptying at a certain height above, so as to give a constant stream.    Some years before the date of Mr. Evans' patent, a Mr. Martin of Caroline county in this State, constructed a drill-plough, in which he used the band of buckets for elevating the grain from the box into the funnel, which let them down into the furrow.    He had bands with different sets

Digitized by Google

of buckets adapted to the size of peas, of turnip seed, etc. I have used this machine for sowing Benni seed also, and propose to have a band of buckets for drilling Indian corn, and another for wheat. Is it possible that in doing this I shall infringe Mr. Evans' patent? That I can be debarred of any use to which I might have applied my drill, when I bought it, by a patent issued after I bought it?

These verbal descriptions, applying so exactly to Mr. Evans' elevators, and the drawings exhibited to the eye, flash conviction both on reason and the senses that there is nothing new in these elevators but their being strung together on a strap of leather. If this strap of leather be an invention, entitling the inventor to a patent right, it can only extend to the strap, and the use of the string of buckets must remain free to be connected by chains, ropes, a strap of hempen girthing, or any other substance except leather. But, indeed, Mr. Martin had before used the strap of leather.

The screw of Archimedes is as ancient, at least, as the age of that mathematician, who died more than 2,000 years ago. Diodorus Siculus speaks of it, L. i., p. 21, and L. v., p. 217, of Stevens' edition of 1559, folio; and Vitruvius, xii. The cutting of its spiral worm into sections for conveying flour or grain, seems to have been an invention of Mr. Evans, and to be a fair subject of a patent right. But it cannot take away from others the use of Archimedes' screw with its perpetual spiral, for any purposes of which it is susceptible.

Digitized by Google

## Correspondence

The hopper-boy is an useful machine, and so far as I know, original.

It has been pretended by some, (and in England especially,) that inventors have a natural and exclusive right to their inventions, and not merely for their own lives, but inheritable to their heirs. But while it is a moot question whether the origin of any kind of property is derived from nature at all, it would be singular to admit a natural and even an hereditary right to inventors. It is agreed by those who have seriously considered the subject, that no individual has, of natural right, a separate property in an acre cf land, for instance. By an universal law, indeed, whatever, whether fixed or movable, belongs to all men equally and in common, is the property for the moment of him who occupies it, but when he relinquishes the occupation, the property goes with it. Stable ownership is the gift of social law, and is given late in the progress of society. It would be curious then, if an idea, the fugitive fermentation of an individual brain, could, of natural right, be claimed in exclusive and stable property. If nature has made any one thing less susceptible than all others of exclusive property, it is the action of the thinking power called an idea, which an individual may exclusively possess as long as he keeps it to himself; but the moment it is divulged, it forces itself into the possession of every one, and the receiver cannot dispossess himself of it. Its peculiar character, too, is that no one possesses the less,

Digitized by Google

because every other possesses the whole of it. He who receives an idea from me, receives instruction himself without lessening mine; as he who lights his taper at mine, receives light without darkening me. That ideas should freely spread from one to another over the globe, for the moral and mutual instruction of man, and improvement of his condition, seems to have been peculiarly and benevolently designed by nature, when she made them, like fire, expansible over all space, without lessening their density in any point, and like the air in which we breathe, move, and have our physical being, incapable of confinement or exclusive appropriation. Inventions then cannot, in nature, be a subject of property. Society may give an exclusive right to the profits arising from them, as an encouragement to men to pursue ideas which may produce utility, but this may or may not be done, according to the will and convenience of the society, without claim or complaint from anybody. Accordingly, it is a fact, as far as I am informed, that England was, until we copied her, the only country on earth which ever, by a general law, gave a legal right to the exclusive use of an idea. In some other countries it is sometimes done, in a great case, and by a special and personal act, but, generally speaking, other nations have thought that these monopolies produce more embarrassment than advantage to society; and it may be observed that the nations which refuse monopolies of invention, are as fruitful as England in new and useful devices.

Digitized by Google

## Correspondence    335

Considering the exclusive right to invention as given not of natural right, but for the benefit of society, I know well the difficulty of drawing a line between the things which are worth to the public the embarrassment of an exclusive patent, and those which are not. As a member of the patent board for several years, while the law authorized a board to grant or refuse patents, I saw with what slow progress a system of general rules could be matured. Some, however, were established by that board. One of these was, that a machine of which we were possessed, might be applied by every man to any use of which it is susceptible, and that this right ought not to be taken from him and given to a monopolist, because the first perhaps had occasion so to apply it. Thus a screw for crushing plaster might be employed for crushing corn-cobs. And a chain-pump for raising water might be used for raising wheat: this being merely a change of application. Another rule was that a change of material should not give title to a patent. As the making a ploughshare of cast rather than of wrought iron; a comb of iron instead of horn or of ivory, or the connecting buckets by a band of leather rather than of hemp or iron. A third was that a mere change of form should give no right to a patent, as a high-quartered shoe instead of a low one; a round hat instead of a three-square; or a square bucket instead of a round one. But for this rule, all the changes of fashion in dress would have been under the tax of patentees. These were

Digitized by Google

**Jefferson's Works**

among the rules which the uniform decisions of the board had already established, and under each of them Mr. Evans' patent would have been refused. First, because it was a mere change of application of the chain-pump, from raising water to raise wheat. Secondly, because the using a leathern instead of a hempen band, was a mere change of material; and thirdly, square buckets instead of round, are only a change of form, and the ancient forms, too, appear to have been indifferently square or round. But there were still abundance of cases which could not be brought under rule, until they should have presented themselves under all their aspects; and these investigations occupying more time of the members of the board than they could spare from higher duties, the whole was turned over to the judiciary, to be matured into a system, under which every one might know when his actions were safe and lawful. Instead of refusing a patent in the first instance, as the board was authorized to do, the patent now issues of course, subject to be declared void on such principles as should be established by the courts of law. This business, however, is but little analogous to their course of reading, since we might in vain turn over all the lubberly volumes of the law to find a single ray which would lighten the path of the mechanic or the mathematician. It is more within the information of a board of academical professors, and a previous refusal of patent would better guard our citizens against harassment by lawsuits. But Eng-

Digitized by Google

## Correspondence          337

land had given it to her judges, and the usual pre-
dominancy of her examples carried it to ours.

It happened that I had myself a mill built in the
interval between Mr. Evans' first and second patents.
I was living in Washington, and left the construction
to the millwright.   I did not even know he had
erected elevators, conveyers and hopper-boys, until
I learnt it by an application from Mr. Evans' agent
for the patent price.   Although I had no idea he
had a right to it by law, (for no judicial decision
had then been given,) yet I did not hesitate to remit
to Mr. Evans the old and moderate patent price,
which was what he then asked, from a wish to en-
courage even the useful revival of ancient inventions.
But I then expressed my opinion of the law in a
letter, either to Mr. Evans or to his agent.

I have thus, Sir, at your request, given you the
facts and ideas which occur to me on this subject.
I have done it without reserve, although I have not
the pleasure of knowing you personally.   In thus
frankly committing myself to you, I trust you will
feel it as a point of honor and candor, to make no
use of my letter which might bring disquietude on
myself.   And particularly, I should be unwilling
to be brought into any difference with Mr. Evans,
whom, however, I believe too reasonable to take
offence at an honest difference of opinion.   I esteem
him much, and sincerely wish him wealth and honor.
I deem him a valuable citizen, of uncommon inge-
nuity and usefulness.   And had I not esteemed still

VOL. XIII—22

Digitized by  Google

more the establishment of sound principles, I should
now have been silent.   If any of the matter I have
offered can promote that object, I have no objection
to its being so used; if it offers nothing new, it will
of course not be used at all.   I have gone with
some minuteness into the mathematical history
of the elevator, because it belongs to a branch of
science in which, as I have before observed, it is
not incumbent on lawyers to be learned; and it is
possible, therefore, that some of the proofs I have
quoted may have escaped on their former argu-
ments.   On the law of the subject I should not
have touched, because more familiar to those who
have already discussed it; but I wished to state my
view of it merely in justification of myself, my
name and approbation being subscribed to the act.
With these explanations, accept the assurance of
my respect.

———

TO JOHN WALDO.

MONTICELLO, August 16, 1813.

SIR,—Your favor of March 27th came during my
absence on a journey of some length.   It covered
your "Rudiments of English Grammar," for which
I pray you to accept my thanks.   This acknowl-
edgment of it has been delayed, until I could have
time to give the work such a perusal as the avoca-
tions to which I am subject would permit.   In
the rare and short intervals which these have

Digitized by Google

**Exhibit C**

*Dollond's Case* **(1766)**

**&**

*Boulton v. Bull,*
**(1795) 126 Eng. Rep. 651, 655 (K.B.)**

BRIESEN & STEELE,
MAR 31 1887
229 BROADWAY, N.Y.

# DECISIONS

ON THE LAW OF

# PATENTS FOR INVENTIONS

RENDERED BY

## ENGLISH COURTS

*SINCE THE BEGINNING OF THE
SEVENTEENTH CENTURY.*

————

VOL. I.
1662 - 1833.

COMPILED AND ANNOTATED
BY
BENJAMIN VAUGHAN ABBOTT.

————

WASHINGTON:
CHARLES R. BRODIX,
LAW PUBLISHER.
1887.

1. Every false recital in a thing not material will not vitiate the grant if the king's intention is manifest and apparent.

2. If the king is not deceived in his grant by the false suggestion of the party, but from his own mistake upon the surmise and information of the party, it shall not vitiate or avoid the grant.

3. Although the king is mistaken in point of law or matter of fact, if that is not part of the consideration of the grant it will not avoid it.

4. Where the king grants *ex certa scientia et mero motu*, those words occasion the grant to be taken in the most liberal and beneficial sense, according to the king's intent and meaning expressed in his grant.

5. Although in some cases the general words of a grant may be qualified by the recital, yet if the king's intent is plainly expressed in the body of the grant the intent shall prevail and take place.

---

## DOLLOND'S CASE.

### Common Pleas, 1766.

#### *Prior Use.*

Use of a process without any disclosure of it to other persons is not such a prior use as deprives a subsequent inventor of his right to a patent.

Action for damages.

The patent was granted to John Dollond, April 19, 1758, for "a new method of making the object-glasses of re-

---

the rules have generally been considered applicable to that class of letters patent.

SDM-MAP Document 23-1 Filed 08/30/12 Page

fracting telescopes by compounding mediums of different refractive qualities, whereby the errors arising from the different refrangibility of light, as well as those which are produced by the spherical surfaces of the glasses, are perfectly corrected."

The principal glass of a refracting telescope is that which is farthest from the eye, and is commonly called the object-glass, because it is at that end of the telescope which is directed toward the object. This glass refracts the rays which proceed from the object in such a manner as to form an image of the aforesaid object in the focus, which image is magnified by the eye-glasses; but as every ray of light consists of parts that differ in their degrees of refrangibility, an image formed by refraction is thereby rendered very defective, as all opticians very well know. Now, in these new telescopes the images of objects are formed by the difference between two contrary refractions, the object-glass being a compound of two or more glasses put close together, whereof one is concave and the other convex. The excess of refraction by which the image is formed is in the convex glass, which is made of a medium or substance in which the difference of refrangibility is not so great as in the substance which the concave is made of; therefore their refractions being proportional to their difference of refrangibility, there remains a difference of refraction by which the image is formed, without any difference of refrangibility to disturb the vision. The radii of the surfaces of each of these glasses are likewise so proportioned as to make the aberrations or errors which proceed from the spherical surfaces of these glasses respectively equal; and being contrary, they destroy each other.

One defense was that of anticipation; to sustain which proof was made that many years before the date of Dollond's patent, a Dr. Hall had made and continued to use object-glasses of precisely similar construction to those of the patent; but it appeared that Dr. Hall had only used them in his own observatory, and had made no publication of their construction or use; on the contrary, he received credit for the correctness of his observations, the public not

SDM-MAP   Document 23-1   Filed 08/30/12   Page

knowing by what means he made them. This was held not to be a public use.

The defendant objected that a patent for a mere method could not be sustained. Another objection taken was that the specification described only the principle, not the mechanical construction. But the patent was sustained.

No formal report of the case is found; but the general grounds of decision may be gathered from allusions to the case made in the opinions (particularly that of BULLER, J.) rendered in the subsequent case of Boulton v. Bull (*post*, p. 59).

BULLER, J. The objection to Dollond's patent was, that he was not the inventor of the new method of making object-glasses, but that Dr. Hall had made the same discovery before him. But it was holden, that as Dr. Hall had confined it to his closet, and the public were not acquainted with it, Dollond was to be considered as the inventor. . . . Dollond's patent was for object-glasses, and the specification properly stated the method of making those glasses. The point contested in that case was whether Dollond or Hall was the first and true inventor within the meaning of the statute, Hall having first made the discovery in his own closet, but never made it perfect; and on that ground Dollond's patent was confirmed.

HEATH, J. I consider Dollond's patent, which was for a refracting telescope, as substantially one for an improved machine. A patent for an improvement of a refracting telescope and a patent for an improved refracting telescope are in substance the same. The same specification would serve for both patents; the new organization of parts is the same in both.

EYRE, C. J. When the effect produced is some new substance or composition of things, it should seem that the privilege of the sole working or making ought to be for such new substance or composition without regard to the mechanism or process by which it has been produced, which, though perhaps also new, will be only useful as producing the new substance. Upon this ground Dollond's patent

was perhaps exceptional, for that was for a new method of producing a new object-glass, instead of for the object-glass produced.

---

## ROEBUCK v. STIRLING.

### House of Lords, 1774.

*Prior Public Use.  England and Scotland.*

Public use of an invention in England, prior to the issue of a patent for it in Scotland,—*Held* to have rendered the Scotch patent void.

Appeal from the Court of Session.

Letters patent under the great seal of Scotland were issued, June 11, 1771, to John Roebuck and S. E. Garbett, for "the means of obtaining an acid spirit from sulphur and saltpetre in vessels of lead, and likewise of purifying the same also in vessels of lead."

The specification as enrolled by Roebuck described the method of making acid spirit by burning sulphur and saltpetre, and collecting the condensed fumes, and stated the "material discovery to be the use of leaden vessels instead of vessels of glass, in all or any part of the process."

