# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| **MADSTAD ENGINEERING, INC.**, a Florida corporation, and **MARK STADNYK**, an individual,<br><br><br>        **Plaintiffs,**<br><br>**v.**<br><br><br>**U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS**, in his official capacity as Director of U.S. **PATENT AND TRADEMARK OFFICE**, and **THE UNITED STATES OF AMERICA,**<br><br>        **Defendants.** | <br><br><br><br><br><br>**CASE NO.: 8:12-CV-01589-SDM-MAP**<br><u>Injunctive Relief Sought</u> |

## <u>PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION</u>

## **TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................................1

II.  ARGUMENT ....................................................................................................2

   A.  The Issues Before The Court Are Pure Questions Of Law. ...........................2

   B.  Plaintiffs Have Established Irreparable Injury. ............................................2

      1.  The Act's Effective Date Does Not Bar Plaintiffs' Challenge. .................4

      2.  Plaintiffs' Additional Expenses Are A Concrete Injury. ..........................5

      3.  Increased Burdens On Plaintiffs From FTF. .............................................7

      4.  Plaintiffs Face A Competitive Disadvantage...........................................8

      5.  Loss Of Potential Investors And Business Partners. .................................9

   C.  Plaintiffs Have Established Probability of Success. ...................................10

      1.  The Government's Attempt to Rewrite The AIA Fails. ...........................10

      2.  Even If The Government Were Right That The AIA Retained An Inventorship Requirement, It Would Still be Unconstitutional. .........................................13

      3.  The Government's Defense of the AIA Is Flawed..................................16

      4.  Plaintiffs Have Established Probable Success On Non-Severability. ......................20

   D.  Plaintiffs Have Satisfied The Remaining Requirements. ...........................20

III. CONCLUSION................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advanced Cartridge Technologies, LLC v. Lexmark Intern., Inc.*, 2011 WL 6719725
(M.D.Fla. Dec. 21, 2011)..................................................................................4

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) ...............................................20

*Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970)...5

*Atlanta Gas Light Co. v. U.S. Dept. of Energy*, 666 F.2d 1359 (11th Cir. 1982)....................5

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) ...............................4

*Barlow v. Collins*, 397 U.S. 159 (1970) ...............................................................5

*Bedford v. Hunt*, 3 F.Cas. 37 (C.C.D.Mass. 1817)....................................................14

*Board of Trustees of Stanford University v. Roche Molecular Sys. Inc.*, 131 S.Ct. 2188 (2011)
.........................................................................................................17

*Burger King Corp. v. Agad*, 911 F.Supp. 1499 (S.D.Fla. 1995)........................................10

*Center for Auto Safety v. NHTSA*, 793 F.2d 1322 (D.C.Cir.1986) .....................................9

*Central Arizona Water Conservation Dist. v. U.S. E.P.A.*, 990 F.2d 1531 (9th Cir. 1993) ......7

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir.2005) ......................7

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994) ....................................4

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009)...............................8, 17

*Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107 (D.C.Cir.1990) ..................................9

*Dawson v. Follen*, 7 F.Cas. 216 (C.C.Pa. 1808) ...................................................15

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ...........................................................17

*Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5 (1939)....................................20

*Evans v. Eaton*, 16 U.S. (3 Wheat.) 454 (1818).....................................................15

*Evans v. Jordan*, 8 F. Cas. 872 (C.C.D.Va. 1813) .................................................15

*Fair v. EPA*, 795 F.2d 851 (9th Cir.1986) ..........................................................5

*Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir.2008) .....................8

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003).......7

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010)...............3

*Gayler v. Wilder,* 51 U.S. (10 How.) 477 (1850).....................................................19

*Gibson v. Chase Home Finance, LLC*, 2011 WL 6319401 (M.D.Fla. Dec. 16, 2011)............5

*Graham v. John Deere Co.,* 383 U.S. 1 (1966) .............................................14, 17

*International Institute for Learning, Inc. v. J. Ross Pub., Inc.*, 2007 WL 4707057, (S.D.Fla.
Aug. 28, 2007).....................................................................................10

*Kendall v. Winsor*, 62 U.S. (21 How.) 322 (1858).................................................19

*Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289 (2012)........................12, 13

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S.
656 (1993)...........................................................................................9

*Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed.Cir.1998) ..............................................11

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910 (5th Cir.
1997)................................................................................................7

*Pennock v. Dialogue*, 27 U.S. 1 (1829).............................................................15

*Reed v. Cutter*, 20 F.Cas. 435 (C.C. Mass. 1841) ................................................16

*Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974) ...............................................4

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc*., 427 Fed.Appx. 714 (11th Cir. 2011) ...............................................................................................................5

*Thomas v. Union Carbide Agr. Products Co*., 473 U.S. 568 (1985) ......................................4

*Thompson v. Haight*, 23 F.Cas. 1040 (C.C.N.Y. 1826) .........................................................16

*United States v. Canals–Jimenez*, 943 F.2d 1284 (11th Cir.1991) .......................................11

*United States v. Forey-Quintero,* 626 F.3d 1323 (11th Cir. 2010) ........................................11

*United States v. Students Challenging Regulatory Agency Procedures ("SCRAP")*, 412 U.S. 669 (1973)........................................................................................................................7

*Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*, 143 U.S. 275 (1892) ....19, 20

*Ziegler v. Ziegler*, 632 F.2d 535 (5th Cir. 1980)....................................................................5

## Statutes

35 U.S.C. § 1 .........................................................................................................................12

America Invents Act of 2011, 125 Stat. 284.............................................................. 1, 13, 18

Patent Act of 1790, 1 Stat. 109 .............................................................................................14

Patent Act of 1793, 1 Stat. 322 .............................................................................................14

## Other Authorities

Edward C. Walterscheid, *Priority of Invention: How the United States Came to Have a "First-to-Invent" Patent System*, 23 AIPLA Q.J. 263 (1995) .........................................16

H.R. Rep. No. 112-98 (2011)................................................................................... 10, 11, 13

Joseph Story, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES .................17

Karen E. Simon, *The Patent Reform Act's Proposed First-to-File Standard: Needed Reform or Constitutional Blunder?* 6 J. MARSHALL REV. INTELL. PROP. L. 129 (2006-2007)........16

U.S. Patent & Trademark Office, Report to Congress on the Prior User Rights Defense (Jan. 2002)................................................................................................................................18

