UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MADSTAD ENGINEERING, INC.,
and MARK STADNYK,

      Plaintiffs,

v.                                                              CASE NO.  8:12-cv-1589-T-23MAP

U.S. PATENT & TRADEMARK OFFICE;
DAVID KAPPOS, in his official capacity
as Director of the U.S. Patent & Trademark
Office, and THE UNITED STATES OF
AMERICA,

      Defendants.

_____/

## **ORDER**

Mark Stadnyk and Madstad Engineering, Inc., sue the United States, the U.S.

Patent and Trademark Office (PTO), and the Director of the PTO and challenge as

unconstitutional the America Invents Act (the AIA), Pub. L. No. 112-29, 125 Stat.

284 (2011).  The complaint seeks injunctive and declaratory relief.  The essence of

the complaint appears in paragraphs three, four, and five (Doc. 1 at 2):

> Traditionally, the U.S. patent system has awarded patents to the first
> person to invent a new discovery.  The AIA changes this long-settled
> approach.  Although the AIA is labeled as a "First-Inventor-to-File"
> system, that label is a smokescreen. Under the AIA, the patent will be
> awarded to the person who is first to file a patent application,
> regardless of whether the applicant was the actual first inventor of the
> technology in question.  In fact, the AIA removes from the "conditions
> of patentability" of Section 102 of the Patent Act (and thereby from the

> conditions of patent validity) the requirement that the named inventor actually invented the claimed subject matter.
>
> The new "First-to-File" system violates the Intellectual Property Clause, Article I, Section 8, Clause 8 of the Constitution, which provides Congress with the power "[T]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."
>
> The Intellectual Property Clause prohibits Congress from vesting patents in anyone but actual "Inventors" of genuine "Discoveries." Congress is not authorized to award patents to the winners of the race to file at the PTO.

Because the parties agree that the papers in the case fully present the controlling issues, the parties agreed during a telephone conference (1) to combine the plaintiffs' motion for a preliminary injunction and the complaint's request for permanent injunction and (2) to treat the motion to dismiss and accompanying papers and the opposition to the motion and the accompanying papers, as well as the memoranda for and against the preliminary injunction, as a dispositive motion for resolution by the court without oral argument and without an evidentiary hearing or trial.  The parties agree that no issue of fact precludes final disposition.

## STANDING

The defendants challenge the plaintiffs' standing to sue.  The plaintiffs' standing is addressed by paragraphs twenty-eight through forty-one of the complaint, which are supported by two affidavits from Mark Stadnyk (Docs. 11-1 and 27-1).

Stadnyk is an inventor and a patentee and alleges that ideas of his are "close to patentability."  Madstad and Stadnyk allege that because of the AIA and the

consequent "first-to-file" environment, "maintaining heightened security around potential inventions" has increased business costs, including especially the costs resulting from maintaining the security of computers against "hackers" who seek information about prospective inventions.  To defeat the aspirations of "hacking" intellectual property thieves, Stadnyk and Madstad (and other inventors) "invest substantially" in "hardware firewalls, software firewalls, encryption software, internal storage systems, and the IT expertise to install and manage all of this, which usually means hiring an outside company or professional."  Stadnyk and Madstad allege "approximately $3,500.00 in additional computer security measures."

Stadnyk and Madstad allege that a "small-entity inventor such as Plaintiffs" lacks the ability either "to produce prototypes [and] manufacture samples" or to "execute testing and development" and that sending unpatented intellectual property "into the public domain or to outside vendors" for "such services" "exposes it to theft . . . with no safeguards to successfully defend against such theft under the AIA."  As a result, Stadnyk and Madstad claim expenses of "$105,000 in additional equipment for product development and testing" and $840.00 per month for facilities.

Further, Stadnyk and Madstad allege that the AIA visits upon them "burdens in the form of increased time and effort and higher costs relating to patent applications."  Stadnyk and Madstad allege that the former "first-to-invent" system permitted "inventors like Plaintiffs to delay filing an application until their inventions

are more fully developed" but that the "first-to-file" system under the AIA "creates the need to file a provisional patent application [PPA] and full patent application for an invention as soon as possible." Stadnyk and Madstad allege that the filing of a PPA, which "gives an inventor 12 months to develop his or her invention without fear of IP theft," compels "small-entity inventors like Plaintiffs" to incur further costs arising from the need to hire (often on a more expensive, expedited basis) "outside companies" to produce prototypes and complete testing and engineering.

Stadnyk and Madstad next allege that, owing to the hurried testing and engineering caused by the AIA and the brief twelve-months' protection granted by a PPA, "should continued testing reveal new claims that were not part of the first [patent application]" or "should the inventor need to change the product slightly," the inventor incurs "additional financial burdens" – a "substantial" burden for "small companies and individual inventors" – in the form of expensive "multiple patent filings for the same product."