The patentees, in their case, stated the uses of the article and the usual methods of preparing it: 1. By burning sulphur and collecting the fumes by a bell-glass held over, by which the fumes were condensed ; 2. By distillation, in strong glass retorts, over a strong fire ; 3. By burning sulphur and saltpetre in close glass vessels ; 4. By burning these materials, and collecting, rectifying and purifying, in vessels of lead, the spirit, which was the subject of the above patent.   They alleged that by this invention the price of the articles was reduced 30 per cent. immediately ; that they carried on the manufacture in secret for a time, but, on discovering that others were learning the art by decoying their servants, they applied for and obtained the above patent.

In January, 1772, after the respondents, William Stirling

effectual in law, to all intents, constructions, and purposes, against the offender, and all persons claiming under him. If this be true, I think there can be no doubt on the words of the deed of assignment, which is not a particular conveyance of particular lands, but a general conveyance of all the real and personal property of the bankrupt. And the court is bound to construe the bankrupt laws in the **[463]** most liberal and beneficial manner for the creditors. I therefore hold that every species of right, of which by any possibility profit can be made, passes to the assignees.

HEATH, J.  I am of the same opinion. My Brother Williams's argument goes to prove, that even a right of entry on a vacant possession would not pass by the assignment. But he says the assignees are not without remedy, for the action may be brought in the name of the bankrupt; but suppose the bankrupt were to release his right of action, or make a fraudulent conveyance, if he were to bring the action, such release or conveyance might be set up to defeat it. As to the case cited from Vernon, I think it a very strange one, for a covenant to renew a lease runs with the land. With respect to the second point, I am also of opinion that the words used in the assignment were sufficient. The commissioners are strangers to the bankrupt, and cannot describe every particular species of his property. We should therefore do infinite mischief, if we were to hold, that every thing belonging to him did not pass under the general words that are used.

ROOKE, J., of the same opinion.

Rule for arresting the judgment discharged.

BOULTON AND WATT *against* BULL.  Saturday, May 16th, 1795.

A patent was granted to A. B. for a new invented method of using an old engine in a more beneficial manner than was before known. The specification stated, that the method consisted of certain principles, and described the mode of applying those principles to the purposes of the invention, and an act of parliament, reciting the patent to have been for the making and vending certain engines by him invented, extended to A. B. for a longer term than 14 years, the privilege of making, constructing and selling the said engines.—Q. Whether, under these circumstances, the patent right was valid (a)[1]?

This was an action on the case for infringing a patent. The first count of the declaration stated, that the king by letters patent under the great seal, bearing date on the 5th of January, 1769, granted to the Plaintiff James Watt the sole benefit and advantage of making, exercising and vending a certain invention of him the said James, being a method by him invented of lessening the consumption of steam and fuel in fire engines, for the term of 14 years, with a proviso for a specification, &c. in the usual manner. It then stated, that by a private act of parliament passed in the 15th year of the king, the benefit of the patent (a)[2] was extended to 25 years, to Watt and his as-**[464]**-signs: that on the 5th of September, 1777, he assigned two thirds of the patent right to Boulton the other Plaintiff, for the remainder of the term of 25 years, and that the Defendant, against the consent of the Plaintiffs, made, constructed and sold divers engines, in imitation of the said engine so invented and

---

(a)[1] [This question came afterwards before the Court of King's Bench, in the case of *Hornblower* v. *Boulton*, 8 T. R. 95, on error from the Common Pleas, when it was unanimously resolved that the invention was the subject of a patent, and the patentee's right was valid. It seemed admitted there that under the statute 21 Jac. I. c. 3, s. 6, there cannot be a patent for a philosophical principle only, which has been since held in the case of *Rex* v. *Wheeler*, 2 B. & A. 345. Upon the construction of the word manufactures in the statute of James I., the Court in the last cited case observed, "It may perhaps extend also to a new process to be carried on by known implements or elements acting upon known substances, and ultimately producing some other known substance, but producing it in a cheaper or more expeditious manner, or of a better and more useful kind." As to patents for improvements, see *Harmar* v. *Playne*, 11 East, 110. *Macfarlane* v. *Price*, 1 Stark. N. P. C. 199. *Lord Cochrane* v. *Smethurst*, ibid. 205. *Campion* v. *Benyon*, 3 Brod. & Bing. 5. See also *Hill* v. *Thompson*, 8 Taunt. 375. 3 Merivale, 629.  2 B. Moore, 425, S. C.  *Savory* v. *Price*, 1 R. & M. N. P. C. 1.]

(a)[2] This act is stated at large, in the arguments on the part of the Defendant.

found out by Watt, and of the like nature and kind, in breach of the said act of parliament, and against the privilege granted to Watt as aforesaid, whereby, &c.   The second count was for making and constructing (not mentioning selling) engines, &c. like the first count.   The third was for making, constructing and selling engines, &c. partly in imitation as aforesaid.   The fourth, for making and constructing (omitting selling) engines partly in imitation &c.   The fifth, for using and putting in practice the invention of the Plaintiff Watt.   The sixth, for using and putting in practice part of the said invention.   The seventh for counterfeiting the said invention, and using and putting in practice certain engines, counterfeiting the said engine mentioned in the said act of parliament.   The eighth, for imitating the said invention.   The ninth, for resembling the said invention.   The tenth, for counterfeiting in part the said invention, and using and putting in practice engines counterfeiting in part the said engine &c.   The eleventh, for imitating in part the said invention.   The last, for resembling in part the said invention.

The general issue being pleaded, the cause came on to be tried before the Chief Justice at the sittings after Trinity term 1793, when a case was reserved for the opinion of the court, which stated, that his present majesty by letters patent dated the 5th day of January in the ninth year of his reign, granted to the Plaintiff James Watt, his special licence, full power &c. that he the said James Watt, his executors, administrators and assigns should and lawfully might, during the term of fourteen years therein mentioned, use, exercise and vend, throughout that part of Great Britain called England, the Dominion of Wales, and Town of Berwick upon Tweed, and also in his majesty's colonies and plantations abroad, his the said James Watt's new invented method of lessening the consumption of steam and fuel in fire engines, with the usual proviso for the inrolling of the specification.   That Watt did in pursuance of the proviso, cause a specification or description of the nature of the said invention, to be inrolled in the Court of Chancery, which description was particularly set forth in the said act of [465] parliament, and was as follows, "my method of lessening the consumption of steam, and consequently fuel in fire engines, consists of the following principles.   First, that vessel in which the powers of steam are to be employed to work the engine, which is called the cylinder in common fire engines, and which I call the steam vessel, must during the whole time the engine is at work, be kept as hot as the steam that enters it; first, by inclosing it in a case of wood, or any other materials that transmit heat slowly ; secondly, by surrounding it with steam or other heated bodies ; and thirdly, by suffering neither water nor any other substance colder than the steam, to enter or touch it during that time.   Secondly, in engines that are to be worked wholly or partially by condensation of steam, the steam is to be condensed in vessels distinct from the steam vessels, or cylinders, although occasionally communicating with them.   These vessels I call condensers, and whilst the engines are working, these cylinders ought at least to be kept as cool as the air in the neighbour-hood of the engines, by application of water or other cold bodies.   Thirdly, whatever air or other elastic vapour is not condensed by the cold of the condenser, and may impede the working of the engine, is to be drawn out of the steam vessels or condensers by means of pumps wrought by the engines themselves, or otherwise.   Fourthly, I intend in many cases to employ the expansive force of steam to press on the pistons, or whatever may be used instead of them, in the same manner as the pressure of the atmosphere is now employed in common fire engines.   In cases where cold water cannot be had in plenty, the engines may be wrought by this force of steam only, by discharging the steam into the open air after it has done its office.   Fifthly, where motions round an axis are required, I make the steam vessels in form of hollow rings or circular channels, with proper inlets and outlets for the steam, mounted on horizontal axles, like the wheels of a water mill ; within them are placed a number of valves, that suffer any body to go round the channel in one direction only.   In these steam vessels are placed weights, so fitted to them as entirely to fill up a part or portion of their channels, yet rendered freely capable of moving freely in them, by the means hereinafter mentioned or specified.   When the steam is admitted in these engines between these weights and the valves, it acts equally on both, so as to raise the weight to one side of the wheel, and by the re-action on the valves successively, [466] to give a circular motion to the wheel, the valves opening in the direction in which the weights are pressed, but not on the contrary : as the steam vessel moves round, it is supplied with steam from the boiler, and that which has performed its

office may either be discharged by means of condensers, or into the open air.   Sixthly, I intend in some cases to apply a degree of cold not capable of reducing the steam to water, but of contracting it considerably, so that the engines shall be worked by the alternate expansion and contraction of the steam.   Lastly, instead of using water to render the piston or other parts of the engines air and steam tight, I employ oils, wax, resinous bodies, fat of animals, quicksilver, and other metals in their fluid state."

And the said James Watt, by a memorandum added to the said specification, declared, that he did not intend that any thing in the fourth article should be understood to extend to any engine where the water to be raised enters the steam vessel itself, or any other vessel having an open communication with it.   In the fire engines referred to in the said specification, and which were in use prior to the patent in question, motion was given to the piston by the pressure of the atmosphere acting upon one side of it, while a vacuum or certain degree of exhaustion was produced on the other side within the steam vessel denominated the cylinder, by means of the injection of cold water, whereby the steam was condensed ; which operation, prior to the invention of the said James Watt, was always performed in the steam vessel or cylinder itself ; when the steam had been condensed, and the piston had descended, such portions of air and water as remained under it within the steam vessel or cylinder, were expelled through valves by the next succeeding steam from the boiler, and that steam counterbalancing the pressure of the atmosphere at the open end of the cylinder, allowed the piston to rise up with that end of the lever to which it was attached, while the other end of the lever and the matters attached thereto descended by reason of their greater comparative weight, and thus the engine was restored to that state in which it was previous to the first condensation.   The steam was, for this purpose, as occasion required, admitted through a pipe from a distinct vessel called the boiler, where it was generated, which occasionally communicated with the cy-[467]-linder by means of a valve, which was opened and shut by the action of the engine.   The injection of cold water was in like manner admitted, as occasion required, into the cylinder through a pipe from another distinct vessel containing cold water, called the injection cistern, by means of a cock or valve which was also opened and shut by the action of the engine, and such pumps as were used in these engines were also wrought by the engines themselves.   The construction and use of pumps for drawing out air, elastic vapour, or water from places or vessels where a vacuum or exhaustion was required, were known and practised before the obtaining the letters patent above mentioned, but had not been applied to the cylinders or condensers of steam engines. The said invention of the said James Watt was at the time of making the said letters patent, a new and a useful invention, and the said privilege vested by the said act of parliament in the said James Watt and his assigns, was infringed by the Defendant in the manner charged upon him by the declaration.   The said specification made by the said James Watt, is of itself sufficient to enable a mechanic acquainted with the fire engines previously in use, to construct fire engines producing the effect of lessening the consumption of fire and steam in fire engines, upon the principle invented by the said James Watt.

And the questions for the opinion of the Court were,

1st.   Whether the said patent was good in law, and continued by the act of parliament above mentioned ?

2d.   Whether the above specification of the Plaintiff James Watt was in point of law sufficient to support the above patent ?

This case was twice argued, the first time by Watson, Serjt., for the Plaintiffs, and Le Blanc, Serjt., for the Defendant ; and the second, by Adair, Serjt., for the Plaintiffs, and Williams, Serjt., for the Defendant.

On the part of the Plaintiffs, the substance of the arguments was the following. The Plaintiffs have a right to recover damages for the infringement of their patent, which is : 1st, both good in law, and continued by the act 15 Geo. 3, c. 61 ; and 2dly, duly supported by the specification.   It is good in law, as being for a newly discovered method of producing an important effect in the use of the old steam engine, and comes within the provision of the stat. 21 Jac. 1, c. 3, s. 6, [468] which protects inventions of this kind from the declaration mentioned in the former part of the statute.   By every fair rule of construction, the words " working or making any manner of new manufactures," must include the invention of the Plaintiffs.   The term manufacture means " any thing made or produced by art," and the method or invention for which

the patent is granted, is to produce an effect by artificial means, by which the consumption of fuel shall be lessened in steam-engines. Whether the word method be used as in the patent, or engine as in the act for continuing it, the meaning is obviously the same, and the Court will not deprive the Plaintiffs, the merit and utility of whose invention is on all sides admitted, of the benefit of that invention by mere verbal criticisms.

[Heath, J. When a mode of doing a thing is referred to something permanent, it is properly termed an engine; when to something fugitive, a method.] This patent is not expressed in terms new or unusual; almost all the patents upon record that have been granted to those who have made discoveries or improvements in the mechanic arts, being for the method of doing the thing, and not for the thing done. [Heath, J. Is there any instance of a patent for a mere method?] The patent granted to Dollond for his improvement in making the object-glasses of telescopes was, for "an invention of a new method of making the object-glasses of refracting telescopes." So also, David Hartley's patent was for his method of securing buildings from fire. So likewise are the numerous patents that have been granted for the different improvements which have been made of late years, in chemistry and medicine (*a*). The patent, therefore, of the Plaintiffs is good in law : and it is also continued by the act 15 Geo. 3. That act expressly recites the patent, and extends the benefit of it for 25 years to Watt and his assigns. It was therefore clearly the intention of the legislature that the patent already granted should be continued, and the Court will construe the act in such a manner as to effectuate that intention.