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## I.       INTRODUCTION

Plaintiffs Mark Stadnyk ("Stadnyk") and MadStad Engineering, Inc. ("MadStad") respectfully submit this reply in support of their motion for preliminary injunction against the America Invents Act of 2011, 125 Stat. 284 ("AIA").  The AIA eliminates the "First-to-Invent" ("FTI") patent system that has existed for over two centuries and has produced the inventions of Thomas Edison, the Wright Brothers, and the Information Age.   The Government tries to rewrite the plain language of the AIA, contending that the Act "requires that an individual be *an* 'inventor' of a 'discovery'' (Govt.Br.2 (emphasis added)), though not necessarily "the" inventor (i.e., the first, actual inventor).  But the Government relegates to a footnote (*id.* at 4 n.4) the Act's deletion of the inventorship requirement previously contained in Section 102(f) of the Patent Act.  By eliminating Section 102(f), the AIA removes from the conditions of patent validity the requirement that the patent-holder be an inventor at all, whether first, second, or even third.

In any event, the Government's reinterpretation of the AIA cannot save it.  The Government's view of "inventorship" does not comport with the constitutional one.  The Government asserts that Constitution does not "constrain Congress to grant patents only to first inventors" (Govt.Br.21) and that if two people "independently" create an invention (*id.* at 22), Congress may grant the patent to whom the Government calls the "second inventor." (*Id.* at 24.)  But Thomas Jefferson, Chief Justice John Marshall, Justice Joseph Story, the First Congress, and other authorities all rejected that position.  They agreed that, if two people work independently, only the first, actual inventor is entitled to a patent.

1

The Government admits that under the first two Patent Acts courts held "the first inventor was entitled to the patent over a subsequent inventor." (*Id.* at 27 n.21.) The Government does not deny that the weight of scholarship supports Plaintiffs. (Dkt. 11, at 15-17.) Nor does the Government address the underlying principles of the Patent Clause: to reject the premise of European patent systems that made government-bestowed licenses (rather than the inventor's own ingenuity) the basis for property rights. Two hundred years of settled constitutional law and practice should not be so casually discarded. The motion for preliminary injury should be granted.

## II.    ARGUMENT

### A.    The Issues Before The Court Are Pure Questions Of Law.

The Government does not deny Plaintiffs' showing that the questions before this Court are issues of law amenable to complete resolution in the context of a preliminary injunction motion. (Dkt. 11, at 2.) Accordingly, the Government's focus on the difference between a preliminary injunction and a "trial on the merits" (Govt.Br.10) is misplaced. In this case, a preliminary injunction should not be viewed as a disfavored remedy. There is no discovery or fact-finding necessary to resolve Plaintiffs' claims. A preliminary injunction will resolve the issues in this case and can be converted into a permanent injunction.

### B.    Plaintiffs Have Established Irreparable Injury.

The Government contends that Plaintiffs have failed to show that the FTF system would cause them to lose a particular patent. (Govt.Br.11.) But that is not the only potential

2

form of irreparable injury.[1]  Plaintiffs have shown multiple kinds of irreparable injury: (1) the burden of maintaining heightened secrecy around potential inventions until a patent application is filed, which has already cost Plaintiffs approximately $3,500.00 (Stadnyk Decl. (Dkt. 11-1) ¶¶ 5-7); (2) the need to acquire and maintain additional equipment for product development and testing, which has cost Plaintiffs $105,000.00 plus $840.00 per month on an ongoing basis (*id.* at ¶¶ 8-9); (3) increased time and effort and higher costs caused by the need to file additional patent applications (*id.* at ¶¶ 10-15); and (4) lost business and investment opportunities caused by the AIA's chilling effect, which deters Plaintiffs from sharing ideas with potential partners and investors.  (*Id.* at ¶ 16.)

None of these injuries is speculative.  All are corroborated by Plaintiff Stadnyk's declaration and by the declaration and attachments of technology investor Gary Lauder ("Lauder Decl.").  (Dkts. 11-2, 11-3, 11-4.)  Further, they are exactly the kinds of harms that Members of Congress warned FTF would cause.  (Dkt. 11, at 21 n.27.)  The Government does not introduce any evidence of its own challenging Plaintiffs'.  Its strategy is merely to

---

[1] Even if a plaintiff averred in advance that a particular patent will be held invalid under FTF, the Government contends that such an averment would be speculative (Govt.Br 12).  Moreover, no plaintiff would be willing to make such averment, because it would entail the loss of valuable property.  Requiring such an admission would entail the kind of penalty that due process forbids, cf. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3151 (2010) ("We normally do not require plaintiffs to 'bet the farm' . . . before 'testing the validity of the law.'") (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007), and citing *Ex parte Young*, 209 U.S. 123 (1908)).  The Government's demand that a plaintiff must effectively surrender a patent in order to challenge the AIA would insulate it from judicial review.

nit-pick at Plaintiffs' argument, and its strategy fails.[2]   Plaintiff has submitted a Reply

Declaration addressing the Government's quibbles.   (Reply Declaration of Mark Stadnyk in

Support of Plaintiffs' Motion for Preliminary Injunction ("Reply Stadnyk Decl.") ¶¶ 1-6.)

Plaintiffs' showing of injury is more substantial and less speculative than that in cases cited

by the Government.[3]

> 1.      **The Act's Effective Date Does Not Bar Plaintiffs' Challenge.**

The Government insists that "Plaintiffs are not suffering irreparable harm because the

first-inventor-to-file provisions do not take effect until March 16, 2013."  (Govt.Br.1.)  But

the AIA already causes Plaintiffs concrete injury, here and now.  The Government ignores

settled law allowing pre-enforcement challenges to statutes:  "One does not have to await the

consummation of threatened injury to obtain preventive relief.  If the injury is certainly

impending, that is enough."[4]

---

[2] The Government conflates Article III "injury" and preliminary injunction "irreparable injury."  *See Advanced Cartridge Technologies, LLC v. Lexmark Intern., Inc*., No. 8:10–cv–486–T–23TGW, 2011 WL 6719725, *2 (M.D.Fla. Dec. 21, 2011) (criticizing party for mixing different kinds of "injury').  If Plaintiffs can establish any form of "injury," it will qualify as **irreparable**, because the Government does not come to grips with Plaintiffs' showing that they would face insuperable barriers in recovering monetary damages from the Government.  (Govt.Br.9 n.10.)  Nor does the Government deny Plaintiffs' showing that the difficulty in measuring Plaintiffs' injuries qualifies them as "irreparable."  (Dkt. 11, at 22 (citing, inter alia, *Ferrero v. Associated Materials Inc*., 923 F.2d 1441, 1449 (11th Cir.1991)).