Finally, Stadnyk and Madstad allege their "reduced access" to "potential investors and business partners" because of an increased reluctance to share "ideas and inventions" with "potential investors and business partners," who might "'scoop' ideas and inventions through IP theft."

In response to the defendants' attack on standing, the plaintiffs encapsulate (Doc. 30 at 3-4) as follows their "concrete injury":

> Plaintiffs have shown multiple kinds of irreparable injury: (1) the
> burden of maintaining heightened secrecy around potential inventions

- 4 -

until a patent application is filed, which has already cost Plaintiffs approximately $3,500.00 (Stadnyk Decl. ¶¶ 5-7); (2) the need to acquire and maintain additional equipment for product development and testing, which has cost Plaintiffs $105,000.00 plus $840.00 per month on an ongoing basis (*id.* at ¶¶ 8-9); (3) increased time and effort and higher costs caused by the need to file additional patent applications, which puts Plaintiffs at a competitive disadvantage vis-à-vis their larger competitors (*id.* at ¶¶ 10-15); and (4) lost business and investment opportunities caused by the AIA's chilling effect, which deters Plaintiffs from sharing ideas with potential partners and investors. (Id. at ¶ 16) All of these injuries are encompassed within Plaintiffs' complaint. (Dkt. 1, ¶¶ 28-42)

While asserting that the expenditures and other "losses," which are identified in the complaint and summarized in the quoted excerpt, are actual and not "contingent" injuries, the plaintiffs insist that establishing "probabilistic, future injuries," that is, establishing a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" and establishing a "chilling effect," suffices to establish standing.

The defendants attack in several particulars the sufficiency of the plaintiffs' attempted demonstration of standing.  First, the defendants argue that the expenditures by the plaintiffs on security and the like, although concrete, are not "fairly traceable" to the AIA and to the defendants but that the expenditures are the result of "voluntary action by the plaintiffs in anticipation of some future speculative harm."  In particular, the defendants argue that the expenditures are the result of voluntary action in anticipation of "the independent action of some third party not before the court," in this instance "hackers," "IP thieves," "potential investors," and "business partners." Second, the defendants argue that both (1) the plaintiffs'

contingent loss of intellectual property to persons who file before the plaintiffs but either did not invent before the plaintiffs or who did not invent – but stole – the invention and (2) the plaintiffs' contingent loss of business opportunity because of the plaintiffs' suspicions of "potential investors and business partners" offer a prospect that is critically less than an injury-in-fact and offer a prospect that is only a conjectural or hypothetical injury, neither distinct nor palpable, neither actual nor imminent (that is, "certainly impending"), and "at least partly within the plaintiff[s'] own control."

To establish standing the plaintiff must assert facts showing that – at the moment of the filing of the suit – the plaintiff suffers from a concrete and imminent injury-in-fact (1) that results from the invasion of a legally protected interest, (2) that is causally and fairly traceable to the defendant's challenged conduct and (3) that a favorable judicial determination likely will redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Allen v. Wright*, 468 U.S. 737 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982); *American Civil Liberties Union of Florida, Inc. v. Dixie County*, 690 F.3d 1244, 1257 n.5 (11th Cir. 2012) ("For jurisdiction, standing had to exist when the suit was filed (not arise later) . . . . It is not enough for Plaintiff to try to establish, in terms of shifting reality, the requirements of standing as the case progresses through the federal courts."); *Koziara v. City of Casselberry,* 392 F.3d 1302, 1306 (11th Cir. 2004) (requiring a "real and immediate threat of future injury"); *Ryan, LLC v. U.S. Secretary of the Treasury*, ___

F. Supp. 2d ___, 2013 WL 1278510 (D.D.C.) (Wilkins, J.) ("[T]o satisfy the 'irreducible constitutional minimum of standing' under Article III, a plaintiff must demonstrate: (1) that it has suffered an 'injury in fact'— an actual or imminent invasion of a legally protected, concrete, and particularized interest; (2) a causal connection between the alleged injury and the defendant's conduct at issue; and (3) that it is 'likely,' not 'speculative,' that the injury 'will be redressed by a favorable decision.  This triad . . . constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.") (citations omitted)

Although standing cases abound and the regnant principles are frequently applied (and although some arguably inconsistent results appear among Supreme Court decisions), undoubtedly at this moment the determination of the plaintiffs' standing is controlled by *Clapper v. Amnesty International USA*, ___ U.S. ___, 133 S. Ct. 1138 (2013), decided after the briefing in this action and identified by the defendants in a notice of supplemental authority (Doc. 32).