With regard to the specification, that is sufficiently explicit to support the validity of the patent. The improvement made by Watt consists in a discovery, that by letting out the steam from the cylinder into another vessel in order to condense it, **[469]** instead of admitting cold water into the cylinder for that purpose, as was done in Newcomen's engine, and by keeping the cylinder hot, the consumption of steam and consequently of fuel would be diminished. The communication between the cylinder and the other vessel is formed by means of valves, which were before in use in Newcomen's engine, and therefore not necessary to be more accurately described, and the mode of keeping the cylinder hot is explicitly stated in the specification. There is no new mechanical construction invented by Watt, capable of being the subject of a distinct specification, but his discovery was of a principle, the method of applying which is clearly set forth, and therefore a drawing or model would have been unnecessary. So in Dollond's patent, (to take one of many instances) the specification describes the principle, but not the mechanical construction by which it is carried into effect. It recites, that a patent had been granted to him for the "invention of a new method of making the object glasses of refracting telescopes, by compounding mediums of different refractive qualities, whereby the errors arising from the different refrangibility of light, as well as those which are produced by the spherical surfaces of the glasses, were perfectly corrected." It then goes on to state, after mentioning the defects of the telescopes then in use, that in the new telescopes the images of objects were formed by the difference between two contrary refractions, the object-glass being a compound of two or more glasses put close together, whereof one was concave and the other convex: that the excess of refraction by which the image was formed was in the convex glass, which was made of a medium or substance in which the difference of refrangibility was not so great as in the substance of which the concave glass was formed ; therefore, their refractions being proportioned to their difference of refrangibility, there remained a difference of refraction by which the image was formed, without any difference of refrangibility to disturb the vision : and that the radii of the surfaces of each of those glasses were likewise so proportioned, as to make the aberrations which proceeded from their spherical surfaces respectively equal, which being also contrary, destroyed each other. But there is no mention of any mechanism, nor does the specification state the degrees of sphericity or curvature of the concave or convex glasses, because it is well known that the curvature of one must be proportioned to that of the other, in order to correct the refrangibility of the **[470]** rays of light. It is also to be observed, that the jury have found that the specification is sufficient to enable a mechanic acquainted with the fire engines previously in use, to construct fire engines producing the effect

(*a*) A great variety of patents of this kind were cited which it is not necessary to repeat, as they all went to the same point.

of lessening the consumption of fire and steam upon the principle invented by the Plaintiff Watt. It is upon the whole, therefore, submitted to the court, that both the questions stated in the case must be answered in the affirmative.

[Buller, J. The objection to Dollond's patent was, that he was not the inventor of the new method of making object-glasses, but that Dr. Hall had made the same discovery before him. But it was holden, that as Dr. Hall had confined it to his closet, and the public were not acquainted with it, Dollond was to be considered as the inventor.]

On the part of the Defendant the arguments were the following.

This question may be argued on three grounds. 1. On the patent itself. 2. Upon the act 15 Geo. 3, c. 61. 3. Upon the act and patent taken together.

In considering the case upon the patent itself, the patent appears to be void, because it differs from the specification, the patent being for a formed instrument or machine, but the specification for principles unorganized. It is for a new invented method. Now the word invention, when applied to mechanical subjects, properly signifies something which has been already formed, some manufacture or machine, and is not applicable to mere unorganized principles. The Plaintiff Watt cannot be said to have invented the principles, for those principles were in use in the old or Newcomen's steam-engine. It is true, that the application of those principles in the manner described in the specification is new, but it was well known long before that steam had an expansive power, and was condensed by cold. It is in this sense that the word invention is used in the patent. It recites "that Watt had represented to the king, that he had after much labour and expense invented a method of lessening the consumption of steam and fuel in fire-engines." From these words it seems clear that he meant it to be understood by the crown, that the invention which he represented himself as having made, was completely formed, and not that he had merely conceived in his mind the application of certain [471] known principles by which the consumption of steam and fuel would be lessened in fire-engines: for the ideas of the principles before they were organized could not have been attended with great labour, and much less with great expense. That the representation was understood in this sense by the crown, will appear from considering other parts of the patent itself. The king grants to Watt that he shall "make, use, exercise and vend his said invention." In another part of the patent all persons are forbidden to counterfeit, imitate or resemble the same invention, and to make or cause to be made any addition thereto, or subtraction therefrom. In another part it is provided, that the patent shall not extend to give privilege to Watt to use or exercise any invention or work whatsoever which had theretofore been found out or invented by any other, and publicly used or exercised, but that every other person should use and practise their several inventions. Now it is impossible that any of the expressions thus cited from the patent can be applied to the invention of mere unorganized principles of science. If then the patent be, which it clearly is, for a formed instrument or machine, it is void, because it is admitted that there is no specification descriptive of any formed instrument whatever, nor is there any drawing or model.

But supposing it to be a patent for mere principles, (for the specification states that the invention consists of principles,) it is neither originally good in law, nor is it continued by 15 Geo. 3, c. 61. It is not good in law because it does not fall within the construction of the statute 21 Jac. 1, c. 3, upon which alone it must, if at all, be supported. The sixth section of that statute provides, that nothing therein contained shall extend to any letters patent, or grants of privilege for 14 years or under, thereafter to be made, of the sole working or making of any manner of new manufactures, within this realm, to the true and first inventors of such manufactures, which others at the time shall not use. The word manufacture is descriptive either of the practice of making a thing by art, or of the thing when made. The invention therefore of any instrument used in the process of making a thing by art, is a manufacture, and the subject of a patent within the statute, because such an instrument is itself a thing made by art. So also medicines may be said to be a species of manufacture, and within the provision of the statute, because they consist in the practice of mixing together and making up by art, the different ingredients of which they [472] are composed, and are the result of principles organized, as far as the nature of the thing will admit. The same observation may be made with respect to Dollond's telescopes, which are certainly a manufacture, and within the statute Jac. 1, but they consist of principles

reduced into form and practice as much as the subject will admit, and the patent is for glasses completely formed, not for mere principles, and the specification describes the manner in which the invention is to be carried into execution with all the perspicuity of which the thing is capable. That this is the true meaning of the term manufacture as it is used by the legislature, likewise appears from the words making or working being applied to it, and "which others at the time shall not use," and also from the provision that the patentee shall ascertain the nature of his invention, and in what manner the same is to be performed. The specification is the price which the patentee is to pay for the monopoly. In the construction of specifications it is a rule that the patentee must describe his invention in such a manner that other artists in the same trade or business may be taught to do the same thing for which the patent is granted, by following the directions of the specification alone, without any new invention or addition of their own, and without the expence of trying experiments. 1 Term Rep. B. R. 606, *Turner* v. *Winter.* This necessarily excludes any supposition that mere principles can be the subject of a patent. That this is the true construction of the word manufactures in the statute, appears also from Lord Coke's commentary on it, 3 Inst. 184, who, as appears from the journals of the House of Commons, was chairman of the committee to whom the bill was referred, and who therefore probably either drew or perused it. This construction of the word manufactures, in the statute, is also fortified by the opinion of Mr. J. Yates in the controversy respecting literary property, 4 Burr. 2361, *Miller* v. *Taylor,* who there held in illustration of the subject before him, that mere principles, not embodied and reduced into practice, were not the subject of a patent. Until they are so embodied, (to use the simile of that great judge,) they are like the sentiments of an author, while in his own mind. In that state they are alike the property of him or of another. But when once they are published, then, and not before, his exclusive property in them or in the organization of them commences. In *Sir Richard Arkwright's case* too (a) the learned judge before whom it was tried, stated in his sum-[473]-ing up, that for a principle alone a patent could not be obtained, for which he gave very convincing reasons. And independent of authorities, the reason of the thing shews that such a patent could not be obtained within the meaning of the statute. By obtaining a patent for principles only, instead of one for the result of the application of them, the public is prevented, during the term from improving on those principles, and at the end of the term is left in a state of ignorance as to the best, cheapest and most beneficial manner of applying them to the end proposed.

It is true indeed that the jury have found, "that the specification made by Watt, is of itself sufficient to enable a mechanic acquainted with fire-engines previously in use, to construct fire-engines, producing the effect of lessening the consumption of fuel and steam in fire-engines, upon the principle invented by Watt." But it is not found that the specification would enable a mechanic to construct Watt's fire-engines; nor is it found to what extent the consumption of steam and fuel would be lessened in fire-engines constructed upon the principles stated in the specification; nor whether those engines would have the effect of lessening the consumption of steam to the same degree with Watt's engines. All this is left uncertain. The merit of the invention must be measured by the quantity of fuel which may be saved by it. Now it is possible, that agreeable to this finding, a fire-engine might be made, which indeed would produce the effect of lessening the consumption of fuel and steam, upon the principles mentioned in the specification, but yet such engine might save only one bushel of coals or other fuel, where Watt's engine would save a hundred. The finding of the jury therefore does not mend the case. The specification ought to have described the method by which the machine might be made to save the greatest quantity of fuel which it was known to be capable of saving, and which it in fact does save when used by the inventor. It is a settled rule of law that if a patentee makes the thing, for which the patent is granted with cheaper materials, or if he applies and uses it in a more advantageous and useful manner than is described in the specification, the patent is void, because he does not put the public in possession of his invention, or enable them to derive the same benefit that he himself derives from it. 1 Term Rep. B. R. 602, *Turner* v. *Winter.*

(a) See the printed account of that trial, at the Sittings at Westminster after Trinity Term 25 Geo. 3, before Mr. J. Buller.

It is to be shewn in the next place, that the patent is not continued by the act 15 Geo. 3, c. 61. The title of it is, an act for vesting in James Watt, "the sole property of certain steam-engines, called fire-engines, of his invention." It recites, "that [474] the king by his letters patent had given and granted to Watt the sole benefit and advantage of making and vending certain engines by him invented for lessening the consumption of steam and fuel in fire-engines, with a proviso, that Watt should cause a particular description of the nature of the said invention to be inrolled, and that he accordingly had caused a particular description of the nature of the said engine to be inrolled. It farther recites, that the said James Watt had employed many years, and a considerable part of his fortune, in making experiments upon steam-engines, commonly called fire-engines, but on account of the many difficulties which always arise in the execution of such large and complex machines, he could not complete his intention before the end of the year 1794, when he finished some large engines as specimens of his construction, and that his engines might be of great utility, and then enacts, that the sole privilege of making, con-structing and selling the engines therein before particularly described, shall be vested in Watt for 25 years, and that he during the said term shall make, exercise and vend the said engines." Now is it possible to say, that this act continues a patent for mere principles? Certainly not. If therefore the patent be really for principles, it is not continued by the act. But supposing that though the act does not describe the patent according to the terms of it, yet it does describe it according to its import, namely, as a patent for principles; in that case it would not be within the protection of the statute of Jac. 1 for the reasons already offered.

There is a proviso in the act 15 Geo. 3, that every objection in law competent against the said patent, shall be competent against the act to all intents and purposes, except so far as relates to the term thereby granted. Though this therefore is a grant of a monopoly by the Legislature, yet it is to receive precisely the same construction, as if it had been a grant by letters patent. Now the grant itself is void, being founded on a false suggestion of the party to whom it is made, for it is a rule of law, that if the king's grant be founded on a false suggestion of the party to whom it is made, it is void; as if any thing mentioned in the consideration of the grant be false. 5 Co. 94 a. *Barwick's case.* The consideration, which is the foundation of this grant in the act, is the recital "that the king had in January 1765, by his letters patent, granted to Watt for the term of 14 years, the sole benefit and advantage of making [475] and vending certain engines, by him invented, for lessening the consumption of steam and fuel, and that owing to the reasons which are mentioned in the recital, it was probable, that the whole term granted by the patent would elapse before he could receive any compensation adequate to his labour; for which reasons the term granted by the patent is prolonged, and the act vests in him the sole privileges of making, constructing, and selling the said engines for 25 years; that is, the engines, the sole making and vending of which the king had granted by his said letters patent. But it is admitted, that the king did not grant by the patent a monopoly for making and vending any engines whatever. The recital therefore, which is the very foundation of the grant, is untrue. It has been also adjudged, that if a private act of Parliament like the present, be founded upon a false recital, the act is void: as where an act, reciting that A. had been attainted of treason, confirms the attainder, and farther enacts that he shall be attainted, and forfeit his lands; the king afterwards grants the lands of A. to another; if in fact A. never was attainted, or if his attainder appear on the face of it, to have been coram non judice, the act is void, and it shall not be made use of as an attainder de novo, notwithstanding it confirmed the attainder, and expressly enacted that he should be attainted, but A. shall take advantage of it by mere pleading without a writ of error, and shall oust the grantee of the king. Plowd. 390, *Earl of Leicester v. Heydon,* where it is laid down, that statutes which mis-recite things to which they refer, are void, and that in the principal case, the statute which recited that A. was attainted, when in fact he was not attainted, was void, ibid. 400, &c. Another objection to this act 15 Geo. 3, is that it professes to vest in Watt the exclusive property in an entire machine, notwithstanding the inven-tion which he claims to be his, is admitted to be of an improvement only of a known machine. And upon this point, it is to be observed, that Lord Coke says, "such a privilege as is consonant to law, must be substantially and essentially newly invented; but if the substance was in esse before and a new addition thereunto, though that

addition make the former more profitable, yet it is not a new manufacture in law."
3 Inst. 184. The act is also defective in not setting forth any specification of a
formed instrument or machine ; it is indeed admitted that no such specification is to
be found.

[476] If the subject be viewed as arising from the patent and act taken together,
the arguments which have been already used respecting those instruments separately,
apply themselves more strongly, inasmuch as if the act be considered as explanatory
of the patent, or as a part of it, there cannot be a doubt but that it means to grant a
monopoly for a formed engine or machine. Upon the whole therefore of the case, it
appears either that the patent is for an entire formed machine, when it ought to have
been for an improvement only, and in which case the specification does not correspond
with it, or it is for mere principles, which, according to the stat. 21 Jac. 1, c. 3,
cannot be the subject of a patent.

The sum of the reply was as follows. The patent is neither for a formed instru-
ment, nor is the specification for a principle unorganized. The former is for " a new
invented method of lessening the consumption of steam and fuel in fire engines," by
whatever mode that effect may be produced : the latter states both the principle of
the invention, and also the mode in which it is to operate, namely, the preserving the
cylinder hot by the means described, and the condensing the steam in separate vessels
communicating with the cylinder. The difference in the terms used in the patent and
the specification, arises from the nature of the subject, but the real meaning of them
is the same. Where an improvement is made upon a machine already known, the
patent ought not to be for the machine itself, but for the method of improving it.
Thus a patent was granted in 1759, to one Wood " for a scheme to work a fire engine,
at half the expense of coals," an effect which must have been caused by an alteration
of the engine, yet the patent was for the scheme, or method, and not for the engine
itself. And in the case of an improvement in making watches, Jessop's patent was
avoided, because it was for the whole watch, when the invention consisted of only one
movement. But notwithstanding this rule, if from the nature of the thing a patent
for the new method or improvement only should have the effect of giving a right to
the whole machine, that is not of itself a ground on which the patent can be set aside.

On this day, after consideration, the judges thus delivered their respective opinions.