[3] *Church v. City of Huntsville*, 30 F.3d 1332, 1338 (11th Cir. 1994) (plaintiff had standing to seek injunction because of the "likelihood that City officials will continue to respond to the plaintiffs' conduct") (cited in Govt.Br.21).

[4] *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 144 (1974) (internal quotation marks and citation omitted); *see also Thomas v. Union Carbide Agr. Products Co*., 473 U.S. 568, 581 (1985); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979); *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc*., 427

### 2.    Plaintiffs' Additional Expenses Are A Concrete Injury.

Plaintiffs have already spent thousands of dollars on security measures and additional testing equipment and facilities as a result of the AIA, and those ongoing expenses will continue in the future.  (Reply Stadnyk Decl. ¶ 3.)  Pecuniary injury is clearly "a sufficient basis for standing."  *Fair v. EPA*, 795 F.2d 851, 853-54 (9th Cir.1986).[5]

The Government claims that, "if Plaintiffs cannot establish with certainty that the AIA will cause them to lose a specific patent right, then a fortiori they cannot show that harms contingent upon the loss of a specific right, such as increased IT security costs and competitive disadvantages, are actual and imminent."  (Govt.Br.13.)  That is a non sequitur. Homeowners do not wait to purchase alarm systems until they can "establish with certainty" that they will be robbed.  Likewise, Plaintiffs have been forced to incur substantial IT security costs and other expenses precisely because of the need to ensure that they ***do not*** lose patent rights under the AIA.

The risks faced by Plaintiffs are not "based on Plaintiffs' own fearful presumptions" (Govt.Br.16) but rather by evidence and sound judgment.  (Reply Stadnyk Decl. ¶ 4.)  The

---

Fed.Appx. 714, 721-22 (11th Cir. 2011); *Atlanta Gas Light Co. v. U.S. Dept. of Energy*, 666 F.2d 1359, 1363 n.7 (11th Cir. 1982); *Ziegler v. Ziegler*, 632 F.2d 535, 538 (5th Cir. 1980) (per curiam).

[5] *See also Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("Certainly he who is 'likely to be financially' injured may be a reliable private attorney general to litigate the issues of the public interest in the present case.") (citation omitted); *Barlow v. Collins*, 397 U.S. 159, 163-64 (1970) (additional expenses attributable to challenged law constitute injury in fact); *Gibson v. Chase Home Finance, LLC*, No. 8:11–cv–1302–T–23TBM., 2011 WL 6319401 (M.D.Fla. Dec. 16, 2011) (injury in fact shown where plaintiff forced to pay the $2,015 annual charge for flood insurance from a third-party).

risks are also corroborated by Mr. Lauder, who states (in a declaration the Government does not challenge) that the AIA encourages theft by increasing the value of stolen IP (as shown by overseas experience).[6]   The Government admits that, prior to the AIA, an inventor could use an "interference proceeding" to show that he (rather than the thief) was the genuine inventor.  (Govt.Br.14-15.)  The AIA eliminates this option.  Further, prior to the AIA, patent law provided a one year "grace period," so that even if an invention was stolen and publicly disclosed, "the true inventor can still secure the patent provided that he filed his application within a year of the disclosure."  (Govt.Br.15.)  The AIA eliminates this provision as well. (*Id.*)  The sole hope for inventors under the AIA is the complex and untested "derivation

_____

[6] Lauder Decl., Exh. A (Dkt. 11-3, at 2) ("The main problem with FTF is the new secrecy required prior to filing due to the fact that if someone else learns of the invention, that party can apply for the patent – and prevail – unless the original inventor can prove that it was derived from him or her without the benefit of discovery.  This creates an unparalleled reward system for corporate espionage and hacking."); *id.* at Exh. B (Dkt. 11-3, at 5) ("Under the existing system, . . . if someone applies for a patent and you have evidence that you invented it first, you can institute an interference proceeding.  This is a rare event (less than 100/year, and less than 0.05% of patents issued/year), but this system gives proper recourse and therefore discourages theft more than FTF.  Under FTF, theft is much easier, rewarding hacking and other bad behavior, and most important to me: will suppress the openness on which our innovation ecosystem thrives."); *id.* at Exh. C (Dkt. 11-3, at 9) ("Theft of others' ideas is still common, but here the inventor has a fighting chance.  Elsewhere, the patent systems are barely used by individuals or small companies since they don't benefit. It's too expensive and unfair.  Here, inventor-entrepreneurs can feel safer demonstrating their invention to a room of potential investors, even if they have not filed their patents yet. Overseas, inventors are admonished to file before that, but that takes money they don't yet have."); *id.* at Exh. D (Dkt. 11-3, at 14) (documenting problem of patent theft); *id.* at Exh. G (Dkt. 11-4, at 14-15 (explaining how the move to an FTF system increases the incentives for theft: "Our FTI system discourages theft much more than FTF.  As a result, in countries where FTF prevails, the standing advice that entrepreneurs receive is to apply for patents PRIOR to talking to investors (whose money would be needed to apply) and PRIOR to talking to customers . . . . With stolen IP suddenly being worth much more due to the FTF, hacking could increase dramatically even further.").

procedure" (*id.* at 15-16), and the Government ignores Mr. Lauder's analysis that it is inadequate.[7]   The increased costs that Plaintiffs must incur in order to protect their property rights under FTF are not "speculative" or "voluntary" (*id.* at 16, 17), but are directly traceable to the AIA.   In fact, the causal chain is much more substantial than relationships found sufficient in prior cases.[8]

### 3.   Increased Burdens On Plaintiffs From FTF.

A plaintiff suffers injury in fact when a defendant "impair[s] its ability to engage in its projects by forcing the organization to divert resources to counteract" the defendant's

---

[7] Lauder Decl., Exh. F (Dkt. 11-4, at 9) ("[T]he law gives the inventor no subpoena power to get information from the alleged deriver to make this showing.  Even if that information were available, showings of 'derivation' are among the most difficult and expensive showings in the patent law, so companies will go to great lengths to avoid the risk of having to show derivation."); *id.* at Exh. G (Dkt. 11-4, at 14) ("Since the inventor does not have the right to discovery [in a derivation proceeding], and more importantly, since someone who knowingly applies for a patent based on stolen ideas knows they must cover their tracks, it is not likely that evidence can be found to prove derivation.  Derivation proceedings are expected to be at least as expensive as interference proceedings, but much less likely to succeed.").