In *Clapper*, Section 702 of the Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. § 1881a, is constitutionally challenged by "attorneys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad;" who "believe that some of the people with whom they exchange foreign intelligence information

are likely targets of surveillance under § 1881a;" and who "claim that they

communicate by telephone and e-mail with people the government 'believes or

believed to be associated with terrorist organizations,' 'people located in geographic

areas that are a special focus' of the government's counter-terrorism or diplomatic

efforts, and activists who oppose governments that are supported by the United

States Government." 133 S. Ct. at 1145.  The plaintiffs claimed to "have ceased

engaging" in communication with certain witnesses, sources, and the like; claimed to

have traveled abroad for "in-person conversations;" and claimed to have

"undertaken 'costly and burdensome measures' to protect the confidentiality of

sensitive [international] communications."  133 S. Ct. at 1146.

Seeking declaratory and injunctive relief, the plaintiffs alleged "two separate

theories of Article III standing":

> First, they claim that there is an objectively reasonable likelihood
> that their communications will be acquired under § 1881a at
> some point in the future, thus causing them injury.  Second, [the
> plaintiffs] maintain that the risk of surveillance under § 1881a is
> so substantial that they have been forced to take costly and
> burdensome measures to protect the confidentiality of their
> international communications; in their view, the costs they have
> incurred constitute present injury that is fairly traceable to
> §1881a.

133 S. Ct at 1146.  Although in *Amnesty Internatinal USA v. McConnell*,

646 F. Supp. 2d 633 (S.D.N.Y 2009), Judge Koeltl considered with admirable

thoroughness and rejected each of the plaintiffs' theories of standing, a panel (Judges

Calabresi, Sack, and Lynch) of the Second Circuit in *Amnesty International USA v.*

- 8 -

*Clapper*, 638 F.3d 118 (2nd Cir. 2011), reversed the district court and accepted each of the plaintiffs' assertions of standing.  The Second Circuit panel discovered both a basis for "standing due to the objectively reasonable likelihood that [the plaintiffs'] communications will be intercepted at some time in the future" and a basis for standing due to the plaintiffs' "suffering 'present injuries in fact—economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct.'"  133 S. Ct. at 1146 (court's emphasis).  On the motion for rehearing *en banc* the Second Circuit deadlocked and several opinions resulted, including Judge Lynch's opinion concurring in the denial and Judge Raggi's opinion dissenting from the denial.

Noting "the importance of the issue" and "the novel view of standing adopted by the Court of Appeals," the Supreme Court granted certiorari and reversed, five to four.  Echoing a theme of Judge Raggi's dissent in the court of appeals, the Supreme Court early stated that the standing requirement derives from separation-of-powers principles and to relax impermissibly the standing requirement tends toward a usurpation of executive and legislative power.  Respect for separation-of-powers requires a judicial standing inquiry that is "especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  133 S. Ct. 1447.  The Supreme Court helpfully distilled the requirements of Article III standing:

> To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent,' fairly traceable to the challenged action,' and redressable by a favorable ruling." "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.

133 S. Ct. at 1147 (citations omitted; court's emphasis). And, as Judge Raggi stated plainly, "[P]laintiffs sue to strike down an act of Congress. That circumstance, by itself, demands an 'especially rigorous' standing inquiry." *Clapper*, 667 F.3d at 174.

In discussing the sufficiency of the plaintiffs' claimed fear of future surveillance and in determining with especial rigor whether the perceived injury was certainly impending, the Supreme Court recounted the formidable series of contingencies necessary to actually injure the *Clapper* plaintiffs: the government must target persons outside the United States with whom the plaintiffs communicate, the government must target these persons under Section 1881a rather than under other authority, the pertinent judicial inquiry must find that the surveillance accords with constitution and statute, the authorized surveillance must succeed in capturing a communication, and the successful capture must occur during a conversation to which a plaintiff is a party. The Supreme Court determined that this "highly attenuated chain of possibilities" presents no prospect of a "certainly impending" injury to the plaintiffs and presents no basis for Article III standing to challenge Section 1881a. 133 S. Ct. at 1148.

The Supreme Court next considered the plaintiffs' alternative claim of "standing based on the measures that [the plaintiffs] have undertaken to avoid § 1881a-authorized surveillance . . ." 133 S. Ct. at 1150. Again echoing a theme from Judge Raggi's dissent on rehearing in the court of appeals and finding that the Second Circuit panel's reasoning "improperly waters down the fundamental requirements of Article III," the Supreme Court held that:

> [The plaintiffs'] contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing— because the harm respondents seek to avoid is not certainly impending. In other words, [the plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.