[477] ROOKE J., after stating the special case at length, thus proceeded. From
this state of the case, and from the admission of counsel on both sides, I assume the
following facts, viz. that the Plaintiff Watt is the inventor of a new and useful
improvement in fire engines, whereby the consumption of steam, and consequently
of fuel is considerably lessened : that the improvement is of such a nature that it
may legally be the object of protection by royal patent : that a patent has been
granted to the inventor, on the condition of a specification of the nature of the
invention : that a specification has been made, sufficient to enable a mechanic to
construct fire engines containing the improvement invented by the patentee : and
that the Legislature six years after the patent had been granted, thought proper to
extend the duration of it from the eight years then to come, to twenty-five years, the
patent having been granted in the ninth, and the statute having passed in the fifteenth
year of the present king.

Under these circumstances, I think I conform to the spirit of the stat. 21 Jac. 1,
c. 3, s. 6, if I incline to support this patent, provided it may be supported without
violating any rule of law : and I think so for two reasons, first, because the patentee
is substantially intitled to the protection of the patent, and secondly because the
public are sufficiently instructed, and will be duly benefited by the specification.
Against the claim of the patentee certain objections have been made, which, it is
contended, deprive him of all legal right to that protection. First, it is objected
that the patent is not for fire engines upon the particular construction which contains
this new improvement, but for a new invented method of lessening the consumption
of steam and fuel : secondly, it is objected, that no particular engine is described in
this specification, but that it only sets forth the principles : and the last objection is,
that the statute has not duly prolonged the patent, because the patent is for a method,
and the statute for an engine. It is obvious that these objections are merely formal :
they do not affect the substantial merits of the patentee, nor the meritorious considera-
tion which the public have a right to receive, in return for the protection which the
patentee claims. With regard to the first objection, it is that the patent is not for a

fire engine of a particular construction, but for a new invented **[478]** method. It pre-supposes the existence of the fire engine, and gives a monopoly to the patentee of his new invented method of lessening the consumption of steam and fuel in fire engines. The obvious meaning of those words is, that he has made an improvement in the construction of fire engines, for what does method mean but mode or manner of effecting? What method can there be of saving steam or fuel in engines, but by some variation in the construction of them? A new invented method therefore conveys to my understanding the idea of a new mode of construction. I think those words are tantamount to fire engines of a newly invented construction; at least I think they will bear this meaning if they do not necessarily exclude every other. The specification shews that this was the meaning of the words as understood by the patentee, for he has specified a new and particular mode of constructing fire engines. If he has so understood the words, and they will bear this interpretation, then I think this objection, which is merely verbal, is answered. To which I add, that patents for a method or art of doing particular things have been so numerous, according to the lists left with us, that method may be considered as a common expression in instruments of this kind. It would therefore be extremely injurious to the interests of patentees, to allow this verbal objection to prevail. As to the second objection, that no particular engine is described, that no model or drawing is set forth, I hold this not to be necessary, provided the patentee so describes the improvement as to enable artists to adopt it when his monopoly expires. The jury find that he has so described it. It is objected, that he professes to set forth principles only; but we are not bound by what he professes to do, but by what he has really done. If he had professed to set forth a full specification of his improvement, and had not set it forth intelligibly, his specification would have been insufficient, and his patent void. It seems therefore but reasonable, that if he sets forth his improvement intelligibly, his specification should be supported, though he professes only to set forth the principle. The term principle is equivocal; it may denote either the radical elementary truths of a science, or those consequential axioms which are founded on radical truths, but which are used as fundamental truths by those who do not find it expedient to have recourse to first principles. The radical principles on which all steam engines are founded, **[479]** are the natural properties of steam, its expansiveness and condensibility. Whether the machines are formed in one shape or another, whether the cylinder is kept hot or suffered to cool, whether the steam is condensed in one vessel or another, still the radical principles are the same. When the present patentee set his inventive faculties to work, he found fire engines already in existence, and the natural qualities of steam already known and mechanically used. He only invented an improvement in the mechanism, by which they might be employed to greater advantage. There is no newly discovered natural principle as to steam, nor any new mechanical principle in his machine; the only invention is a new mechanical employment of principles already known. As to the specification, some part of it, so much as represents the future intentions of the patentee, may be considered, according to the language of the specification, as merely theoretical; but the greater part describes a practical use of improved mechanism, the basis on which the improvement is founded. The object of the patentee was to condense the steam without cooling the cylinder: the means adopted to effectuate this were to enclose the cylinder in a case which will confine the heat or transmit it slowly, to surround it with steam or other heated bodies, and to suffer neither water nor any other substance colder than the steam, to enter or touch it during that time. These means are set forth. The objection is, that there is no drawing or model of a particular engine; and where is the necessity of such drawing or model, if the specification is intelligible without it? Had a drawing or model been made, and any man copied the improvement, and made a machine in a different form, no doubt this would have been an infringement of the patent. Why? Because the mechanical improvement would have been introduced into the machine, though the form was varied. It follows from thence, that the mechanical improvement, and not the form of the machine, is the object of the patent; and if this mechanical improvement is intelligibly specified, of which a jury must be the judges, whether the patentee call it a principle, invention, or method, or by whatever other appellation, we are not bound to consider his terms, but the real nature of his improvement, and the description he has given of it, and we may I think protect him without violating any rule of law. As to the articles of the specification which denote intention only, and do not state the thing to which

[480] it is to be applied, I do not think he could maintain an action for breach of these articles; for he cannot anticipate the protection, before he is entitled to it by practical accomplishment.   But the patent is for a method already adopted, and the two first and most material articles are set forth as already accomplished, and the case states it was new and useful at the time of making the patent.   I therefore consider the most essential part of the patent, the keeping the cylinder hot, inclosing it in a case, and surrounding it with steam, as carried into practical effect at the time of granting the patent; this the Defendant has infringed; and I will presume after verdict, where nominal damages only are given, that the evidence was applied to, and the damages given for those articles only which are well specified.   Now if he has nfringed those articles which are well specified, he shall not be excused from an ction, because he has been guilty of an additional infringement on that which is specified as matter of intention only.   As to the objection of the want of a drawing or model, that at first struck me as of great weight.   I thought it would be difficult to ascertain what was an infringement of a method, if there was no additional representation of the improvement, or thing methodized.   But I have satisfied my mind thus: infringement or not, is a question for the jury; in order to decide this case, they must understand the nature of the improvement or thing infringed; if they can understand it without a model, I am not aware of any rule of law which requires a model or a drawing to be set forth, or which makes void an intelligible specification of a mechanical improvement, merely because no drawing or model is annexed.   In the present case, I do not hear that the want of a drawing or a model occasioned any difficulty to the jury; they have expressly decided that Mr. Watt has the merit of a new and an useful invention, and that this invention was infringed by the Defendant.   How then can I say, that they could not understand it for the want of a drawing?   Especially when they have added, that the specification is sufficient to enable a mechanic acquainted with the fire-engines previously in use, to construct fire-engines producing the effect of lessening the consumption of fuel and steam, upon the principle invented by the Plaintiff.   For these reasons I think the second objection, that no particular engine is set forth, is not of sufficient weight to destroy the effect of the patent.

[481] HEATH J.   This patent is expressly for a new invented method for lessening the consumption of steam and fuel in fire-engines.   It appears that the invention of the patentee is original, and may be the subject of a patent; but the question is, inasmuch as this invention is to be put in practice by means of machinery, whether the patent ought not to have been for one or more machines, and whether this is such a specification as entitles him to the monopoly of a method?   If method and machinery had been used by the patentee as convertible terms, and the same consequences would result from both, it might be too strong to say, that the inventor should lose the benefit of his patent, by the misapplication of his term.   In truth it is not so.   His counsel have contended for the exclusive monopoly of a method of lessening the consumption of steam and fuel in fire-engines, and that therefore would better answer the purposes of the patentee, for the method is a principle reduced to practice; it is in the present instance the general application of a principle to an old machine.   There is no doubt that the patentee might have obtained a patent for his machinery, because the act of parliament he obtained acknowledged his patent, and he himself in 1782 procured a patent for his invention of certain new improvements upon steam and fire engines for raising water &c., which contained new pieces of mechanism, applicable to the same.   Upon this statement the following objections arise to the patent, which I cannot answer: namely that if there may be two different species of patents, the one for an application of a principle to an old machine, and the other for a specific machine, one must be good and the other bad.   The patent that admits the most lax interpretation should be bad, and the other alone conformable to the rules and principles of common law, and to the statute on which patents are founded.   The statute 21 Jac. 1 prohibits all monopolies, reserving to the king by an express proviso so much of his ancient prerogative, as shall enable him to grant letters patent and grants of privilege, for the term of fourteen years or under, of the sole working or making of any manner of new manufactures within this realm, to the true and first inventor and inventors of such manufactures.   What then falls within the scope of the proviso?   Such manufactures as are reducible to two classes.   The first class includes machinery, the second [482] substances (such as medicines) formed by chemical and other processes, where

the vendible substance is the thing produced, and that which operates preserves no permanent form. In the first class the machine, and in the second the substance produced, is the subject of the patent. I approve of the term manufacture in the statute, because it precludes all nice refinements; it gives us to understand the reason of the proviso that it was introduced for the benefit of trade. That which is the subject of a patent, ought to be specified, and it ought to be that which is vendible, otherwise it cannot be a manufacture. This is a new species of manufacture, and the novelty of the language is sufficient to excite alarm. It has been urged that other patents have been litigated and established; for instance Dollond's, which was for a refracting telescope. I consider that as substantially an improved machine. A patent for an improvement of a refracting telescope, and a patent for an improved refracting telescope, are in substance the same. The same specification would serve for both patents, the new organization of parts is the same in both. I asked in the argument for an instance of a patent for a method, and none such could be produced. I was then pressed with patents for chemical processes, many of which are for a method, but that is from an inaccuracy of expression, because the patent in truth is for a vendible substance. To pursue this train of reasoning still further, I shall consider how far the arguments in support of this patent will apply to the invention of original machinery founded on a new principle. The steam engine furnishes an instance. The Marquis of Worcester discovered in the last century, the expansive force of steam, and first applied it to machinery. As the original inventor he was clearly entitled to a patent. Would the patent have been good applied to all machinery, or to the machines which he had discovered? The patent decides the question. It must be for the vendible matter, and not for the principle. Another objection may be urged against the patent, upon the application of the principle to an old machine, which is, that whatever machinery may be hereafter invented would be an infringement of the patent, if it be founded on the same principle. If this were so it would reverse the clearest positions of law respecting patents for machinery, by which it has been always holden, that the organization of a machine may be the subject of a patent, but principles cannot. If the argument for the patentee were **[483]** correct, it would follow, that where a patent was obtained for the principle, the organization would be of no consequence. Therefore the patent for the application of the principle must be as bad as the patent for the principle itself. It has been urged for the patentee, that he could not specify all the cases, to which his machinery could be applied. The answer seems obvious, that what he cannot specify, he has not invented. The finding of the jury that steam engines may be made upon the principle stated by the patentee, by a mechanic acquainted with the fire-engines previously in use, is not conclusive. This patent extends to all machinery that may be made on this principle, so that he has taken a patent for more than he has specified; and as the subject of his patent is an entire thing, the want of a full specification is a breach of the conditions, and avoids the patent. Indeed it seems impossible so specify a principle, and its application to all cases, which furnishes an argument that it cannot be the subject of a patent. It has been usual to examine the specification, as a condition on which the patent was granted. I shall now consider it in another point of view. It is a clear principle of law that the subject of every grant must be certain. The usual mode has been for the patentee to describe the subject of it by the specification; the patent and the specification must contain a full description. Then in this, as in most other cases, the patent would be void for the uncertain description of the thing granted, if it were not aided by the statute. The grant of a method is not good, because uncertain, the specification of a method or the application of principle is equally so, for the reasons I have alleged.

BULLER, J. Few men possess more ingenuity, or have greater merit with the public, than the Plaintiffs on this record; and if their patent can be sustained in point of law, no man ought to envy them the profits and advantages arising from it. Even if it cannot be supported, no man ought to envy them the profits which they have received; because the world has undoubtedly derived great advantages from their ingenuity. We are called upon to deliver our opinions on the dry question of law, whether upon the case disclosed to us, this patent can or cannot be sustained. And I shall deliver my opinion first upon the case itself, and secondly on the arguments which have been urged at the bar.

**[484]** The case states the Plaintiffs' patent, the specification, and the act of parliament. It gives a description of the old engine, and then states that the invention

of the Plaintiffs is a new and useful one, and that the specification is sufficient to enable a mechanic to construct fire-engines, producing the effect of lessening the consumption of fuel and steam in fire-engines, upon the principle invented by Mr. Watt.  One objection made by the Defendant was, that it did not appear on the case, that a mechanic could, from the specification, construct an engine which should lessen the consumption of fuel and steam, with equal effect, or to the same extent as Mr. Watt himself did.  If the negative appeared, viz. that a mechanic could not from the specification make an engine with equal effect, or if it required expense and experiments before it could be done, I agree that either of those facts would avoid the patent.  But that is not so stated; and upon this case I think we are bound to say there is no foundation for either of those objections.  There is another objection to the case, which I think more important, and that is, that the jury have not told us wherein the invention consists, whether it be in an additional cylinder, or other vessel to the old machine, or what the addition is, or whether it be only in the application of the old parts of the machine, or in what is called at the bar, the principle only, or in what that principle consists.  These defects have opened a great field of argument, and have driven the Plaintiffs' counsel to the necessity of endeavouring to support his case on all possible grounds.  The old engine consisted of a cylinder, a boiler, a pipe which occasionally communicated between them, an injection cistern, and pumps.  The two material parts of the new engine, as mentioned in the specification, are the old cylinder, now called the steam vessel, and the vessel now called the condenser, which it is said must be distinct from the steam vessel, though occasionally communicating with it.  The old boiler did occasionally communicate with the cylinder.  The pumps, grease and other things are admitted to be trifling circumstances, and not worthy any observation.  Upon this state of the case, I cannot say that there is any thing substantially new in the manufacture; and indeed it was expressly admitted on the argument, that there were no new particulars in the mechanism: that it was not a machine or instrument which the **[485]** Plaintiffs had invented: that mechanism was not pretended to be invented in any of its parts: that this engine does consist of all the same parts as the old engine: and that the particular mechanism is not necessary to be considered.  The fact of there being nothing new in the engine drove the counsel to argue on very wide grounds, and to touch on the possibility of maintaining a patent for an idea or a principle, though I think it was admitted that a patent could not be sustained for an idea or a principle alone.