[8] *E.g.*, *United States v. Students Challenging Regulatory Agency Procedures ("SCRAP")*, 412 U.S. 669, 688 (1973) (railroad rate increase would lead to more littering by increasing use of nonrecyclable commodities); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir.2005) (injury need only be "fairly traceable" to defendant); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) (test is more relaxed than probable cause); *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997) (businesses had standing to challenge law that "presents them with a Hobson's choice, viz., they must either (a) forego bidding on tax exemption applicants' projects, which represent a substantial percentage of the market and their own businesses, or (b) undertake the extra burdens and costs of complying with [the law"); *Central Arizona Water Conservation Dist. v. U.S. E.P.A.*, 990 F.2d 1531, 1537 (9th Cir. 1993) (increased costs of complying with regulation constituted injury in fact and was not "indirect, speculative, and hypothetical," even though "the extent of [plaintiffs'] economic harm is not readily determinable" because a portion of the cost would be passed on to other parties).

actions. *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir.2008); *see also id.* at 1165-66 (plaintiff injured because it "ha[s] to divert personnel and time"); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (plaintiff forced to "divert resources").  Plaintiffs suffer just such an injury here.  FTF forces Plaintiffs to divert business resources to prepare more patent applications and to file them sooner, in order to compete in the race to the PTO.  (Dkt. 11-1, ¶¶ 12-13; Reply Stadnyk Decl. ¶ 6).[9]  The Government cites the option of provisional patent applications (PPAs) (Govt.Br.13 n.13), but ignores the uncontested evidence that PPAs are no solution to the burden on Plaintiffs.  (Dkt. 11-1, ¶ 14.)

**4.     Plaintiffs Face A Competitive Disadvantage.**

Plaintiffs have also documented concrete (not speculative) injury because they suffer from a competitive disadvantage vis-à-vis larger companies in the race to file patent applications with the PTO.[10]  "When the government erects a barrier that makes it more

---

[9] Lauder Decl., Exh. F (Dkt. 11-4, at 9) ("'Forced-to-file' will have severe consequences on our nation's startups, new businesses and universities.  Preparing a written description adequate to meet the requirements of the new Patent Reform grace period will cost thousands of dollars per invention for attorney fees, and many thousands of dollars in time of the company's key personnel . . . .  This diversion of capital and of time of key personnel, from running the business to gratuitous legal costs with only speculative business benefit, is not a recipe for a healthy startup ecosystem. . . .  Earlier decisions will be less accurate decisions, so patent protection will be lost for valuable inventions, and costly applications will be filed for inventions that turn out to be useless.").

[10] Lauder Decl., Exh. E (Dkt. 11-4, at 3) ("One of the great benefits of our FTI system is that inventors can refine and improve their inventions in private prior to filing for it. Under FTF, one should file early and often on each idea, however impractical it later proves to be.  The burden falls disproportionately on smaller companies for whom patenting expenses are material."); *id.* at Exh. F (Dkt. 11-4, at 10) ("The proponents of the change, all either currently at the nation's largest companies, or recently moved to government after a

difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). The Government seeks to limit that principle to equal protection cases (Govt.Br.18 n.16), but standing does not depend on the nature of the underlying claim, and courts have applied the principle outside the equal protection context. *See Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1331-34 (D.C.Cir.1986) (reduced opportunity to purchase fuel-efficient vehicles was a cognizable injury); *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C.Cir.1990) (reduced opportunity to purchase larger vehicle is cognizable injury, even though plaintiffs "cannot point to any specific car or model that they have been prevented from buying").

### 5.   Loss Of Potential Investors And Business Partners.

The Government claims that Plaintiffs "have failed to provide any description of the lost business opportunities, the specific reasons why those opportunities were supposedly lost, and the economic impact." (Govt.Br.18). Mr. Stadnyk provides those details in his

---

career in large companies, make a number of arguments that 'forced-to-file' is good for small companies. With all respect for their integrity and experience within the large company environment, their arguments make clear they have no understanding of the differences between how large companies and small companies use the patent system . . . In large companies, an inventor can assemble capital, R&D, manufacturing and marketing within the company, without an external disclosure that triggers patent deadlines. In contrast, small companies have to talk to outsiders: investors, potential employees and other outside experts to solve specific business problems. Current law accommodates this; Patent Reform does not. 'Forced-to-file' is an innocuous small change for small companies, but it's a gag order for small companies, making it much harder to assemble the resources the company needs.")

reply declaration, where he also explains the ongoing nature of the injury, which will continue into the future.  (Reply Stadnyk Decl. ¶ 5.)  The cases cited by the Government are inapposite.  *International Institute for Learning, Inc. v. J. Ross Pub., Inc.*, No. 07-80574-CIV, 2007 WL 4707057, *2 (S.D.Fla. Aug. 28, 2007) (plaintiff "did not pinpoint any harm beyond [a] general concern") (cited Govt.Br. 17); *Burger King Corp. v. Agad*, 911 F.Supp. 1499, 1506 (S.D.Fla. 1995) (economic loss not irreparable injury where it is readily measurable and defendant will pay damages).

### C.  Plaintiffs Have Established Probability of Success.

The Government contends that the AIA is constitutional because Congress supposedly has the power to vest patents in what the Government calls "second inventors." (Govt.Br.21).  The Government's argument is triply flawed: (1) because the AIA deletes Section 102(f), the Act eliminates any inventorship requirement at all – i.e., the AIA does not require that an applicant be a first, second, or even third inventor, (2) even if the AIA contained some sort of "inventorship" requirement, the AIA would still be unconstitutional, because the Patent Clause does indeed constrain Congress to granting patents only to whom the Government calls "first inventors" (and what the Constitution calls "inventors"); and (3) the Government's defenses of the AIA have no merit.