133 S. Ct. at 1151. The Supreme Court added that the plaintiffs' costs – a form of "self-inflicted injuries" – were not "fairly traceable" to Section 1881a because, before and without regard to Section 1881a, the plaintiffs "had a similar incentive to engage in many of the counter-measures that they are now taking." 133 S. Ct. at 1152.

*Clapper* arises from FISA and from the international communications of legal, media, and other interests. The present action arises from the AIA and the prospective actions of putatively ruthless IP thieves and the designs of putatively untrustworthy business suitors. But, despite differences in the particulars of the respective actions, a manifest and compelling congruence emerges between the facts and law of *Clapper* and the facts and the law of the present action. In each case, the plaintiffs test the constitutionality of a statute – in *Clapper*, the plaintiffs sued on the

- 11 -

effective date of the statute; in the present action the plaintiffs sued in anticipation of the effective date – and in each case the plaintiffs trigger an especially rigorous inquiry into the plaintiffs' standing.  In each case, the plaintiffs responded to a felt need to expend money to avoid entirely hypothetical consequences of legislation, that is, in each case the plaintiffs expended funds in response to an entirely subjective and self-actuated trepidation about conjectural events.  In each case, actualization of the conjectural events depends upon the contingent action of a third party (an "independent actor[] not before the court," 133 S. Ct. at 1150 n.5) .  In each case, the expenditures in anticipation of these conjectural events are controlled entirely by the judgment and discretion of the plaintiffs ("manufactured" and "self-inflicted wounds," 133 S. Ct. at 1151-52).

Additionally, in each case, the events about which the plaintiffs directly complain – the events in anticipation of which the plaintiffs expend the money and other resources on which the plaintiffs rely to evidence a tangible and present injury-in-fact – depend contingently upon an acutely attenuated concatenation of events that are insufficient to qualify as "certainly impending" for the transparent and compelling reason that the events are neither certain nor impending.  For example, the plaintiffs in the present action claim standing in part based on expenses incurred in purchasing "counter-measures" to avoid the possibility that an IP thief who is a hacker will know about the plaintiffs' "close to patentability" ideas (or, unaccountably, will hack the plaintiffs among all the world's inventors), will

recognize and resolve to steal and patent the ideas, will resolve to steal by hacking the plaintiffs' computers, will actually undertake the theft by hacking, and will wrongly and triumphantly patent those purloined ideas.  Further, the plaintiffs' standing scenario assumes that the plaintiffs, although knowing of hacking threats to their intellectual property, will fail otherwise to acquire, install, and operate successfully the available state-of-the-art security (which, one must assume, would otherwise prove sufficient against the exertions of the IP thieves), and that the IP thieves will successfully hack the plaintiffs' computers, discover the plaintiffs' intellectual property, boldly and corruptly apply for a patent (assuming the plaintiffs have not  already filed by PPA or otherwise), succeed in receiving the patent, and (against steep odds, one supposes) succeed during the derivation proceeding in disguising their robbery.  Of course, the sufficiency of even this exotic scenario to confer standing is diluted further because the pertinence of the scenario depends entirely on the dicey notion that the plaintiffs in any event – with or without the AIA – would not avail themselves of the state-of-the-art computer security to defend against the persistent and threatening hacking of IP thieves.  The same line of reasoning serves to classify as neither certain nor impending the array of "counter-measures" – the third-party contracting for samples, the prophylactic filing of defensive patent applications, and the other contingent items – featured by the plaintiffs in an attempt to demonstrate causation and standing.

Were the Second Circuit's (former) "novel" standard – "objectively reasonable likelihood," "chilling effect," and the rest – the governing standard of the Supreme Court, the plaintiffs' complaint and the accompanying papers, viewed in the context of the AIA, would present a more persuasive claim for standing.  But, as Judge Koeltl in the district court and Judge Raggi and the dissenters in the Second Circuit demonstrate, the Second Circuit's standard was not the Supreme Court's standard before *Clapper*.  The Second Circuit's former standard governs neither in the Eleventh Circuit, in this district court, nor finally in this action.  Determination of the constitutionality of the AIA's "first-to-file" (or "fist-inventor-to-file") provision and other provisions must await a more tangible, immediate, defined, and sharp dispute by a more directly affected party.  Both Article III and judicial prudence require as much.

## CONCLUSION

The defendants' motion to dismiss (Doc. 29) for lack of standing is **GRANTED**, and the action is **DISMISSED**.  The Clerk is directed (1) to enter a judgment of dismissal for the defendants and against the plaintiffs, (2) to terminate any pending motion, and (3) to close the case.

ORDERED in Tampa, Florida, on May 8, 2013.

*Steven D. Merryday*
—————————————————
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 14 -