The very statement of what a principle is, proves it not to be a ground for a patent.  It is the first ground and rule for arts and sciences, or in other words the elements and rudiments of them.  A patent must be for some new production from those elements, and not for the elements themselves.  The Plaintiffs' case is considerably distressed in many parts of it, and as it seems to me, the arguments which have been adduced were very much calculated to keep clear of difficulties, which the counsel foresaw might be introduced into the case; as first, that unless the principle can be supported as the ground of the patent, there may be some danger of confirming the Defendant's objection to it: secondly, that unless the principle can be supported, it may open a fatal objection to the specification, because that does not state in what manner the new machine is to be constructed, how it varies from the old one, or in what way the improvements are to be added: or thirdly, because the patent embraces the whole principle, and is founded on that alone; but the invention is taken to consist of an improvement or addition only.  Another objection may arise both to the patent and specification, viz. that the patent is granted for the whole engine, and not for the addition or improvement only.  Perhaps it may be convenient and judicious to keep these objections as much as possible in the back ground, and out of the view of the court.  But it is our duty to sift and dive into the facts and circumstances of the case, and the bearings and consequences of them, as far as our abilities or knowledge of the subject will admit.  There is one short observation arising on this part of the case, which seems to me to be unanswerable, and that is, that if the principle alone be the foundation of the patent, it cannot possibly stand, with that knowledge and discovery which the world were in possession of before.  The effect, the power, and the operation of steam were known long **[486]** before the date of this patent; all machines which are worked by steam are worked on the same principle.  The principle was known before, and therefore if the principle alone be the foundation of the patent, though the addition may be a great improvement, (as

it certainly is,) yet the patent must be void ab initio. But then it was said, that though an idea or a principle alone would not support the patent, yet that an idea reduced into practice, or a practical application of a principle was a good foundation for a patent, and the present case. The mere application or mode of using a thing, was admitted in the reply not to be a sufficient ground (a); for on the court putting the question, whether if a man by science were to devise the means of making a double use of a thing known before, he could have a patent for that, it was rightly and candidly admitted that he could not. The method and the mode of doing a thing are the same: and I think it impossible to support a patent for a method only, without having carried it into effect and produced some new substance. But here it is necessary to inquire, what is meant by a principle reduced into practice. It can only mean a practice founded on principle, and that practice is the thing done or made, or in other words the manufacture which is invented.

This brings us to the true foundation of all patents, which must be the manufacture itself; and so says the statute 21 Jac. 1, c. 3. All monopolies except those which are allowed by that statute, are declared to be illegal and void; they were so at common law, and the sixth section excepts only those of the sole working or making any manner of new manufacture: and whether the manufacture be with or without principle, produced by accident or by art, is immaterial. Unless this patent can be supported for the manufacture, it cannot be supported at all. I am of opinion that the patent is granted for the manufacture, and I agree with my Brother Adair that verbal criticisms ought not to avail, but that principle in the patent and engine in the act of parliament mean and are the same thing. Besides, the declaration is founded on a right to the engine, and therefore, unless the Plaintiffs can make out their right to that extent, they must fail. In most of the instances of the different patents mentioned by my Brother Adair, the patents were for the manufacture, and the specification rightly stated **[487]** the method by which the manufacture was made: but none of them go the length of proving, that a method of doing a thing without the thing being done or actually reduced into practice, is a good foundation for a patent. When the thing is done or produced, then it becomes the manufacture which is the proper subject of a patent. Dollond's patent was for object-glasses, and the specification properly stated the method of making those glasses. And as I mentioned in the course of the argument, the point contested in that case was, whether Dollond or Hall was the first and true inventor within the meaning of the statute, Hall having first made the discovery in his own closet, but never made it public; and on that ground, Dollond's patent was confirmed. Mechanical and chemical discoveries all come within the description of manufactures: and it is no objection to either of them that the articles of which they are composed were known and were in use before, provided the compound article which is the object of the invention, is new. But then the patent must be for the specific compound, and not for all the articles or ingredients of which it is made. The first inventor of a fire-engine could never have supported a patent for the method and principle of using iron. Nor could Dr. James (supposing his patent had been clear of other objections) have sustained a patent for the method and principle of using antimony. In the first case, the patent must have been for the fire-engine, eo nomine; and in the second, for the specific compound powder. Suppose the world were better informed than it is, how to prepare Dr. James's fever powder, and an ingenious physician should find out that it was a specific cure for a consumption, if given in particular quantities; could he have a patent for the sole use of James's powder in consumptions or to be given in particular quantities? I think it must be conceded that such a patent would be void; and yet the use of the medicine would be new, and the effect of it as materially different from what is now known, as life is from death. So in the case of a late discovery, which as far as experience has hitherto gone, is said to have proved efficacious, that of the medicinal properties of arsenic in curing agues, could a patent be supported for the sole use of arsenic in aguish complaints? The medicine is the manufacture, and the only object of a patent, and as the medicine is not new, any patent for it, or for the use of it, would be void. The case of water tabbies which has often been mentioned in Westminster **[488]** Hall, may afford some illustration of

(a) By an error of the press, this question and the admission in answer to it are omitted in the statement of the reply.

this subject. That invention first owed its rise to the accident of a man's spitting on a floor cloth, which changed its colour, from whence he reasoned on the effect of intermixing water with oils or colours, and found out how to make water tabbies, and had his patent for water tabbies only. But if he could have had a patent for the principle of intermixing water with oil or colours, no man could have had a patent for any distinct manufacture, produced on the same principle. Suppose painted floor cloths to be produced on the same principle, yet as the floor cloth and the tabby are distinct substances, calculated for distinct purposes, and were unknown to the world before, a patent for one would be no objection to a patent for another.

The true question in this case is, whether the Plaintiffs' patent can be supported for the engine? I have already said I consider it as granted for the engine, and if that be the right construction of the patent, that alone lays all the arguments about ideas and principles out of the case. The objections to this patent, as a patent for the engine, are two: first, that the fire-engine was known before: and secondly, though the Plaintiffs' invention consisted only of an improvement of the old machine he has taken the patent for the whole machine, and not for the improvement alone. As to the first, the fact which the Plaintiffs' counsel were forced to admit, and did repeatedly admit in the terms which I mentioned, viz. that there was nothing new in the machine, is decisive against the patent. And the second objection is equally fatal. That a patent for an addition or improvement may be maintained, is a point which has never been directly decided; and *Bircot's case*, 3 Inst. 184, is an express authority against it, which case was decided in the Exchequer Chamber. What were the particular facts of that case we are not informed, and there seems to me to be more quaintness than solidity in the reason assigned, which is, that it was to put but a new button to an old coat, and it is much easier to add than to invent. If the button were new, I do not feel the weight of the objection that the coat on which the button was to be put, was old. But in truth arts and sciences at that period were at so low an ebb, in comparison with that point to which they have been since advanced, and the effect and utility of improvements so little known, that I do not think that case ought to preclude the question. In later **[489]** times, whenever the point has arisen, the inclination of the court has been in favour of the patent for the improvement, and the parties have acquiesced, where the objection might have been brought directly before the court. In *Morris* v. *Branson* which was tried at the sittings after Easter term 1776, the patent was for making oilet holes or net work in silk, thread, cotton, or worsted; and the Defendant objected that it was not a new invention, it being only an addition to the old stocking frame. Lord Mansfield said "after one of the former trials on this patent, I received a very sensible letter from one of the gentlemen who was upon the jury, on the subject whether on principles of public policy, there could be a patent for an addition only. I paid great attention to it, and mentioned it to all the judges. If the general point of law, viz. that there can be no patent for an addition, be with the Defendant, that is open upon the record, and he may move in arrest of judgment. But that objection would go to repeal almost every patent that was ever granted." There was a verdict for the Plaintiffs with 500l. damages, and no motion was made in arrest of judgment. Though his Lordship did not mention what were the opinions of the judges, or give any direct opinion himself, yet we may safely collect that he thought on great consideration, the patent was good, and the Defendant's counsel, though they had made the objection at the trial, did not afterwards persist in it. Since that time, it has been the generally received opinion in Westminster Hall, that a patent for an addition is good. But then it must be for the addition only, and not for the old machine too. In *Jessop's case*, as quoted by my Brother Adair, the patent was held to be void because it extended to the whole watch, and the invention was of a particular movement only. It was admitted in the reply, that the patent should be applied to the invention itself: but it was contended, that if in consequence the patent gave a right to the whole engine, that would be no objection. To this I answer, that if the patent be confined to the invention, it can give no right to the engine, or to any thing beyond the invention itself. Where a patent is taken for an improvement only, the public have a right to purchase that improvement by itself, without being incumbered with other things. A fire-engine of any considerable size, I take it, would cost about 1200l. and suppose the alteration made by the Plaintiff, with a fair allowance for profit would **[490]** cost 50 or 100l. is it to be maintained, that all the persons who already have fire-engines must be at the

expence of buying new ones from the Plaintiffs, or be excluded from the use of the improvement? So in the case of the watch, may not other persons in the trade buy the new movement, and work it up in watches made by themselves? Where men have neither fire-engines nor watches, it is highly probable that they will go to the inventor of the last and best improvements for the whole machine; and if they do, it is an advantage which the inventor gets from the option of mankind, and not from any exclusive right or monopoly vested in him. But here the Plaintiffs claim the right to the whole machine. To that extent their right cannot be sustained, and therefore I am of opinion that there ought to be judgment for the Defendant.

LORD CHIEF JUSTICE EYRE. Upon this case two questions are reserved for the opinion of the court; the first, whether the patent is good in law, and continued by the act of parliament mentioned in the case; the second, whether the specification stated in the case is in point of law sufficient to support the patent? As I take it, the facts of the case are stated with a view to the application of them to these questions, and not to any other question which may be thought to arise upon them. Perhaps indeed, if the court saw that another material question might arise out of these facts which had escaped the attention of the court and jury at Nisi Prius, they might direct the case to be amended or a new trial to be had in order to introduce it. These two questions were thus stated in order to bring before the court the points of law insisted on upon the part of the Defendant, and also to give an opportunity for considering a doubt which occurred to me upon my first view of the case at the trial, which was, whether a patent right could attach upon any thing not organized, and capable of precise specification. As these two questions are framed, there are three points for the consideration of the court. First, whether the patent was in its original creation good or bad? Secondly, taking it to be good, whether it was continued by the act of parliament? And thirdly, taking it to be good in its original creation, and to have been continued by the act of parliament, subject to an objection for the want of a specification, whether there has been a sufficient specification? Though **[491]** we have had many cases upon patents yet I think we are here upon ground which is yet untrodden, at least was untrodden till this cause was instituted, and till the discussions were entered into which we have heard at the bar, and now from the court. Patent rights are no where that I can find accurately discussed in our books. Sir Edward Coke discourses largely, and sometimes not quite intelligibly, upon monopolies, in his chapter of monopolies, 3 Inst. 181. But he deals very much in generals, and says little or nothing of patent rights, as opposed to monopolies. He refers principally to his own report of the case of monopolies. 11 Co. 86 b. ; he also mentions a resolution of all the judges in 2 & 3 Eliz. from a MS. of Dyer, condemning a grant to the corporation of Southampton by Phillip and Mary, for the sole right of importing malmsey wine, and that no malmsey wine should be landed at any other place, upon pain to pay treble customs. He also mentions *Bircot's case* in the Exchequer Chamber, 15 Eliz. for a privilege concerning the preparing and melting of lead ore, but he states no particulars ; and the principle on which that case was determined has been, as my Brother Buller observes, not adhered to; namely, that an addition to a manufacture cannot be the subject of a patent. There is also a case in Godbolt *(a)*, and there are a few others condemning particular patents, which were beyond all doubt mere monopolies. The modern cases have chiefly turned upon the specifications, whether there was a fair disclosure. Such was the case of *Turner* v. *Winter*, 1 Term Rep. B. R. 602. The case of *Edgeberry* v. *Stephens*, 2 Salk. 447, is almost the only case upon the patent right, under the saving of the statute of Jac. 1, that is to be found. That case establishes, that the first introducer of an invention practised beyond sea, shall be deemed the first inventor : and it is there said, the act intended to encourage new devices useful to the kingdom ; and whether acquired by travel or study it is the same thing. Deriving so little assistance from our books, let us resort to the statute itself, 21 Jac. 1, c. 3. We shall there find a monopoly defined to be "the privilege of the sole buying, selling, making, working or using any thing within this realm ;" and this is generally condemned as contrary to the fundamental law of the land. But the 5th and 6th sections of that statute save letters patent, and grants of privileges of the **[492]** sole working or making of any manner of new manufacture within