### 1.  The Government's Attempt to Rewrite The AIA Fails.

The Government runs from the plain language of the AIA.  It tries to rewrite the AIA by contending that the law is not a "First-to-File" (FTF) statute after all – even though the final Committee Report says that the Act "switches the United States to a first-to-file patent system." H.R. Rep. No. 112-98, at 62 (2011), in order to harmonize U.S. law with "the first-

to-file systems used in the rest of the world." *Id.* at 42.  The Government ignores all of the provisions of Section 3 of the AIA that delete or rewrite references to priority of inventorship in the Patent Act and instead make the patent process turn on the "effective filing date" of an application.  Thus, the AIA deletes Section 102(g)(2), which formerly provided that an applicant is not entitled to a patent if "before the applicant's invention thereof, the invention was made . . . by another who had not abandoned, suppressed, or concealed it."

The Government relegates to a footnote (Govt.Br.4 n.4) the deletion of Section 102(f) of the Patent Act, which formerly made inventorship a condition of patentability.  *E.g.*, *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349–50 (Fed.Cir.1998) ("Thus, [35 U.S.C. § 102(f)] ... makes the naming of the correct inventor or inventors a condition of patentability."); *see also* Dkt. 11, at 4 (citing cases where courts enforced requirement of Section 102(f)).

The repeal of Section 102(f) is not simply a "first inventor" vs. "second inventor" problem, as the Government contends.  (Govt.Br.21-24.)  Rather, the elimination of Section 102(f) allows a statutorily valid (although not a constitutionally valid) patent to issue to one who is *not an inventor at all*.  Because it eliminates the inventorship requirement, the AIA is unconstitutional in every application.  (Govt.Br.7 n.9.)

The Government contends that the AIA's deletion of Section 102(f) is meaningless because that section supposedly was "redundant."  (Govt.Br.4 n.4.)  But"[a] basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." *United States v. Canals–Jimenez*, 943 F.2d 1284, 1287 (11th Cir.1991); *see also United States v. Forey-Quintero,* 626 F.3d 1323, 1327 (11th Cir. 2010) (same).  This Court should not dismiss Section 102(f) (enacted in the

1952 Patent Act) as a "redundant" provision.   According to the Government, Congress retained Section 102(f) in the Patent Act for over half a century -- during which time Congress made at least 17 amendments to the Patent Act, *see* 35 U.S.C. § 1 (note) – but then coincidentally decided to repeal it in 2011.  The Government's attempt to portray the deletion of Section 102(f) as meaningless flies in the face of well settled canons of statutory construction.

Next, the Government insists that "the AIA explicitly requires that an individual be an 'inventor' of a 'discovery' in order to obtain a patent. *See* 35 U.S.C. § 101."  (Govt.Br.2.) That statement is incorrect.  Section 101 is not a provision of the AIA.  It is part of the pre-existing Patent Act.   If the Government means that the AIA *retains* an inventorship requirement in Section 101, that statement too would be inaccurate.  As stated in Plaintiffs' Opening Motion (Dkt. 11, at 5 n.3) (and as the Government nowhere contests), Section 101 provides that patents may be obtained "subject to the conditions and requirements of this title," which under the AIA is an FTF system.   Section 102 is entitled "Conditions for patentability; novelty and loss of right to patent."  In other words, Section 102 (along with Section 103) prescribes the "conditions" to which Section 101 refers.  By removing Section 102(f) and eliminating inventorship as a "condition for patentability," the AIA eliminates inventorship as one of the "conditions" to which Section 101 refers.

The Government cites *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289 (2012), for the proposition that "Section 101's requirement that an individual must be an actual inventor is an enforceable condition of patentability."   (Govt.Br.4 n.4.)   But the *Prometheus* case addressed patentable subject matter (holding that laws of nature are not

eligible for patent), not the inventorship requirement.  The Court referred to "the § 101 patent-eligibility inquiry," 132 S.Ct. at 1304, not an inventorship inquiry.  Similarly, the Committee Report to the AIA refers to Section 101 as relating to "utility, eligibility" rather than inventorship, and the Report also notes "patent-eligible subject matter under § 101." H.R. Rep. No. 112-98, at 42, 81.  Until now, inventorship has been enforced through Section 102(f), which the AIA eliminates.

The Government cites the concept of "prior art" (Govt.Br.4-5), but that does not impose an inventorship requirement.  In fact, the AIA amends Section 102(a) by eliminating the requirement that an invention cannot be previously "known," which is the very definition of the term "invention."  AIA, Section 3, § 102(a)(1), 125 Stat. at 285-86.  The AIA defines "prior art" as of the filing date of the application, not the date of invention.

The Government also cites derivation proceedings.  (Govt.Br.5-6, 20.)  In addition to the practical flaws already discussed, *see supra* note 6, derivation proceedings are not aimed at identifying the first true inventor, but only whether the inventor can prove (without the benefit of depositions, document requests, or other discovery) that the first-filer stole or copied the invention.  That is not an inventorship requirement.

### 2.     Even If The Government Were Right That The AIA Retained An Inventorship Requirement, It Would Still be Unconstitutional.

Even if the AIA contained an "inventorship" requirement, it would still be unconstitutional, because preferring a "second" inventor over a "first" inventor violates the Patent Clause.  The Government observes that the Patent Clause does not use the term "first inventor" (Govt.Br.21), but that is because such a locution would be redundant.  Only a "first inventor" can discover something "new" or "not known" before, in the definitions of Samuel

Johnson's Dictionary and Webster's Dictionary.  (Dkt. 11, at 8.)  Two people can work independently (Govt.Br.22), but once the first creates an invention, the discovery is no longer "new" or "unknown."  Even if John Cabot had known nothing of Columbus, we would not say that Cabot "discovered" the New World.  Tellingly, the Government (in an unguarded moment) refers to "the true inventor."  (Govt.Br.15.)

If the text of the Patent Clause were unclear, its constitutional history and purpose would be dispositive.  The Government acknowledges that "Plaintiffs are correct to point out that the Patent Acts of 1790 and 1793 are valuable sources of the Framers' intent." (Govt.Br.31.)  The Government insists that the 1790 Act's requirement that the patentee be "the first and true inventor" (§ 5, 1 Stat. 109, 111) "merely established a rule of priority." (Govt.Br.31.)  The Act specified: "if it shall appear that the patentee was not the first and true inventor or discoverer, judgment shall be rendered by such court for the repeal of such patent or patents."  1 Stat. at 111.  Likewise, the 1793 Act (which Jefferson drafted, *Graham v. John Deere Co.,* 383 U.S. 1, 7 (1966)) permitted a defendant to plead for a declaration of invalidity if "the thing, thus secured by patent, was not originally discovered by the patentee," § 6, 1 Stat. 322, and provided for the repeal of a patent if the "patentee was not the true inventor or discoverer." § 10, 1 Stat. 322.