---

*(a)* Godb. 252.  *The Cloth-workers of Ipswich's case*, ib. 413.  *Lord Zouch and More's case.*

this realm, to the first and true inventor or inventors of such manufactures, with this qualification, "so they be not contrary to the law, nor mischievous to the state," in these three respects: first, "by raising the prices of commodities at home;" secondly, "by being hurtful to trade;" or, thirdly, by being "generally inconvenient." According to the letter of the statute, the saving goes only to the sole working and making; the sole buying, selling and using, remain under the general prohibition; and with apparent good reason for so remaining, for the exclusive privilege of buying, selling and using, could hardly be brought within the qualification of not being contrary to law, and mischievous to the state, in the respects which I have mentioned. I observe also, that according to the letter of the statute, the words "any manner of new manufacture" in the saving, fall very short of the words "any thing" in the first section. But most certainly the exposition of the statute, as far as usage will expound it, has gone very much beyond the letter. In the case in Salkeld, the words "new devices" are substituted and used as synonymous with the words "new manufacture." It was admitted in the argument at the bar, that the word "manufacture" in the statute was of extensive signification, that it applied not only to things made, but to the practice of making, to principles carried into practice in a new manner, to new results of principles carried into practice. Let us pursue this admission. Under things made, we may class, in the first place, new compositions of things, such as manufactures in the most ordinary sense of the word; secondly, all mechanical inventions, whether made to produce old or new effects, for a new piece of mechanism is certainly a thing made. Under the practice of making we may class all new artificial manners of operating with the hand, or with instruments in common use, new processes in any art producing effects useful to the public. When the effect produced is some new substance or composition of things, it should seem that the privilege of the sole working or making, ought to be for such new substance or composition, without regard to the mechanism or process by which it has been produced, which, though perhaps also new, will be only useful as producing the new substance. Upon this ground Dollond's patent was perhaps exceptionable, for that was for a method of [493] producing a new object-glass, instead of being for the object-glass produced. If Dr. James's patent had been for his method of preparing his powders, instead of the powders themselves, that patent would have been exceptionable upon the same ground. When the effect produced is no substance or composition of things, the patent can only be for the mechanism if new mechanism is used, or for the process, if it be a new method of operating, with or without old mechanism, by which the effect is produced. To illustrate this. The effect produced by Mr. David Hartley's invention for securing buildings from fire is no substance or composition of things; it is a mere negative quality, the absence of fire. This effect is produced by a new method of disposing iron plates in buildings. In the nature of things the patent could not be for the effect produced. I think it could not be for the making of the plates of iron, which, when disposed in a particular manner produced the effect, for those are things in common use. But the invention consisting in the method of disposing those plates of iron, so as to produce their effect, and that effect being a useful and meritorious one, the patent seems to have been very properly granted to him for his method of securing buildings from fire. And this compendious analysis of new manufactures mentioned in the statute, satisfies my doubt, whether any thing could be the subject of a patent, but something organized and capable of precise specification. But for the more satisfactory solution of the other points which are made in this case, I shall pursue this subject a little further. In Mr. Hartley's method, plates of iron are the means which he employs; but he did not invent those means, the invention wholly consisted in the new manner of using, or I would rather say, of disposing a thing in common use, and which thing every man might make at his pleasure, and, which therefore, I repeat, could not, in my judgment, be the subject of the patent. In the nature of things it must be, that in the carrying into execution any new invention, use must be made of certain means proper for the operation. Manual labour to a certain degree must always be employed; the tools of artists frequently; often things manufactured, but not newly invented, such as Hartley's iron plates; all the common utensils used in conducting any process, and so up to the most complicated machinery that the [494] art of man ever devised. Now let the merit of the invention be what it may, it is evident that the patent in almost all these cases cannot be granted for the means by which it acts, for in them there is nothing new, and in some of them nothing capable of appropriation. Even where the

most complicated machinery is used, if the machinery itself is not newly invented, but only conducted by the skill of the inventor, so as to produce a new effect, the patent cannot be for the machinery.   In *Hartley's case* it could not be for the effect produced, because the effect, as I have already observed, is merely negative, though it was meritorious.   In the list of patents with which I have been furnished, there are several for new methods of manufacturing articles in common use, where the sole merit and the whole effect produced are the saving of time and expence, and thereby lowering the price of the article, and introducing it into more general use.   Now I think these methods may be said to be new manufactures, in one of the common acceptations of the word, as we speak of the manufactory of glass, or any other thing of that kind.   The advantages to the public from improvements of this kind, are beyond all calculation important to a commercial country, and the ingenuity of artists who turn their thoughts toward such improvements, is in itself deserving of encouragement ; and in my apprehension it is strictly agreeable to the spirit and meaning of the statute Jac. 1, that it should be encouraged : and yet the validity of these patents, in point of law, must rest upon the same foundation as that of Mr. Hartley.   The patent cannot be for the effect produced, for it is either no substance at all, or what is exactly the same thing as to the question upon a patent, no new substance, but an old one, produced advantageously for the public.   It cannot be for the mechanism, for there is no new mechanism employed.   It must then be for the method ; and I would say, in the very significant words of Lord Mansfield (4 Burr. 2397) in the great case of the copy-right, it must be for method detached from all physical existence whatever. And I think we should well consider what we do in this case, that we may not shake the foundation upon which these patents stand.   Probably I do not over-rate it when I state that two-thirds, I believe I might say three-fourths, of all patents granted since the statute passed, are for methods of operating and of manufacturing, producing no new substances **[495]** and employing no new machinery.   If the list were examined, I dare say there might be found fifty patents for methods of producing all the known salts, either the simple salt, or the old compounds.   The different sorts of ashes used in manufactures are many of them inventions of great merit, many of them probably mere speculations of wild projectors : the latter ought to fall, the former to stand.   If we wanted an illustration of the possible merit of a new method of operating with old machinery, we might look to the identical case now in judgment before the court.   If we consider into what general use fire-engines are come, that our mines cannot be worked without them, that they are essentially necessary to the carrying on many of our principal manufactures, that these engines are worked at an enormous expence in coals, which in some parts of the kingdom can with difficulty be procured at all in large quantities, it is most manifest that any method found out for lessening the consumption of steam in the engines, which by necessary consequence lessens the consumption of coals expended in working them, will be of great benefit to the public, as well as to the individual who thinks fit to adopt it.   And shall it now be said, after we have been in the habit of seeing patents granted, in the immense number in which they have been granted for methods of using old machinery, to produce substances that were old, but in a more beneficial manner, and also for producing negative qualities by which benefits result to the public, by a narrow construction of the word manufacture in this statute, that there can be no patent for methods producing this new and salutary effect, connected, and intimately connected as it is, with the trade and manufactures of the country ?   This, I confess, I am not prepared to say.   An improper use of the word principle in the specification set forth in this case has, I think, served to puzzle it.   Undoubtedly there can be no patent for a mere principle, but for a principle so far embodied and connected with corporeal substances as to be in a condition to act, and to produce effects in any art, trade, mystery, or manual occupation, I think there may be a patent.   Now this is, in my judgment, the thing for which the patent stated in the case was granted, and this is what the specification describes, though it miscalls it a principle.   It is not that the patentee has conceived an abstract notion that **[496]** the consumption of steam in fire-engines may be lessened but he has discovered a practical manner of doing it ; and for that practical manner of doing it he has taken this patent.   Surely this is a very different thing from taking a patent for a principle ; it is not for a principle, but for a process.   I have dwelt the more largely upon this part of the case because, in my apprehension, this is the foundation upon which the whole argument will be found to rest.   If upon the true con-

struction of the statute there may be a patent for a new method of manufacturing or conducting chemical processes, or of working machinery, so as to produce new and useful effects, then I am warranted to conclude that this patent was in its original creation good. I will next consider the specification, before I proceed to the consideration of the question arising upon the statute for continuing this patent. The specification has reference to the patent, and not to the statute, and therefore it will be proper to consider it in this stage of the argument. I distinctly admit that if this patent is to be taken to be a patent for a fire-engine, the specification is not sufficient; it is not a specification of mechanism of any determinate form, having component parts capable of precise arrangement, and of particular description. On the other hand, if the patent is not for a fire-engine, but in effect for a manner of working a fire-engine, so as to lessen the consumption of steam, which, as I conceive, the words of the patent import, let us see whether this specification does not sufficiently describe a manner of working fire-engines, so as to produce the effect expressed in the patent, and whether the only objection to the specification is not that it is loaded with a redundancy of superfluous matter. The substance of the invention is a discovery, that the condensing the steam out of the cylinder, the protecting the cylinder from the external air, and keeping it hot to the degree of steam-heat, will lessen the consumption of steam. This is no abstract principle, it is in its very statement clothed with practical application. It points out what is to be done in order to lessen the consumption of steam. Now the specification of such a discovery seems to consist in nothing more than saying to the constructer of a fire-engine, "for the future condense your steam out of the body of the cylinder, instead of condensing it within it, put something round the cylinder to protect it from the external air, and to preserve **[497]** the heat within it, and keep your piston air-tight without water." Any particular manner of doing this one should think would hardly need to be pointed out, for it can scarcely be supposed, that a workman capable of constructing a fire engine would not be capable of making such additions to it as should be necessary to enable him to execute that which the specification requires him to do. But if a very stupid workman should want to know how to go about this improvement, and in answer to his question was directed to conduct the steam which was to be condensed from the cylinder into a close vessel, by means of a pipe and a valve, communicating with the cylinder and the close vessel, to keep the close vessel in a state of coldness sufficient to produce condensation, and to extract from it any part of the steam which might not be condensed by the pump; and was also told to inclose the cylinder in a wooden case, and to use a resinous substance instead of water to keep the piston air-tight, can it be imagined that he would be so stupid as not to be able to execute this improvement, with the assistance of these plain directions? If any man could for a moment imagine that this was possible, I observe that this difficulty is put an end to, because the jury have found that a workman can execute this improvement in consequence of the specification. Some machinery it is true must be employed, but the machinery is not of the essence of the invention but incidental to it. The steam must pass from the cylinder to the condensing vessel, for which purpose there must be a valve to open a pipe to convey, and a vessel to receive the steam. But this cannot be called new invented machinery, whether considered in the parts or in the whole, and therefore there can be no patent for this addition to the fire-engines. Suppose a new invented chemical process, and the specification should direct that some particular chemical substance should be poured upon gold in a state of fusion, it would be necessary, in order to this operation, that the gold should be put into a crucible, and should be melted in that crucible, but it would be hardly necessary to state in the specification the manner in which, or the utensils with which the operation of putting gold into a state of fusion was to be performed. They are mere incidents with which every man acquainted with the subject is familiar. Some observations were made in the course of the argument at the bar, on its being left unascer-**[498]**tained both in the specification and case, to what extent the consumption of steam would be lessened by the invention; but the method does not profess to ascertain this: it professes to lessen the consumption; and to make the patent good, the method must be capable of lessening the consumption to such an extent as to make the invention useful. More precision is not necessary, and absolute precision is not practicable. The quantity of steam which will be saved in each machine must depend upon a great variety of circumstances respecting each individual fire-engine, such as the accuracy of casting

or boring the cylinder, or the dimensions of it, the accuracy of the workman in putting his apparatus together, the care in keeping the cylinder in a proper degree of heat, and the more or less perfect order for working, in which the engine is kept.  All these circumstances will affect the quantity of steam to be lessened.  Some weighty observations have been made upon parts of this specification, but those parts appear to me not properly to relate to the method described in the patent; they are rather intimations of new projects of improvement in fire-engines, and some of them, I am very ready to confess, either very loosely described or not very accurately conceived.  I do not undertake to pronounce which, but one or the other is pretty clear.  They are the fourth and fifth articles: the first, second, third and sixth appear to me to belong to this method, and very clearly to point out and explain the method to every man who has a common acquaintance with the subject, and to be intelligible even to those who are unacquainted with it.  If there be a specification to be found in that paper, which goes to the subject of the invention as described in the patent, I think the rest may very well be rejected as superfluous.  If indeed the Defendant could have shewn that he had not pirated the invention which is sufficiently specified, but that what he hath done hath a reference to another method of lessening the consumption of steam to which the questionable parts of the specification were meant to relate, the objection to the specification would have remained, and perhaps some other objections which have been alluded to, might have been taken both to the patent and specification.  But I would observe here, that with regard to this and some other difficulties, there is no question reserved in this case respecting the infringement of the patent.  The general fact only is stated; that it has been in-[499]- fringed by the Defendant and in the consideration of a case reserved, we are not to search for difficulties upon which the parties have not proposed to state any point to us for our judgment, and into which I think we are not at liberty to go.  The difficulty which struck me, as it did my Brother Buller, with respect to the declaration, is applied to the patent as it originally stood, not as it now stands continued by the act of parliament.  If we were at liberty to go into it, that difficulty might perhaps produce a nonsuit, and that nonsuit a new action in which the difficulty would be removed.  But this cause was instituted to try the merits of the patent: I thought therefore that a formal objection was wisely overlooked.  Supposing then the difficulty upon the patent itself and the specification to be got over, the act of parliament remains to be considered.  The objection stated in the strongest manner would amount to this, that the act continues a patent for a machine, when in fact the patent is for a process.  It is to be observed that there is nothing technical in the composition or the language of an act of parliament.  In the exposition of statutes the intent of parliament is the guide.  It is expressly laid down in our books, I do not here speak of penal statutes, that every statute ought to be expounded not according to the letter, but the intent.  2 Roll. Abr. 118, Plowd. 350, 363.  This doctrine has been carried into effect by cases.  Though a corporation be misnamed in an act of parliament, if it appears that the corporation was intended it is sufficient.  10 Co. 5 b.  So the statute of quia emptores terrarum has said that every one shall hold of the lord paramount secundum quantitatem terræ, but this shall be construed to be secundum valorem terræ; for so was the intent.  Plowd. 10, 57.  We all know that an act of parliament may be extended by equity.  No authority has been cited which amounts to proof that a mistake in point of description in an act of parliament of this nature when the true meaning can be discovered, and when there is a foundation on which the act can be supported, shall vitiate it.  The case cited from Plowden differs essentially from this case.  The act of parliament in that case gave effect to a supposed legal attainder, and proceeded upon it altogether.  If the groundwork fell, and there was no legal attainder, nothing remained: the supposed attainder in that case fell, consequently all fell.  Now the difference between that case and the present is, here the true patent meant to be described exists, and may [500] therefore be a ground-work to support the act.  This case was compared to the case of the king being deceived in his grant.  But I am not satisfied that the king, proceeding by and with the advice of parliament, is in that situation in respect of which he is under the special protection of the law, and that he could on that ground be considered as deceived in his grant: no case was cited to prove that position.  The objection on the act of parliament is of the same nature as one of the objections to the specification : the specification calls a method of lessening the consumption of steam in fire-engines a principle, which it is

not; the act calls it an engine, which perhaps also it is not; but both the specification and statute are referable to the same thing, and when they are taken with their correlative are perfectly intelligible. Upon the wider ground I am therefore of opinion that the act has continued this patent. A narrower ground was taken in the argument, which was to expound the word engine in the body of this act, in opposition to the title of it, to mean a method; and I am ready to say I would resort to that ground if necessary in order to support the patent, ut res magis valeat quàm pereat. But it is not necessary: for let it be remembered, that though monopolies in the eye of the law are odious, the consideration of the privilege created by this patent, is meritorious, because, to use the words of Lord Coke, "the inventor bringeth to and for the commonwealth a new manufacture by his invention, costs and charges." I conclude therefore that the judgment of the court ought to be for the Plaintiff.

The court being thus equally divided, no judgment was given, but the parties seemed disposed to put the case upon the record, in the form of a special verdict, in order that it might be carried on to a Court of Error.