The Government admits that "Plaintiffs are correct" that early judicial decisions interpreting the Patent Acts held that "the first inventor was entitled to the patent over a subsequent inventor" (Govt.Br.27 n.21), and it even quotes Justice Story as holding that "[t]he first inventor, who has put the invention in practice, and he only, is entitled to a patent."  *Bedford v. Hunt*, 3 F.Cas. 37, 37 (C.C.D.Mass. 1817) (Story, Circuit Justice).  The

Government is wrong in denying the cases' significance.  The decisions often referred to both statutory and constitutional language and treated the two as related.  For example, in *Evans v. Jordan*, 8 F. Cas. 872 (C.C.D.Va. 1813), Chief Justice Marshall opined that "[t]he constitution and law, taken together, give to the inventor, from the moment of invention, an inchoate property therein, which is completed by suing out a patent." *Id.* at 873.  A "second" inventor's rights are inferior, even before a patent is granted:  "Whenever, then, previous to a patent, any person constructs a machine discovered by another, he constructs it subject to the right of that other." *Id.*  In *Evans v. Eaton*, 16 U.S. (3 Wheat.) 454 (1818) (Marshall, C.J., but erroneously cited at Govt.Br.27 n.21 as Story, J.), the Court cited both the Act and the Clause (*id.* at 513) and explained that the patentee must be "the first inventor or discoverer." *Id.*  The Court addressed the situation where two persons independently create the same invention:  "It may be that the patentee had no knowledge of this previous use or previous description; still his patent is void." *Id.* at 514.  In *Pennock v. Dialogue*, 27 U.S. 1 (1829) (cited Govt.Br.27 n.21), Justice Story explained that both the Patent Act and "general principles of law" gave "the right to the first and true inventor and to him only." *Id.* at 23.[11] The Framers had a very clear idea of the proper "mechanism for determining priority

---

[11] *See also Dawson v. Follen*, 7 F.Cas. 216, 217 (C.C.Pa. 1808) (Washington, Circuit Justice) ("original inventor"); *Reed v. Cutter*, 20 F.Cas. 435, 437 (C.C. Mass. 1841) (Story, J.) ("Under our patent laws, no person, who is not at once the first, as well as the original, inventor, by whom the invention has been perfected and put into actual use, is entitled to a patent. . . . [T]his has been the habitual, if not invariable, interpretation of all our patent acts from the origin of the government."). The Government cites Madison's statement that "[t]he right to useful inventions, seems with equal reason to belong to the inventors" (Govt.Ex.A, Dkt. 23-1, at 4), but this statement supports Plaintiffs by stressing the role of inventorship.

between competing inventors who independently invent something" (Govt.Br.21):  awarding the patent to the first inventor.

Moreover, the AIA violates the underlying principles of the Patent Clause.  As the Government does not dispute, the purpose of the Clause was to reject European patent models under which Government-bestowed licenses and grants were the basis of property rights.  (Dkt. 11, at 12-15.)  The Framers deliberately created a difference between U.S. and European patent systems, with which the AIA improperly seeks to "harmonize."  Thus, the Government cites English authority, including *Dollond's Case*.  (Govt.Br.30-31.)  Justice Story said, "I am aware of *Dollond's Case*; but I do not consider it to be a just exposition of the patent law of this country."  *Reed*, 20 F. Cas. at 438.  *See also Thompson v. Haight*, 23 F.Cas. 1040, 1045 (C.C.N.Y. 1826) ("[T]here is a difference between our statute and that of Great Britain  . . . [O]ur act does not, like the English statute, refer to the grant of letters patent, but to the time of the invention.") (quotation marks, citation omitted).[12]

   **3.    The Government's Defense of the AIA Is Flawed.**

---

[12] The Government admits that the first Patent Board, on which Thomas Jefferson sat, rejected a first-to-file system, but it denies the Board acted for constitutional concerns. (Govt.Br.32 n.28.)   The Board awarded four non-overlapping patents, with the original inventor given the broadest.  *See* Karen E. Simon, *The Patent Reform Act's Proposed First-to-File Standard: Needed Reform or Constitutional Blunder?* 6 J. MARSHALL REV. INTELL. PROP. L. 129, 134-35 & nn. 44, 45 (2006-2007).   The Government's own source acknowledges that it is "possible the board may have interpreted 'inventor' to mean the true and first, i.e. original, inventor in a literal sense."  Edward C. Walterscheid, *Priority of Invention: How the United States Came to Have a "First-to-Invent" Patent System*, 23 AIPLA Q.J. 263, 292 (1995) (cited Govt.Br. 30, 32). The Government also maintains that the First Congress' rejection of "patents of importation" (Govt.Br.31-32) does not support Plaintiffs' argument, but again its own source disagrees.  Walterscheid, 23 AIPLA Q.J. at 282 ("During debate on the [Patent Act of 1790], however, the House removed this language from H.R. 41, apparently out of concern that there indeed was a constitutional impediment to patents of importation," because they would not restrict patents to "the original inventor.").

The Government claims that "there are no restraints" on Congress' ability to define patent rights, save the rational basis test.  (Govt.Br.19-20.)  Such a limitless theory would permit Congress (for example) to vest a patent right in whomever the PTO decided was best suited to commercialize the invention, even if the person had played no role in the discovery. That absurd position gains no support from *Graham v. John Deere Co.,* 383 U.S. 1 (1966) (cited Govt.Br.19-20), which addressed the standard of obviousness, not the persons to whom Congress could award a patent.  Moreover, *Graham* explained that the Patent Clause "is both a grant of power and a limitation" and that "[t]he Congress in the exercise of the patent power may not overreach the restraints imposed by the stated constitutional purpose." *Id.* at 5-6.  *Eldred v. Ashcroft*, 537 U.S. 186 (2003) (cited Govt.Br.20), addressed Congress' power to extend copyright terms, not whether Congress could vest a copyright in someone who was not the author of the book at all.  Surprisingly, the Government does not address the Supreme Court's most recent relevant decision: "Since 1790, the patent law has operated on the premise that rights in an invention belong to **the inventor**." *Board of Trustees of Stanford University v. Roche Molecular Sys. Inc.*, 131 S.Ct. 2188, 2192 (2011) (emphasis added). "[A]n inventor owns the product of [his or her] original thought." *Id.* at 2195.[13]

The Government contends that Congress is entitled to prefer a first-filer over an actual inventor who "withholds" or "suppresses" his discovery.  (Govt.Br.21.)  The Government cites the importance of "public disclosure of an invention" (*id.* at 22) and

---

[13]   The Government cites Justice Story's treatise (Govt.Br.32), which states: 'It has been doubted whether Congress has authority to decide the fact, that a person is an author or inventor in the sense of the Constitution, so as to preclude that question from judicial inquiry." Joseph Story, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1153 (Govt.Exh. E, Dkt. 23-1, at 65.)

maintains that "a withholding inventor 'comes not within the policy or objects of the Constitution or acts of Congress.'" (*Id.* at 23 (quoting *Kendall v. Winsor*, 62 U.S. (21 How.) 322, 328 (1858)). The attempt to repackage the AIA as addressing this problem falls flat.