[501] HOLLINGWORTH AND OTHERS, Assignees of Daniel, a Bankrupt, *against* TOOKE. Saturday, May 16th, 1795.

In the Exchequer Chamber in Error.

[See 5 Term Rep. B. R. 215.]

It is agreed between A. and B. that B. shall purchase of A. all the goods of a certain kind, which A. shall send him, at a fixed price, and that A. shall draw bills on B. for the amount of the purchase, and also that B. shall accept other bills drawn by A. for his convenience, to cover which A. shall remit value to B. After they have acted some time under this agreement B. becomes bankrupt, being under acceptances to a great amount. A. (being ignorant of the bankruptcy) sends a quantity of goods of the same kind together with other bills to B. for the purpose of discharging those acceptances, which come into the hands of the assignees. A. afterwards himself discharges the acceptances. Under these circumstances B. is to be considered as the factor or banker of A., and as having only a qualified property in the goods and bills which were so sent for a particular purpose, the general property being in A. Therefore that purpose not being answered, A. may recover back from the assignees of B. the amount of those goods and bills (a).

A Writ of Error having been brought on the judgment in this case, it was twice argued in this court; first by Wigley for the Plaintiff in error, and Walton for the Defendant; and secondly, by Pigot for the Plaintiff and Erskine for the Defendant; the substance of which arguments will be seen by referring to the three former ones which the case underwent in the Court of King's Bench 5 Term Rep. B. R. 215. And now the judgment of this court was pronounced by

LORD CHIEF JUSTICE EYRE, who, after stating the special verdict proceeded thus.

The case was well and laboriously argued at the bar. It was very full of thorny points, which necessarily required from us a good deal of investigation. The consequence has been that a length of time, perhaps somewhat inconvenient to the parties, has elapsed before we could come to an agreement. We have at length come to an agreement, and we are all of opinion that this judgment ought to be affirmed. I shall state very shortly the reasons which have induced me to concur in that opinion. The right of the parties to the light gold and bills, which are the subject of this action, appears to me to depend principally upon the true construction of the original agreement between Tooke and Daniel, made two years and upwards before the bankruptcy. That agreement consisted of [502] two parts; one being a contract for a bargain and sale of light gold by Tooke to Daniel at a given price, to be paid for by bills of

: (a) [As to the specific appropriation of bills, see *Bent* v. *Puller*, 5 T. R. 494; *Parke* v. *Eliason*, 1 East, 544; *Giles* v. *Perkins*, 9 East, 12; *Carstairs* v. *Bates*, 3 Campb. N. P. C. 301; *Thompson* v. *Giles*, 2 B. & C. 422; *Ex parte Sarjeant*, 1 Rose, 153; *Ex parte Sollars*, 18 Ves. 229; *Ex parte Pease*, 1 Rose, 232; *Ex parte Rowton*, 1 Rose, 15.]

**Exhibit D**

*Lewis v. Marling*,
**(1829) 109 Eng. Rep. 359, 361 (K.B.)**

LEWIS v. MARLING

letters to Kell and Son. It was contended on this evidence, that the son ought to have been made a co-plaintiff with his father. The learned Judge told the jury, that if the plaintiff and his son had been sued by the defendant for a debt, or for negligence, there was ample evidence to charge the son, on the ground that he had suffered himself to be held out as a partner. Here the plaintiff sued as a creditor of the defendant. It was perfectly immaterial to the debtor that the son had held himself out as a partner, if, in fact, he was not one, and had no claim upon the defendant. The son had sworn that he was not in fact a **[21]** partner with his father during the time the business was done for the defendant, and if they believed the son's testimony, the plaintiff was entitled to a verdict. The jury having found for the plaintiff,

Gurney now moved for a new trial. The case was not properly submitted to the jury. It should have been left to them upon the evidence, to consider whether the father and the son were or were not jointly employed by the defendant. There was ample evidence of this being a joint employment. No arrangement between the father and son could alter the nature of that employment. It was wholly immaterial whether the father and son were jointly interested in profit and loss, provided the defendant employed the two. He never knew that they were not in fact partners. The plaintiff, by his letters, represented that they were. It is quite clear that the two would have been liable in an action for negligence.

Lord Tenterden C.J. The question was properly submitted to the jury. If the son of the plaintiff spoke the truth, he was not a partner with his father. The effect of the evidence might be to shew that both the father and son would have been jointly liable for negligence, but that would be on the ground not that they were actual partners, but that they held themselves out as such to the defendant.

Littledale J. concurred.

Parke J. A party with whom the contract is actually made may sue without joining others with **[22]** whom it is apparently made. Here there was no evidence to shew that the son was actually employed by the defendant. The son proved that he was not an actual partner; and although he may have appeared to the defendant to have been a partner, unless he were a party to the contract, for the breach of which the action was brought, he need not join in such action. Here he was no party to that contract.

Rule refused (a).

J. LEWIS AND W. LEWIS *against* MARLING. Wednesday, November 11th, 1829.

    Where a patentee of an improved machine claimed as his invention a part of it which turned out to be useless: Held, that this did not vitiate the patent, the specification not describing it as essential to the machine. Where it appeared in evidence that the patentee himself invented and brought into use the machine for which the patent was granted ; but before that time several other persons had seen a model and specification of such a machine, which were brought over from America: Held, that the patentee was nevertheless to be considered the inventor within the meaning of the stat. 21 Jac. 1, c. 3, s. 6, no machine having been manufactured and brought into use from the model and specification, and there being no evidence that the patentee had ever seen them.

[S. C. 5 Man. & Ry. 66 ; 8 L. J. K. B. O. S. 46 : Ll. & W. 28 ; Web. P. C. 493 ; 1 Carp. P. C. 457 : at Nisi Prius, 4 Car. & P. 52 ; Web. P. C. 490. Applied, *Poupard* v. *Fardell*, 1869, 21 L. T. 699.]

Case for infringing a patent granted to the plaintiffs for improvements on shearing machines for shearing or cropping woollen and other cloths. Plea, not guilty. At the trial before Lord Tenterden C.J., at the Westminster sittings after last Trinity term, it appeared that the patent in question was granted in 1818, and the plaintiffs in their specification (which was accompanied by a drawing) claimed as their invention, thirdly, " The application of a proper substance fixed on or in the

---

(a) See *Teed* v. *Elworthy*, 14 East, 210, and *Page* v. *Hiscox*, and *Parsons* v. *Crosby*, there cited. And *Loyd* v. *Archboule*, 2 Taunt. 334.

cylinder A to brush the surface of the cloth to be shorn;" and, fourthly, "The described method of shearing cloth across from list to list by a rotatory cutter." The brush for the surface of the cloth was soon found to be useless, and the plaintiffs never sold any machines with it. On **[23]** this ground the defendant contended that they had claimed too much, and therefore the patent was void. As to the fourth thing claimed, the defendant contended that it was not new, and proved that a similar machine was in use at New York twenty years ago, and that a specification of it was sent over in 1811 to one Thompson, residing at Leeds, who employed two engineers to manufacture a machine from it; but this was never finished in consequence of the disturbances made by the Luddites. This specification was shewn to several persons, but the machine was never brought into use. It appeared also that in 1816 a model for a machine to shear from list to list by means of a rotatory cutter was brought over from America by one Smith, and he shewed it to three or four persons in his manufactory, but no machine was ever made from it, nor was it publicly known to exist; and Smith always used machines manufactured by the plaintiffs. It appeared also that many years ago one Coxon had made a machine to shear from list to list, which was tried by a person called on behalf of the defendant, but he did not think it answered, and soon discontinued the use of it. For the defendant it was contended that this evidence deprived the plaintiffs of the right to a patent, as their invention was not new. Lord Tenterden told the jury that the first objection failed, as the plaintiffs had not described the brush to be attached to the cylinder, as an essential part of their invention, and therefore the patent might be good although further investigation proved that part of the invention to be useless. And as to the other, that as the invention of the machine for shearing from list to list by a rotatory cutter had not been generally used or known in this country, the plaintiffs might be considered **[24]** the inventors within the meaning of the statute 21 Jac. 1, c. 3, s. 6, notwithstanding the specification and the model which had been brought over from America, and the making of a machine to work in that manner by Coxon, and his Lordship left to the jury the questions whether it had been generally known, and whether the patent had been infringed by the defendant. The jury found a verdict for the plaintiffs; and now

F. *Pollock* moved for a rule nisi for a new trial on the grounds urged at the trial. First, the patent was void on the ground that the plaintiffs claimed as part of their invention the application of a brush for the purpose of raising the nap on the cloth. That proved to be entirely useless, if not prejudicial, and in fact they never sold any machines with the brush attached. The public, therefore, would be misled, if at the expiration of the time for which the patent was granted they attempted to manufacture a machine on the patent principle. The answer given to this objection at the trial was, that the specification did not describe the brush as an essential part of the machine. But that is no answer in law, the defendant has a right to consider the case as if the patent had been taken out for that only. In every patent, all that is claimed must be new and useful, *Turner* v. *Winter* (1 T. R. 609), *Crompton* v. *Ibbotson* (Danson & Lloyd, 33). [Parke J. The specification there stated, that a certain article would produce the desired effect. The evidence was, that nothing else would do it.] Secondly, Lord Tenterden did not leave the question of novelty to the jury in the manner warranted by former decisions. The **[25]** substance of the invention was the application of a rotatory cutter in shearing cloth from list to list. The evidence was, that thirty years ago one Coxon made such a machine, in 1811 a specification in which that principle was stated was brought over from America, and a machine commenced but never finished. In 1816, a model of such a machine was brought over, and although no machine was made from it, the model was shewn to various persons. The person who brought it over could not, after that, have maintained a patent for it; and if he could not, it is difficult to understand why the plaintiffs should be in a better situation. [Parke J. It might be new in use although the principle was known before.] Affidavits were then produced as to the knowledge of that whereof the plaintiffs claimed to be inventors before the patent was granted.

Lord Tenterden C.J. I am of opinion that we ought not to grant a rule to disturb the verdict in this case. It is contrary to the usual practice to grant a rule in such a case on affidavits. If the facts disclosed in them are sufficient to vitiate the patent, it may be repealed by *scire facias*. As to the objection, on the ground that the application of a brush was claimed as a part of the invention, adverting to the

specification, it does not appear that the patentee says the brush is an essential part of the machine, although he claims it as an invention. When the plaintiffs applied for the patent, they had made a machine to which the brush was affixed, but before any machine was made for sale they discovered it to be unnecessary. I agree, that if the patentee mentions that as an essential ingredient in the patent article, which is not so, nor even useful, and whereby he mis-[26]-leads the public, his patent may be void; but it would be very hard to say that this patent should be void, because the plaintiffs claim to be the inventors of a certain part of the machine not described as essential, and which turns out not to be useful. Several of the cases already decided have borne hardly on patentees, but no case has hitherto gone the length of deciding that such a claim renders a patent void, nor am I disposed to make such a precedent. The next point was an alleged misdirection on my part to the jury. To impugn the novelty of the invention, evidence was given that one Coxon had previously made a machine for shearing from list to list; but it was not approved of, and never came into use. Another piece of evidence was, that a model had been sent over from America and exhibited to a few persons, but no machine was made from it, and the very persons who had the model, bought and used machines manufactured by the plaintiffs. It was also proved that a specification had been brought over from America, and two persons employed to make a machine from it. But that never was completed, so that until the plaintiffs' invention came out, no machine was publicly known or used here for shearing from list to list. I told the jury, that if it could be shewn that the plaintiffs had seen the model or specification, that might answer the claim of invention; but there was no evidence of that kind, and I left it to them to say, whether it had been in public use and operation before the granting of the patent. They found that it had not, and I think there is no reason to find fault with their verdict.

Bayley J. I am of the same opinion. To support a patent, it is necessary that the specification should [27] make a full and fair disclosure to the public of all that is known to the patentee respecting his invention. If it does not, the consideration on which he obtains his patent fails. If he represents several things as competent to produce a specific effect, when only one will answer, that is bad; or if he suppresses any thing which he knows will answer, that also is bad. But it is objected here, that the plaintiff described the application of a brush as parcel of his discovery. At the time when the patent was obtained a brush was used, and there is no reason to doubt that the plaintiffs at that time thought it necessary. That objection, therefore, fails. On the other point, if the model brought from America had been seen by the plaintiff, he could not afterwards have claimed to be the inventor. But if I discover a certain thing for myself, it is no objection to my claim to a patent that another also has made the discovery, provided I first introduced it into public use. Here there was no ground to doubt that the plaintiffs were the inventors of the machine, and first introduced.

Parke J.(a). The objection to the patent as explained by the specification may be thus stated. The patent is for several things, one of which then supposed to be useful is now found not to be so; but there is no case deciding, that a patent is on that ground void, although cases have gone the length of deciding, that if a patent be granted for three things, and one of them is not new, it fails in toto. The prerogative of the Crown as to granting patents was restrained by the statute [28] 21 J. 1, c. 3, s. 6, to cases of grants, "to the true and first inventors of manufactures, which others at the time of granting the patent shall not use." The condition, therefore, is, that the thing shall be new, not that it shall be useful; and although the question of its utility has been sometimes left to a jury, I think the condition imposed by the statute has been complied with, when it has been proved to be new. There was no evidence in this case to shew that the plaintiffs were not the inventors of this machine, in this country at least. But the statute further requires that it shall not have been used by others, and it is said that the latter part of the condition has not been satisfied. But there was no evidence of the use of such a machine before the grant of the patent, and there is no case in which a patentee has been deprived of the benefit of his invention because another also had invented it, unless he had also brought it into use. Upon

---

(a) Littledale J. was in the Bail Court.

K. B. XXXVIII.—12*

these grounds, I think that neither of the objections taken ought to prevail, and that the plaintiffs are entitled to retain the verdict found in their favour.

Rule refused.

MARY DAVIS *against* R. CAPPER, ESQ.   Thursday, Nov. 12th, 1829.   Trespass will lie against a magistrate for committing a party charged with felony for re-examination for an unreasonable time, but without any improper motive.   Semble, that a warrant of commitment for an unreasonable time is wholly void.

[S. C. 5 Man. & Ry. 53 ; 8 L. J. M. C. O. S. 67 : at Nisi Prius, 4 Car. & P. 134.]