First, the Government's reinterpretation of the AIA is at war with itself. Section 5 of the AIA, 125 Stat. at 297-99 (which the Government does not cite), creates a defense to infringement based on prior commercial use (35 U.S.C. § 273), allowing those who keep innovations hidden from the public to later use those secrets as defenses to patent infringement lawsuits. Section 5 prefers secrets over patents. It ***affirmatively encourages*** the kind of withholding and suppression that the Government now claims it was the very purpose of the AIA to prevent.[14] The Government's new-found defense of AIA Section 3 would call Section 5 into question.

Next, Section 3 is not limited to inventors who "suppress" their inventions. The AIA eliminates inventorship as a basis for patent rights across the board, even for those who comply diligently with all disclosure rules. Current law already addresses those who suppress or conceal their inventions, as the Government notes. (Govt.Br.28.) Plaintiffs' argument does not call into question current patent practice. Rather, the point is that sanctions for suppression do not show that Congress may disregard inventorship altogether. By analogy, the right to vote is subject to reasonable regulation and may be lost or forfeited if the voter does not comply with certain requirements. But that does not mean that Congress

---

[14] U.S. Patent & Trademark Office, Report to Congress on the Prior User Rights Defense 34 (Jan. 2002) (available at http://www.uspto.gov/aia_implementation/20120113-pur_report.pdf) ("Several respondents, including a prior director of a technology-focused Federal research organization, asserted that prior user rights would create incentives for businesses to protect innovations through trade secrets instead of seeking patents.")

may simply abolish a person's right to vote and award it to someone else.

The Government apparently believes that losing the race to the PTO is equivalent to "suppressing" or "withholding" a patent. Yet the cases it cites reject that argument. In *Kendall v. Winsor*, 62 U.S. (21 How.) 322 (1858) (Govt.Br.22, 23, 25, 26), for example, the Court stressed that any duties of disclosure "by no means forbid a delay requisite for completing an invention, or for a test of its value or success by a series of sufficient and practical experiments; nor do they forbid a discreet and reasonable forbearance to proclaim the theory or operation of a discovery during its progress to completion, and preceding an application for protection in that discovery." *Id.* at 328-29. In *Mason v. Hepburn*, 13 App.D.C. 86 (D.C.Cir.1898) (Govt.Br.26), the court of appeals noted that a "spirit of indulgence" "has always been manifested toward those who in good faith delay application for patent whilst engaged in a diligent effort to perfect their inventions." Similarly, *Gayler v. Wilder,* 51 U.S. (10 How.) 477 (1850) (Govt.Br.22, 24, 25), reaffirmed that "the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which the law requires." *Id.* at 493. In the exceptional circumstances of that case, however, Conner's safe had been "finally forgotten or abandoned" (*id.* at 498), so that Fitzgerald was effectively the original inventor. *Id.* ("the Conner safe had passed away from the memory of Conner himself, and of those who had seen it, and the safe itself had disappeared, the knowledge of the improvement was as completely lost as if it had never been discovered"). In *Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*, 143 U.S. 275, 292 (1892) (Govt.Br.25), the Court looked to the dates of publication and public use as part of its inquiry into which party

was "the actual inventor" (*id.* at 292), not to suggest that a first-filer would prevail over a first-inventor.   The Government's reference to overseas inventors (Govt.Br.29) proves nothing because the treatment of foreign inventors is a matter of legislative grace rather than constitutional right.   *Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 10-11 (1939).

### 4.   Plaintiffs Have Established Probable Success On Non-Severability.

The Government refuses to fully brief the severability issue (Govt.Br.34-35), even though Plaintiffs agreed to every extra page and every extra day the Government requested, and this Court granted the Government's page extension after the fact.   There is no reason to indulge the Government further or exempt it from the normal briefing rules, particularly when the argument it seeks to make – that "the AIA contains numerous sections that could operate independently from the first-inventor-to-file provisions" (*id.* at 34 n.30) – is a non-starter.   *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (test is not whether "the balance of the legislation is incapable of functioning independently").

### D.   Plaintiffs Have Satisfied The Remaining Requirements.

The balance of the equities and the public interest favor a preliminary injunction.   FTI is a proven, tested system, and the radical change to FTF is fraught with risk.   Countries like Canada that have made the switch have suffered reduced innovation.   Lauder Decl., Exh. B (Dkt. 11-3, at 4).   This lawsuit has been brought well in advance of the AIA's effective date, so the Government's claims of disruption are hollow.   And the Government does not contest Plaintiffs' argument that no bond is necessary.   (Dkt. 11, at 24-25).