This was an action of trespass against the defendant, a justice of the peace for the county of Gloucester, for assaulting and imprisoning the plaintiff, and detaining her in prison for fifteen days.   Plea, not guilty.   At the trial before Gaselee J. at the Summer Assizes for [29] the county of Gloucester 1828, the following appeared to be facts of the case.   On the 5th of January 1828, the plaintiff, who had lodged in the house of one Ann Hamerton, made a deposition that her property had been stolen, and that part of it had been discovered in the possession of Ann Hamerton ; but the latter was not at that time committed on such charge.   On Sunday the 27th of January, Ann Hamerton sent for Russell the superintendant of the Cheltenham police, and told him she had been robbed while Mary Davis lived with her.   She produced a letter addressed to the plaintiff at Miss Hamerton's house, and bearing the Cheltenham post-mark ; and alleging that upon looking in at the ends, she believed it to contain some allusion to the robbery, induced Russell to break it open.   The letter, which was anonymous, purported to come from an accomplice in the robbery residing at London, who demanded payment at the hands of the plaintiff as a joint perpetrator of the offence, and stated, that he would await her answer for a fortnight.   Miss Hamerton also told Russell, that four days after the robbery a letter had arrived for the plaintiff in the same handwriting, with the London post-mark, and that the plaintiff had refused to shew it ; she then expressed her suspicions of the plaintiff being concerned in the robbery, and said she thought Russell ought to take her into custody.   He then took the plaintiff into custody, and on the following morning carried her before the defendant ; and upon the information of Ann Hamerton that she, during the time the plaintiff lived in her house, had lost various articles of bed-furniture and wearing apparel described in the information, and that she had reason to suspect and did suspect that Mary Davis was concerned in the robbery, the defendant [30] committed her to the Bridewell at Northleach, and by his warrant required the gaoler to keep her in custody until the 12th of February, and then to bring her up for re-examination.   The alleged anonymous letter was produced and read before the magistrate.   On the 12th of February she was taken before two magistrates (the defendant not being one of them) for re-examination, and was re-committed by them.   On the 16th of February she was again brought up before the defendant, and he discharged her ; on that day the defendant said that there was no evidence against her, that he would have discharged her on the 12th if he had been present at the examination, and that he committed her in the first instance until the 12th, thinking she would by that time have stated who had written the letter.   No evidence was given on the part of the defendant.

It was contended by the defendant's counsel, that a magistrate might in his discretion commit for further examination for such time as he thought proper ; and that even if he exercised his discretion improperly, trespass would not lie against him.

The learned Judge was of opinion that the action was not maintainable, but in order to save the expense of another trial, he left it to the jury to say, 1st, whether the commitment was made bonâ fide for the purpose of further examination, or for the purpose of compelling the plaintiff to state who the writer of the letter was.   And secondly, whether in their judgment, the time for which the defendant had been committed was reasonable.   The jury retired, and after being out several hours, stated that they could not agree ; upon which they were discharged, and the learned Judge nonsuited the plaintiff.

A rule nisi was afterwards obtained for a new trial, on the ground that there was evidence to go to the jury [31] that the commitment was for the purpose of extorting

# Exhibit E

## Joseph Story,
### *Commentaries on the Constitution*
### *of the United States*

# COMMENTARIES

ON THE

# CONSTITUTION OF THE UNITED STATES:

WITH

A PRELIMINARY REVIEW OF THE CONSTITUTIONAL HISTORY
OF THE COLONIES AND STATES BEFORE THE
ADOPTION OF THE CONSTITUTION.

BY

## JOSEPH STORY, LL.D.

IN TWO VOLUMES.

VOL. II.

FOURTH EDITION, WITH NOTES AND ADDITIONS

By THOMAS M. COOLEY.

"Magistratibus igitur opus est; sine quorum prudentiâ ac diligentiâ esse civitas non potest;
quorumque descriptione omnis Reipublicæ moderatio continetur."
CICERO, DE LEG., lib. 3, cap. 2.

"Government is a contrivance of human wisdom to provide for human wants."
BURKE.

## BOSTON:

LITTLE, BROWN, AND COMPANY.

1873.

Digitized by Google

GRAY
JK
211
.S89
1872
v. 2

Entered according to the act of Congress, in the year one thousand eight hundred and thirty-three, by JOSEPH STORY, in the Clerk's Office of the District Court of the District of Massachusetts.

Entered according to Act of Congress, in the year 1851, by WILLIAM W. STORY, in the Clerk's Office of the District Court of the District of Massachusetts.

Entered according to Act of Congress, in the year 1858, by WILLIAM W. STORY, in the Clerk's Office of the District Court of the District of Massachusetts.

Entered according to Act of Congress, in the year 1873, by WILLIAM W. STORY, in the Office of the Librarian of Congress, at Washington.

CAMBRIDGE:
PRESS OF JOHN WILSON AND SON.

Digitized by Google

## CHAPTER XIX.

### POWER TO PROMOTE SCIENCE AND USEFUL ARTS.

§ 1151. THE next power of Congress is, " to promote the prog- ress of science and the useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

§ 1152. This power did not exist under the confederation ; and its utility does not seem to have been questioned.  The copyright of authors in their works had, before the revolution, been decided in Great Britain to be a common-law right ; and it was regulated and limited under statutes passed by Parliament upon that sub- ject.[1]  The right to useful inventions seems, with equal reason, to belong to the inventors ; and, accordingly, it was saved out of the statute of monopolies in the reign of King James the First, and has ever since been allowed for a limited period, not exceeding four- teen years.[2]  It was doubtless to this knowledge of the common law and statutable rights of authors and inventors, that we are to attribute this constitutional provision.[3]  It was beneficial to all parties, that the national government should possess this power ; to authors and inventors, because, otherwise they would have been subjected to the varying laws and systems of the different States on this subject, which would impair, and might even destroy the value of their rights ; to the public, as it would promote the prog- ress of science and the useful arts, and admit the people at large, after a short interval, to the full possession and enjoyment of all writings and inventions without restraint.  In short, the only boon which could be offered to inventors to disclose the secrets of their discoveries, would be the exclusive right and profit of them, as a monopoly, for a limited period.  And authors would have little inducement to prepare elaborate works for the public, if

[1] 2 Black. Comm. 406, 407, and Christian's note (5) ; 4 Burr. R. 2303 ; Rawle on Const. ch. 9, p. 105, 106 ; 2 Kent's Comm. Lect. 36, p. 306, 307, 314, 315.

[2] 2 Black. Comm. 407, and Christian's note (8) ; 4 Black. Comm. 159 ; 2 Kent's Comm. Lect. 36, p. 299 to 306.

[3] The Federalist, No. 43.

Digitized by Google

their publication was to be at a large expense, and, as soon as they were published, there would be an unlimited right of depredation and piracy of their copyright. The States could not separately make effectual provision for either of the cases;[1] and most of them, at the time of the adoption of the Constitution, had anticipated the propriety of such a grant of power, by passing laws on the subject at the instance of the continental Congress.[2]

§ 1153. The power, in its terms, is confined to authors and inventors; and cannot be extended to the introducers of any new works or inventions. This has been thought by some persons of high distinction to be a defect in the Constitution.[3] But perhaps the policy of further extending the right is questionable; and, at all events, the restriction has not hitherto operated as any discouragement of science or the arts. It has been doubted whether Congress has authority to decide the fact, that a person is an author or inventor in the sense of the Constitution, so as to preclude that question from judicial inquiry. But, at all events, such a construction ought never to be put upon the terms of any general act in favor of a particular inventor, unless it be inevitable.[4]

§ 1154. It has been suggested, that this power is not exclusive, but concurrent with that of the States, so, always, that the acts of the lattter do not contravene the acts of Congress.[5] It has, therefore, been asserted, that where Congress go no further than to secure the right to an author or inventor, the State may regulate the use of such right, or restrain it, so far as it may deem it injurious to the public. Whether this be so or not, may be matter for grave inquiry whenever the question shall arise directly in judgment. At present it seems wholly unnecessary to discuss it theoretically. But, at any rate, there does not seem to be the same difficulty in affirming, that, as the power of Congress extends only to authors and inventors, a State may grant an exclusive right to the possessor or introducer of an art or invention, who does not claim to be an inventor, but has merely introduced it from abroad.[6]

[1] 2 Kent's Comm. Lect. 86, p. 298, 299.
[2] The Federalist, No. 43. See also 1 Tuck. Black. Comm. App. 265, 266; Rawle on Const. ch. 9, p. 105, 106; See Hamilton's Report on Manufactures, § 8, p. 235, &c.
[3] Hamilton's Rep. on Manufactures, § 8, p. 235, 236.
[4] *Evans* v. *Eaton*, 8 Wheat. R. 454, 513.
[5] 1 Tuck. Black. Comm. App. 265, 266; *Livingston* v. *Van Ingen*, 9 John. R. 507.
[6] *Livingston* v. *Van Ingen*, 9 John. R. 507; Sergeant on Const. ch. 28 [ch. 80.]

Digitized by Google

§ 1155. In the first draft of the Constitution the clause is not to be found ; but the subject was referred to a committee (among other propositions), whose report was accepted, and gave the clause in the very form in which it now stands in the Constitution.[1] A more extensive proposition " to establish public institutions, rewards, and immunities for the promotion of agriculture, commerce, and manufactures," was (as has been before stated) made, and silently abandoned.[2] Congress have already, by a series of laws on this subject, provided for the rights of authors and inventors ; and, without question, the exercise of the power has operated as an encouragement to native genius, and to the solid advancement of literature and the arts.

§ 1156. The next power of Congress is " to constitute tribunals inferior to the supreme court." This clause properly belongs to the third article of the Constitution ; and will come in review when we survey the constitution and powers of the judicial department. It will therefore be, for the present, passed over.

[1] Journal of Convention, 260, 327, 328, 329.

[2] Journal of Convention, 261. [The power of Congress to legislate on the subject of patents is plenary. *McClurg* v. *Kingsland*, 1 How. 202; s. c., 17 Pet. 228. It may make special grants ; *Bloomer* v. *Stolley*, 5 McLean, 158; and special extensions : *Blanchard's Factory* v. *Warner*, 1 Blatch. 258 ; *Evans* v. *Eaton*, Pet. C. C. 322. It may give its grants a retrospective effect. *Blanchard* v. *Sprague*, 2 Story, 164 ; *McClurg* v. *Kingsland, supra.* But the intention to do so will not be presumed. *Blanchard* v. *Sprague*, 3 Sum. 535.

The patent laws can have no effect in a foreign country ; and the use upon a foreign vessel, in an American port, of an improvement patented here is not an infringement of the patent, provided it was placed upon her in a foreign port, and was authorized by the laws of the country to which she belongs. *Brown* v. *Duchesne*, 2 Curt. 371, and 19 How. 183.]

Digitized by Google

**Exhibit F**

*Edgeberry v. Stephens*,
(1691) 91 Eng. Rep. 387, 387 (K.B.)

**[446]** MONEY.

DIXON *versus* WILLOUGHS.

[Mich. 8 Will. 3, B. R.]

See 1 Salk. 25.   2 Keb. 463.   Latch, 84.   Yelv. 80, &c. *infra.   Indebitatus assumpsit* in 13l. 10s. for nine guineas, well.   Latch, 84.   Yelv. 80, 135.   Poph. 28.   Cro. Car. 515.   Palm. 407.   5 Mod. 6, 7.   Lutw. 487, 488.   1 Salk. 9, 22, 25, S. C. *Ante*, 311.   3 Salk. 239.   Holt 471.   Cases B. R. 100.   Comb. 327, 387, S. C.   *Vide* Co. Lit. 107 a. but note 1, to Co. Lit. 107 b.

In *case* upon four several promises, there was a verdict for the plaintiff, and entire damages.   It was moved in arrest of judgment, that one of the promises was ill laid, viz. that whereas the defendant was indebted to him in 13l. 10s. for nine guineas, he promised to pay, &c., and says not, nine guineas *ad valorem, &c.*, as he ought, the value being not ascertained by proclamation.   *Et per Holt, C.J.:*

1st, Any piece of money coined at the Mint is of value as it bears a proportion to other current money, and that without proclamation.   The unit was the old price, which was 20s.   In King James the First's time, the unit was by proclamation raised 16d., which was the reason and occasion of the coin of guineas, and of their being 16d. short of the unit.

2dly, There are guineas of 40s. a-piece, and so we will intend these were, and that the plaintiff was satisfied the rest.

3dly, That it was not necessary to set forth the number of the guineas; for in an *indebitatus assumpsit* the consideration is only set forth to shew it was not a debt by bond, &c.

**[447]** MONOPOLY.

EDGEBERRY AND STEPHENS.

*Vide* 3 Mod. 131.   1 Mod. 18.   Vaugh. 345, 346.   3 Lev. 351, 352.   2 Jon. 53, 54, 353, &c.   2 Brownl. 296.   F. N. B. 222.   S. C. Comb. 84.   1 Rol. Rep. 4.   3 Inst. 181.   2 Inst. 540.   Holt 475.   1 Hawk. ch. 79, s. 14.

A grant of a monopoly may be to the first inventor by the 21 Jac. 1; and, if the invention be new in England, a patent may be granted, though the thing was practised beyond sea before; for the statute speaks of new manufactures within this realm; so that if they be new here, it is within the statute; for the Act intended to encourage new devices useful to the kingdom, and whether learned by travel or by study, it is the same thing.   Agreed by Holt and Pollexfen, in the case of *Edgeberry and Stephens.*

MONSTRANS DE DROIT, &C.

DOMINA REGINA *versus* MASON.

[Trin. 1 Ann. B. R.]

*Vide* 5 Mod. 57, 58.   Ryley Plac. Parl. 257, 351.   Staundf. P. C. 72.   If the plaintiff fails in his title, he cannot take advantage of want of title in the Crown, or of a stranger's title.   S. C. Far. 32.

It was found by inquisition, that Ford had forfeited his office of warden of the Fleet, upon which it was seized into the Queen's hands.   One Mason brought a *monstrans de droit* in Chancery on the inquisition, and sets forth a title, and traverses Ford's being seized of the office, so that by consequence he could not forfeit it; the Attorney-General demurred.   The cause was brought into B. R. *per proprias manus* of the Lord Chancellor; and now it appeared that Mason's title, as set forth, was