### III.   CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted.

Dated: September 13, 2012

Respectfully submitted,

/s/   *Jonathan S. Massey*

**TRIAL COUNSEL**

Jonathan S. Massey, Esq. *(pro hac vice granted)*
D.C. Bar No.:457593
Leonard A. Gail, Esq. *(pro hac vice granted)*
ARDC No.: 6199745
Matthew J. Reedy, Esq. *(pro hac vice granted)*
ARDC No.: 6306809
Attorneys For Plaintiffs
MadStad Engineering, Inc., and Mark Stadnyk
**Massey & Gail LLP**
1325 G St., NW, Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
Fax: (312) 379-0467
Email: Jmassey@masseygail.com
Email: Lgail@masseygail.com
Email: mreedy@masseygail.com


Michele Leo Hintson, Esquire
Florida Bar No. 0604941
Jaime Austrich, Esquire
Florida Bar No. 084565
Attorneys For Plaintiffs
MadStad Engineering, Inc., and Mark Stadnyk
**Shumaker, Loop & Kendrick, LLP**
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
Telephone: (813) 229-7600
Fax: (813) 229-1660
Email: MHintson@slk-law.com
Email: JAustrich@slk-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 13, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Matthew A. Josephson
> United States Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., N.W., Room 7141
> Washington, D.C. 20530
> Matthew.A.Josephson@usdoj.gov
> Tel: (202) 514-9237
> Fax: (202) 616-8470
>
> *Counsel for Defendants*

|  | */s/ Jonathan S. Massey* |
| --- | --- |
| **TRIAL COUNSEL** | Jonathan S. Massey, Esq. |
|  | D.C. Bar No.:457593 |
|  | Leonard A. Gail, Esq. |
|  | ARDC No.: 6199745 |
|  | Matthew J. Reedy, Esq. |
|  | ARDC No.: 6306809 |
|  | Attorneys For Plaintiffs, |
|  | MadStad Engineering, Inc., and Mark Stadnyk |
|  | **Massey & Gail LLP** |
|  | 1325 G St., NW, Suite 500 |
|  | Washington, DC 20005 |
|  | Telephone: (202) 652-4511 |
|  | Fax: (312) 379-0467 |
|  | Email: Jmassey@masseygail.com |
|  | Email: Lgail@masseygail.com |
|  | Email: Mreedy@masseygail.com |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

|  |  |
|---|---|
| **MADSTAD ENGINEERING, INC., a Florida corporation, and MARK STADNYK, an individual,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO.: 8:12-CV-01589-SDM-MAP** <br> <u>**Injunctive Relief Sought**</u> |
| **U.S. PATENT AND TRADEMARK OFFICE, DAVID KAPPOS, in his official capacity as Director of U.S. PATENT AND TRADEMARK OFFICE, and THE UNITED STATES OF AMERICA,** | |
| **Defendants.** | |

<u>**REPLY DECLARATION OF MARK STADNYK IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

1.      I am over 21 years of age and a resident of the State of Florida.  I make this declaration based on personal knowledge and subject to penalties for perjury under the laws of Florida and the United States.  I have previously submitted a declaration in this action, and I submit this Reply Declaration to supplement my prior statement.

2.      As I explained in my previous declaration, I hold three patents and have numerous inventions at different stages of development.  The Government has raised a question as to whether my new (currently non-patented) inventions will ultimately meet the necessary preconditions for obtaining a patent.  I am operating on the assumption that they will meet the requirements of patentability.  I believe that some of my inventions are in fact

close to patentability. I am continuing to research, develop, and test my inventions in preparation for filing patent applications. Certainly, prior to the AIA, I had every intention of patenting them. As a result of the enactment of the AIA, MadStad and I face increased costs and burdens from having to operate in a First-to-File environment.

3.      As I stated in my prior declaration, since the enactment of the AIA, MadStad and I have been forced to invest approximately $3,500.00 in additional computer security measures. In addition, since the enactment of the AIA, MadStad and I have been forced to invest approximately $105,000 in additional equipment for product development and testing, as well as $840.00 per month investment in expanded facilities for same. The Government has taken the position that already incurred historical costs do not provide a basis for seeking a forward-looking injunction. I wish to clarify that the additional security measures, the additional equipment for product development and testing, and the expanded facilities for development and testing are not one-time costs but rather ongoing costs that I will continue to pay (at one level or another) into the future.

4.      The Government states that I have not pointed to any examples of attempted theft of my inventions. In fact, the possibility of online theft is very real for inventors like me. As reported in the New York Times on September 10, 2012, another Florida company not far from mine confirmed an intrusion and theft of a private computer file containing millions of confidential Apple mobile device ID numbers.[1] Intrusions and malware attacks on my computers are detected by my firewall software every week, and as was the case for this company cited, I may never know what information was stolen until it is

---

[1] http://www.nytimes.com/2012/09/11/technology/company-says-it-not-fbi-was-hacking-victim.html?_r=1&ref=technology.

too late.  Details regarding products currently under development could be stolen now and filed in March of 2013 after the AIA goes into effect.  Since much of my IP development information is stored on my computers, I must spend money now to protect it.

   5.   MadStad and I have also suffered further injury from the challenged provisions of the AIA because we have suffered reduced access to potential investors and business partners due to the new law.  The Government claims that I have not provided specific details of lost business.  But on numerous occasions, I have been deterred (and will continue to be deterred in the future) from sharing ideas and inventions with potential investors and business partners because of the risk that another party will "scoop" ideas and inventions through IP theft or other means and be the first to file a patent application with the PTO.  One example is a retractable knife design that I wanted to license to a well-known knife manufacturer.  I am not in the knife-making business so it was neither practical nor desirable for me to attempt to start up a new factory and produce this product myself.  This manufacturer expressed interest but would not agree to sign a non-disclosure agreement, and I could not be confident that my proprietary design would be held confidential.  Therefore I refused to release the details of my design and had to walk away from a potential licensing opportunity.  Filing a PPA to protect myself was not a viable option because my design was not yet fully developed nor tested.  My hope was that the licensee would agree to incur these costs as part of the licensing agreement.  My rushing to file an incomplete PPA or patent application would not promote the progress of science and could cause me to incur additional costs to either file a new and updated patent application, or to defend the original incomplete application.

6.      The Government says that the burdens of operating in a first-to-file environment are speculative.  But I am already forced to plan for such an environment for my inventions that are under development.  Some of these will take months or years to develop, which means the AIA will already be in effect before the inventions are ready for filing.  As such I must treat and plan my IP development as if the AIA was already in effect.  My business is based around my IP, and like most other companies my business plans extend out one year, three years and five years.  This is why I am already facing the need to file patent applications sooner than I would like, and I am already incurring costs and burdens as a result.  I am spending more time preparing to make premature patent applications and am spending less time running my business.  I am forced to spend money now to protect my IP development from theft because such theft is indefensible under the AIA.  The act of inventing will no longer be the focus of patent law; the focus will now be an administrative act of filing, and administration costs time and money.  I am the key person in my company, and the diversion of time caused by the AIA is quite harmful to the business.  I should be allowed to focus on the important issues to my company, instead of having to worry about filing patent applications as early as possible in order to win the race to the PTO.

Further Declarant sayeth not.

September 13, 2012

Mark Stadnyk